Moshe Frankel
20 Harriet Street
Brighton, MA 02135
Telephone: (617)782-0782
email: m@framework.com

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE
2025 MAR 18 AM 3:35
U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| MOSHE FRANKEL, PRO SE<br>Plaintiff,<br><br>v.<br><br>INTEL CORPORATION,<br>ANDY D. BRYANT,<br>BARBARA G. NOVICK,<br>FRANK D. YEARY,<br>OMAR ISHRAK,<br>TSU-JAE KING LIU,<br>GREGORY D. SMITH,<br>RISA LAVIZZO-MOUREY,<br>JAMES (JIM) J. GOETZ,<br>DION WEISLER,<br>ALYSSA HENRY,<br>ANDREA GOLDSMITH,<br>STACY J. SMITH,<br>LIP-BU TAN<br>AND DOES 1-25,<br><br>Defendants. | Case No.<br><br>COMPLAINT FOR:<br><br>Promissory Fraud<br>Constructive Fraud<br>Aiding And Abetting Fraud<br>Conspiracy To Violate Federal Civil Rico<br>Violations Of Federal Civil Rico<br>Breach Of Express Contract<br>Breach Of Implied Contract<br>Breach Of Implied Covenant<br>Breach Of Quasi-contract<br>False Advertising Under The<br>    Lanham Act<br>Unfair Competition<br>False Advertising<br>Aiding And Abetting<br>Tortious Interference With<br>    Contract<br>Violation Of The 1914 Clayton Act<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Moshe Frankel ("Plaintiff"), alleges upon information and belief the following against Defendant Intel Corporation ("Intel"), Defendant Andy D. Bryant ("Defendant Bryant"), Barbara G. Novick ("Defendant Novick"), Frank D. Yeary ("Defendant Yeary"), Omar Ishrak ("Defendant Ishrak"), Tsu-Jae King Liu ("Defendant King Liu"), Gregory D. Smith ("Defendant Gregory D. Smith"), Risa Lavizzo-Mourey ("Defendant Lavizzo-Mourey"), James J. Goetz ("Defendant Goetz"), Dion Weisler ("Defendant Weisler"), Alyssa Henry ("Defendant Henry"), Andrea Goldsmith ("Defendant Goldsmith"), Stacy J. Smith ("Defendant Stacy J. Smith"), Lip-Bu Tan("Defendant Tan"), Defendants DOES 1-25 ("Consortium Participants"), and all Defendants collectively ("Defendants", "Consortium", or "Consortium Participants"):

## Table of Contents

I.   INTRODUCTION .................................................................8

II.  JURISDICTION AND VENUE...................................................22

III. PARTIES.......................................................................23

IV.  INTEL TECHNOLOGY

      A. INTEGRATED CIRCUIT (IC)...............................................25

      B. MOORE'S LAW...............................................................27

      C. DARK SILICON AND PLAINTIFF'S TECHNOLOGY.................28

      D. THE CPU THEORETICAL, LEGAL AND COMMERCIAL
          ASPECTS, PLAINTIFF TECHNOLOGY, INTEL AND THE
          CONSORTIUM ........................................,....30

      E. INTEL'S CONFLICT AND TRAP...........................................37

V.   PLAINTIFF RIGHT TO FREELY USED CPU

      A. 1936 SUPREME COURT ADDRESS OF THE CLAYTON ACT.... 40

      B. LAYING THE ANTITRUST BREACH FOUNDATIONS............  41

      C. INTEL X86 CONFLICT WITH THE CONSORTIUM...............  43

      D. THE CONSORTIUM SCHEME TO EXPLOIT THE INTERNET..  44

      E. CONSORTIUM EXPLOITATION OF X86 DESIGN...................45

      F. LIMITING USER'S PROGRAMMING OF THEIR X86 CPU.........45

      G. CONSORTIUM BLOCKING ACCESS TO X86 INTERRUPTS...... 46

      H. BLOCKING OF INTERNET CONNECTIVITY......................... 47

      I. SECURITY VULNERABILITIES...........................................48

      J. X86 INHERENT FAILURES...............................................49

      K. PLAINTIFF'S CONTRACT.................................................49

      L. PLAINTIFF'S MOTION TO INTERVENE U.S. V. MICROSOFT. 50

VI.  THE ANTICOMPETITIVE DESIGN ORIGIN AND PLAINTIFF

      A. CPU PENNIES PER UNIT BREAKTHROUGH......................... 51

      B. IBM PROTECTION RATIONAL............................................ 52

C. THE IBM PC "MONOPOLY CHAIN" LEGAL DESIGN............ 53

D. INTEL'S X86 OPERATING SYSTEM .................................. 54

E. CIRCUMVENTION OF ANTITRUST LAW BY DESIGN........... 55

F. FROM WINTEL CARTEL TO FINANCIAL CONSORTIUM........ 56

G. INTEL LOW PROFIT MARGIN PLIGHT............................. 59

H. INTEL KING-MAKER BY WIELDING INFORMATION.............61

I. INTEL DOMINANCE.........................................................61

J. THE CONSORTIUM'S ARCHITECT..................................... 62

K. THE CONSORTIUM'S LONG HANDS..................................66

L. THE CONSORTIUM'S UNWRITTEN MARKET RULES............ 69

VII. INDEX-BASED TRADE AS A CIRCULAR OWNERSHIP COVER-UP

A. HIDING CIRCULAR OWNERSHIP IN PLAIN SIGHT.............. 70

B. CIRCULAR OWNERSHIP HIDES ANTITRUST VIOLATIONS.... 72

VIII. PLAINTIFF STRUGGLE WITH THE CONSORTIUM - ASHTON-TATE

A. ASHTON-TATE..............................................................73

B. NOVEL, ASHTON-TATE AND BORLAND DEMISE................. 75

C. INTEL TRAP.................................................................77

D. PLAINTIFF PRODUCT DESTINED FOR DESTRUCTION.......... 83

E. VANISHING PRODUCTS AND PLAINTIFF'S CONTRACT........ 83

F. PLAINTIFF PRODUCT DEVELOPMENT.............................. 84

G. INTENTIONAL INTRODUCTION OF INCOMPATIBILITY....... 85

H. PREDATORY DESIGN ADVERSE CONSEQUENCE................. 86

IX. PLAINTIFF'S AND AMD, AMD'S MANUFACTURING DESTRUCTION

A. INTEL ATTACK X86 COMPETITORS................................. 89

B. PLAINTIFF CONTACT WITH AMD....................................90

C. MICROSOFT INCOMPATIBILITY SWORD OVER AMD........... 92

D. ATIC RASA ROLE AT AMD............................................93

E. THE GOOSE THAT LAID THE GOLDEN EGGS..................... 93

F. THE AFTERMATH AND THE DAMAGE............................. 95

G. INTEGRATION OF MANUFACTURING AND DESIGN........... 98

X. TURNING ABDUCTED X86 FUNCTIONALITY INTO WINDFALL

A. INTEL CONTROL X86-BASED OEM COMPUTER MAKERS.... 99

B. ABDUCTING X86 FUNCTIONALITY................................100

C. INTERFERENCES WITH X86 DESIGN..............................103

D. MODEM (MODULATOR-DEMODULATOR)...................... 105

E. PLAINTIFF'S CUSTOMERS..........................................105

F. EFFICIENT INTERNET TOOLS DEMISE...........................106

G. HP 200LX STATIC CPU REMOVAL FROM THE MARKET.... 106

H. X86 STATIC CHIP EFFICIENT POCKET SIZE COMPUTING.. 108

I. PLAINTIFF'S AND ALTERA, NOW INTEL FPGA.................109

J. CONSORTIUM'S INFLUENCE ACADEMIC.........................110

K. OPEN SOFTWARE INJURIOUS DESIGN...........................111

L. PLAINTIFF'S EMAIL AND NETWORKING SYSTEM............111

M. THE ABDUCTION OF X86 USERS INTERNET ACCESS....... 112

N. ADDICTIVE TECHNOLOGY AND PREDATORY DESIGN..... 115

O. ANDY GROVE WEALTH CREATION PLAN.......................121

P. MONETIZING ABDUCTED X86 FUNCTIONALITY.............. 123

Q. THE CABLE MODEMS TYING SCHEME........................... 124

XI. PREDATORY DESIGN AND ITS CONSEQUENCE

A. LEGAL TEST: PREDATORY DESIGN AND MODULARITY.. 124

B. CROWDSTRIKE IN CIRCULAR OWNERSHIP.................... 125

XII. CONSORTIUM PARTICIPANTS FRAUD ON CONSUMERS AND

PLAINTIFF

A. CPU, SOFTWARE AND TRADEMARK FRAUD...................127

B. MICROSOFT FRAUD ON CONSUMERS AND INTEL........... 129

C. MICROSOFT, AMAZON, APPLE, NVIDIA, QUALCOMM...... 131

1    D. CONSORTIUM INFLUENCE ON INTEL AND AMD............. 134

2    E. DESTRUCTION OF INTEL SMARTPHONE AND

3         SEMICONDUCTOR MANUFACTURING.........................135

4    F. PREDATORY DESIGN UNDER THE CONSORTIUM

5    INFLUENCE.    140

6    G. INTEL BREACH OF CONTRACT.....................................144

7    H. RELATIVELY OPEN X86 STANDARD DESTRUCTION

8         VIOLATING 1950 CELLER KEFAUVER-ACT.................. 148

9    I. CONCEALING CONSORTIUM'S INFLUENCE.................... 151

10   J. UNNECESSARY AI POWER CONSUMPTION: MICROSOFT AND

11        BLACKROCK GAIIP ..................................................152

12   K. THE CONSORTIUM GROUNDWORKS ............................ 155

13   L. THE CURRENT STATE OF TECHNOLOGY AND IMPASSE... 162

14   M. MICROSOFT..............................................................169

15   N. AMAZON..................................................................175

16   O. APPLE.....................................................................178

17   P. NVIDIA....................................................................180

18   Q. QUALCOMM.............................................................183

19   XIII. PREDATORY DESIGN PROFITEERING. HARM AND RIGHTING.

20   A. PROFITEERING SLOWS AND IMPEDES PROGRESS........... 184

21   B. THE IPO INDUSTRY SCHEME.......................................186

22   C. ANTITRUST ENFORCEMENT THAT IS TOO LATE TO RIGHT

23        THE DAMAGE ......................................................187

24   D. MONETIZING ANTITRUST VIOLATIONS, COMPETITORS

25        ENTRAPMENT TO PROTECTS UNICORNS' STOCK......... 189

26   E. CONSORTIUM SCHEME INHERENT CONFLICT WITH VLSI

27        SEMICONDUCTOR TECHNOLOGY .............................198

28   F. COMPUTING FRAGMENTATION RACKETEERING............201

IXV. CONSORTIUM INTERFERENCE IN INTEL DESIGN

A. INTEL X86 PART REMOVAL TO PROTECT MICROSOFT.... 203

B. THE EFFORT TO END INTEL'S COMPETITIVE EDGE......... 208

C. PLAINTIFF'S TECHNOLOGY............................................211

D. THE DESTRUCTION OF INTEL MANUFACTURING........... 221

E. DEFENDANT BRYANT IMPACT ON INTEL......................229

F. DEFENDANT BARBARA G. NOVICK..............................233

G. DEFENDANT FRANK D. YEARY, INTEL'S CHAIRMAN...... 238

H. DEFENDANT OMAR ISHRAK.........................................241

I. DEFENDANT LIP-BU TAN..............................................245

J. ALL INDIVIDUAL DEFENDANTS.....................................252

XV. CONCLUSION

A. DESTROYING INTEL AND THE U.S. SEMICONDUCTOR
   MANUFACTURING ...................................................258

B. DESTRUCTION AND BLOCKING OF EFFICIENT
   TECHNOLOGIES AND ITS CONSEQUENCE ................. 261

XVI. ASSIGNMENT OF DIRECT CLAIMS TO THE PLAINTIFF

COUNT I: PROMISSORY FRAUD.........................................263

COUNT II: CONSTRUCTIVE FRAUD.....................................268

COUNT III: AIDING AND ABETTING FRAUD.........................270

COUNT IV: CONSPIRACY TO VIOLATE FEDERAL RICO........ 272

COUNT V: VIOLATIONS OF FEDERAL CIVIL RICO............... 273

COUNT VI: BREACH OF EXPRESS CONTRACT.................... 275

COUNT VII: BREACH OF IMPLIED-IN-FACT CONTRACT....... 277

COUNT VIII: BREACH OF IMPLIED COVENANT.................. 279

COUNT IX: BREACH OF QUASI-CONTRACT..........................281

COUNT X: FALSE ADVERTISING UNDER THE LANHAM ACT.. 282

COUNT XI: UNFAIR COMPETITION.................................... 286

1            COUNT XII: FALSE ADVERTISING…………………………288

2            COUNT XIII: AIDING AND ABETTING BREACH OF FIDUCIARY

3                  DUTY TO INTEL STAKE HOLDERS…………………………289

4            COUNT XIV: TORTIOUS INTERFERENCE WITH CONTRACT.. 293

5            COUNT XV: VIOLATION OF THE 1914 CLAYTON ACT…….. 295

6            COUNT XVI: DECLARATORY RELIEF ……………………299

7    XVII. DEMAND FOR TRIAL BY JURY……………………………… 300

8    XVIII. PRAYER FOR RELIEF……………………………………301

9    DATED AND SIGNED…………………………………………306

10   APPENDIX

11        INDEX …………………………………………………307

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

## I. INTRODUCTION

1.   This Complaint details a firsthand account of Plaintiff's largely futile attempts to introduce new, essential, cost-effective, and secure semiconductor and software technologies, defend his clients' use of his products on x86 computers and fight against the destruction of essential, powerful, energy-saving computing technologies that were removed from the market to protect profits derived from inefficiencies fostered by the concentration of undue control and influence over the computing industry.

2.   The Defendants are a part of a Consortium that includes multiple companies, along with some of their executives, officers, and employees, that plan and implement predatory practices and designs, destroy competing technologies and products and businesses, manipulate technologies and markets to eliminate competition, and profit from the increases in value of publicly traded shares issued by companies that benefit from the protections the Consortium provides. The Consortium harmed Plaintiff by blocking his products from the market, enacting exclusionary practices that harmed him, and violating agreements with him. In a scheme to replace the functionality of x86-based computers with inferior, less secure, less energy-efficient, and more expensive toll-based, centrally distributed services offered by Consortium-associated companies, the Defendants manipulated and destroyed semiconductor and software technologies to increase computing costs for consumers, increase energy consumption, and obstruct functionality and access. Consortium's Participants earned billions of dollars through the issuance of public shares in these companies and their subsequent appreciation, all of which are the result of flagrant violations of antitrust, trademark, financial, and antiracketeering laws and regulations.

3.   The manipulation of semiconductor design, particularly by Intel, is crucial for maintaining the profitability and appreciation of publicly traded shares of technology companies like Microsoft, Amazon, Apple, Nvidia, and

Qualcomm, as well as index-based funds like Vanguard, BlackRock, and State Street; cable and wireless Internet service providers; and other computing and communications companies that form the Consortium. Intel is the only company that unifies design and manufacturing,

giving it a unique ability to satisfy market demand for optimization and efficiency and bring it to consumers using the prevalent and relatively open x86 standard, which will end the Consortium's exorbitant profitability. Controlling and suppressing Intel's design and manufacturing is the key element in the Consortium scheme, which exerts influence and control over companies in multiple industry sectors with the aim of shifting personal and business computing, as well as information technology and media creativity, away from autonomous consumer computing devices and placing them behind a barrier of toll-based, centrally distributed, subscription-based Consortium Participants' services.

4. To that end, the Consortium is attempting to destroy the open x86 standard on which Plaintiff and his customers depend.

5. To that end, the Consortium is blocking direct communication between Internet users and as a result is preventing Plaintiff's x86-based programs from running and providing that functionality on x86-based computers.

6. As detailed in this Complaint, the Consortium destroyed AMD's x86 manufacturing after preventing Plaintiff from collaborating with AMD to bring Plaintiff's technology to market.

7. As detailed in this Complaint, the Consortium has inflicted significant damage on Intel's manufacturing and Intel's ability to support and maintain its open x86 standard.

8. As detailed in this Complaint, the Consortium compelled Intel to withdraw its x86 smartphone line from the market, with the aim of weakening Intel and preventing the open x86 from entering the closed smartphone market.

9.    As detailed in this Complaint, Intel violated an agreement between the Plaintiff and Intel to collaborate on the development of an x86-based smartphone operating system, which is intended to unify personal computing and mobile phones. Intel and Consortium Participants within Intel engaged in deception when they approached Plaintiff, with the intention of containing Plaintiff's technology and preventing it from reaching the market.

10.    The Complaint details how the Consortium prevents Plaintiff's x86-compatible products from operating on existing x86-based computers, substituting them with exclusive Consortium Participant's toll-based, centrally distributed subscription-based services. These services, in comparison to Plaintiff's programs, lead to a 50 percent increase in consumer costs, exhibit slower user interface responsiveness, rely on an Internet connection, are vulnerable to delays and data loss, expose personal information and programming data to monetized information harvesting, are prone to failure, and offer less security.

11.    The Consortium violated the 1950 Celler Kefauver Act by using the index-based funds-held shares in a scheme designed to lessen competition. By purchasing publicly traded shares, the Consortium acquired influence and control over Intel and utilized it to compel Intel to implement exclusionary policies and predatory designs, with the intention of eliminating competition by x86-based users against the Consortium Participants' services that would have halted the meteoric rise in Consortium companies' publicly traded shares that bring windfall profits to Consortium Participants. Furthermore, the Consortium used that control and influence to force Intel to destroy more efficient technologies, including Plaintiff's, as well as abort and ignore profitable market segments and trends that compete with Consortium services and products. The Consortium also used its influence and control to force Intel to destroy its own semiconductor manufacturing advantages, advantages that could have put the Consortium scheme

at risk by providing x86 users with safer, more powerful, and efficient autonomous computing power that would have rendered the Consortium services obsolete. This not only stifled innovation and competition but also resulted in the loss of semiconductor manufacturing primacy to both Intel and the U.S. economy with dire implications.

12.  The Consortium, an ongoing racketeering enterprise, has been inflicting significant harm on the Plaintiff for more than four decades. It has engaged in violations of antitrust law, financial infringements, and various economic crimes, ranging from the destruction of technologies and companies to bribery and blackmail.

13.  The Consortium generates substantial benefits for a select few while inflicting immense harm on Plaintiff and degrading all facets of life at an enormous cost to everyone else. The Complaint provides a detailed account of the Consortium's background, history, methods, strategies, and tactics, along with its ongoing efforts to perpetuate its malicious actions. The untold damage done by the Consortium is impairing the U.S. semiconductor industry with dire global implications.

14.  This Complaint presents first-hand testimony that outlines the Consortium's origin and foundations, laid out in the 1970s by IBM as part of its meticulously planned scheme to safeguard its highly profitable business model from the newly invented semiconductor-based CPU. The Complaint details the Consortium's destruction of empowering and efficient computing and power-efficient semiconductor technologies, forcing the entire industry to use two inefficient, expensive, and unsafe semiconductor architectural designs that limit computing power and raise power consumption, making x86 users dependent on the Consortium's centrally distributed services for essential functions.

15.  The Complaint outlines similar practices in related markets, the consequences of those meticulously planned antitrust violations that shifted the

economy into a dependency on costlier but inferior centrally distributed services by destroying superior technologies and products, hindering innovation, limiting x86-based computers and related markets users' autonomy, and contributing to climate overheating by suppressing low-energy technologies as part of the effort to enforce a market dependency on central services provided by a small number of companies. To protect and preserve this deleterious scheme, Intel reneged on a collaboration agreement with Plaintiff.

16. As early as 1978, when Plaintiff first encountered that scheme, IBM devised a plan to utilize illegal tying to regulate and restrict the general programmability of consumers' CPUs. By 1981, IBM disguised this illegal tying by dividing IBM PC design and manufacturing among multiple companies, thereby creating an artificial division between semiconductor design, software, and product manufacturing. This artificial division of the market and the fragmentation of technology that was established in unofficial agreements aimed to hide the control and manipulation of consumers' x86-based computer usage to shield IBM's highly profitable products and services from potential competition from CPU users' running competitive programs on their personal computers.

17. This illegal cross-company tying and discrimination, which extended through partnerships, licensing, and unofficial agreements, as well as the launch of new companies designed as "investment opportunities" for Consortium Participants, quickly emerged as the dominant economic force in the x86 CPU-based market. Adapted enthusiastically by dominant financial service companies that joined the Consortium, it replaced the profits from manufactured products with those from publicly traded shares. The Consortium's business model, which relies on illegal cross-company tying, discrimination, and protection through the manipulation of computing and communication technology, particularly x86 technology, has led to an unprecedented increase in the value of these shares.

18.   The Consortium began in 1981, as an official alliance between IBM, Intel, and Microsoft, with an unofficial agreement to use cross-company tying to protect existing IBM products and services from competition from the new PC programming capabilities. The Consortium then evolved into the Intel-Microsoft "Wintel Cartel," a dominant force in the personal computer market during the early 1980s. However, it swiftly grew and evolved into a powerful force, dismantling companies and technologies to uphold its control over x86 technology. It also shaped an unbalanced market, utilizing the stock market as the main instrument to turn control over consumers' x86-based computer usage into lucrative profits. The scheme ultimately impacted every aspect of life, transforming the empowering independent computation and communication capabilities of the Intel-base x86 personal computer into toll-based, centrally distributed online services that consumers had to rely on due to the prohibition on free independent usage of x86 computers.

19.   In a free market, there would have been competition among x86 technology-related providers, between x86-based technologies, and, at the time, existing products and services from companies that enabled the independent programming of x86-based computers. The Consortium's creation of a skewed market in the 1980s necessitated strict adherence to the Consortium's mandates, dictates, and goals. The Consortium destroyed technologies that empowered consumers independence, forcing consumers to depend on toll-based, centrally distributed subscription-based services that maximize cost to consumers in order to maximize profits for Consortium Participants.

20.   Internet access is a crucial technological advancement for consumers. After realizing that Internet access became the gateway for communication and commerce, the Consortium used illegal cross company tying and manipulation, hindering consumers' ability to use their Internet connection for free peer-to-peer networking, sharing, collaborating, and communicating. By the end of the 1990s,

illegal tying and discrimination prevented Plaintiff's technologies and programs, which provided these capabilities to x86-based computer users through modem management, from running on x86-based computers.

21.   Internet users, prevented from freely selecting their Internet connections, became the core of the Consortium's lucrative scheme. The Consortium presents companies that provide toll-based, centrally distributed services as investment opportunities with publicly traded shares, aiming to replace Plaintiff's blocked product. Plaintiff's products offered more efficient, user-friendly, and faster functionality but relied on computer-to-computer communication instead of subscription-based communication with the service provider's servers. The Consortium forced consumers to buy services at a significantly higher cost, requiring reliance on a remote provider, which is less secure, susceptible to failures and delays, loss of time and data, and compromised information and security.

22.   The Consortium Participants exploited illegally tied cable modems to deny consumers the freedom to select their Internet connections, forcing them to use centrally distributed servers for communication and computing. At the same time, the Consortium established new norms and developed technologies and standards that allow it to collect virtually all personal and business data of Internet users. The Consortium Participants then utilize their undue control over consumer Internet usage to convince investors that they have secured a technological monopoly that they can exclusively monetize. They use this argument to justify the inflation of Internet-based service provider companies' share value and the consolidation of numerous local, highly efficient, and competitive cable companies into giant geographical monopolies.

23.   Presenting themselves to investors as uniquely positioned to capitalize on their illegal control over users' choice of Internet connections, monetize data collection and enforce consumer dependency on services Participants inflate their

1    self-value, contributing to the stock market bubble that collapsed in March 2000

2    and became known as the 2000-2003 Dot-com bust. This process is currently

3    resurfacing, amplified by index-based funds, which are specifically designed to

4    ignore this particular type of risk.

5        24.    The Consortium created and included Internet service provider

6    monopolies and dominant online service companies in its efforts to stifle

7    competition, transform x86-based computer functionality and all computational

8    and communication functions into toll-based, centrally distributed services under

9    Consortium Participants' control, and enable the harvesting and monetization of

10   personal and business data.

11       25.    The Consortium currently employs a similar strategy to position AI,

12   or artificial intelligence, as an online service. That created a direct conflict

13   between the part of the Consortium that controls the two x86 standard-setting

14   companies, Intel and AMD, on one side, and Intel and AMD themselves on the

15   other. Intel and AMD's core business is to provide consumers with computing

16   power in the form of semiconductor devices. This power can enable consumers to

17   utilize AI algorithms, such as Plaintiff's, without relying on centrally distributed

18   services. The Consortium views this ability, along with the capacity of x86 users

19   to optimize x86 programming and manage their Internet access, as detrimental to

20   its continued profitability. This is due to consumers' reliance on centrally

21   provided AI services, which require significant investments and energy

22   consumption. While this reliance ensures substantial profits for Consortium

23   Participants and contributes to the current boom, it may also be known in the

24   future as the DOT-AI bubble.

25       26.    The Consortium's scheme turned out to be worth trillions of dollars to

26   the companies and individuals that this Complaint refers to as the Consortium

27   Participants. Currently, Microsoft, Apple, Nvidia, and Qualcomm dominate the

28   Consortium. They are using their unwarranted control over Intel to force it to

1    withhold existing semiconductor technologies, including Plaintiff's, from the

2    market. If these technologies were made available to consumers, they could

3    potentially end the Consortium's schemes. Microsoft, Apple, Nvidia, and

4    Qualcomm have gained undue control and influence over Intel through three

5    funds: Vanguard, BlackRock, and State Street. These funds control the majority

6    shares of Intel's and AMD, the only x86 semiconductor companies. They use this

7    control to flout anti-trust laws and promote the illegal Consortium's scheme.

8        27.   The Consortium's scheme, which must stifle technological

9    advancement in order to survive, relies on manipulating Intel's semiconductor

10    design and the x86 standard, which dominates access to technology and is

11    exclusively defined by Intel after the Consortium forced AMD to relinquish its

12    semiconductor manufacturing capabilities.

13        28.   Intel was one of the Consortium founders but was transformed over

14    the years because of its inherent industrial character as a component supplier,

15    unlike the other Consortium Participants who sell directly to consumers and, as

16    part of the scheme, converted themselves into service providers, which made

17    them the largest customers of Intel as well as his competitors. As a victim of the

18    Consortium, Intel is now attempting to break away, posing a threat to the

19    Consortium's very survival.

20        29.   The Consortium is attempting to force Intel to separate its design from

21    its manufacturing, which will hinder its ability to provide technology, such as

22    Plaintiff's, that can defy the Consortium. The Consortium has used similar

23    methods to force AMD to give away its manufacturing after it agreed to

24    collaborate with Plaintiff in introducing to the market an x86 design that would

25    have hindered the Consortium's continued harm.

26        30.   The Consortium's scheme is preventing Plaintiff, as well as

27    programmers and users, companies and organizations from freely using their

28    x86-based computers devices in direct violation of Section 3 of the Clayton Act

1    and the 1936 Supreme Court decision that clarified and reinforced it.

2        31.  Limiting and restricting the ability of Plaintiff's, as well as other

3    programmers and consumers, to program and use their own x86-based computers

4    as they wish, as well as hindering consumers' access to the Internet, is essential

5    for the survival of the Consortium Participants. The Consortium Participants rely

6    on controlling their respective markets to prevent competitors like Plaintiff's from

7    competing with their services.

8        32.  Microsoft and Qualcomm, two Consortium companies, are illegally

9    developing an x86-compatible chip to force users of the Microsoft Windows

10   operating system to buy only Microsoft-distributed software, thereby restricting

11   the relatively open programming options available to Plaintiff and other x86

12   programmers and users. Microsoft is already offering consumers an illegal

13   version of Windows as it assesses responses from regulators and consumers,

14   aiming to set a precedent.

15       33.  As the attack on Intel and the relatively free usage of x86-based

16   computers intensifies, Microsoft and Qualcomm, unable to provide full Windows

17   compatibility on their own ARM-based Windows chip, are attempting to force

18   Intel to sell them its x86 design. This move aims to enable them to run the full

19   range of Windows programs on their new ARM-based chip, which was designed

20   to control and restrict Windows users' usage and prevent the running of software

21   not distributed by Microsoft.

22       34.  As this Complaint details, since its inception, Consortium Participants

23   exerted undue pressure on Intel to withhold from x86 users and programmers,

24   including Plaintiff, design improvements, capabilities, technical details about x86

25   working, and solutions that, if available, would have provided x86-based

26   computer users with higher efficiency, cost savings, better functionality, security,

27   and privacy. This resulted in increased costs for consumers and protected their

28   products from competition and their profits.

35.   The Consortium unfairly treats Plaintiff and other x86 developers, destroys technologies and businesses, manipulates the market, and illegally ties products together to limit the use of x86-based computers. It also alters semiconductor technology and the design of the x86 to give Consortium Participants unfair advantages.

36.   These actions aim to prevent crucial functions, like those offered by Plaintiff's products, from operating on x86 computers. New Consortium companies, offering publicly traded shares, then provide these critical functions as toll-based, centrally distributed services. This scheme generates trillions of dollars in illegal profits, which the Consortium distributes as publicly traded shares of companies it establishes for the benefit of Consortium Participants.

37.   The Consortium Participants include individuals within and outside Intel and the companies that operate and enforce the scheme. The Consortium is causing significant harm to Plaintiff, inflicting untold harm on consumers and IT (information technology) workers, damaging the U.S. economy by reducing productivity and competitiveness, and introducing security flows and failures. The scheme is significantly harming the U.S. semiconductor industry, as well as the United States' global trade and geopolitical standing.

38.   This Complaint describes the scheme's origin and evolution as witnessed firsthand by Plaintiff, his futile attempts to thwart the demise of businesses and technologies and to keep his x86 technologies available to his clients. It starts with Plaintiff's introduction to Intel's semiconductor-based CPU and the subsequent release of IBM's Intel-based x86 personal computer, in a partnership that was designed to cover up the forming Consortium's Participants' violations of antitrust laws in order to enable protection of IBM services and goods from competition.

39.   This Complaint describes how the illegal methods used to position the x86 computers in the market evolved into a covert financial machine that

1   produces and distributes to individuals and companies who are Consortium

2   Participants windfall profits valued at trillions of dollars. The Consortium

3   Participants are harvesting these profits from the increased value of publicly

4   traded shares of businesses positioned and sometimes created to offer exclusive

5   toll-based, centrally distributed services at exorbitantly high costs. The

6   Consortium forces these services on consumers, replacing crucial functionality

7   and features of products like Plaintiff's that were designed to run locally and

8   independently under the user's control on x86-based computers, by blocking and

9   preventing their use.

10         40.   Plaintiff's Frankel's software products and technologies, which are

11   designed to run on Intel x86-based computers or utilize Intel's semiconductor

12   fabrication services, are prevented from accessing the markets due to

13   exclusionary acts that were put in place and are executed by the Defendants who

14   are acting to protect companies and technologies from competition and enrich

15   Consortium Participants that are enjoying that illegal protection.

16         41.   Plaintiff products include major software packages that were

17   developed by large technology companies and used by millions worldwide. In the

18   early 1990s, Plaintiff acquired the rights to these products and their trademarks

19   after the companies responsible for creating and marketing them to x86 computer

20   users fell victim to the Consortium's scheme aimed at destroying these companies

21   and their products to reduce competition.

22         42.   Plaintiff obtained the rights to those products after preparing a legal

23   action against individuals and companies behind that scheme and received the

24   rights to those products in exchange for the withdrawal of that legal action and

25   the destruction of evidence gathered by Plaintiff for the case signed into a

26   contract.

27         43.   That contract was prepared by the law firm Wilson Sonsini Goodrich

28   & Rosati, which represented and consulted at the time and, possibly still today,

members of the "Wintel Cartel," who are being addressed in this Complaint as Consortium which is what the "Wintel Cartel" morphed into as it expanded to include Internet-related, mobile, and communication technology companies.

44.  Plaintiff's products and technologies, those taken over by Plaintiff as well as those designed by Plaintiff, inherently conflict with the Consortium Participants' scheme to control and prevent x86-based computer users from being able to us their computers to perform certain critical tasks in order to offer these tasks as toll-based, centrally distributed services by companies that enrich the Consortium Participants. The inherent conflict is the result of the control over information, activities and the program they run on their own x86 computers that Plaintiff's products and technologies give x86 computer users.

45.  Intel's directors, officers, and managers, acting on behalf of the Consortium and for their own personal gain from the appreciation of Consortium Participants' shares they purchased and received while protecting those Participants, misrepresented Intel's and their own intentions to mislead Plaintiff, obtained information from Plaintiff under false pretenses, and engaged in the destruction of low-power computing technology and an effort to prevent Plaintiff's low-power computing technology from reaching the market.

46.  Defendant Bryant was hired by Intel in 1981 and played a key role in managing and establishing the "Wintel Cartel," a term that refers to the dominating alliance between Intel and Microsoft, which coordinated exclusionary acts, product tying, intimidation, and bribery to gain control over the x86-based personal computing market.

47.  In 2012, Defendant Bryant was installed by Consortium Participants as Chairman of Intel's Board of Directors in order to implement and execute a strategy and policies that were designed to weaken Intel semiconductor manufacturing capabilities and its standing in the market and lessen competition in order to protect the Consortium's scheme that generated a windfall in profits

for the Consortium Participants. Defendant Bryant left Intel as a billionaire, having made his fortune by investing in Consortium company shares. During his tenure as Intel's Chairman of the Board, he undermined the company's manufacturing capabilities, causing significant long-term damage to the U.S. global standing, and led to the stagnation of Intel's share price.

48.   The Consortium's scheme was designed to weaken Intel semiconductor manufacturing capabilities in order to prevent Intel's from replacing centrally distributed inefficient software with vastly more efficient technologies that are becoming available thanks to Intel's significant investment in its manufacturing and design capabilities, as explained in detail later in this Complaint.

49.   Consortium Participants are partially known to Plaintiff. Consortium Participants include Intel stakeholders such as Intel's major shareholders and the largest publicly traded technology companies who participate in the Consortium's nefarious activities in order to maintain the meteoric rise of their shares. Consortium Participants may include Intel stakeholders and business partners, as well as computing industry executives who participated in actions that were designed to lessen competition and directly caused Plaintiff's loss and exclusion of his technology from the market. Consortium Participants inside Intel caused specific Intel exclusionary actions, misrepresentation, and violations of collaboration agreements with Plaintiff.

50.   Intel's market dominance, which benefits consumers through improvements in manufacturing, design, and management, is not the subject of this Complaint. However, the Complaint addresses market dominance and monopolies resulting from deliberate exclusionary actions, which serve to discriminate and create uneven markets, thereby limiting or preventing competition.

51.   This Complaint does not concern Intel's or other company's

technological improvements or additions designed that benefits consumers as tying.

52.    This Complaint primarily focuses on the Defendants' misuse of their position, their manipulation of technology, and the specific tying that forces consumers to purchase and use designs and products that restrict their free usage of x86 computers. Additionally, it highlights the removal of essential x86 designs, which hinder consumers use of x86-based computers.

53.    Ending the Consortium's nefarious scheme, including ending its undue influence over Intel, will open the market to Plaintiff's products and technologies, resulting in efficiency, cost savings, improved functionality, security, and privacy that the Consortium is withholding from consumers.

## II. JURISDICTION AND VENUE

54.    This Complaint alleges violations of the Sherman Act, 15 U.S.C. § 2. it is filed under, and jurisdiction is conferred upon this Court by, sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26. Plaintiff also alleged violations of the Federal Trade Commission Act 15 U.S.C. §§ 41-58, as amended by the 1950 Celler-Kefauver Act. Plaintiff seeks damages and civil penalties, as well as injunctive and other equitable relief under those laws. All claims under federal law are based upon a common nucleus of operative facts, and the entire action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this is a civil case arising under the federal Racketeer Influenced and Corrupt Organizations Act.

55.    The Court further has jurisdiction over the federal claims under 28 U.S.C. §§ 1331, 1332, and 1337 as the matter in controversy well exceeds $75,000 in value and is between citizens of different states.

56.    Jurisdiction over Defendants is proper pursuant to 15 U.S.C. §§ 22. Also Section 4 of the Clayton Act, 15 U.S.C. § 15, authorizing private antitrust

1    suits for damages, provides in part: "Any person who shall be injured in his

2    business or property by reason of anything forbidden in the antitrust laws may

3    sue therefor . . . . ".

4        57.  Venue is proper in this district under 15 U.S.C. § 22 and 28 U.S.C.

5    §§ 1391 because Defendant Intel resides and/or is found in this district and the

6    other Defendants operate or operated public companies that conduct business in

7    this district. Intel maintain an office in this District located at 75 Reed Rd.

8    Hudson MA 01749.

9        58.  Intel own a subsidiary, Intel Massachusetts Inc. with headquarters

10    located this District at Hudson, Massachusetts. All meetings between Plaintiff and

11    Intel have taken place at Plaintiff's residence located in this District.

12        III. PARTIES

13        59.  Plaintiff Moshe Frankel, individual, and resident of Massachusetts

14    representing himself bringing this action as authorized by federal law, as the

15    owner of software products designed to run on Intel x86 computers that are

16    subject to Defendants lessening of competition. Plaintiff is a programmer, a

17    software, semiconductor, operating system, and a "model of computation"

18    designer and has a number of agreement with Intel including a licensing

19    semiconductors development agreement with Altera, now Intel FPGA, and an

20    agreement to collaborate in the development of a unified mobile and personal

21    operating system for Intel x86 devices including smart phones.

22        60.  Defendant Intel Corporation is a Delaware corporation with its

23    principal executive offices at Santa Clara, California. It conducts business both

24    directly and through wholly-owned and dominated subsidiaries worldwide. Intel

25    and its subsidiaries design, produce, and sell a variety of microprocessors, flash

26    memory devices, and silicon-based products for use in the computer and

27    communications industries worldwide. Intel created and dominates the x86

28    computer markets.

Case _____ Document 1 Filed 03/18/25 Page 24 of 323

1          61.   Defendant Andy D. Bryant, Former Chairman, Intel, was hired by

2      Intel in 1981 and served as Intel Chairman between 2012 and January 2020.

3          Defendant Barbara G. Novick, joined Intel's board of directors in

4      December 2022. A founder of Blackrock which hold approximately 8 percent of

5      Intel's publicly traded shares and is heading Intel board's Audit & Finance and

6      Compensation committees.

7          Defendant Frank D. Yeary, Chair of Intel's Board of Directors, joined

8      Intel's board of directors in March 2009.

9          Defendant Omar Ishrak, joined Intel's board of directors March 2017 and

10     serve as a the board chair from January 2020, until December 2020.

11         Defendant Tsu-Jae King Liu, joined Intel's board of directors in July 2016.

12         Defendant Gregory D. Smith, joined Intel's board of directors in March

13     2017.

14         Defendant Risa Lavizzo-Mourey, joined Intel's board of directors in March

15     2018.

16         Defendant James (Jim) J. Goetz, joined Intel's board of directors in

17     November 2019.

18         Defendant Dion Weisler, joined Intel's board of directors in June 2020.

19         Defendant Alyssa Henry, joined Intel's board of directors in January 2020.

20         Defendant Andrea Goldsmith, joined Intel's board of directors in September

21     2021.

22         Defendant Stacy J. Smith, joined Intel's board of directors in March 2024.

23         Defendant Lip-Bu Tan joined Intel's board of directors in August 2022 and

24     resign from the board in Aug 2024.

25         62.   Plaintiff is informed and believes and based thereon alleges that the

26     fictitiously named Defendants captioned herein above as Does 1 through 25,

27     inclusive, and each of them, were in some manner responsible or legally liable

28     for the actions, damages, events, transactions, and circumstances alleged herein.

1    The true names and capacities of such fictitiously named Defendants, whether

2    individual, corporate, associate, or otherwise are presently unknown to Plaintiff,

3    and Plaintiff will amend this Complaint to assert the true names and capacities of

4    such fictitiously named Defendants when they have been ascertained. For

5    convenience, each reference herein to the named Defendants shall also refer to

6    the Doe Defendants and each of them.

7    IV. INTEL TECHNOLOGY

8        A. INTEGRATED CIRCUIT (IC)

9        63.   Intel was founded in 1965 to create newly invented transistors. A

10    transistor is a solid-state device; it has no moving parts. It consists of a sandwich

11    of semiconductor materials that is used as an electrical conductor. Its electrical

12    conductivity depends on the electrical voltage applied to a part of it and can be

13    controlled by changing that voltage. That makes it possible to use it to amplify an

14    electrical signal or as a switch in control or logic systems.

15        64.   In computational devices, transistors serve as controlled switches.

16    Open or closed transistors represent logical states or carry logical operations.

17        65.   Transistors replaced bulky electrical relays and vacuum tubes,

18    revolutionizing electronics by allowing the creation of products such as miniature

19    portable radios and smaller computers.

20        66.   Intel was one of the companies that developed a way, akin in some

21    aspects to printing, the ability to manufacture multiple transistors simultaneously

22    on a semiconductor wafer. This development enabled Intel to integrate a large

23    number of transistors, along with the electrical circuitry connecting them, into a

24    single functional device. These became known as integrated circuits (IC).

25        67.   Similar to printing, but significantly more complex, the Intel

26    manufacturing method produced multiple copies of an IC design on a single wafer

27    of semiconductor material. After testing and packaging, these individual chips

28    were ready for use in various electronic and computational products. The

1    dramatic and impactful development at the time allowed for the automated

2    creation of entire computers on a chip, akin to today's ability to print an entire

3    car. This development caused concern among established computer companies,

4    who were selling large computers made from individual transistors at the time.

5         68.   The number of transistors in each IC device determines its capacity to

6    produce useful work. The number of IC devices on a single silicon wafer

7    determines their manufacturing cost, which comes after the initial cost of their

8    design and engineering. The IC device invention created an economic and

9    technological environment where the number of transistors per unit area, or

10    transistor density, became the most important determinant.

11         69.   Initially, integrated circuits were small devices with a limited number

12    of transistors that provided limited functionality, such as a specific logic

13    operation, a clock signal generator, or an electrical current amplifier. However,

14    due to their unlimited ability to design and manufacture increasingly complex

15    devices with an increasing number of transistors, integrated circuits eventually

16    evolved into complex devices capable of replacing entire computer systems or

17    even a large number of computers in a single device. Today, these devices are

18    commonly available as miniature x86 devices, which can support multiple

19    computers and their support circuits.

20         70. A CPU (central processing unit) is a component of John von

21    Neumann's "Central Architecture" model that forms the foundation of most

22    modern computers. A CPU is an implementation of the abstract Turing machine

23    concept consisting of logic circuits that perform a set of arithmetic and logic

24    instructions. Each instruction corresponds to an arithmetic or logic operation and

25    will be carried out when it is read from memory, where it is stored as a binary

26    code number followed by the instructions' parameters. Parameters may convey a

27    numeric value, a processor register reference, or a memory address used to store

28    a value.

71. To function as part of a computer, a CPU must have additional circuits that provide access to memory as well as communication with input and output devices.

72. Computer programs, also referred to as software, consist of lists of CPU instructions and their parameters, stored as an ordered list in memory.

73. When a program runs, the CPU reads each program instruction from memory and performs the instruction corresponding operation, repeating that in a cycle until the program's last instruction.

74. Microprocessors are integrated circuits that combine a CPU and all of the necessary circuits for a computer's operation into a single device.

75. SOC (System On a Chip) is a single chip that contains a microprocessor as well as other circuits that provide functionality, such as peripheral interface, wireless and line communication and networking interfaces, making it possible to build a complete computing device, such as a smartphone, on a single chip. Intel's x86 devices are SOC.

## B. MOORE'S LAW

76. Gordon Moore, one of Intel's founders, noted shortly after the launch of Intel microprocessors that the number of transistors in an integrated circuit (IC) doubles roughly every two years. Moore's law is an observation and projection of a historical trend rather than a physics law. It also predicted an increase in the speed of integrated circuits with every new generation.

77. According to Moore's law, a transistor's physical size shrinks with each new generation, allowing for the packing of more of them on a given area of an IC. Since the number of transistors in a device and the speed they operate determine the computational work the device can produce, the Intel business model is based on Moore's law.

78. For most of its history, Intel was able to follow that model, increasing the average number of transactors in its IC from a few thousands to a few

1    billions. Transistors, however, generate heat with each logical operation, and

2    when operating at a faster switching rate per second, the amount of heat they

3    produce increases. At the same time, the shrinkage of the transistor area limits

4    the amount of heat that a transistor can dissipate, resulting in slowing down, if

5    not ending, Moore's Law.

6        79.  Following Moore's Law led to a reduction in transistor size, which

7    ended the ability to increase the speed of x86 devices about 20 years ago. As a

8    transistor's heat generation approaches the physics-permitted minimum, its

9    increasingly smaller size restricts the amount of heat it can dissipate to its

10    surroundings. This can lead to overheating, necessitating costly cooling systems,

11    increasing the risk of failure, and increasing energy consumption. Plaintiff's

12    technology solves that conflict, in effect restarting Moore's law as it hits the end

13    of life under the limits of current technology.

14              C. DARK SILICON AND PLAINTIFF'S TECHNOLOGY

15        80.  To meet the constantly growing demand for computing power, a

16    growth trend that can only accelerate with time, more transistors per chip are

17    required. Increasing the clock speed of a chip doesn't significantly impact its

18    functionality, as parallel operations, which increase with the number of

19    transistors, do not improve with increased speed. Following "Moore's Law,"

20    Intel's significant investment in research and manufacturing satisfied this growing

21    demand by designing smaller transistors, making it possible to pack more of them

22    into each chip. However, this approach came with a significant drawback. As the

23    number of transistors increases, their size shrinks. Smaller transistors can

24    dissipate less heat, resulting in rising chip temperatures that cause logic errors

25    and can end with a burnt-out chip.

26        81.  Intel and other semiconductor companies address that excess heat by

27    creating redundant parts on the chip and switching between them at a high rate.

28    This allows the overheating parts of the chip to rest and cool down while the

1     operation continues uninterrupted on other parts. However, in practical terms, the

2     switching process consumes time, energy, and additional transistors and hinders

3     parallel operations. The switching process boosts the chip's raw speed, but it also

4     necessitates additional cooling due to the increased heat dissipation and

5     significantly higher power consumption.

6         82.  Intel, as well as other semiconductor companies, use the term "dark

7     silicon" to describe the total area of a chip that must remain at rest at all times to

8     prevent overheating and burning. The dark silicon area in Intel's newer x86 chips

9     can account for as much as 90 percent of the chip area. This suggests that only 1

10    billion of a chip's 10 billion transistors are actively in use at any given time. The

11    rest are actually "dead waits" used to dissipate unwanted heat.

12         83.  To illustrate the implications of Dark Silicon on computing, it helps to

13    consider that some of the most demanding software tasks, such as computer

14    language interpreters and compilers, "What You See Is What You Get"

15    (WYSIWYG) word processors, email and spreadsheet programs, as well as

16    business database servers and networking software, were written to run

17    efficiently with satisfactory responsiveness on Intel's x86 CPU that had a much

18    smaller transistor count, a thousand transistors per chip. Over the years, the

19    average number of transistors in Intel's x86 devices increased from thousands to

20    billions. For users who bear the heavy costs of research and development,

21    engineering, and manufacturing, the additional billions of transistors do not

22    significantly improve the efficiency, ergonomics, and responsiveness of Intel's

23    and AMD's x86-based computers. The significant investment in Moore's Law

24    produces only incremental and, in many cases, marginal improvements for

25    consumers.

26         84.  Plaintiff's semiconductor architecture addresses the dark silicon in

27    current design in a way that increases users' computational power as well as their

28    control over that power in proportion to the actual increase in the number of

transistors as the result of Moore's Law. As this Complaint explains in detail, the Consortium is in direct conflict with Intel since any functionality that Intel may add to the x86 architecture will replace less efficient and less secure central services the Consortium provides exclusively, which is the base for the exorbitant appreciation of publicly issued shares of its Participants. This was the background of the Consortium attack, documented hereafter, on AMD, which forced AMD to give up its manufacturing after AMD communicated with Plaintiff about using Plaintiff's technology to stop the Consortium hold on AMD. It is also the core of the current conflict between the Plaintiff and the Consortium Participants inside Intel.

85. The Consortium compelled Intel to employ predatory design strategies, including the use of dark silicon and elements detrimental to efficient CPU usage, in order to deny consumers the potential computational power that additional transistors could offer. Exorbitant investments in transistor miniaturization, a strategy that effectively deters competition due to the significant costs associated with keeping up with Moore's law, also justify dark silicon.

86. Plaintiff's technology eliminates the need for dark silicon and releases those "dead weight" transactors for actual usage that benefits consumers. When Plaintiff informed Intel, under the mutually signed NDA and collaboration agreements and the agreement to collaborate on a smartphone operating system development, about the existence of technology that can eliminate dark silicon, Consortium Participants inside Intel blocked Plaintiff's access to development information and products and cut off communication and collaboration.

### D. THE CPU THEORETICAL, LEGAL AND COMMERCIAL ASPECTS, PLAINTIFF TECHNOLOGY, INTEL AND THE CONSORTIUM

87. Intel x86 CPUs are a type of universal Turing machine. A Turing machine is a device that solves mathematical expressions. A Turing machine can

execute any arbitrary computable function and produce its mathematically appropriate solution. Universal Turing machines are instruments that perform the Church-Turing thesis that states: Anything computable can be computed by a Turing machine. The x86 CPU is a particular type of Turing machine referred to as a Random-Access Memory Turing Machine. The capability of a Turing machine to perform any mathematical computation and algorithm is referred to as "general programmability." It implies that any program written to run on a particular CPU can be rewritten to run on any other CPU. Mathematics is a type of language. Since its basic elements allow for extension, language has no limits. CPU-based General programmability, like mathematics, is limitless. As for programs that run on a CPU, the Ninth Circuit Court of Appeals ruled in Bernstein v. United States Department of State (1996) that programs' source code is a form of speech, protected under the First Amendment. Like any language, mathematics is a mental tool that can be used internally (in thinking, for example) or externally (using instruments such as a pen and paper, typewriters, calculators, and computers). Both mental and physical tools and machines serve as extensions of human power, empowering both individuals and society. The Intel CPU x86 programming standard is the "lingua franca" of computing, as the majority of Internet access, business, and personal computing is performed on x86 computers. The freedom to use and program Intel's x86 CPU without restrictions and manipulation that are designed to limit its programmability for the benefits of third parties is enshrined in the First Amendment.

88. In 1936, the Supreme Court issued a decision that clarified and reinforced the Clayton Act, ensuring free commerce by prohibiting manipulation or restrictions on machine usage that aim to lessen competition. The Supreme Court's decision addressed IBM's practice of tying its card processing machine with its printed cards. Tying products in order to lessen competition is explicitly illegal under the 1914 Clayton Act.

89. In 1970, before IBM designed and settled its business agreements with Intel and Microsoft that produced the IBM PC, established Intel's x86 as a common standard, and effectively founded the "Wintel Cartel" that developed into the Consortium this Complaint addresses, IBM knowingly made an illegal decision that was highly controversial at the time to restrict full access to its computers' CPU to its customers. The decision created illegal tying between IBM's computers and IBM's programming, optimization, and consulting services. Unlike the 1930s IBM illegal tying of its punch card machine with its printed cards, the 1970s IBM decision to block access to its product's full programming capabilities and indirectly create a dependency of its customers on its services, despite being extremely controversial for IBM customers and programmers, passed without legal scrutiny.

90. The changes that IBM made to its products, the IBM 360 computer line, during the decade between 1970 and 1980 were in direct violation of section two of the 1914 Clayton Act and the 1936 Supreme Court reinforcement of it. IBM, like all other early computer companies, commercialized computing in the 1950s and 1960s and released its computers with full access to their CPUs, including the computer microcode. Microcode refers to the low-level instructions or firmware that control a computer's hardware components. Access to the microcode enables IBM customers and programmers to customize and optimize the way hardware runs programs, enabling improved performance and time and energy savings. Beginning in 1970, IBM restricted access to the IBM 360 computers, thereby compelling its customers to purchase its proprietary support services.

91. This decision illegally tied IBM's 360 line of computers with its support services. IBM phased the introduction of those restrictions gradually over a period of ten years, starting by first restricting the access of smaller companies while continuing to allow larger customers, such as government agencies and the

1     military, to customize and optimize their programs as before. IBM gradually

2     established new illegal norms, standards, and practices, culminating in a total

3     restriction in 1980, in line with the management plan. Those norms, standards,

4     and practices became the Wintel Cartel and later the Consortium's scheme

5     foundations.

6          92. IBM's plan for the IBM PC in 1981 and its partnership with Intel and

7     Microsoft was based on the normalization of its 1970s illegal decision. Intel

8     copied this illegal practice and used it to manipulate the market until the

9     Consortium took over Intel and the limits on CPU usage started to serve the

10    Consortium's scheme. Taking into account legal precedents, the interests of the

11    public, consumers, developers, and competitors, including Plaintiff, as well as

12    Intel itself, Intel should provide its users with unrestricted access to its

13    programmability and peripheral interfaces. This Complaint clearly demonstrates

14    that this is not the case.

15         93. In 2012, with the positioning of Defendant Bryant to the Intel chairman

16    position, Intel was literally taken over by the Consortium. As a result, Intel's x86

17    CPU architecture, access to the x86's programmability and full capabilities, and

18    Intel's strategic plans and business practices were manipulated to protect the

19    consortium's companies, products, and services. Intel succumbed to the

20    Consortium Participants, who are forcing it to implement designs that compel its

21    users to purchase and depend on the Consortium's centrally distributed services

22    while preventing unrestricted full usage of the x86 CPU and unrestricted

23    communication over the Internet. Consumers purchase Intel's products as

24    components of its OEM (original equipment manufacturers) offerings. Intel

25    defines and controls every aspect of its OEM design, including the form factors,

26    capabilities, compatibilities, scope, and performance of any products that include

27    Intel x86 devices. Intel utilizes this control, along with illicit tying, to safeguard

28    the Consortium's long-term objectives.

94. Intel's and its collaborators imposed restrictions on x86 programmability and added predatory design to the x86 architecture in order to force consumers to purchase essential services and products that are available exclusively only from Intel and its partners. This tying is a clear violation of the 1936 Supreme Court decision and the Clayton Act. The Consortium's stock market scheme is based on this illegal tying and Protecting it is the driving force behind the Consortium's efforts to control Intel and destroy its technologies as detailed in this Complaint.

95. A simple formula can be used to assess Intel's predatory design changes to the x86 CPU since its adaptation for the IBM PC in 1981 to the present. Ideally, the transistor count in an Intel CPU device should provide a quantity of functionality that the CPU can perform, and as the transistor count increases, the ratio of one to one with the functionality that the transistors provide should result in a proportional increase in the CPU functionality output. The number of transistors in an x86 device is a known quantity. Assessing the CPU functionality output is an ambivalent and complex task. For that reason, assessing the CPU functionality is measured by comparison using time as a gauge. In 1981 an x86 device contained a certain number of transistors and provided certain functionality.

96. That functionality should have increased since 1981 proportionally to Moore's law as the number of transistors in an average x86 device increased from fifty thousand to five billion, an increase by a factor of one hundred thousand. By the most generous estimates, the functionality of x86 for typical personal and business operations, such as word processing and spreadsheets, aside from running graphics-intensive games and intensive calculations that are performed on dedicated parts that are not intrinsic to the x86 architecture and not relevant for most consumers, has only increased by a factor of less than one hundred.

97.   The difference between 100 and 100,000 shows a loss of functionality resulting from predatory design, which by now dedicate more than 90% of the transistors is x86 devices for features that are directly detrimental to their users and prevents the remaining 10% of functional transistors from being used efficiently for parallel operations. This design aims to compel consumers to use the centrally distributed services of Consortium Participants.

98.   "CPU" stands for "Central Processing Unit"; the word "Central" reflects its serial trait. A CPU cannot perform parallel operations by default. As a result, an increase in transistor count requires the dedication of some transistors for overhead management, and as the transistor count grows, the ratio of one to one cannot be maintained. Plaintiff's older technology that was presented to the industry since 1980s required an overhead of between one and ten percent of the total transistor count to allow multiple CPUs' on a single chip to provide the highest theoretical level of parallelism that a particular functional design can achieve. In comparison, Intel's predatory design overhead is resulting in an overhead of one hundred thousand percent, calculated as the percentage ratio between one hundred and one hundred thousand. Plaintiff technology that was offered to Intel and was blocked by Consortium Participants uses one thousand transistors to deliver the same functionality that one hundred million transistors are providing in the current x86 devices. That estimate is very conservative; the actual number is larger and is doubled every two to three years as Moore's law at Intel is currently growing faster then at TSMC.

99.   Before 2012, when the Consortium took over direct control of Intel by installing Defendant Bryant as Intel's chairman, Intel spent around 30 percent of its revenues on R&D, building semiconductor manufacturing facilities to deliver higher transistor density, conducting material research, and IP design. With the open x86 standard and a higher transistor count, consumers and the economy should have been able to take advantage of the resulting exponential growth in

computing power, which would have stopped the Consortium's unfair advantage and put an end to its scheme. The Consortium moved to eliminate that risk to its scheme by destroying Intel's manufacturing, the x86 standard, and the x86 smartphone market, lowering Intel's market cap in order to limit Intel's options and entrap competing technologies.

100. The entrapment of Plaintiff by Consortium Participants at Intel in order to block his technology was a part of that plan¨to block Intel from providing its users with the result of its investment in Moore's Law. Arrow Electronics informed Intel when it found out about Plaintiff's technology and plans. Intel then deceived Plaintiff and proposed a collaboration strategy that aimed to prevent Plaintiff from entering the market. With Gelsinger's return and Intel's announcements that manufacturing would be opened to independent developers, Plaintiff assumed that Intel would start competing again, but Consortium Participants at Intel installed Defendant Tan to oversee Intel's fab and impede Gelsinger, continuing the Consortium protection scheme.

101. Intel holds a distinct position due to its significant investment in manufacturing, which, up until 2012, positioned it ahead of other semiconductor manufacturers. Additionally, its seamless integration of intellectual property design with semiconductor manufacturing enables it to achieve a superior level of design optimization. This is not possible with contract manufacturing, as contract manufacturing necessitates the sharing of manufacturing parameters between multiple companies and designers.

102. By 2012, Intel had the ability to provide CPU users with exponentially growing power and functionality and make that functionality available to both PC users as well as the smartphone market. The Consortium faces the risk of losing its dominance in both central services and the smartphone market. Since 2012, the elimination of Intel and AMD as competitors in the smartphone market, as well as the destruction of low-power semiconductor

1   technology and x86 access to AI, as well as autonomous computing, have led to

2   the exorbitant increase in the market capitalization of leading Consortium

3   Participants by more than 5 trillion dollars. By eliminating existing detrimental

4   design and restrictions that compel consumers to rely on service providers, Intel's

5   unique position can enable it to incorporate exponentially growing computational

6   power into its x86 CPU devices, enhance their efficiency with low-power and

7   faster computing technologies, and reduce the cost of these devices for consumers

8   by eliminating dependency on services. This is why Intel became the primary

9   target of the Consortium and why Intel directors who operate on behalf of the

10  Consortium and are enriched by it are interfering with and manipulating Intel

11  design and operations.

12              E. INTEL'S CONFLICT AND TRAP

13      103.  Intel's policy, as stated in the 2024 annual report 10-K filing, is:

14      "We aim to deliver open software and hardware platforms with

15  industry-leading standards. We intend to lead and democratize compute with Intel

16  x86 and xPU."

17      104.  Intel's products, as any product manufactured under free market

18  rules, are expected to be optimized for current economic and technological

19  market conditions. Intel products are expected to be efficient, secure, energy

20  efficient, and cost effective. The word "optimal" here conveys those four traits.

21      105.  Antitrust law and the 1936 Supreme Court ruling, explicating the

22  1914 Clayton Act concerning IBM, establish Intel's legal duty to consumers to

23  permit unrestricted use of its products. Intel acknowledges this obligation, as

24  evidenced by its 2024 annual report 10-K filing, but in practice, it blocks

25  Plaintiff's products from operating on x86-based computers to protect the

26  Consortium's products and services from competition.

27      106.  Intel owes it to its shareholders to optimize the usability of its

28  products, thereby enhancing their benefits to users and increasing their market

value, which in turn leads to increased revenues for the company. In actuality, however, the Consortium, consisting of entities that are Intel's competitors with the index-based trade funds that control Intel's board of directors, is interfering with its policies and holding Intel in a trap where Intel is forced to violate antitrust law, actively impede competition, and allow its OEM to limit and control the functionality that is available to users and programmers of its x86-based computers.

107. The computational power that Intel can provide to consumers is limited only by design capabilities, the number of transistors Intel can pack into its devices, and technology constraints. The number of transistors Intel can pack into its devices, its design capabilities, and its technological abilities increased significantly throughout Intel's life due to Intel's enormous investment in research and manufacturing. Under the undue control of the Consortium, Intel is forced to withhold the fruits of that investment from its customers and shareholders and manipulate its technology in order to prevent certain functionalities that are critical for x86-based computer users but compete with the Consortium services. The Consortium monetizes these functionalities, some of which Plaintiff's software blocks from running on Intel computers, by offering them as toll-based, centrally distributed services. Consortium Participants offer these services as exclusive investment opportunities, and the restrictions on free usage of Intel x86-based computers enhance the value of the publicly listed shares issued by these service providers.

108. Intel's increasing available computational power resulting from its significant research and development investment in keeping up with Moore's law is in direct conflict with the Consortium's scheme. By manipulating Intel and the market, the Consortium is preventing x86-based computer users from accessing this power. In a free market, Intel's increased manufacturing and design powers would have replaced the Consortium's products and services, but the

Consortium's restrictions on x86-based computer usage hold back Intel itself as well as by Plaintiff from competing with Consortium Participants' services and products.

109. As this Complaint shows, the Consortium's scheme was and is based on blocking critical x86 functionality from x86-based computer users and packing it into exclusive, lucrative, toll-based, centrally distributed services. Predatory design and market manipulation take away important functions from x86-based computer users, like the freedom to manage and choose their Internet connections and protect their computers from remote unauthorized access and operational failures. These limitations are then turned into profitable investment opportunities that make the Consortium Participants huge profits.

110. Intel provides the Consortium with the predatory design modification that allows such abuse and has technology that can remedy such problems and monetize those solutions to the benefits of Intel, its shareholders, and the market as a whole. It results in an inherent existential conflict between the Consortium and Intel.

111. As this Complaint outlines, that type of conflict between Intel and the Consortium has also driven the multiple attacks on AMD by the Consortium that forced AMD to sell its semiconductor facilities. It is also the reason why the Consortium appointed Defendant Bryant as chairman of the Intel board and instructed him to weaken Intel design and manufacturing in 2012, the reason why the Consortium blocked Plaintiff's products and collaboration with Intel, and the reason for the ongoing attack on Intel and the Consortium attack on Intel's x86 design. It is a repetition of the attack on AMD described below, which culminated in 1996 with a Consortium Participant, Atiq Rasa, being appointed to a key technical position at AMD and his abrupt resignation in 1999 that put AMD's independence and survival in question, much like Intel today, and similarly caused significant damage to the U.S. semiconductor industry.

112. Section IX in this Complaint, IX. PLAINTIFF'S AND AMD, AMD'S MANUFACTURING DESTRUCTION (page 82), details the crippling damage the Consortium did to AMD after an attempt by AMD's founder and Chairman, Jerry Sanders, and Plaintiff to introduce competitive technology to the market. An extraordinary effort by Mr. Sanders saved AMD but left the U.S. semiconductor industry significantly weaker. The Consortium aims to inflict similar crippling damage on Intel's design and manufacturing capabilities.

### V. PLAINTIFF RIGHT TO FREELY USED CPU

#### A. 1936 SUPREME COURT ADDRESS OF THE CLAYTON ACT

113. In 1936, the Supreme Court decided a case in which IBM forbade the users of its card processing machine to use cards supplied by a third party, forcing the use of cards made by IBM. According to the Supreme Court decision, Section 3 of the Clayton Act makes it unlawful for any person engaged in commerce to lease machinery "whether patented or unpatented" on the condition that the lessee shall not use supplies or other commodities of the lessor's competitor, where the effect of the condition "may be" to lessen competition substantially or tend to create a monopoly.

A Syllabus 298 U.S. 131 is copied herein:

International Business Machines Corp. v. United States, 298 U.S. 131 (1936)

No. 758

Argued April 8, 1936

Decided April 27, 1936

298 U.S. 131

Syllabus

Section 3 of the Clayton Act declares it unlawful for any person engaged in commerce to lease machinery "whether patented or unpatented" on the condition that the lessee shall not use supplies or other commodities of the lessor's

competitor, where the effect of the condition "may be" to lessen competition substantially or tend to create a monopoly.

Held:

1. The prohibition is violated by a condition requiring a lessee to operate the leased machine only with supplies from the lessor, since this, in effect, precludes the use of supplies of a competitor. P. 298 U. S. 134.

2. While the section does not purport to curtail the patent monopoly of the lessor, the prohibition of tying clauses is not limited to unpatented supplies but includes also supplies which have been patented to the lessor either separately or in combination with the patented machine. P. 298 U. S. 136.

3. Assuming that, by implied exception, a tying clause would not violate the provision, though it tended to create a monopoly, if its purpose and effect were to protect the goodwill of the lessor in the leased machines, there is no basis for the exception where the substantial benefit of the clause to the lessor is in the elimination of competition and where it does not appear that protection of his goodwill cannot be achieved by method that do not tend to monopoly and are not otherwise unlawful.

### B. LAYING THE ANTITRUST BREACH FOUNDATIONS

114. With an outmost priority of protecting its existing computational products and services, IBM concludes that it must control and limit the capabilities of users to program its new IBM PC.

115. The only technically possible way to restrict a CPU's programmability is to use illicit product tying to block products that enable full programmability while restricting the programmability of the CPU itself, which by definition is an open system because it is a Turing machine, a machine that can solve mathematical formulas.

116. The explicit 1936 Supreme Court decision and IBM's decision to use illegal tying were the driving forces behind IBM's 1981 decision to divide the

design and standard setting of its personal computer between three manufacturers. The appearance and proof of illegal product ties between multiple companies would be easier to conceal, as well as more difficult to identify and legally prosecute.

117. Starting in 1981, when Intel's x86 processor became the market's dominant personal computing standard, numerous individuals and companies began developing x86-compatible software tools and products, as well as hardware solutions that enabled users to use the full capabilities and extend the usage of their x86-based computers.

118. By 1984, when Intel introduced its x86 32-bit version processors, the x386, despite IBM rejecting that standard in an effort to limit the PC's competitiveness and Microsoft withholding an 32-bit version of its x86-tied operating system and programming tools for its own reasons, possibly in compliance with IBM demands, a significant number of 32-bit programming tools and 32-bit extensions to the DOS operating system became available from x86 programmers and companies.

119. Rather than supporting x86-based computer users in their effort to maximize the utilization of their x86-based computers, Intel moved to collaborate with Microsoft and IBM in the creation of operating systems that would restrict and limit the ability of users and programmers to access the full capabilities of its x86 microprocessors while preventing programmers from accessing the information and tools required for offering and marketing alternatives.

120. That effort to control and restrict x86-based computer users, which began in the early 1980s, has remained a core aspect of Intel's current policy, design, marketing, and customer relations to this day.

121. Plaintiff's software provides x86-based computer users with a variety of capabilities, including the ability to choose their Internet connections, peer-to-peer networking, data sharing, and transparent globally integrated email.

1    Plaintiff's software offers efficient client- and server-based database storage,

2    programming tools, and normalized user data with file-format-free encapsulations

3    and annotations, enabling transparent sharing and version control among users.

4    The Consortium withholds these ergonomic capabilities from consumers to ensure

5    their reliance on its toll-based services for sharing and information management.

6        122.  Plaintiff's software depends on the ability of programs that run on

7    x86-based computers to freely access the x86 CPU interrupt instructions.

8        123.  The Consortium Participants prevented Plaintiff's and similar

9    software, which uses free programmatic access to the x86 CPU to interrupt

10   instructions, from operating on consumers' x86-based computers. The

11   Consortium halted the software's operation on x86-based computers, enabling

12   Consortium Participants to provide paid services with comparable but inferior

13   functionality, shielded from competition. The Consortium aimed to maximize

14   consumer costs, monitor consumer x86 computer usage to gather personal and

15   business data, and create investment opportunities that take advantage of the

16   uneven market to profit Consortium Participants.

17       124.  Consortium Participants, both individuals and companies, receive the

18   windfall in the form of profits from exclusive investment opportunities in

19   companies that are created to take advantage of Intel's exclusionary acts and an

20   increase in the value of publicly traded shares of companies benefiting from that

21   scheme.

22              C. INTEL X86 CONFLICT WITH THE CONSORTIUM

23       125.  Intel x86 semiconductor devices are machines. These machines

24   belong to a specific type known as the "Random Access Memory Turing

25   Machine." Intel x86 computers, as well as any other computer, are subject to the

26   1936 Supreme Court decision. Companies that make, sell, or lease computers

27   cannot legally control, limit, or charge for using those computing devices freely

28   and creating software that can run on them.

126. Efforts to limit the ways consumers can use technology in order to benefit dominant companies are not new. The fundamental principles of antitrust law have their roots in the early 20th century, with the 1936 Supreme Court decision addressing an IBM card processing machine that predated computers.

127. As x86 technology advances, it becomes a universal gateway to online commerce, work, computing services, and social interaction. This allows Consortium Participants to exert control over consumer usage for the benefit of companies that coordinate standards, which over time erode the free usage of x86-based computers by their owners.

128. Technology usage is increasingly becoming a critical legal and social issue, significantly influencing the future shape of society. Concepts such as the "Application Store" and restricted programming, now mandated by Google and Apple on smartphones, were unheard of prior to smartphones and remain unaccepted in the realm of personal computing.

129. The Consortium, including Consortium Participants inside Intel, is attempting to replicate the illegal methods of restricting consumer rights that were established in the smartphone market to the business and personal computing markets by substituting consumer-available functionality with centrally controlled services.

130. Companies that make, sell, or lease computers cannot legally control, limit, or charge for using those computing devices, nor limit their free usage, nor charge for the creation and marketing of software that can run on them.

### D. THE CONSORTIUM SCHEME TO EXPLOIT THE INTERNET

131. The Consortium, with the assistance of Consortium Participants at Intel, aimed to replicate the illegal methods used to restrict consumer usage of smartphones in the business and personal computing markets by replacing consumer-available functionality with centrally controlled services. Companies that make, sell, or lease computers cannot legally control, limit, or charge for

using those computing devices freely and limit the creation of software that can run on them.

132. As this Complaint details, the CPU technology itself and the open Intel x86 technology that brings it to the market are in an inherent conflict with the Consortium. The Consortium established itself with the aim of limiting consumer access to the CPU and other technologies it facilitates. That's why the Consortium forced AMD to separate its design from its manufacturing and forced it to sell its manufacturing facilities, and it is why the current attack is trying to do the same to Intel.

### E. CONSORTIUM EXPLOITATION OF X86 DESIGN

133. As this Complaint details, the Consortium's power comes from controlling and restricting the use of the computational power Intel designed into the semiconductor devices it manufactures.

134. The Consortium exerts its power in two distinct ways that control the two aspects of users ability to use their x86-based computers: limiting the ways that x86 CPUs can be programed and limiting the ability of x86-based computer users to freely communicate over the Internet.

### F. LIMITING USER'S PROGRAMMING OF THEIR X86 CPU

135. To limit Plaintiff and his potential customers to freely use and program their x86-based computers, Intel's manipulate is x86 semiconductor design and marketing policies in ways that hinder efficient programming on x86-cased computers, thereby placing restrictions on running programs that could compete with the Consortium's products and services. Preventing programmatic access to x86 CPU interrupt instructions is one way that is used by the Consortium to impose limits on the ability of x86-based computer owners to freely program and use their users.

136. Limiting users' programming is also achieved by the Consortium forcing Intel to design into its x86 processors special capabilities and make them

available only to Consortium Participants in order to create an uneven market that

allows Consortium Participants to develop and sell centrally distributed services

but makes it impossible for x86-based computer programmers and users to

develop competing products. Consortium Participants such as Microsoft enjoy

access to significant areas of x86 devices that are critical for x86 programming

but are not accessible by x86 programmers and users who can only use small

portions of the current functionality available on Intel devices.

### G. CONSORTIUM BLOCKING ACCESS TO X86 INTERRUPTS

137. As part of the effort to block access to x86 CPU interrupt

instructions, companies that provided programming tools that enabled such access

were destroyed, and the operating system currently associated with x86-based

computers was designed to prevent programmers from using x86 interrupts and

prevent programs that use x86 interrupts from running on x86-based computers.

138. As this Complaint details, free market forces or legitimate business

decisions did not cause those developments, but rather a nefarious scheme that

violated the law to maximize consumer costs and generate windfall profits for

Consortium Participants.

139. The "abduction" of x86 functionality that includes the blocking of

efficient access of programs to the x86 processor interrupt instructions and

memory management prevents effective software like Plaintiff's from running.

This is forcing consumers to purchase Consortium Participant services, which

provide handling of Internet server worst-case scenarios that businesses depend

on.

140. Despite its name, the Internet server worst-case scenario describes a

typical situation that any business providing service or product via the Internet

may encounter and must be prepared to handle. Activating a program that

distributes additional customers to additional resources is necessary to prevent

paralysis of the website server when too many potential customers approach an

1     Internet website simultaneously.

2          141. Such a program necessitates access to currently blocked x86 CPU

3     instructions or features not included in the current design. This forces consumers

4     to rely on Consortium's business computing services, which manage the

5     worst-case scenarios by allocating significant, large, and complex resources.

6          142. The Consortium's illegal tying and manipulation limits the capabilities

7     of x86-based computer users to provide commerce services via the Internet.

8     Consumers and most businesses are forced to make significant, unfair, and

9     unnecessary investments in energy and computing infrastructure, which they

10    cannot afford. In this way, the Consortium forced consumers and businesses to

11    rely on its services for the majority, if not all, of their Internet commerce. Such

12    limits imposed on x86-based computer users result in Amazon's advantageous

13    position in the market, including its exorbitant cost to its commerce users.

14                    H. BLOCKING OF INTERNET CONNECTIVITY

15         143. The Consortium's illegal tying and technological manipulation hinder

16    the ability of x86 Internet users to freely choose their Internet connections. The

17    inability of consumers to freely choose their Internet connection hinders

18    Plaintiff's ability to market software that facilitates direct information sharing

19    among Internet users.

20         144. Taking advantage of the ability of x86 Internet users to freely choose

21    their Internet connection makes it possible for the Consortium to create

22    companies that provide connectivity capabilities between consumers as a service.

23    Consortium Participants launch and position companies like Smartsheet as

24    investment opportunities for Consortium Participants.

25         145. Smartsheet, a Consortium participant, positioned a product that

26    exemplifies that practice. The Smartsheet product facilitates data organization and

27    sharing among owners of x86-based computers. The Consortium Internet service

28    providers compel consumers to use cable modems that are illegally tied with an

1    subscription-based service at an exorbitant cost, generating windfall profits for

2    Consortium Participants. Simple design changes to the x86 based on Plaintiff's

3    technology should eliminate the need for additional security services.

4        150.  The Consortium uses the inherent security vulnerability of x86-based

5    computers to justify antitrust violations of consumers' most fundamental rights,

6    which include their freedom to freely use their own x86 CPU to design and run

7    programs of their choice. The most notable argument advocates for the creation

8    of "application stores," which illegally restrict consumers' freedom to design and

9    run programs of their choice on their own computers. Plaintiff's technology

10   renders that argument moot.

11                      J. X86 INHERENT FAILURES

12       151.  The Consortium compelled both x86 companies, Intel and AMD, to

13   incorporate features into the x86 architecture that make x86-based computers

14   prone to failures. These failures result in sudden, unpredictable shutdowns of

15   x86-based computers, leading to loss of time, data, information, and, in some

16   cases, human life. The market recognizes that x86-based computers are prone to

17   failure. The inherent security vulnerability in x86-based computers affects

18   personal and business usage, significantly impacting the economy and

19   jeopardizing personal, business, and national safety.

20       16.  The Consortium exploits the inherent failure of x86-based computers,

21   which hinders their local reliability and forces consumers to rely on centrally

22   distributed online services. This strategy aligns with the Consortium's strategic

23   goal of increasing the dependence of x86-based computer users on its toll-based,

24   centrally distributed services, thereby increasing costs to consumers.

25       152.  Intel can remedy the inherent x86 vulnerability using Plaintiff's

26   technology.

27                 K. PLAINTIFF'S CONTRACT

28       153.  When a Consortium Participant company engaged in the destruction

1    of an x86 software company, Ashton-Tate, and its products, Framework, in an

2    attempt to protect the Consortium Participants' products and services from

3    competition despite the product's popularity, Plaintiff, who had under license

4    developed, marketed, and supported the product at the time of its removal from

5    the market, attempted to purchase it but was offered a bribe to go away by

6    Consortium executives.

7        154.  The Consortium executives argue that the continuation of the product

8    was "against the interest of the industry." Plaintiff prepared a lawsuit against the

9    Consortium, which detailed the destruction of the company that created the

10    product and its removal from the market. After lengthy negotiations, a contract

11    that transferred the rights to the product and its trademark to Plaintiff was signed

12    in return for Plaintiff agreeing to destroy the gathered evidence and withdraw the

13    prepared lawsuit against the Consortium.

14             L. PLAINTIFF'S MOTION TO INTERVENE U.S. V.

15             MICROSOFT

16        155.  In May 18, 1998, the U.S. D.O.J. filed in The United States District

17    Court For The District Of Columbia an antitrust Civil Action No. 98-1232 v.

18    Microsoft Corporation,

19    https://www.justice.gov/atr/complaint-us-v-microsoft-corp

20    Plaintiff Moshe Frankel filed a Motion To Intervene in the said case,

21    https://web.archive.org/web/20010515200354/http://views.com/

22        156.  Plaintiff filed the motion after concluding that the government's

23    complaint, which centered on the tying of a Microsoft browser with the Microsoft

24    Windows operating system to the detriment of Netscape, a company that

25    developed a browser for x86-base computers running the Microsoft Windows

26    operating system, failed to address the primary harm to consumers and the

27    fundamental cause of the uneven x86 market. The remedy requested in the

28    original complaint would have had a negligible impact on the monopolistic

arrangement between Microsoft, Defendant Intel, their OEM's and the
Consortium Participants. This arrangement continues to be a root cause of the
damage to consumers, as it eliminates competing technologies and companies.

157. Plaintiff Moshe Frankel, in his motion, presented his testimony and
requested, as a remedy, that the court order the splitting of Microsoft into two
companies, an operating system company and an application company. In the
initial complaint, neither the government nor the states requested the divestiture
remedy.

158. The District Court determined that Microsoft had maintained a
monopoly in the market for Intel PC operating systems. To remedy the Sherman
Act violations, the District Court issued a Final Judgment requiring Microsoft to
submit a proposed plan of divestiture, with the company to be split into an
operating systems business and an applications business, effectively adapting
Plaintiff conclusions.

159. On appeal, the District Court reversed that portion of its order on
administrative grounds and returned the case to its jurisdiction. However, the
case's judge resigned, and a new judge amended that part of the order.

160. Since 2001, Plaintiff's research focus has changed to semiconductor
architecture optimization. The filing of this lawsuit was prompted by new
information and understanding of the Consortium, Intel, and Defendant Bryant,
which emerged in light of the new research context and the relationship Intel
initiated with the Plaintiff.

## VI. THE ANTICOMPETITIVE DESIGN ORIGIN AND PLAINTIFF
### A. CPU PENNIES PER UNIT BREAKTHROUGH

161. Plaintiff first encountered the Intel CPU technology with its general
programmability capability in 1974, when it was being correctly described as a
breakthrough thanks to its low manufacturing cost and its ability to provide
ubiquitous general programmability and automation, which, as it was obvious at

the time, would impact every aspect of technology and markets.

162.  Plaintiff became aware of a scheme to control CPU usage motivation and logic before it was implemented with the introduction of the Intel x86-based IBM PC. Plaintiff met with IBM executives in 1976 to introduce a technology known as manufacturers inventory, which he had developed and utilized at his electronic manufacturing company for internal purposes using mechanical parts and paper cards. Plaintiff suggested that IBM could bring that design concept to the market using a CPU.

### B. IBM PROTECTION RATIONAL

163.  Plaintiff demonstrated to IBM in 1976 a method of building information management that eliminates the need for expert programming at the operation level and gives users the transparent ability to build and customize manufacturers inventory with cost control and pricing management. An IBM executive responded to Plaintiff by saying, "This is precisely what we do not want to happen."

164.  An IBM executive told Plaintiff during the meeting that "uncontrolled low-cost general programmability will destroy the business (of IBM's and the computing industry)." and "we (IBM) must control how the CPU is used to protect what we (IBM) do.

165.  This same approach has guided the dominant computing companies' strategy since the invention of the semiconductor-based CPU (Central Processing Unit). Five years later, in 1981, IBM chose the Intel x86 CPU for its IBM PC, disregarding the 32-bit Motorola 68000 CPU and the National Semiconductor 32000, both of which offered significant advantages in terms of computational power and cost. Instead, it chose the 16-bit Intel technology as part of an elaborate scheme detailed in this Complaint to curtail potential competition with its bread-and-butter business from programmers of its new PC, which could potentially undermine its core computational database, services, and products.

## C. THE IBM PC "MONOPOLY CHAIN" LEGAL DESIGN

166.  The invention and development of the CPU, along with the personal computing it enabled, presented an existential problem for IBM. The very concept of the CPU and its legal definition are in conflict with IBM's business model and endanger its main revenue source, but IBM was facing a replacement to its technology. To proceed with a new project, all IBM departments must verify that it will not compete with any of the company's existing businesses. IBM has faced conflicts in the past, as evidenced by the 1936 Supreme Court decision regarding IBM card processing machines. To move forward with the IBM PC, the legal department and project designers had to devise a strategy to regulate and restrict the use of these computers, thereby preventing potential competition with IBM's products and services. Since the CPU is a general programmability device that can be programmed to perform any computation task, IBM was looking for ways to use illegal tying to limit its IBM PC functionality without assuming legal responsibility for those products.

167.  That tying would have had to be done without raising scrutiny from regulators or the ire of consumers and legislators. IBM's solution was to divide control of the design, standard, and marketing of the IBM PC among equal members of a "monopoly chain" consisting of equal partisanship between IBM, Intel, and Microsoft, rather than providing the market with a product designed and controlled by a single manufacturer. That division made it possible to manipulate the technology, its marketing and positioning, and establish the illegal tying that was designed to lessen competition. That illegal tying became the formula that dominated the computing industry since and enabled the Consortium's nefarious acts that this Complaint addresses.

168.  The division in 1981 of the IBM PC product between multiple companies was designed to and made it possible to mask the illegal ties that in turn enabled the limitations imposed on competitive usage and the withholding of

1    information that restrict capabilities that are inherent to CPU as a general

2    programmability-capable device. This strategy was designed to protect IBM from

3    competition but instead enabled the forming of the Wintel Cartel and the

4    Consortium that replaced it, ending in just a few years IBM's dominance over the

5    industry. As this Complaint details, division and tying are still the main tools in

6    the Consortium's illicit arsenal, but their usage was expanded to make it possible

7    to create "investment opportunities." As this Complaint details, when Intel moved

8    to block direct communications between Internet users, it transferred its

9    technology to a third-party company to mask the tying that enabled that blocking

10    and at the same time monetize it as an investment opportunity for Consortium

11    Participants.

12    ### D. INTEL'S X86 OPERATING SYSTEM

13    164. By the time IBM approached Intel with its "tying by fragmentation"

14    strategy and plan, Intel had already provided IBM with a ready-to-use x86

15    operating system that was used to demonstrate and program x86 devices long

16    before IBM decided to launch the IBM PC project. That operating system, as

17    well as more advanced versions of it, was offered to IBM for the x86 PC. IBM

18    declined to accept that operating system for the PC, explaining to Intel that the

19    programmable access to x86 capabilities provided by the Intel operating system

20    did not align with its goals of limiting PC functionality to protect its products.

21    IBM reasoned that limiting functionality would be easier to conceal if a separate

22    company controlled the operating system. IBM proceeded to close a deal with

23    Microsoft, which at the time lacked an operating system but was ready to

24    collaborate with IBM's plan. Only after agreeing to IBM's plan did Microsoft

25    move to purchase an operating system and modify for the IBM PC which was

26    then became the main tool used to control the usage of the IBM PC by its users.

27    170. Microsoft moved to purchase an operating system and modify it to

28    create its MS-DOS operating system for the IBM PC only after an agreement

1    with IBM with the terms and strategy that detailed illicit conduct by the two sides

2    was agreed upon. By the time Microsoft joined the IBM plan, Intel was already a

3    part of it. A testimony and discovery that was part of the 1998 DOJ v. Microsoft

4    antitrust case described how Microsoft CEO Bill Gates demanded that Intel CEO

5    Andy Grove remove a part of the x86 architecture that Intel engineers designed to

6    optimize graphic memory allocation. Bill Gates used the word "belong" to

7    support his argument. He argued that the particular functionality he insists on

8    removing "belonged" to Microsoft, "alluding" to the exiting of an original illicit

9    "tying by fragmentation" agreement that was designed, and as Gates' demand and

10   his usage of the word "belong" indicate, to lessen competition by eliminating

11   competition between the three Participants in the agreement.

12                  E. CIRCUMVENTION OF ANTITRUST LAW BY DESIGN

13       166. IBM prioritized safeguarding its core business service from

14   competition by x86 PC programmers. As planned by IBM the division between

15   IBM, Intel, and Microsoft in terms of the obligations and services available to

16   x86 users and programmers made it possible to circumvent antitrust laws drafted

17   with a single manufacturer in mind.

18       167. That illegal tying of an operating system that was missing basic

19   business features such as networking, with limited memory and a close BIOS that

20   limited full access of programmers to the x86 instruction set by withholding

21   critical information, succeeded in preventing competition with IBM's products

22   and services, but not for long.

23       168. However, innovation in memory expansion, storage devices,

24   networking, extensions for the DOS operating system swiftly overcame the

25   restrictions placed on x86 users and software companies to compete in the

26   market. At the same time the tying between Intel and Microsoft products and the

27   limits it imposed made it impossible for companies to develop a product that

28   could offer a complete computing solution to individuals and businesses.

169. While the Intel-based x86 computers market started growing, Intel found itself in an inferior position to Microsoft. Intel's high research and manufacturing costs necessitated higher expenditures, and with few opportunities to create aftermarket products for end users and profit from its x86 popularity, it effectively found itself in a constant survival mode. Microsoft, on the other end, enjoys direct relationships with both OEMs and end users and was able to translate the IBM PC's popularity into exorbitant profits and a stronger financial position. This made Intel more vulnerable to Microsoft's demands and paved the way for a nefarious scheme that involved manipulating x86 technology, which then expanded to encompass personal, business, mobile, and Internet-based computing, as well as Internet access and financial services.

F. FROM WINTEL CARTEL TO FINANCIAL CONSORTIUM

170. The official relationship between IBM, Intel, and Microsoft, formed in 1981, developed into the unofficial "Cartel" led by Microsoft as IBM started losing market share to PC clone makers. Prioritizing the protection of its own products and services, IBM declined to offer its PC users Intel x386 32-bit processors, leaving that market to Compaq. As a result, IBM lost its initial dominant position in the x86 market, leaving total control to Microsoft and Intel. The term "Wintel Cartel" was coined when the Microsoft Windows operating system began to gain market share due to the aggressive illegal tying of Windows with x86-based computers by Intel's OEM that was forced by Intel on behalf of Microsoft, as well as the preferred relationships between Intel and Microsoft.

171. The "Wintel Cartel" is a convention that describes, as the name suggests, market dominance and alleged anti-competitive behavior of Microsoft and Intel in the personal computer industry. Described in the University of Chicago Law School, Chicago Unbound, Articles Scholarship, 2020, The Arc of Monopoly: A Case Study in Computing, Randal C. Picker, Page 545.

https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=13977&context=journal_articles

172.  Microsoft became the dominant player in the x86 market when IBM lost its position to PC clone makers, starting with Compaq entry into the market in 1983. Microsoft's dominance was the result of Microsoft's licensing relations with x86 hardware makers, who depend on Microsoft's licensing of the DOS and later the Windows operating system to be able to sell their products. Microsoft also exerted influence over Intel's potential and actual x86 competitors, such as AMD, who became dependent on Microsoft's assistance to achieve compatibility between their x86 semiconductor devices and Microsoft operating system. Additionally, end users of x86-based computers developed a reliance on Microsoft for support, compatibility, and updates. As the market realized that software running on x86-based computers could provide more and more IBM core business functionality at a much lower cost, Microsoft's power over IBM and other business computing companies increased. As IBM had anticipated when dividing its PC line, Microsoft, with its ability to set PC operating system standards and specifications and its significant influence on x86 PC makers, was able to, and in fact did engage on behalf of IBM, in lessening the competition of x86-based computer software with IBM and other established companies.

173.  IBM's failure to seek the best technology for its customers and fully adapt CPU-based personal computing in the 1970s set him on a decline path by the mid-1980s. Inside the Wintel Cartel, Intel found itself in a weaker financial position as a parts supplier to IBM and PC clone makers, selling a significant portion of its products at low margin wholesale pricing while having to invest heavily in research, development, and manufacturing.

174.  Intel's vulnerability to Microsoft's whims and demands increased as the x86 market transitioned from the DOS operating system to the Windows operating system. Because Windows required more effort to maintain compatibility with Microsoft standards, and Microsoft used that as a pressure tool on both Intel and AMD, both became even more vulnerable to Microsoft's whims

and preferences.

175.  Once IBM lost its dominance over the x86-based domain to Microsoft, monetizing this dominance became the primary driving force behind the Wintel Cartel's evolution and expansion into the wider Consortium. The Consortium expanded rapidly, joining with technology and financial companies that used the exclusivity and control over critical x86 design and its user capabilities that the original Wintel Cartel founders, Microsoft and Intel, exercised to maintain, protect, and monetize lucrative exclusive business provided by a wide array of Consortium Participants.

176.  As this Complaint details, the Consortium Participants used that dominance to protect their own technological products and services, their financial products and services, as well as the continuation of their dominance in their respective areas.

177.  The majority of the Consortium's profits do not come from the sales of its two illegally tied and protected main products, the Microsoft operating system and the Intel x86 semiconductor devices. It comes from financial gains achieved by creating companies and selling publicly listed shares that gain value as a result of the Consortium's market dominance, manipulation of technologies, misinformation, and anti-competitive actions.

178.  In the same token, the majority of the profits of the individuals who are Consortium's Participants do not come from the salaries paid for the official job they perform as executives or decision-makers in the companies that employ them. The Consortium Participants' financial gains come from investing in investment opportunities they create to take advantage of their positions as well as the acquisition, in violation of the 1950 Celler-Kefauver Act, of publicly listed shares of companies they protect from competition, which appreciate in value due to the Consortium's market dominance, technology manipulation, misinformation, and anti-competitive actions.

allow higher profit margins. NEC later pioneered the creation of the first x86-based laptop computer. Other companies have also begun to develop their own versions of compatible x86 semiconductor devices. Intel's anticompetitive actions eventually forced NEC to abandon its x86 semiconductor device line. Intel relied on exclusivity and its Wintel Cartel, which later became part of the Consortium, provided it with opportunities such as the cable modem tying that is detailed in this Complaint, but left it dependent on the Consortium as essentially a commodity company.

184. To increase its profit margin and spread its risk, Intel needed to create more capable products, but the PC line was limited by the anticompetitive limits Intel agreed on with IBM and its increased dependency on Microsoft. On the other hand, as a software company, Microsoft developed direct relations with end users and controlled access to x86 capabilities and the ability to translate those into profit.

185. Intel moved to develop a more competitive 32-bit version of its x86 CPU but encountered resistance from IBM, which views the programmability of a more powerful CPU as a threat to its core business and declines to use it in its PC product line.

186. The answer to Intel's problem appeared when Ben Rosen and a group of engineers started a company named Compaq Computers. To access the market, Compaq needed to develop a firmware layer that would provide consumers with back-compatibility with the Intel IBM PC firmware (also referred to as BIOS, or Basic Input Output System). Once Compaq completed this task, the market became open to other manufacturers who competed to provide PC clones to the rapidly expanding market. However, all these manufacturers fell under the dominance of Microsoft, which, under minimal regulatory scrutiny, used the allocation of its operating system to cement its hold on the market and expand its product line.

## H. INTEL KING-MAKER BY WIELDING INFORMATION

187. With the establishment of Compaq, Intel found itself an industry king maker. Compaq received Intel x86 information and tools, which enabled it to develop an IBM PC-compatible firmware BIOS and proceed with creating IBM PC clones. Customers who purchase an x86 device from Intel should have had access to this information, enabling them to fully utilize their computers, yet it remains largely hidden from the market to minimize competition.

188. Intel discovered that there is more profit in withholding information about its x86 products than in helping its customers use its x86 products freely to their maximum capabilities or enabling competition in building hardware that utilized their full capabilities. Accordingly, Intel directed its semiconductor designers to add a gamut of secret capabilities as well as unnecessary control features that create an uneven market where Intel restricts access to certain capabilities, some critical to programmers and some detrimental to safe usage of x86 computers, at different levels, to different customers, up to a level where, in order to fully debug and diagnose an x86 CPU operation, as is the case while designing hardware for uncooperative x86 devices, an Intel engineer with special equipment must be summoned from Intel to perform that task.

189. Currently, most of the functioning transistors in an x86 chip are designed to provide hidden features that are neither accessible nor advantageous to users. That large portion of the x86 devices was added by Intel to give Consortium Participants an unfair advantage and stop competition with the Consortium Services and scheme as detailed in this Complaint.

## I. INTEL DOMINANCE

190. Intel's new fortune, however, was dependent on its ability to build and maintain total dominance of the x86 market. Intel built legal and marketing departments that, when threatened by competition, moved to squash it with no scruples. Intel implement anticompetitive practices including bribery of computer

1  makers and initiated frivolous lawsuits against NEC, AMD, and other companies

2  that attempted to build x86-compatible devices. NEC, having developed more

3  efficient x86 devices and supplied them to Plaintiff, found itself compelled to exit

4  the x86 market due to the expense of litigation, even though NEC ultimately

5  prevailed in that legal case.

6      191. AMD is kept at second place in the x86 microprocessor market,

7  despite AMD's comparable and sometimes superior product offering at lower

8  prices. Intel achieves that using help from the Consortium as documented in this

9  Complaint and by using bogus legal tactics as well as bribery payments to makers

10  of x86 computers in return for banishing AMD products, as was documented in

11  an antitrust lawsuit brought by NY State v. Intel in November 2009.

12  https://www.naag.org/wp-content/uploads/2020/10/573.civil_.NY-v-Intel-complaint-3.pdf

13      192. The European Commission imposed a record fine of 1.06 billion

14  euros on Intel in May 2009 for abusing its dominant market position. Intel settled

15  all outstanding antitrust and patent cross-licensing disputes with AMD for $1.25

16  billion in November 2009.

17      193. Intel settled an antitrust case with the FTC in August 2010 by

18  agreeing to broad restrictions on its relationship with computer manufacturers and

19  its competitors. Plaintiff's firsthand experience with Intel and Microsoft is that

20  their settlements of antitrust cases brought against them have no effect on their

21  conduct.

22              J. THE CONSORTIUM'S ARCHITECT

23      194. Ben Rosen became the architect of the Consortium's prime

24  profits-producing and distributing instrument, issuing the traded shares and their

25  appreciation. Hatching initial public offerings (Compaq, Borland International)

26  combined with the destruction of competing software and hardware companies

27  accelerated the appreciation of Consortium's Participants issued shares.

28      195. Ben Rosen became the architect of the Consortium's

profits-producing and distributing instrument, issuing publicly traded shares and managing their appreciation. The hatching of initial public offerings (Compaq, Borland International) combined with the destruction of competing software and hardware companies accelerated the appreciation of Consortium's Participants issued shares. The illicit collaboration between the computing and financial sectors continues to be organized as a loose organization of venture capital, investment banking, and index-based fund companies with hardware and software companies that gladly join in making windfall profits by destroying and lessening competition.

196. A key to that approach became the abduction computing functionality, which is critical for business or personal x86-based computers. The Consortium's control over software and hardware then blocks or impairs this functionality, while a newly launched company that issues public shares offers it as a service. What initially appeared as a barrier to competition developed into a more profound form of active "prevention," which included the destruction of products, companies, and, most damaging, efficient technologies that empower consumers and the economy.

197. In 1987, a computer executive told Plaintiff that if the spreadsheet had been invented by a corporation and not an individual, the "industry" would have devised a strategy to prevent it from reaching the market or to confine it behind a barrier of complexity and limited accessibility, keeping it from the hands of consumers and under the control of industry professionals. Numerous inventions and technologies aimed at ergonomically integrating computing with human cognition met the same fate. The industry later achieved its goal by restricting spreadsheet integration in ways that limit competition with the IT industry.

198. Among the technologies that were and are blocked from reaching the market are the interactive evaluation of linguistic expressions, the ability to

design database normalized business management information systems without programming, the ability to transparently synchronize information between users, and many others listed later in this Complaint. Such technologies are blocked by manipulation of the x86 semiconductor architecture, operating systems, and sometimes simply by arbitrary rules, such as Apple's restrictions on applications that can be sold in its stores and run on its smartphones. The biggest impact, however, on consumers and the economy came from the destruction and blocking of low-power computing technologies that conflict with the Consortium's long-term objective addressed in this Complaint. Academic institutions that created the new field of VLSI design were incentivized with generous contributions and access to investment opportunities to support the Consortium's objectives, and the EDA (Electronic Design Automation) companies were positioned as gatekeepers to control entry to semiconductor manufacturing that used to preclude technologies that challenge the Consortium from the market, as detailed later in this Complaint.

199. In conversations with Plaintiff industry executives listed features that software products should not provide to consumers in order to protect the Consortium's control. On multiple occasions and in different circumstances by different executives the reason given to blocking those features were "they are against the interest of the industry.". Those features and traits include:

- Lower power consumption that would allow mobile personal computing.

- Automated data normalization, mirroring, context journaling, and full search.

- Unified data exchange formats.

- Programmatic and automated control over telecommunication modem protocols.

- Universally embedded evaluation.

- Programming-free normalize relational database design.

1          - Automated load balancing.

2          - Direct CPU allocation for parallel tasks.

3          200.  Ben Rosen, at the helm of Compaq and its own venture capital

4     company, spearheaded an effort to safeguard databases and consulting companies,

5     enlisting them in the Consortium and its stock market scheme. As part of this

6     effort, Intel and Compaq withheld support for 32-bit programming for the 32-bit

7     x386 for a decade, from 1985 to 1995. However, companies outside the

8     Consortium developed numerous essential x86-based business capabilities. Novell

9     developed networking capabilities, hard drive manufacturers provided large

10    storage capacity, and independent developers made 32-bit compilers and

11    operating system extensions available. Intel and Compaq, along with other Intel

12    OEMs who entered the market, illegally tied the Microsoft 16-bit operating

13    system to x86-based computers, thereby blocking support for 32-bit programming

14    until Microsoft introduced its 32-bit version of Windows in 1995.

15         201.  Ben Rosen was the key person in the removal from the market of a

16    host of companies, their products and technologies, that competed with the

17    Consortium, Digital Equipment, Ashton-Tate, and Borland International, as

18    detailed hereafter.

19         202.  In order to compensate Intel for the losses in x386 sales due to

20    Microsoft's decision to withhold 32-bit programming from the x86 market,

21    Microsoft added significant CPU operations overhead to Windows, which in turn

22    slowed down software running on x86 computers and created a demand for

23    higher-speed CPUs. Using "Dark Silicon," Intel boosted the clock speed of the

24    x386 CPUs to offset Microsoft's slowing overhead. Consumers were forced to

25    upgrade to x386 computers before they could develop 32-bit software that

26    allowed them to utilize their investment.

27         203.  To prevent users from taking advantage of the x386 32 bit

28    programming using DOS 32-bit extenders, such as the one owned by Plaintiff,

which provide transparent 32 bit programming capabilities, the Consortium stopped the sales of computers with DOS and forced consumers to buy computers with Microsoft Windows pre-installed. Dell Computers, for example, was forced by the Consortium to force its own customers to pay for Windows, increasing the cost to its customers, even though internally its own business operations continue to be conducted using the more efficient DOS operating system that did not mandate CPU overhead, more expensive hardware, and significant delays and loss of time on maintenance and unnecessary slow reboots.

## K. THE CONSORTIUM'S LONG HANDS

204. In 1988, Plaintiff entered into a development agreement with Texas Instruments to use his technology to develop an x86-compatible operating system with a universal graphic interface that will run on the x86-compatible TIGA (Texas Instruments Graphic Adapter) card. TIGA was an x86-PC plug-in graphic card that included the first GPU (Graphic Processing Unit) that was invented by Texas Instruments. It allowed hardware-based graphic processing independently of the x86-based computer CPU and included a compiler to achieve that task. The project reached a significant milestone in 1991.

205. In 1991, Texas Instruments reached out to Plaintiff to let him know that it was exiting the computer and CPU markets, discontinuing the production of the TIGA card, and selling its computer division to Hewlett-Packard (HP). HP is a prominent Intel and Consortium collaborator on various projects, including the 200 LX, which will be discussed later in this Complaint, and the Itanium processor. HP is also, at different times, Intel's largest x86 OEM.

206. Texas Instruments, which created its own line of computers and manufactured x86-compatible semiconductors under a license from Intel, ended its venture into the computer and workstation markets, deciding to focus instead on the DSP (digital signal processor) and semiconductors for embedded, industrial, and communication markets. Unofficially, Plaintiff was told that the

1   decision to exit the CPU-based personal and business computer market was based

2   on the realization that the noncompetitive, skewed marketplace created by IBM,

3   Microsoft, and Intel had become omnipotent as it transformed from the Wintel

4   Cartel into the Consortium, which includes dominant financial firms, making it

5   impossible to participate in it without breaking antitrust laws pertaining to pricing

6   and technology coordination between businesses and consumer abuse.

7       207.  National Semiconductor executives conveyed a similar message to

8   Plaintiff following a 1995 discussion about integrating Plaintiff's technology with

9   their x86 low-power and low-cost marketed under the name "Geode" that was

10  used in personal computing devices, with significant market share in South

11  America but were not available to consumers in the U.S. Following that

12  discussion, National Semiconductor sold its x86 part to AMD, ending its ability

13  to challenge the Consortium.

14      208.  In 2003, Plaintiff implemented his design as a semiconductor based

15  technology using a FPGA (Field Programmable Gate Array) semiconductor

16  development and testing system and tools purchased and licensed from Altera, an

17  FPGA company. Altera provided semiconductor developers with access to a

18  manufacturing method known as "Hard Copy" as part of the development

19  licensing agreement. Plaintiff attempted to bring his technology to the market

20  using the Hard Copy manufacturing technology, but after Altera executives found

21  out from Plaintiff that the intended target market of his design was an

22  x86-compatible consumer product that will provide general programmability with

23  personal and business functionality, Altera refused further communication with

24  Plaintiff.

25      209.  NEC executives conveyed a similar message to Plaintiff in 2003

26  during a discussion about combining Plaintiff semiconductor technology with

27  NEC x86-compatible product lines. Despite its significant success, the NEC x86

28  product line was previously removed from the market due to an Intel lawsuit,

which resulted in a lengthy and costly legal battle.

210.  NEC executives shared with Plaintiff that the company that developed both 16-bit and 32-bit x86-compatible semiconductor devices and manufactured the first successful x86 laptop computer was attacked by a frivolous legal lawsuit from Intel and decided to abandon its x86 investment because of the skewed personal computer market and the risk that market posed to the rest of the company. NEC made this decision despite having ultimately won its legal battle with Intel in court.

211.  Intel acquired Altera for approximately $16.7 billion in December 2015. As one of two leading providers of FPGA semiconductor design devices and tools, Altera allowed independent developers and companies to design and test semiconductor devices as well as bring their designs as products to market. By taking over Altera, Intel gained effective control over that access to the market. Intel refrained from integrating the Altera FPGA technology with its x86 technology, which could have expanded x86 programming power and increased design options for x86 developers, due to the potential risk this integration could pose to the Consortium. Intel maintained the Altera product line as a distinct, separate technology, encased in burdensome marketing layers that effectively shield the Consortium from competition.

212.  In February 2022, Xilinx, the only other FPGA leading company, was taken over by AMD, the only other x86 company, which is dominated by the same Consortium Participants, in an all-stock transaction valued at approximately $49 billion and its integration with AMD similar lines.

213.  In 2007, Plaintiff initiated a discussion with Texas Instruments about implementing low-power, semiconductor-based general programmability, which provided transparent compatibility with personal and business computers in mobile processors to enable Texas Instruments to maintain its leading position as a supplier of telecommunication processors to the two dominant mobile phone

companies at the time, Nokia and Motorola. It would have enabled Texas Instruments to maintain its leading position as a supplier of telecommunication processors. In a discussion that, at the Plaintiff's insistence, was shared with Texas Instruments CEO, Plaintiff's suggested that Apple's iPhone and Google's Android entry into the market would lead to the inevitable decline and market loss of Nokia and Motorola with the loss of that market to Texas Instruments. Texas Instruments could have preserve its leading position in the market by providing superior and more efficient open autonomous personal and business development capabilities, which Apple's iPhone and Google's Android phones are designed to withhold from users of their smartphones. Texas Instruments declined, effectively resigning itself to the loss of its investment and position in the mobile phone market, just as it had previously lost its investment and position in the computing market.

214.  Soon after, both Motorola and Nokia lost their leading position in the cell phone market. Microsoft and Google, respectively, took over their cellular divisions. Texas Instruments exited the mobile processor business around 2012 after being the major supplier of processors and baseband chips for Nokia and Motorola during their peak years. The company restructured and implemented significant job cuts rather than compete with the Consortium. In 2012, Texas Instruments announced plans to cut 1,700 jobs as it shifted its focus away from the smartphone market. Texas Instruments had previously earned a significant portion of its income from mobile chips, resulting in the company's significant downsizing.

## L. THE CONSORTIUM'S UNWRITTEN MARKET RULES

215.  Index-based trade funds invest their client funds in indexed companies, thereby reducing their clients' investment risk through diversification among the indexed publicly traded shares. As their own prospectus stipulates, their managers must follow the index and refrain from influencing companies or

1    markets. If that stipulation is violated, a single entity consisting of a small

2    number of closely connected individuals would end up controlling and influencing

3    all the market-dominating companies in violation of every aspect of antitrust laws

4    and financial regulations.

5        216. This Complaint details how a Consortium, which includes the

6    index-based funds whose managers played a central role in its formation and

7    operations, unduly influenced multiple segments of the technology market,

8    including x86 semiconductors and software, the smartphone market, Internet

9    access, and online commerce. This influence resulted in the deceptive fabrication

10    of fake competition and the illusion of a free market, concealing an

11    anticompetitive strategy and policies that mandate the exclusion from the market

12    of efficient technologies that can reduce costs while forcing consumers to accept

13    impaired technologies that enhance the Consortium's profits.

14        217. Currently, free market rules do not apply to companies that can

15    challenge the Consortium, such as Intel and AMD. Nor do they lead to better

16    products or lower prices for consumers. Companies are forced to select and

17    manipulate technologies to raise consumer prices, safeguard the Consortium's

18    control, and restrict consumer ability to use their computational devices. The

19    Consortium aims at maximizing its profit from the activities of consumers, and to

20    achieve this, it manipulates technology, robbing consumers of their independence

21    and compelling them to purchase unnecessary services. To that end, technologies

22    such as Plaintiff's that allow consumers to avoid purchasing unnecessary services

23    are banned from the market.

24        VII. INDEX-BASED TRADE AS A CIRCULAR OWNERSHIP

25            COVER-UP

26            A. HIDING CIRCULAR OWNERSHIP IN PLAIN SIGHT

27        218. The Consortium's primary leaders are composed of eight entities and

28    their leaders. The three major index-based investment funds, Vanguard Group

Inc., BlackRock Inc., and State Street Corporation, and five technology companies that dominate their respective markets, Microsoft, Amazon, Apple, Nvidia, and Qualcomm. The five technology companies gained their position due to the appreciation of their share value, which, as detailed later in this Complaint, was largely achieved through manipulation of x86 technology. By acquiring the majority shares of entire industry sectors, the three index-based trade funds offer direct control, coordination, and communication methods that regulators cannot easily scrutinize. These include the majority shares of Intel and AMD, the sole suppliers of x86 technology.

219. The three investment funds and the five companies, Microsoft, Amazon, Apple, Nvidia, and Qualcomm, have established a circular ownership relationship that encompasses entire technology sectors through a multitude of mutual investments in shares and projects. The Consortium's design conceals and amplifies the profits it reaps from illicit actions like breaching antitrust laws and financial regulations by manipulating technologies and markets to boost the three investment funds' index-based profits and the direct investments of Consortium Participants in the so-called "investment opportunities" that the Consortium creates and offers to its Participants.

220. This market structure conceals and amplifies profits derived from questionable practices. The introduction of companies such as Smartsheet and CrowdStrike that provide superfluous services for which consumers are forced to pay and the appreciation of publicly traded shares value as a result of those practices enhance index-based fund returns, while the scheme structure raises ethical and legal concerns about transparency, accountability, and fiduciary responsibility in corporate governance. As this complex ownership model continues to evolve, it invites scrutiny regarding its implications for market integrity and the broader economic landscape. This model's design effectively prevents individual investors in index-based trade from balancing short-term

1    profit maximization with long-term responsible business practices and strategic

2    goals that would maximize the total return on their investment and enhance the

3    behavior of the companies they invest in.

4        221.  The fund prospectus, which mandates that fund managers make

5    purchases and sell shares based on the shares' short-term performance while

6    disregarding long-term considerations, compels companies that span entire

7    technology and service sectors, which are dominated by index-based trade funds,

8    to adhere to unsustainable short-term tactics. This perpetuates a cycle that

9    prioritizes immediate gains over innovation and sustainable growth, thereby

10    undermining the potential for a more stable and responsible economic landscape.

11        B. CIRCULAR OWNERSHIP HIDES ANTITRUST VIOLATIONS

12        222.  Trade-based fund investments allow circular ownership that conceals

13    direct antitrust violations involved in undue influence, communication, and

14    coordination designed to lessen competition. The x86 and Internet service

15    provider sectors worked together to strip x86-based commuter users of their

16    ability to choose their Internet connections. This control was available to

17    x86-based computer users until the end of the 1990s.

18        223.  After Intel developed a unified x86 modem protocol to standardize

19    Internet service transmission, Intel and Internet cable companies worked together

20    to incorporate an unnecessary additional processor into a "cable modem" and

21    force users to use it while preventing the use of the technology with existing

22    coaxial cable (network) modems compatible with x86-based computers. This

23    action enabled Internet providers to remotely exert control over their users'

24    modem operations, thereby preventing Plaintiff's x86-based products from

25    providing essential features like inter-user synchronization, data sharing, direct

26    email, and inter-user communication to users of x86-based computers. 224. The

27    Consortium Participants, dominated by the three primarily index-based

28    investment funds that portray themselves as a financial scheme in their official

prospectus, are in fact running an illicit scheme that violates financial and antitrust laws. The design of the three funds' prospectuses, combined with their anticompetitive actions, results in violations of the 1950 Celler-Kefauver law. The funds purchase the dominant shares of entire industries and commerce sectors with the intention of lessening competition, as detailed in this Complaint. Their scheme is dependent on the obstruction of direct communication between Internet users, as detailed in this Complaint, that results in a sharp increase in the value of the publicly traded shares of companies that are protected from competition as a result of that obstruction. The Consortium Participants convert this illicit protection scheme into a windfall gain of publicly traded shares. As outlined in this Complaint, the Consortium's scheme, which started to block direct communication between Internet users in 1997, forces consumers to purchase the same functionality that Plaintiff's products offered prior to 1997 from Consortium Participants who provide these services as subscription-based, centrally distributed services. These subscription-based services are 50 times more expensive, less efficient, slower to respond, less safe, secure, and reliable, and are dependent on an Internet connection, making them susceptible to unexpected shutdowns.

VIII. PLAINTIFF STRUGGLE WITH THE CONSORTIUM - ASHTON-TATE

A. ASHTON-TATE

225. By 1984, Ashton-Tate had developed x86 software that provided individuals and businesses with everything that was needed to build and maintain independent data management and commerce using x86-based computers. Ashton-Tate provided significant new and improved functionality, reduced business costs, and broadened the market by introducing self-educating products. These products enabled individuals and companies without any computing experience to construct and oversee intricate manufacturing, commerce, and

1    services that ranged from public transportation to medical care. Following the

2    Consortium's removal of Ashton-Tate and its products from the market in 1991,

3    a large number of individuals, companies, and organizations reached out to

4    Plaintiff for updates and support for Ashton-Tate software products.

5        226.  During the early 1980s, when the x86-based PC was first introduced,

6    the company developed a new business model and software licensing. This model

7    offered customers automated, user-friendly x86 programming tools and functional

8    templates, ready to run as stand-alone applications, which Ashton-Tate licensors

9    could then distribute to their own employees and customers. This led to the

10   creation of a burgeoning market, where thousands of independent value-added

11   resellers (VARs) emerged, offering custom database programming and support

12   for x86-based computers. Each year, Ashton-Tate released a Developers Guide

13   listing over 1000 VARs in the U.S. markets, boasting 26 million registered users

14   involved in x86 development activities. This figure does not include the

15   significantly larger user base of its runtime version, which is distributed by its

16   VARs. Ashton-Tate dominated that market worldwide.

17       227.  Ashton-Tate employed a trained sales force that marketed

18   Ashton-Tate's database software design programming tools. This force, in

19   conjunction with thousands of independent programmers and companies already

20   engaged in providing custom programs to businesses worldwide, successfully

21   attracted numerous large companies and organizations as clients. These clients

22   included Travelers Insurance, the Army Corps of Engineers, the U.S.

23   departments of Interior and Defense, and the U.S. Air Force, among others, who

24   received support and updates from Plaintiff following Ashton-Tate's removal

25   from the market in 1991.

26       228.  Ashton-Tate's business technology and licensing models, specifically

27   its runtime licensing, were being replicated by other companies such as Foxbase,

28   alarming IBM and database companies as the popularity of its database product

started growing the autonomous x86-based share of the business computing market. Ben Rosen, having already coordinated the Consortium's blocking of 32-bit programming of Intel x86 to protect the core business of IBM and other companies that dominated database technology before Ashton-Tate opened PC programming to relational database technology, spearheaded a Consortium effort to remove Ashton-Tate and its products from the market. The effort targeted a host of companies, products, the technologies behind them, and the licensing models that popularized them, as well as thousands of value-added resellers of Ashton-Tate and compatible technologies such as Foxbase, who operated businesses that provided custom programming and support to a large number of companies and individuals that relied on them for custom management and accounting software. A market targeted by Consortium Participants such as Microsoft, who target that market with a product called Microsoft Money and acquire Foxbase, eliminating the support to Ashton-Tate Vars, who were using that product.

### B. NOVEL, ASHTON-TATE AND BORLAND DEMISE

229.   A few years after the introduction of the Intel x86-based IBM PC in 1981, companies like Novell and Ashton-Tate, who respectively pioneered networking and database technology on the x86-based computers, were gaining significant market share of business computing. They were competing with service companies like IBM by providing autonomous, competitive technology to large businesses and institutions, while also expanding the market by introducing business information management to smaller companies and individuals.

230.   IBM and the rest of the computing services-based industry move aggressively to curtail that competition from PC software companies. The anticompetitive powers provided by the collaborative agreement on the PC "monopoly chain" tying structure that enabled the "Wintel Cartel" dominance became even more critical in the effort to control and impede the competitiveness

of an increasing number of companies that rely on x86-based personal computers to provide the market with essential products and services. However, the original design of the anticompetitive war line to safeguard IBM's core services underwent a revision. The focus of the anticompetitive effort shifted to the destruction and prevention of autonomous control of computers by their users, with the aim of compelling consumers and companies to rely on toll-based, centrally distributed services. 231. Ashton-Tate, the company that brought database technology to x86-based computers, also introduced an advanced unified application and programming product, which Plaintiff started to use in his research on optimal control systems that he engaged in since the mid-1960s before the availability of semiconductor-based logic. The pioneering RunTime licensing and VARs (value-added resellers) allowed database programmers and consultants to purchase a RunTime license for Ashton-Tate products, customize it for individual customers using its built-in programming language, and distribute their work with a copy of the Ashton-Tate software product without having to pay royalties or purchase additional software packages, making the company's products highly competitive against some of the largest companies in the computing industry.

232. Even more competitive were the thousands of companies listed in the yearly publication of the Ashton-Tate Developers Directory, who rely on the Ashton Tate Runtime licensing model to offer custom database programming and consulting that enabled autonomous use of x86-based computers and customization of information systems beyond anything that can be made available as a centrally distributed service.

233. Ashton-Tate products and VAR's services were being widely used by individually owned businesses as well as large companies such as Travelers Insurance, institutions such as hospitals and schools, local government, the U.S. Military, the U.S. Air Force, the Army Core of Engineers, The World Bank, as

1    well as banks in developing countries, to mention some of the users included later

2    in Plaintiff's customers list.

3          234. Ashton-Tate was expanding rapidly; however, when the company

4    became public, it made itself vulnerable to outside influence from investors who

5    joined the Consortium and shared interests and investments that conflicted with

6    the company they effectively controlled. Ashton-Tate's accelerated growth and

7    competitiveness made other companies vulnerable to competition from its

8    products. Investors, who controlled Ashton-Tate through its board, appointed

9    executives tasked with hindering the company's competitiveness, while the

10   company's innovators and honest consumers' advocates grappled with a

11   perplexing, ongoing conflict with management. That formula that was executed

12   by Consortium Participants was well tested as it was used on numerous

13   companies, and as this Complaint details, it is being used on Intel to achieve

14   similar results, protecting the Consortium's illicit scheme.

15                    C. INTEL TRAP

16         235. By 1984, Intel had added to its line of 16-bit x86 devices a 32-bit

17   x386. Aimed at boosting its profit margin, which stemmed from its role as a

18   commodity supplier to the budding Wintel Cartel, the development of the x386

19   32-bit presented a challenge to IBM. The new powerful technology could

20   compete with IBM's core business, database consulting services to large

21   companies, and with its more expensive, larger computers. Pre-production

22   samples of the new 32-bit x386 were made available to Microsoft and IBM.

23         236. IBM perceived Intel's attempt to enhance its product's computational

24   capabilities by extending the x86 16-bit to the 32-bit x386 as a challenge to its

25   core business and declined to incorporate the x386 32-bit into its IBM PC

26   computers. Intel chose Compaq Computers as a preferred partner to introduce the

27   x86 32-bit to the market, hoping to reduce its reliance on the emerging

28   Consortium and boost its profit margin by offering more powerful and capable

1    32-bit computers to the PC market.

2        237.  The Consortium accepted the introduction of 32-bit x86-based

3    computers by Intel and Compaq into the market, but it came with a price: the

4    withholding and blocking of 32-bit programming tools from consumers, as well

5    as a prolonged delay in the availability of 32-bit operating systems and

6    peripherals.

7        238. By 1984, George Tate, the founder and CEO of Ashton-Tate, a

8    company that introduced database business technology to the x86-PC and already

9    provided consumers with a suite of programmable products that met all business

10   and personal needs, expressed interest in offering a complete x86-based solution.

11   This solution would include a 32-bit operating system and an integrated software

12   suite, providing complete business and personal functionality to x86-based

13   computer users. The Ashton-Tate solution, which integrates users' environments

14   and development tools, has raised significant concerns among Consortium

15   Participants. The potential impact on IBM and other service and database

16   companies would have cut deep into their business.

17       239.  Instead of providing programmers with a 32-bit DOS extension, like

18   the one Plaintiff possesses, that permits users to execute 32-bit programs on their

19   computers, the Consortium implemented intricate measures to postpone the

20   availability of 32-bit programs and their programmability until 1995 a ten-year

21   delay. Simultaneously, the Consortium decided to obstruct database operations

22   technology on x86 computers, safeguarding the highly profitable database

23   services offered by Consortium Participants, IBM, and specialized database

24   companies.

25       240.  In 1984, George Tate, Ashton-Tate founder and CEO, unexpectedly

26   passed away. The Consortium Participant seized control of the company,

27   interfered with its management, manipulated its credit line, and subjected its

28   employees to deliberate, anticompetitive mismanagement. Key executives left as a

number of executives arrived from Consortium Participants and were installed in top company positions by the board that fell under the Consortium influence.

241.  Among the first decisions taken by the arriving executive was cancelling the development of products that challenged Consortium's Participants products and designs, as well as stopping the updates of 16-bit software to 32-bit to prepare for the new x86 32-bit computers from Intel and Compaq. This decision aligned with the Consortium's strategy of restricting the programming options of Intel x386-based 32-bit computers to their users, with the aim of shielding Consortium companies' products and services from competition. Consequently, the majority of x86 computer users were unable to utilize their 32-bit computers for a full decade.

242. The methods that were used by executives, some arriving from IBM and some positioned by the venture capital firm Kleiner Perkins, were well tried and tested; the same method was used later at Borland Intentional and eventually Intel. Ashton-Tate's top talent and producer employees were pushed out of the company, competitive projects and updates of existing technologies were blocked, salespeople and representatives were ordered, and incentives were given to curtail sales of competitive products while promoting declining products. Outsiders manipulated the company's share price downward and launched a propaganda campaign that disparaged its products and employees.

243.  In a harbinger to the Consortium manipulation of the x86 technology by interfering with Intel and AMD the Consortium moved to end autonomous programmable database and programming tools RunTime licensing business model. Alongside Ashton-Tate, a programming tool company named Borland International developed a similar business model, focusing on independent programmers using the DOS operating system. The company's technology gave programmers using the Borland International programming tools unlimited access to the x86 instruction set. The company was approached by Ben Rozen, a venture

capitalist, the main investor behind Compaq Computers, which introduced the first Intel X386 32-bit computers in 1985, and the Consortium point man to deal with the potential unwanted competition database companies faced from Ashton-Tate.

244.  Ben Rozen invested in a database company that produced the Paradox product that was modeled after the Ashton-Tate database product. He then approached Borland International and suggested that Borland acquire the Paradox database company with his financing, aiming to rival Ashton-Tate with a business model similar to Ashton-Tate's highly successful model. The true hidden agenda behind the plan was to destroy the technologies that the three companies had brought to the market in order to safeguard the Consortium's objectives. Borland International accepted Rosens' offer along with financing from Rosen, who became Borland's board of directors chairman. Borland International then approached Ashton-Tate and offered its 11 directors an extremely tempting offer, designed by Rosen, if they agreed to a Borland's takeover.

245.  Plaintiff became concerned about the potential intentional destruction of the technologies he relied on for his research. Ashton-Tate's new executives took various actions to cause this destruction, including eliminating the product's development budget, restricting the product interface to only the essential features available internally, and instructing the Ashton-Tate sales force not to sell the product, even to businesses that would most benefit from it.

246.  Under Ben Rosen's chairmanship, Borland experienced similar interference with existing technologies and products, restricting programming tools' access to the x86 instruction set. This was done to serve the interests of Intel and Microsoft, forcing consumers to spend more on new computers by destroying programming products for their existing computers. Borland executives justify their actions with explanations that it is done "in the interest of the industry," and Ben Rosen was not shy about his business views and methods,

1    proposing the idea of organizing software and hardware companies into an

2    official Japanese "Keiretsu," a type of conglomerate that unifies entire industries

3    under a single dominating ownership to control demand, supply, availability,

4    pricing, market allocation, and competition. Such an arrangement would clearly

5    breach every facet of U.S. antitrust law, but Rosen started a website to promote

6    that "Keiretsu" idea with prominent database and hardware companies listed as

7    "members." While Rosens' Keiretsu website disappears soon after Plaintiff has

8    taken action against Borland, it appears that the three index-based funds did

9    succeed in implementing a system that resembles a Japanese keiretsu with an even

10   larger scope under the cover of neutral investment.

11       247.  Plaintiff became aware of a coordinated effort between Ashton-Tate's

12   investors, Ben Rosen, Microsoft, Intel, and Consortium Participants who would

13   have benefited from the demise of both companies and their products to destroy

14   the two companies.

15       248.  Ashton-Tate software was popular in Eastern European countries,

16   which at the time, after the fall of the Soviet Union, were seeing a rapid

17   computerization of their economies with large-scale western governments and

18   private financial support. The continuing availability of DOS in Eastern Europe

19   would have cost the Consortium significant profits. In meetings with Plaintiff,

20   Consortium Participants executives advocated for the discontinuation of the DOS

21   operating system and its supporting software products, stating that it was "in the

22   interest of the industry." At the time, this meant replacing them with Microsoft

23   Windows, a decision that would have resulted in significant economic costs.

24       249.  Ashton-Tate software was popular in Eastern European countries,

25   which at the time, after the fall of the Soviet Union, were seeing a rapid

26   computerization of their economies with large-scale western governments and

27   private financial support. The continuing availability of DOS in Eastern Europe

28   would have cost the Consortium significant profits. Executives, in meetings with

Plaintiff Consortium Participants, advocated for the discontinuation of the DOS operating system and older software products "in the interest of the industry." At the time, this meant replacing them with Microsoft Windows, a decision that resulted in significant economic losses due to its inherent inefficiencies.

250.  During meetings with Ashton-Tate's European sales representatives that took place in September 1990 in Amsterdam, eleven months before Ashton-Tate announced the end of its operations, Plaintiff discovered that company executives had told the company's European sales representatives to anticipate the closure of the company and had directed them to stop selling Ashton-Tate products in spite of ongoing demand. Executives that arrived at Ashton-Tate from Consortium Participants companies and then returned to those companies after Ashton-Tate ceased operations instructed the company's European distributors to terminate their support and service contracts with the company's clients and transition to competing products that operated on more expensive hardware and Microsoft Windows. In the best-case scenario, the Windows-based products were either inferior, subpar, half-baked imitations of mature Ashton-Tate products or vaporer that was not yet available in the market.

251.  Borland International acquired Ashton-Tate in September 1991. Major Wall Street companies, requisitioned by Ben Rosen, managed a 400 million dollar public offering to finance the takeover and further development of the unified companies, which Plaintiff was aware were destined to be deliberately destroyed in an effort to eliminate competition from autonomous database companies and force a faster move of the x86-based business and personal computing markets from DOS to Microsoft Windows, which required significant spending on new computers.

252.  Following the merger's completion, Borland International promptly removed the Ashton-Tate product, which Plaintiff had used for his research on optimal control systems, from the market. This prompted Plaintiff to approach

1 investors and prepare an offer to purchase the product from Borland

2 International. Despite Borland's ending the product development and marketing

3 and the obligations they assume to the product's significant number of worldwide

4 users, Borland refused a sale. Borland executives told Plaintiff that the product

5 was "harming the industry.".

6     253. In a cordial phone conversation with Ben Rosen, who served as

7 Borland International as well as Compaq Computers and other companies'

8 chairman, Plaintiff received persuasive arguments that included the quotes "the

9 industry must protect itself" and "companies must be profitable." Plaintiff kept

10 insisting on acquiring the product and conveyed his intention to proceed with

11 legal action that will force Borland to either continue to support the product or

12 offer it for sale. By the end of the same day, Ben Rosen announced his

13 resignation from the Borland board of directors, and on the next day, Plaintiff

14 received a phone call from an associate of Ben Rosen with a financial offer to go

15 away, which Plaintiff rejected.

16     **D. PLAINTIFF PRODUCT DESTINED FOR DESTRUCTION**

17     254. Plaintiff initiated the process of preparing a lawsuit against the

18 individuals and companies responsible for the demise of Ashton-Tate, the

19 removal of its products from the market, and the ongoing plan to destroy Borland

20 International and its products. Borland, already facing a class action shareholder

21 lawsuit from its own shareholders for misrepresenting the merger with

22 Ashton-Tate and the destruction of its products, which led to the collapse of its

23 share price, responded to Plaintiff and, after lengthy negotiations, involved on

24 Borland International side the law firm of Wilson Sonsini Goodrich & Rosati

25 which represented at the time companies that had benefited from the demise of

26 Ashton-Tate, Borland agreed to hand over to Plaintiff the rights to the product

27 and trademark in exchange for the withdrawal of the lawsuit and the destruction

28 of the evidence gathered in the case.

1

## E. VANISHING PRODUCTS AND PLAINTIFF'S CONTRACT

2  255. The contract that gave Plaintiff the rights to the product and

3 associated trademarks was prepared by the law firm Wilson Sonsini Goodrich &

4 Rosati, which represented, at the time and possibly still today, members of the

5 "Wintel Cartel," who became and are being addressed in this Complaint as

6 Consortium Participants.

7  256. Plaintiff's activities did not deter the Consortium Participants,

8 individuals and companies, behind the scheme from proceeding with the

9 destruction of both companies and their products. A few years later, both

10 companies, along with numerous other companies and technologies crucial for the

11 unrestricted use of x86-based computers, vanished from the market. The

12 Consortium tightened its grip on x86 computer users, and the technologies that

13 enabled users of x86 computers to fully utilize the x86's capabilities vanished

14 from the market. Plaintiff's maintenance and updates to the product he took over,

15 including a technology that made it possible for its users to run it on Windows

16 XP, were blocked by Microsoft, which modified its Windows API and removed

17 from the later versions of Windows features to make it impossible to run the

18 updated product on later Windows versions.

19

## F. PLAINTIFF PRODUCT DEVELOPMENT

20  257. After obtaining the rights and source code of the product, Plaintiff

21 proceeded to develop an upgrade for the technology. Plaintiff eventually recreates

22 the product that was originally designed to run on 16-bit x86 computers using

23 new technology developed with a newer, more efficient design that is capable of

24 taking advantage of newer x86 features. The new technology introduces

25 efficiency and functionality superior to anything currently available for x86 users

26 and does not require Microsoft Windows. 258. Intel, however, imposed

27 restrictions on x86 computers to prevent software that is not running on Windows

28 or Linux from entering the market. By design, Linux does not compete with

Windows in the personal computing market, as its intended use for servers renders it irrelevant to Plaintiff customers.

259.  To accommodate former Ashton-Tate customers who were forced to replace their computers and start using the Microsoft Windows operating system, Plaintiff created a new version of the product that was designed to run on Microsoft Windows XP that was released in 2001. Using the Windows API and GUI, Plaintiff and his team developed a technology they named "x86 WinAPI memory thunking" that allows unrestricted x86 programs to run Plaintiff's product on Windows XP.

260. Memory thunking is a technology that allows programs to share different memory types and address spaces. Plaintiff and his team developed x86 WinAPI Thunking to unlock the Intel x86 CPU instructions that Windows had blocked. x86 WinAPI memory thunking makes it possible to avoid the mandated intentional Windows overhead and limitations that Microsoft designed to boost demand for Consortium's products and impede efficient local autonomous usage of x86-based computers. x86 WinAPI memory thunking technology provides access to the Windows API (application interface) and GUI (graphics user interface), making it possible for owners of x86-based computers with Windows to utilize their computers in full without the limits imposed by Windows. Microsoft, however, changed its operating systems following Windows XP to prevent Plaintiff's technology and products from running on current Windows versions.

G. INTENTIONAL INTRODUCTION OF INCOMPATIBILITY

261.  Microsoft introduced incompatibility between Windows and Plaintiff's technology in subsequent Windows versions following Windows XP. Starting with Windows Vista, released in 2006, Plaintiff's product and technology that were created for the Windows API were prevented from running on Microsoft Windows. Microsoft accompanied the introduction of this

1    incompatibility with a frivolous yet threatening letter, declaring that companies

2    supporting "legacy" products cannot use the Windows trademark in their

3    presentations or marketing materials.

4        262.  In 2009, after Plaintiff threatened to start a legal action against

5    Microsoft for intentional introduction of incompatibility, Microsoft provided a

6    way to run the product in a virtual machine under Windows 7 Pro using a virtual

7    free version of Windows XP that provided transparent integration with the

8    Windows 7 Pro host computer. In 2012, with the introduction of Windows 8,

9    Microsoft again introduced incompatibility, which persisted in subsequent

10    versions of Windows, preventing the product from operating on current Windows

11    versions. With Intel continuing its illegal tying of x86 computers with Windows,

12    it is impossible to run the product on current x86 computers.

13                H. PREDATORY DESIGN ADVERSE CONSEQUENCE

14        263.  The IBM PC inception started illicit relationships between Intel and

15    Microsoft, where the two companies agreed to protect each other from

16    competitors. The first operating system, DOS, didn't give Microsoft much room

17    to control the market. It protected IBM but gave Microsoft limited opportunities

18    to exploit it. When Microsoft designed Windows, it wanted to give itself more

19    control over CPU instructions and features, as well as design options for

20    programmers and program designers, so it could get unfair market advantages

21    and make them easier to hide. A significant motivation in Windows design was

22    adding significant overhead and exploitable vulnerabilities, masked by

23    unnecessary complexity to slow down programs running on Windows in order to

24    allow Microsoft to obtain an unfair advantage. The additional unneeded added

25    complexity, a form of predatory design, was intended to create ways to monetize

26    the problem it created for programmers and companies by providing mitigation

27    for it.

28        264.  During the transition of Intel's x86 architecture from 16-bit to 32-bit,

1    the development of multi-core CPU devices, and the creation of SOC (System on

2    a Chip) with system and peripheral management, Intel purposefully introduced

3    unnecessary faulty design features and hidden functionality, with the intention of

4    giving Microsoft an unfair market advantage. These faulty design features

5    introduce security vulnerabilities as well as a high level of susceptibility to

6    failure. Microsoft exploited these flaws in two ways: first, by restricting the use

7    and access of x86 CPUs by their owners, instead of delegating control to

8    programmers, and second, by preventing competitors like Plaintiff from

9    launching products that could rival Microsoft's inferior offerings. Intel's

10   predatory design, which aimed to give Microsoft control over and limit the ways

11   x86-based computer owners could use their devices, violates the 1936 Supreme

12   Court decision that established the Clayton Act's prohibition against imposing

13   such restrictions. The consequences of this design were far-reaching. The

14   introduction of inherent security and reliability vulnerabilities into the x86

15   architecture not only caused significant time and productivity loss for x86-based

16   computer users and the economy due to unnecessary failures, reboots, and

17   updates, but also significantly impacted the entire economy. These vulnerabilities

18   also became part of the Consortium scheme, generating windfall profits for

19   Consortium Participants. As part of this scheme, the Consortium created

20   companies that promised solutions to these security vulnerabilities, presenting

21   those companies as investment opportunities for Consortium Participants. While

22   operating in a market that compel consumers and the economy to subscribe to

23   their services, these companies issue public shares, generating windfall profits for

24   Consortium Participants. Over time, criminal organizations and hostile

25   governments reverse-engineer these defects and construct measures that pose

26   significant national security risks. Despite significant investment and effort, these

27   risks cannot be mitigated because they are inherent in the current design. The

28   only way to resolve those problems, eliminate Microsoft's unfair advantage,

1    prevent time and productivity losses for users and the economy, and remove the

2    risk that criminals and hostile governments pose is to remove those defects from

3    the x86 architecture.

4    265.  Microsoft provide Intel with protection by forcing users of

5    competitors' x86 devices, notably AMD, to manually install special updates in

6    order to be able to run certain software packages significantly hampering AMD's

7    marketing efforts.

8    266.  Microsoft leveraged display capabilities integrated into the Windows

9    operating system to propel its marketing strategy and shift the market from DOS

10   to Windows. The addition of an intrinsically optimized graphic display to the x86

11   architecture made it easier for potential competitors to offer alternatives for it.

12   Microsoft demanded that Intel remove such additions, and Intel complied and

13   removed them. As a result, Nvidia was able to charge consumers for similar

14   functionality 100-fold compared to similar x86 intrinsic optimization that Intel

15   removed from the x86 architecture, first protecting Microsoft and accelerating

16   Windows dominance, and then, starting in 2009, helping Nvidia fit into the

17   Consortium stock market scheme that also supported Intel's suppression of

18   low-power semiconductor technologies.

19   267.  Intel grants Microsoft exclusive access to x86 parts, which are crucial

20   for programming x86-based computers, while restricting this access to potential

21   competitors such as Plaintiff. Additionally, it prevents x86-based computer

22   buyers from booting their machines without Microsoft tools, thereby hindering

23   Plaintiff's ability to market its product to x86 computer users.

24   268.  At the expense of unnecessary increases in inefficiency and overhead

25   for users of its x86 products, Intel has removed direct control over CPUs in

26   multi-CPU core x86 devices, concealing it behind a layer of management

27   designed in partnership with Microsoft to give Microsoft exclusive control over

28   parallelism and the ability to produce efficient optimized programs. Intel designed

a thread management system to hinder x86 programmers, including Plaintiff, from running optimized parallel programs that could boost computing speed and minimize hardware needs. Intel and Microsoft illicitly collaborated to keep competitors from running efficient code on x86 computers, costing the economy enormous sums while degrading the US economic standing.

269. The tying of the Microsoft Windows operating system and x86 computers imposed by Intel on, and executed by, Intel's OEMs. Dell, Compaq, and HP, resulted in OEM forcing their customers to pay for Microsoft Windows even though internally companies such as Dell continued to use the DOS operating system, which allow the running of more efficient business software and demand less hardware resources such as memory, as well as allowing usage of x86 computers that would have been made obsolete because of the larger memory capacity and higher speed requirements of Microsoft Windows.

## IX. PLAINTIFF'S AND AMD, AMD's MANUFACTURING DESTRUCTION

### A. INTEL ATTACK X86 COMPETITORS

270. Since the introduction of the x86 PC standard, Intel has engaged in aggressive anti-competitive efforts aimed at preventing both potential and actual x86 makers from accessing the market. Harassed by Intel and abused by Microsoft, most x86 semiconductor manufacturers, including NEC, National Semiconductor, Cyrix, and Transmeta, that brought x86-compatible technology to the market even under licensing from Intel, abandoned their product line under anticompetitive pressure. A few survived by imposing limits on their design, avoiding the U.S. personal computing market, and limiting their marketing to foreign countries to avoid the wrath of the Consortium. All were reluctant to collaborate with Plaintiff because of threats. AMD, the lone surviving competitor to Intel, was an exception. When AMD founder and chairman at the time, Jerry Sanders, expressed a keen interest in using Plaintiff's technology and freeing

AMD and the market from the Consortium constraints, the Consortium stopped that attempt, causing an enormous cost to AMD, consumers, and the American semiconductor industry.

271. In November 2009, the State of New York filed a lawsuit against Intel Corporation in the United States District Court for the District of Delaware, documenting AMD's fight against legal harassment and anti-competitive predatory schemes by Intel. These schemes included threats to withhold critical x86 design information from its OEM and bribes to cancel and avoid purchasing competitive AMD x86 devices. Unlike other x86 device makers, AMD has successfully resisted Intel's attacks and market manipulation. However, the Consortium, which controls both Intel and AMD, is forcing AMD to implement the same anticompetitive limitations on its technology. AMD is dependent on its ability to provide transparent compatibility between its x86 processors and Microsoft Windows. That compatibility is used as leverage to keep AMD from challenging the Consortium objective. It is posing a significant obstacle and risk for AMD's marketing as reflected in the company statement regarding Intel and Microsoft in its 10-K form quoted in paragraph 735 of this Complaint.

B. PLAINTIFF CONTACT WITH AMD

272. During the early 1990s, Plaintiff successfully tested an early version of low-power design on an FPGA (Field Programmable Gate Array) that simulated x86 architecture functionality. During discussions with a company named SMOS, which manufactured a credit card-size x86-based computer using Intel-supplied x86 semiconductor cores Plaintiff learned that the company was restricted by Intel from offering miniaturized form factor devices to the personal computing consumers. In a meeting with executives of the company that owned and provided SMOS assembly technology, Plaintiff learned about restrictions that the Consortium imposed on the company's target market and about SMOS's imminent closure.

273. Plaintiff reached out to Mr. Jerry Sanders, the founder and chairman of AMD at the time, proposing a new x86 form factor that will utilize Plaintiff's low-power technology, bringing to the market a credit card-sized computer that will improve as well as lower the cost of x86 systems that were tied with Microsoft Windows, the only choice for x86-based computer users. Jerry Sanders recognized the advantages the plan would bring to AMD and consumers and enthusiastically favored the proposal.

274. Both Microsoft and Intel were adamant about preventing the miniaturization of x86 computers, as evidenced by their removal of the HP 200 LX handheld computers detailed later in this Complaint. The resistance to the miniaturization of x86-based computers was aimed at preventing lower costs for consumers and, consequently, lower profits; preventing competition from more efficient software that would require fewer hardware resources than such devices require; and creating incompatibility between desktop and mobile standards to maintain a higher price level for desktop computing products. The technology developed by Plaintiff would have enabled AMD to replace Microsoft Windows and provide consumers with credit card-sized computers that would offer full business functionality at significant savings, opening a mobile market with transparent compatibility with personal computers.

275. AMD had its own U.S.-based semiconductor manufacturing facilities and was the only significant competitor to Intel after other independent manufacturers, such as NEC, left the market. NEC developed its own x86 semiconductor design, including 32-bit versions, but left the market due to frivolous legal attacks by Intel that were unsuccessful but too costly to handle. AMD at times achieved market share as high as 50 percent in the x86 market. In a detailed phone call presentation to Mr. Sanders, Plaintiff detailed the technology that could have, among other advantages, reduced the transistor count in AMD's Intel-compatible devices. Mr. Sanders, recognizing the advantages of

1  the plan to AMD and its customers, arranged a phone conversation between the

2  Plaintiff and AMD CTO, Mr. Atiq Raza.

3  C. MICROSOFT INCOMPATIBILITY SWORD OVER AMD

4  276. Microsoft CEO Bill Gates introduced Atic Rasa, a semiconductor

5  engineer who designed an x86-compatible processor, to Jerry Sanders, AMD

6  Chairman. The relationship between AMD and Microsoft was a constant source

7  of concern for AMD due to the challenges AMD faced in maintaining transparent

8  compatibility with the Windows operating system and Microsoft's practice of

9  forcing consumers to manually handle incompatibilities, despite Microsoft's

10  ability to eliminate such incompatibilities transparently. This practice created a

11  barrier for AMD support and marketing, thereby exerting Microsoft's influence

12  over AMD.

13  277. Random access memory processors, like x86 processors, feature

14  dynamic software that can automatically adapt to specific idiosyncratic

15  characteristics of a CPU. However, Microsoft required AMD customers to run

16  special programs known as "patches" to be able to run certain software packages,

17  including Plaintiff's. Microsoft gave cryptic names to these patches, making it

18  difficult for customers running specific software products on AMD x86

19  processors to obtain support, which was, in one case, unavailable from

20  Microsoft. That effectively hurt AMD marketing. Microsoft could have

21  automated the execution of "patch programs," but AMD customers had to search

22  for them using sparse, sometimes unclear information and cryptic names.

23  D. ATIC RASA ROLE AT AMD

24  278. Against this background, Microsoft CEO Bill Gates introduced Atic

25  Rasa to Mr. Jerry Sanders, who then hired him as AMD's CEO. AMD acquired

26  Atic Rasa company with its x86 design.

27  279. At the end of Plaintiff's phone conversation with AMD chair Mr.

28  Jerry Sanders, Mr. Sanders told the Plaintiff to expect a phone call from AMD's

CTO, Atiq Rasa. Mr. Raza called Plaintiff soon after, and in the ensuing discussion, Plaintiff outlined the technology, its advantages, and its competitive benefits to AMD and the market. As a semiconductor engineer and x86 designer Atiq Rasa, was quick to understand Plaintiff's technology and its advantages and consequential savings to AMD manufacturing costs and its customers, as well as the competitive advantages the technology would give AMD against the anticompetitive acts AMD was facing. Mr. Raza agreed with Plaintiff's technical and market assessment.

280. Mr. Raza however, responded with the same exact argument that Plaintiff heard before from Consortium executives who were involved in the destruction of companies that challenged the Consortium with competitive technologies.

### E. THE GOOSE THAT LAID THE GOLDEN EGGS

281. Atiq Raza started by saying, "What you do is going to kill the goose that laid the golden eggs." and continues with, "this is bad for the industry", then proceeded with saying, "The cost of a single CPU (referring to the Intel and Microsoft-compatible AMD CPU semiconductor device) is cents, but we are selling it for hundreds of dollars, and you want to end that.". Plaintiff's technology, however, had no bearing on the price AMD could charge its customers.

282. Atiq Rasa's so-called "goose that laid the golden egg" was the increase in value of Intel's, Microsoft's, and other Consortium-initiated publicly traded shares that were skyrocketing as the result of anticompetitive design and market manipulation by Intel and Microsoft that put limits on x86 technology and increased its cost to consumers who depended on it. As his subsequent actions and relationships with Intel later confirmed, Atiq Rasa was safeguarding not only Intel, Microsoft, and the rest of the Consortium, but also his personal investments in their shares and his loyalty to the Consortium. The Dot-com stock market

1   bubble in 2000 ultimately collapsed due to the increase in the value of

2   Consortium companies' shares and the manipulation of technology to limit

3   consumer functionality and shift it towards Consortium companies. Atic Rasa was

4   violating his duties to AMD and its shareholders as an AMD officer and, in all

5   likelihood, was aware that he was violating antitrust law by shielding Intel and

6   Microsoft from competition and scheming to maintain unnecessarily higher costs

7   to consumers by impeding competition. The 1981 arrest of American Airlines

8   CEO Robert Crandall for proposing a coordinated price increase to the CEO of

9   Braniff Airlines in a less egregious phone call demonstrated the applicability of

10  antitrust laws to such communications.

11      283.  Plaintiff ended the phone conversation with Atiq Raza cordially but

12  recognized that AMD was snared in the same exact trap that the Consortium built

13  around Ashton-Tate and Borland International before their destruction. The

14  Consortium achieved its objectives and safeguarded its survival by placing

15  Consortium Participants in key positions within those companies. This is the

16  situation Intel has been in since Defendant Bryant was appointed to the position

17  of chairman of Intel's board of directors in 2012.

18      284.  Bill Gates introduced and recommended Atic Raza to AMD after

19  Raza's company presented to the market an x86 design as compatible with

20  Microsoft's operating system. This point significantly influenced AMD choice,

21  particularly in light of the anticompetitive market environment it operated in at

22  the time. This environment is even more anticompetitive today, given Intel's

23  collaboration with Microsoft in predatory design, which grants Microsoft

24  exclusive access to CPU features not available to competitors, thereby degrading

25  performance for non-Microsoft users such as Plaintiff. AMD's 2024 10-K form

26  quoted in paragraph 735 of this Complaint includes statements that recognize that

27  risk.

28      285.  The positioning of Atic Raza as AMD's CEO served the same

purpose as the positioning of Ashton-Tate executives by the Consortium: to protect the Consortium from competing products and competitive technology. Atiq Raza's aim, as the conversation with Plaintiff shows, was to protect the illegal anticompetitive dependency of AMD on Microsoft. The dependency that AMD Chairman at the time, Mr. Jerry Sanders, concurred with Plaintiff, prevented competition, increased costs to consumers, and should have been eliminated using Plaintiff's technology that provided better and more functionality at a lower cost, in a smaller memory footprint, and at a higher speed. The parallel between AMD then and Intel today is impossible to miss. In a Fortune magazine article, former Intel CEO Craig Barrett cautioned that Intel's current predicament could hinder America's pursuit of semiconductor leadership. He drew comparisons between Intel's current situation and AMD's 2008 forced sale of its manufacturing to a foreign company, which consequently reduced its competitiveness and cemented its dependency on Intel and Microsoft standards, as the AMD 2024 10-K form filing states. GlobalFoundries, the foreign company that took over AMD and IBM's USA-based manufacturing, has fallen behind because it lacks any differentiating technology that would allow it to be on the cutting edge of semiconductor manufacturing, forcing AMD to use foreign-based manufacturing in Taiwan.

## F. THE AFTERMATH AND THE DAMAGE

286. After the conversation with Atiq Raza, Plaintiff realizes that AMD faces the same danger and anticompetitive constraints as Ashton-Tate, as its leadership has been compromised by Consortium Participants. An obvious conflict between AMD CTO. Atiq Rasa and AMD founder and chairman, Mr. Jerry Sanders, was unavoidable, and the company was facing a mortal challenge. Plaintiff, however, underestimated the extent to which the Consortium would go to protect its scheme, as it eventually meant harming the U.S. semiconductor manufacturing sector with dire consequences to this day.

287. Considering the power dynamics between the Consortium and AMD, as well as the Plaintiff's unsuccessful efforts to communicate with the DOJ, Plaintiff has come to the conclusion that maintaining contact with AMD could potentially escalate a conflict and potentially cause long-term harm to the semiconductor industry, extending beyond personal computing. A confrontation between AMD chair Jerry Sanders and Atiq Rasa was inevitable considering that AMD, under Jerry Sanders's directives, was expanding its semiconductor manufacturing in New York State and Europe with a focus on the latest technologies. By that time, the Consortium had already recognized the critical importance of its control over semiconductor manufacturing for its scheme, as it was actively manipulating technology at Intel and the CAD industry to eliminate competition from lower-cost and low-power technologies. AMD's competitive strategic objectives and actions under Jerry Sanders were a direct challenge to the Consortium.

288. Without any further involvement from the Plaintiff, that conflict escalated into an episode that nearly destroyed AMD and, in the long run, significantly weakened the U.S.'s global position in semiconductor manufacturing. Financial coercion by the consortium forced AMD to sell its semiconductor manufacturing"a situation similar to the coercion Ashton-Tate and Borland International faced from the consortium before their demise and similar to the current pressure being placed on Intel to control its semiconductor manufacturing.

289. Despite AMD's success in the market and its victory in its legal battle with Intel, Mr. Raza unexpectedly and abruptly announced his resignation from AMD's CEO position. When explaining his decision, he bad-mouthed Mr. Jerry Sanders and groundlessly cast doubt on AMD's technology and its ability to survive. That attack was coordinated with negative publicity to maximize the damage to AMD and was used by the Consortium as in the current situation with

1    Intel, to try to bring about the demise of the company.

2        L.A. Times, July 15, 1999, 12 AM PT

3        https://www.latimes.com/archives/la-xpm-1999-jul-15-fi-56197-story.html

4    AMD President Resigns; Firm Posts Loss Again

5        SUNNYVALE, Calif.

6            Advanced Micro Devices Inc., Intel Corp.'s biggest rival in the

7        microprocessor market, suffered a major blow Wednesday with the

8        resignation of President and Chief Operating Officer Atiq Raza, heir

9        apparent to Chief Executive Jerry Sanders.

10       290.  A coordinated attack on AMD's financial credit line with bad press

11   led to a significant decline in its share value, reminiscent of the manipulation of

12   Ashton-Tate publicly traded shares by a competitor. Mr. Jerry Sanders was

13   forced to simultaneously find a new CTO while raising capital to compensate for

14   credit lines that were cut and handle pressure from anxious shareholders and

15   customers. AMD did survive thanks to the extraordinary efforts of its chairman,

16   Jerry Sanders, and AMD employees, as well as the recruitment of a new,

17   experienced, and visionary CEO who laid the groundwork for AMD's current

18   success through mergers, enabling AMD to reclaim its position in the x86 market

19   and ultimately recover, albeit with a significant compromise with the Consortium

20   demands that keeps it from challenging the Consortium.

21       291.  The crisis that Atiq Rasa's cause on behalf of the Consortium had a

22   detrimental effect on the market and the U.S. semiconductor industry that is

23   lasting to the present. AMD was forced to sell its manufacturing facilities to a

24   foreign company, Global Foundries, which left Intel as the sole company that

25   controlled both its design and manufacturing. Intel left as the sole company that

26   had integration between its design and manufacturing but with total dependency

27   on a monolithic and manipulated market under the Consortium control with dire

28   implications for the U.S. position as detailed later in this Complaint.

## G. INTEGRATION OF MANUFACTURING AND DESIGN

292.  The integration of manufacturing and design is essential for optimal design and the implementation of changes and improvements in both the design and manufacturing processes. The extremely high cost of halting the latest high density semiconductor EUV based manufacturing, which is the possibly the costliest mass industrial process, means that semiconductor contract manufacturers, who purchase manufacturing capacity must limit their design flexibility. To optimize manufacturing yields, which is the ratio of usable chips to those that fail testing and are disposed of, and to avoid process adjustments that could lead to delays, contact manufacturers are forced to maintain less flexible manufacturing parameters that could not easily be adjusted to the architectural design of a particular company, as the manufacturing process is shared between multiple companies and multiple designs.

293.  By integrating design and manufacturing under one roof, Intel engineers gain access to manufacturing information beyond the official Production Design Kit (PDK), which outlines the extensive design rules chip design engineers must follow. Such close collaboration allows the design team to make adjustments to both the design and manufacturing processes. Separation between design and manufacturing prevents that level of integration. When design and manufacturing are separated, the manufacturing company must provide a standardized design environment to multiple clients to maximize yields and minimize delays. Manufacturing companies have no vested interest in optimizing the performance of a specific product beyond meeting basic testing requirements. TSMC, which manufactures AMD's chips, cannot offer AMD any adjustments to its manufacturing process beyond what is defined in its official PDK. This limitation arises because TSMC serves numerous clients that rely on the same manufacturing process. Any changes to that process could disrupt the production of other companies, leading to significant delays and costly adjustments.

294.  After leaving AMD, Atic Raza proceeded to create a new company that raised capital from Consortium Participants. He obtained positions in companies associated with the Consortium and became a partner in a venture capital company associated with Intel. He was eventually fined by the FTC more than a million dollars for conducting insider trading of publicly-traded shares of a company he was involved with.

## X. TURNING ABDUCTED X86 FUNCTIONALITY INTO WINDFALL

### A. INTEL CONTROL X86-BASED OEM COMPUTER MAKERS

295.  Intel OEMs who manufacture x86 computers must follow Intel's strict guidelines and restrictions concerning every aspect of their product. The Consortium uses that power to limit competition, manipulate pricing, and control the usage of x86 products to protect its dominance of non-x86 markets, such as the wearable and smartphone markets that are protected from competition by the relatively-open x86 devices. The Consortium use that control to protect the Consortium's services from competing design and usage that could lower cost to consumers. Intel meticulously controls the form factors of x86-based products that are available to consumers as well as the capabilities OEMs are allowed to enable in their devices.

296. OEM dependency on Intel is absolute. x86-based products cannot be designed and manufactured without Intel support and Intel's allocations of the required devices. Intel must approve every design decision, form factor, operating system type, and even the wholesale supplier sourcing the Intel devices. OEMs continue to depend on Intel to ensure a sufficient supply of devices and technical information during the life of their products.

297.  Intel does not provide OEMs with access to CPU instructions, which are crucial for hardware design, debugging, and reporting. OEMs do receive exclusive debugging access, which is not available to non-Consortium Participants like Plaintiff. However, only Intel engineers can perform complete

debugging and testing of OEM hardware product designs that utilize Intel x86 devices. Intel uses this to regulate pricing and feature availability for consumers, safeguarding both itself and Consortium Participants like smartphone manufacturers, Internet service providers, and cellular service providers, while also exerting pressure on OEMs to restrict and limit their purchases of AMD devices.

298.  Intel uses its meticulous control over x86-based computer OEMs to limit competition, which could lead to improved products and lower costs for consumers. OEMs are not allowed to bring to the market devices that may compete with smartphone form factors, lower the cost by miniaturizations, and open the market to alternatives to Microsoft and Linux-based products that can reduce cost, the required clock speed, power, memory requirements, and the reliance of consumers on Consortium services.

## B. ABDUCTING X86 FUNCTIONALITY

299.  Intel's 2024 10-K form filing referred to the X86 standard as "open.". The Defendants, in contrast, act on behalf of the Consortium to restrict access to the x86 standard in order to block potential Consortium competitors, including the Plaintiff, from accessing the market and force their customers to purchase the Consortium's services. Intel's directors moved against Intel's CEO, Gelsinger, to hinder Intel's stated mission defined in its 2024 10-K form, to avail the x86 design to Intel fab services clients. The Defendants appointed managers and tasked them with impeding access to Intel fab services. Eventually, they took direct control over the most crucial aspect of competition: the ability to customize x86 design IP (intellectual property) and combine it with competitors' IP, including Plaintiff's. The directors created an anticompetitive "wall" around Intel's manufacturing services, which also include Intel's FPGA (formerly Altera). The wall was designed and used to block Plaintiff as well as other potential competitors against the Consortium products and services from

1    accessing Intel's fab services. Gelsinger's policies, outlined in Intel's stated 10-K,

2    were blocked by managers who were tasked by board members to block potential

3    competitors. A board member, Defendant Lip-Bu Tan, was put in charge of Intel

4    fab services operations to accomplish that task. The conflict between the

5    Defendants and Intel's CEO, Gelsinger, culminated with Gelsinger's forced

6    departure from Intel after he stabilized Intel's financial situation that worsened

7    under Consortium attacks, successfully protected Intel's x86 IP from being taken

8    over by Consortium Participants, and came up with a plan to put Intel

9    manufacturing under a separate board to free it from the Consortium's

10   interference.

11       300.  Intel's 2024 10-K statement states: "We aim to deliver open software

12   and hardware platforms with industry-leading standards. We intend to lead and

13   democratize compute with Intel x86 and xPU." is qualified as it begins with "We

14   aim to deliver...". The x86 standard is relatively open, but not completely open.

15   However, Intel's fab operations are well within the boundaries of the protections

16   it exercises to safeguard its intellectual property. Even before Intel established its

17   manufacturing service, and later under the Defendants board members and

18   Defendant Lip-Bu Tan, Intel provided manufacturing services that included x86

19   IP to Consortium Participants while withholding them from competitors,

20   including Plaintiff.

21       301.  Since December 28, 2015, when Intel took over Altera, Intel has

22   avoided extending Altera's FPGA manufacturing and design with x86 IP. This

23   policy is designed to keep the high level of optimization that FPGA design tools

24   and manufacturing provide from Consortium's competitors, such as Plaintiff,

25   who aimed at bringing it directly to consumers and competing with centrally

26   distributed Consortium's services.

27       302.  Consumers and competitors do not expect Intel to provide the same

28   level of open standards, such as RISC-V, that aims to help semiconductor design

companies. Consumers who rely on x86 standards have expectations that align with the patent protection of Intel's x86 designs and the patent-sharing agreement that underpins Intel's x86 compatibility with AMD. However, consumers, including programmers, companies, and end-users of x86-based computers, consider Intel's statements, including its K-10 form, when purchasing and investing in Intel products. They also take into account factors such as the cost of ownership, usage, maintenance, updates, and the level of backward compatibility, all of which rely on the freedom of x86-based computer owners to program and use their computers. To comply with antitrust law, that aspect of the x86 standard must remain fully open.

303. The Consortium's attack on Intel's x86 standard includes an attempt by Microsoft and Qualcomm to develop a proprietary ARM-based, closed chip that is marketed as a Windows-compatible device but is incompatible with existing Windows programs. Microsoft is altering its product line to deceive and force customers to use its new, incompatible, closed ARM-based device instead of the relatively open x86 standard, in an effort to destroy the open x86 standard. If the Consortium's goal¨and specifically Microsoft's and Qualcomm's efforts to destroy the open x86 standard¨is successful, owners of x86-based computers will no longer be able to program their computers, as is already the case in the smartphone market dominated by Apple and Google.

304. The 1936 Supreme Court clarification of the Clayton Act settled the freedom of owners of x86-based computers, as well as any other CPU-based devices, such as smartphones, to freely program and use their products with no limits. Programmers and users should be able to freely use and program their x86-based computers without restrictions that prevent them from accomplishing their tasks or force them to purchase products they do not need or want. Intel must provide programmers and users of x86 with all the information and access that allow free, unlimited usage of their devices.

## C. INTERFERENCES WITH X86 DESIGN

305. A less obvious antitrust violation, yet more significant and well-established in antitrust law, is Intel's manipulating the x86 architecture with predatory design to achieve the same goals that Section 3 of the Clayton Act deems unlawful. The Federal Circuit in deciding C.R. Bard, Inc. v. M3 Systems, Inc. 157 F.3d 1340 (Fed. Cir. 1998) held that a jury could reasonably have found that a product redesign may be anticompetitive and, at the very least, go to the jury.

306. Intel, intentionally, has made numerous design modifications and additions, some but not all of which are mentioned in this Complaint, that are detrimental to the ability to use the x86 standard safely, securely, efficiently, and competitively. Intel's design choices, intended to shield Consortium Participants from competition, negatively impact shareholders who are not Consortium Participants. These predatory design changes not only affect x86 users but also the entire market and economy that rely on x86 technology. The introduction of security flaws and vulnerabilities forces consumers to purchase services that can never mitigate such flaws and vulnerabilities. These flaws and vulnerabilities lead to increased inefficiencies, increased energy consumption, increased costs, and catastrophic failures. For instance, the CrowdStrike service update in July 2024 resulted in the shutdown of hundreds of computers in major companies worldwide.

307. A central element in the Consortium's nefarious strategy is an increase in power consumption required for intensive computation, which forces the concentration of computational power into the hands of a few large Consortium Participants who are able to assemble the required energy level. Low-power technologies can equip users with efficient x86 devices that could provide the computational power and functionality that the Consortium offers as centrally distributed services, which the Consortium then converts into windfall

1    profits in the form of publicly traded shares. This same motivation led to Intel's

2    decision to withdraw its x86-based smartphones from the market after the

3    Consortium took control of the company by appointing Defendant Bryant as its

4    board chairman in 2012. It also prompted Intel to renege on its agreement with

5    Plaintiff regarding the development of a low-power x86 environment that can

6    support smartphones.

7        308. In 1997, the Consortium coordinated the manipulation of design and

8    marketing by Intel to enable windfall profits from the tying of an x86 CPU and

9    coaxial Internet modems into a cable modem form factor. By tying that cable

10    modem with Internet service, Internet service providers are restricting

11    consumers' Internet connection choices, forcing them to rely on the

12    Consortium's Internet service companies. Beginning in 1997 and still in effect

13    today, this strategy led to an unprecedented surge in the value of these

14    companies' publicly traded shares, ultimately causing the Dot-com bubble stock

15    market collapse in March 2000. It is still a central part of the ongoing

16    Consortium's scheme.

17        309.  An example of a company that was created to produce a windfall

18    profit for the Consortium by taking advantage of x86 design flaws that Intel was

19    compelled to implement is a security company named CrowdStrike. The

20    Consortium founded CrowdStrike solely to tackle a purposeful design flaw in the

21    x86 architecture, which compelled consumers to buy security services to

22    counteract the security risks this flaw brought. The global x86-based computer

23    failure in July 2024 was caused by that deliberate design flaw and a CrowdStrike

24    update failure, which paralyzed entire economies. Nefarious actors can exploit

25    this design flaw, which can lead to even more catastrophic outcomes.

26        310.  Another example among many is a company called Smartsheet, which

27    offers services similar but inferior to Plaintiff's products. Currently, x86-based

28    computers cannot run Plaintiff's products, which facilitate direct communication

among Internet users. Like all Consortium companies, the value of Smartsheet's publicly traded shares increases due to consumers being compelled to pay for subscriptions that offer inferior functionality compared to Plaintiff's products, at fifty-fold higher cost.

### D. MODEM (MODULATOR-DEMODULATOR)

311.  A modem (MOdulator-DEModulator) is an electronic device that converts data from a digital format used by computers into electrical currents (analog signals) suitable for transmission via various types of cables, such as coaxial, fiber optic, or wireless radio signals. Modems perform limited conversion operations and are typically low-cost devices. Modems are controlled by the CPU in computers such as x86 device they are plugged into. Standard signals, commonly known as modem commands, govern them. Modem commands make it possible for programmers to build elaborate functionality that uses communication over the Internet, wirelessly, and over phone lines.

312. Modems enable communication between x86-based computers and have been available as plug-in boards for personal computers from various manufacturers, offering a wide range of types and speeds since the beginning of personal computing.

313.  Internet service providers typically bring a coaxial cable to the subscriber's home. The customer typically connects the cable to a coaxial connector on a modem. Any Internet service provider could offer service to x86 computers through a modem with the appropriate IP.

### E. PLAINTIFF'S CUSTOMERS

314.  Until the Consortium blocked direct communication between Internet users as described in this Complaint, Plaintiff's products provided to x86-based computer users functionality that included direct Internet communication between computers over the Internet, application-integrated email wide area networking, and a variety of features that automate teamwork and data sharing. Starting in

1988, Plaintiff provided his customers with a worldwide free email service that used telephone lines, local networks, and eventually Internet connections during the 1990s.

315. Carroll David Colston, one of the pioneers of Internet communication and Web browsers, developed x86-based email and networking software products that Plaintiff integrated into his products.

## F. EFFICIENT INTERNET TOOLS DEMISE

316. Carroll David Colston is a software developer who has used Borland International x86-specific software development tools that facilitated efficient access to x86 hardware resources before the tools and eventually Borland itself were removed from the market by the Consortium to create a unique mobile TCP/IP handler driver that was packaged in 16-bit x86 downloaded interrupt. Colston developed browser and email products for the x86-based DOS operating system that became popular on the pocket-sized HP 200LX computers.

317. David Colston's Internet browser and email, as well as Plaintiff's integrated suite of software applications, were available to x86-based computer users, including the HP 200LX, a palm-size x86 computer made by HP using a highly efficient Intel x186 device. Despite a strong market demand and being highly profitable, the HP 200LX handheld computer and the extremely efficient static semiconductor technology that underpins it were removed from the market to accommodate the Consortium demands that are still being enforced that include keeping x86 personal and business computing incompatible with mobile computing as well as withholding certain Intel technologies from the market.

## G. HP 200LX STATIC CPU REMOVAL FROM THE MARKET

318. Intel x86 devices are dynamic. They required a continuous electrical switching, referred to as a clock signal, to maintain and drive their state. When the clock signal stops, the CPU loses its state. Restarting programs that run when a dynamic chip stops requires saving the program's state in non-volatile memory

before the stop occurs and reloading the program after the CPU restart.

319. Static devices used a different type of transistor that allows programs to stop and restart without losing their internal state. A static CPU can halt in the middle of a program, remain inactive for an extended period, and resume its previous state upon restarting. This feature is crucial for battery-operated personal and mobile computing, as it effectively pauses computation without any power consumption or overhead associated with program state saving. Since turning a static CPU on and off takes no additional power and involves no delay, it is possible to pause such a computer or parts of it between inputs, such as a user's keystrokes, and build computers that take a negligible amount of electricity.

320. One example of such a computer was the HP 200LX. It was based on an 80186 chip that was designed as a static device. The technology ensured low-power, battery-operated computing without any drawbacks. Intel X86 static technology made it possible for the HP 200LX to pause the CPU to conserve power and then resume operations without losing any data or state. It provided full x86 compatibility using two standard AA batteries before rechargeable batteries became popular. The batteries lasted between 3 to 6 weeks when used for typical operations such as spreadsheets and word processing, modem-based phone calls, Internet browsing, and email. The HP 200LX was a fully capable 16-bit x86 that ran virtually all 16-bit x86-compatible software, including business applications such as Plaintiff's. Companies and developers, including Plaintiff, designed custom programs to utilize the 200LX plug-in modems for Internet browsing and email.

321. The conflict between the Consortium and Intel was intensifying by the time the HP 200LX debuted in August 1994. The 200LX showcased a technology that enabled Intel to offer robust, independent personal, mobile, and business computing in a mobile form factor, thereby preventing the Consortium from

1    implementing many of the prevalent mobile computing schemes that currently
2    dominate the market and harm consumers.
3        322.  Similar to other projects halted due to Consortium demands, Intel's
4    engineers attempted to break free from the Consortium's anticompetitive
5    constraints with the 200LX, which ultimately resulted in Intel breaking its
6    obligations to its customers and the majority of its shareholders who are not
7    Consortium Participants. After the introduction of the 200LX, Intel discontinued
8    the technology. HP officially discontinued the 200LX in December 1999 as part
9    of a myriad of decisions and strategies by the Consortium that resulted in the
10   Dot-com stock market bubble and subsequent collapse.
11       323.  Despite significant popularity and enthusiasm by its users and
12   growing demand for it, HP removed that pocket-size HP 200LX x86 computer
13   from the market and replaced it with a non-x86 computer with limited power that
14   was intentionally designed to be incompatible with existing x86 software and
15   peripherals. The HP replacement was tied with a new Microsoft operating system
16   designed for a Japanese-made CPU that was aimed at preventing users from
17   sharing software between PC computers and the new developing mobile platform.
18       324.  HP and Intel engaged in the Consortium's scheme to abduct the x86
19   web-based functionality, such as programmability, user-manageable email, and
20   user-controlled Internet browsers that were available to x86-based computer users
21   and hence to the HP 200LX users, and restrict the usage of mobile devices, as
22   well as to remove a lower-cost alternative x86 choice from the market. Despite
23   protests from individual customers and companies dependent on the popular
24   pocket-size computer, HP and Intel proceeded to remove it from the market.
25           H. X86 STATIC CHIP EFFICIENT POCKET SIZE COMPUTING
26       325.  Intel eliminated static chip technology from its manufacturing options.
27   Static chip design makes it possible to create x86-based, pocket-sized,
28   energy-efficient computers that could significantly exceed current standards in

mobile computing. Both Plaintiff and David Colston collaborated with x86 chip design companies that successfully designed and tested x86-compatible chips of that type that were aimed at pocket-size machines that, like the Intel-based x86 200LX model, would run on low-cost batteries for weeks at a time, but under threats and manipulation by the Consortium, those designs were removed from the x86 consumer market. Some of those designed can still be found at the embedded market, where products that incorporated them included display, machine control, and communication products.

326. Companies that developed x86-compatible static chip systems on a chip design for lower-cost, battery-operated portable devices were forced by the Consortium to limit the distribution of their products to the developing world markets. The Consortium forced Taiwan-based x86 companies to keep their products out of the US market, leading them to develop a significant market for x86-compatible computers in Africa and Asia. The Consortium forced an American semiconductor company, National Semiconductor, to restrict its x86 distribution to South America, where it gained a significant market share. The Consortium eventually took control of that company after Plaintiff's discussion with it.

I. PLAINTIFF'S AND ALTERA, NOW INTEL FPGA

327. In 2005, Plaintiff purchased a semiconductor development license and semiconductor design tools from Altera, an FPGA company that offered a semiconductor manufacturing method and service under the name "hard copy.". Plaintiff proceeds to develop products that would implement his technology, utilizing Altera's agreed-upon "hard copy" semiconductor manufacturing system to bring them to market. After a period, Plaintiff approached Altera to begin the manufacturing of his design using the "hard copy" method. When Altera found out that the Plaintiff's product was intended to offer x86-compatible functionality for the mobile market, it stopped all communication and blocked Plaintiff's

1    access to the "hard copy" technology.

2        328. Eventually, Intel took over Altera, which now operates as an Intel

3    department under the name Intel FPGA. Plaintiff proceeded to collaborate with

4    another FPGA company named Blue Silicon, but as soon as the collaboration

5    started, Blue Silicon was taken over by Lattice Semiconductor, which

6    disconnected communication with Plaintiff and removed Blue Silicon technology

7    from the market. Recently, Lattice has expressed interest in purchasing Altera

8    from Intel. Both Altera technology and Intel's manufacturing and design

9    capabilities complement each other if Intel can break free from the Consortium's

10   undue influence. The market and consumers would benefit greatly from the

11   integration of Altera and Intel's technologies, similar to the current integration

12   between Xilinx and AMD. Based on Plaintiff's experience with Lattice and Blue

13   Silicon, the so-called interest in purchasing Altera reflects the long hands of the

14   Consortium attempting to interfere with Intel's effort to capitalize Altera while

15   continuing to integrate it with its own technology for the benefits of consumers

16   and the market.

17                    J. CONSORTIUM'S INFLUENCE ACADEMIC

18       329. The Consortium's long hands also reached academic institutions. A

19   government-sponsored effort of national importance tasked MIT Media Lab with

20   designing the "One Hundred Dollars Computer" for the U.S. and international

21   educational market. Plaintiff presents the x86-based Internet connectivity options

22   and the advantages that make the largest, relatively open software and software

23   tools standard available to students at low cost. MIT Media Lab, however,

24   received regular payments from Consortium Participants, which obligated them to

25   safeguard the x86 market from low-cost competition. Under the Consortium's

26   mandate to safeguard the x86 market from low-cost competition, the MIT Media

27   Lab chose a non-x86-compatible CPU. This decision doomed the 100 Dollars

28   Computer project, leaving the majority of the billion children the project intended

1    to reach without access to computing and the Internet. Eventually, the

2    Consortium-sponsored smartphone, designed as exploitative technology that takes

3    away free choices from its users, took over that market.

4         330.  The official launch of MIT Media Lab 100-dollar computer in 2007

5    dubbed as the "green machine" ended as a waste of the public, philanthropic, and

6    private resources that were dedicated to the project, with a few computers ever

7    being actually put to use.

8                    K. OPEN SOFTWARE INJURIOUS DESIGN

9         331.  Consortium's payments to MIT Media Lab financed the creation and

10   design of the "Open Software Foundation." Consortium Participants including

11   Intel control and set the foundation's distribution and standards with the aim of

12   preventing independent programmers and companies from competing against the

13   Consortium's services. "Open Software" enables Consortium Participants like

14   Intel and Microsoft to conceal their strategic software dumping efforts, which aim

15   to shield Consortium products from competition. The dumping of obscure,

16   partial, and undocumented software replaces the release of documentation and

17   tools that are required by competitors for being able to freely program x86-based

18   computers.

19        332.  The lack of mechanisms to verify security requirements in "Open

20   Software" amplifies the impact of x86 design flaws introduced and maintained by

21   the Consortium. Consequently, consumers must tolerate security vulnerabilities

22   that the Consortium's security solutions can only partially and untimely address,

23   potentially leading to catastrophic outcomes.

24                 L. PLAINTIFF'S EMAIL AND NETWORKING SYSTEM

25        333.  Plaintiff designed its x86-based email and networking products for

26   public networks, starting with telephone networks and extending it for the

27   Internet. A "store and forward" design method is employed in these products

28   using a modem-connected x86-based computer as a relay to receive and then store

messages until a connection that forms part of the path to the message's ultimate destination is established. Computers listed in the valid path to the message's final destination receive and store messages on route. Initially relying on networks and phones, the system expanded to the Internet and remained in use until around 2002, when Internet service providers finalized their takeover of the Internet, forcing their subscribers to use cable modems, thereby blocking Internet subscribers' freedom of communication and ability to use Plaintiff's products.

## M. THE ABDUCTION OF X86 USERS INTERNET ACCESS

334. By 1990, as the market for home-based Internet subscriptions rapidly expanded, Intel recognized that the majority of Internet access points were x86-based computers and that trend will continue to increase with Intel's x86-based computers dominance. Various plug-in x86-compatible modem types were being used at homes and businesses to access phone-based BBS (Bulletin Board Services) such as CompuServe, AOL (America On Line), and others that provide business services such as credit verification, peer-to-peer communication, and email, as well as Internet access.

335. When the Internet-based World Wide Web standard and Internet browser emerged in the early 1990s, telephone lines provided the majority of home Internet connections. By 1994, Intel x86-based computers dominated a vast, expanding home Internet subscription market with high-speed coaxial cable connections and Netscape's commercial Internet browser available to x86 users. High-speed Internet connectivity to homes was being provided by a number of Internet service providers across multiple states via phone lines as well as coaxial cable that was connected to a modem installed in an x86-based computer and controlled by the x86-based computer CPU, hence providing equal access to the Internet to subscribers.

336. Intel's well-documented anticompetitive campaign against AMD and virtually all other x86 providers, along with its control over OEM and

x86-compatible peripheral manufacturers, gave it a dominant position in the rapidly expanding home computing market, where home computers became the primary gateways to the Internet. Intel realized it could take away from x86-based computer Internet users one of their most valuable assets: their control over their Internet connectivity and their ability to use some of their most valuable x86 applications and features. Using the well-established Consortium scheme, it could then monetize this control by giving it to Consortium Participants, who will provide it exclusively as a services appreciating the value of publicly traded shares that would be distributed to Consortium Participants.

337. The scheme has evolved in line with prevailing business practices at the time, which included exploiting consumers by using addictive technologies, a common practice in cable TV companies. Intel famously had business discussions with Barry Diller, investor, promoter, and champion of addictive TV channels such as QVC and Home Shopping Network, to explore ways to monetize control over x86-based computers. Intel aimed to transform the x86 standard into addictive technology, enabling the delivery of addictive media to its users.

338. Taking into account Intel's x86 market dominance, its control over x86 OEM and peripheral manufacturing, and the Consortium's control of x86 companies and Internet service providers, Intel proceeded to design a plan that would grant Consortium Participants control over their subscribers Internet connectivity. The scheme involved multiple cases of illegal tying. The scheme involves attaching a superfluous CPU to an x86 coaxial modem, creating a new form factor known as a "cable modem." Internet service providers will use illegal tying to force their subscribers to use the cable modem and use the superfluous CPU to remotely control modem operations at the subscriber's home, using it to control subscribers access to the Internet and prevent direct communication between them, thereby forcing them to rely on high-capacity servers that monitor their Internet communication and data transfers.

339.  The scheme would generate revenue through investments in the publicly traded shares of its direct beneficiaries, which would increase in value due to the scheme's ability to compel consumers to consume addictive media and perform data harvesting on subscribers' personal information. The scheme would allow Consortium Participants to capture consumers that were using Plaintiff's products and other peer-to-peer email, data synchronization, sharing, and networking that would be blocked from running on x86 computers. Customers would be required to utilize Consortium Participants' services, consenting to the sale of their information for data harvesting, behavioral surveillance, and tracking of their behavior.

340.  The Consortium's formula that was designed to enable and conceal distribution of windfall profits from illicit antitrust violations did enrich a few Intel executives, but Intel's hopes as a company were dashed when the scheme that converted x86-based computer users' time, privacy, and information into profits in the form of the appreciation of publicly traded share value resulted in the bubbled stock market that collapsed in the Dot-com bubble burst at the beginning of 2000.

341.  Intel's share value never recovered, enabling the Consortium to use the company as its primary exploitative tool for establishing and protecting intrusive standards and practices in the x86 market that became intertwined with Internet-based computing. The heroic efforts of Intel's engineers during the 1990s and the first decade of 2000, which propelled the company to the forefront of semiconductor design and manufacturing, were halted by the Consortium by 2012 since any technology that could have empowered consumers jeopardized the Consortium's scheme that was designed to control them.

342.  By 2012, the Consortium moved to micromanage Intel, masking its activity behind the veil of the vast Intel bureaucracy, suppressing innovative development that empowers consumers, and ejecting their prompters from the

company. The Consortium began Intel's decline by using its undue influence to shut down x86 design projects that competed with the Consortium's stock market runs. That effort culminated in a complete takeover of the company with the appointment of Defendant Bryant to the chairman position in 2012 that was followed by the departure of Intel's key manufacturing and design managers and engineers, as well as the subsequent destruction of Intel's manufacturing and mobile products and technology.

343. The current Consortium scheme requires every Internet subscriber to pay for an additional unneeded CPU, installed in a cable modem box and used for the sole purpose of giving Internet service providers control over their subscriber's modem actions. The Consortium uses this control to restrict the choices and freedom of x86-based computer owners to use their computers and Internet connectivity as they desire. The redundant CPU in the cable modem carries out operations previously performed by the CPU in x86-based computers until 2002. An Internet service provider, or anyone who gains access to an Internet service provider network, can not only control the subscriber's modem but also the subscriber's connected x86-based computer. This allows for real-time monitoring and manipulation of x86-computer modem commands, the updating of security settings, and the execution of intrusive operations on subscribers' computers without leaving a trace. The Consortium, with Intel as its main enforcer, is preventing x86-compatible plug-in modems compatible with Internet service providers standard protocols from reaching consumers.

N. ADDICTIVE TECHNOLOGY AND PREDATORY DESIGN

344. Between 1990 and 1995, while exploring ways to monetize its complete control over the x86 standard, the supply of x86 devices, their form factors, and the expanding home computing market that coincided with the rise in home Internet subscriptions, Intel conceived a scheme to gain control over Internet subscribers' ability to control and manage their Internet communication

1    and monetize that control to the benefit of the Consortium. The scheme involved

2    the tying of an additional superfluous x86 CPU to an Internet service

3    subscription. The plan was to use the additional superfluous x86 CPU as an

4    "agent" to regulate the usage of x86-based computers. Intel began exploring ways

5    to monetize this scheme, communicating with Internet service providers and

6    media companies that had developed and employed addictive technology.

7        345. By 1996, Intel's scheme created a new device that combined an x86

8    CPU and a modem into a single box, which became known as a "cable modem."

9    The Internet service provider would force subscribers to relinquish control over

10   their Internet connection by placing this device between an x86-based computer

11   and the Internet connection. The Internet service provider would remotely control

12   the additional superfluous CPU in the cable modem, thereby replacing the

13   x86-based CPU that manages and controls the modem connected to the coaxial

14   Internet feed line. By 1996, the first part of the scheme was ready. The second

15   part of the scheme required the Internet service provider to compel consumers to

16   purchase or lease cable modem devices, which they would then insert between

17   their computers and their Internet feeds.

18       346. The cable TV industry has already implemented "addictive

19   technology" and "addictive media" in a variety of forms. One such form is the

20   compulsory inclusion of TV shopping channels with TV cable service

21   subscriptions. A series of meetings have taken place between Intel and cable TV

22   executives, including one between Intel CEO Andy Grove and Barry Diller, a

23   champion promoter of addictive TV channels like Home Shopping Network and

24   QVC.

25       347. Home Shopping Network and QVC present habit-forming spectacles,

26   designed to provide TV watchers with a stimulus akin to that of addictive drugs,

27   and then associate this stimulus with shopping, aiming to override the TV

28   watcher's judgment. The term addiction is used here to describe a compulsive

behavior in which an addicted individual spends a significant amount of time and money watching and purchasing products that can lead to problems, like any addictive behavior may. A key element of such technology is the inability of subscribers to avoid the inclusion and delivery of the addictive part. The cable subscription package includes shopping and religious channels without offering subscribers the option to exclude them.

348. Intel considered the idea of forcing x86-computer users to watch addictive TV by replicating the Home Shopping Network business formula but deemed it too controversial. Participants in the Consortium, both inside and outside Intel, devised an easier-to-conceal method to monetize control over Internet subscribers' communication by utilizing the Consortium's well-established formula and singularly unique financial infrastructure.

349. The Consortium's tried and tested formula starts with the identification of an essential functionality that x86-based computer users must rely on. The Consortium then blocks that functionality from operating on x86-based computers, while a Consortium Participant exclusively provides a toll-based, centrally distributed subscription service with similar but inferior functionality. Consortium Participants are the first to receive shares in the companies offering these services. As an exclusive offering of an essential functionality, these shares appreciate in value in a tilted market, generating windfall profits for Consortium Participants due to their exclusive position in the market.

350. The Consortium's formula encompasses and supplies all the essential elements required to carry out the scheme. The predatory planning and design, the coordination, the delivery mechanism with the tying that is necessary for the completion of such schemes, along with the singular financial infrastructure that is required to monetize, inflate, and distribute the schemes loot in the form of public shares. That was the exact script initiated by Intel and implemented by the Consortium.

351. As the scheme developed and a software modem protocol standard that could be shared across the Internet provider service sector was prepared, the Consortium increased its investments and influence in the companies that would execute the illegal tying of the cable modem with Internet service and would monetize the control over Internet service subscribers that would be gained. Under the guise of investing in a new digital technology, the Consortium raised and invested billions in cable operator companies. The investments were used to inflate the proxies that were offered to the public and to finance the takeover of highly efficient Internet service provider companies that already provided unrestricted high-speed Internet to x86-based computer owners over coaxial cable connected to a modem installed in the x86-based home computer and managed by the x86 CPU.

352. Executives from Intel, media, and cable operator companies discussed in detail the potential benefits of the scheme. They included,

- Bundling Internet service with cable TV increases its cost.

- Enabling the tying of Internet service, cable TV package, phone and web services such as email.

- Computer users would be forced to receive addictive media channels.

- Computer users would be compelled to depend on centrally distributed services.

- Computer users would be compelled to consent to collection of their personal data.

- Computer users would be compelled to use programs that track and monetize their behavior.

Indeed, after the scheme's implementation, social media companies developed algorithms that modify users' behavior using abusive designs while taking advantage of the consumer dependencies the scheme created. As an example, direct computer-to-computer communications provided by Plaintiff's software

products were blocked by the scheme, forcing consumers to rely on social communication from social networking companies.

353. Between 1998 and 2002, cable operators and phone companies took over virtually all the independent Internet service providers operating in the U.S. and forced all consumers to stop using their own modems and install the cable modem between their computer and their Internet feed, transferring the control over the Internet connection to the new regional monopolies of Internet service providers.

354. By 2003, the convergence of the cable TV industry, which had already established addictive technologies and media paradigms, with Internet service providers was complete. The built-in CPU of the cable modem, which the cable companies forced their customers to buy or lease, gave the cable companies complete control over the modem, allowing them to eliminate a class of communication options that were previously available to their subscribers.

355. Addictive technology meets three tests: it delivers an addictive product, monetizes its use, and mandates its use by preventing its removal or avoidance by its targeted user. Any technology has the potential to become addictive, but when it incorporates a coercive trait to facilitate one of these three elements, it results in a predatory design. In today's market, consumers are compelled to purchase high-speed Internet that is bundled with broadband TV channels, telephone service, and other associated services, such as streaming. Removing parts of such bundles is costly, disincentivized, discouraged, and impossible with regard to cable TV channels that expose cable subscribers to intrusive and addictive media against their will.

356. The U.S. government created the Internet as a public network, granting equal access to all its users under laws. Public networks are not a new phenomenon; they existed before the Internet, some as a closed subscription-based model like the telephone network and some as open but

regulated, such as amateur radio. By definition, networks provide their users the ability to communicate with all other users.

357. Network nodes must have a unique identifier that allows other users to address them. A century of experience with multiple companies providing public telephone networks led to the establishment of worldwide telephone numbers. By now, subscribers effectively own their telephone numbers. Subscribers can keep their telephone number when they change their telephone service provider. The Internet is a network that uses unique identification consisting of IP addresses (Internet Protocol addresses) to identify network nodes. Here, IP stands for Internet Protocol. Devices connected to the Internet use IP addresses, a numerical label, as their unique identifier. The Internet's fundamental design relies on unique IP addresses for identifying devices connected to the Internet, giving every device the ability to control the sending and receiving of information from and to any other device connected to the Internet.

358. The Consortium's nefarious scheme takes from x86-computer users control over their IP address, transferring it to Consortium Participants. It is done by compelling the subscriber to insert between the subscriber's x86 computer and the Internet feed connection a remotely controlled superfluous computer that is controlled by the Internet service provider. That computer has its own IP address, hiding the subscriber's x86-based computer IP address from the rest of the Internet and preventing any direct communication between subscribers. The name given to that computer was cable box.

359. x86-based computers, such as Plaintiff's and his customers, that were connected to the Internet directly until 2002 were forced after 2002 to connect via a cable modem instead, and their ability to send and receive information over the Internet to and from any other computer connected to the Internet was taken away, forcing them to use substitute paid services and pay for those services by allowing data harvesting that is used by Internet providers and their corporate

1    customers to monetize both personal and communication information.

2         360.  The use of IP addresses for identity verification is essential for secure

3    remote connections over the Internet. It required remote management of servers,

4    online services, and commerce, as well as remote working. However, Internet

5    service providers have stripped their subscribers of the identification mechanism

6    that is transparently inherent in the design of the Internet. An Internet

7    subscriber's IP address, associated with the cable modem rather than their own

8    computer, is subject to arbitrary and random changes at any given time. Some

9    Internet service providers allow their home subscribers to pay an additional

10   monthly fee to rent their own IP address, essentially charging a fee to prevent

11   abusive practice.

12                    O. ANDY GROVE WEALTH CREATION PLAN

13        361.  By 1997, Intel executives had devised a strategy to leverage Intel's

14   dominance in the x86 market, which dominated Internet access points, and turn

15   the Internet into a wealth creation tool for corporations and their executives. The

16   strategy aimed to change the Internet from a public communication system with

17   equal access, which the US government transferred to the public, into a

18   centralized tool under corporate control. This tool would block independent

19   communication, thereby facilitating the distribution of corporate products that

20   incorporate addictive media and would enable corporations to monetize their

21   control over users and private business information.

22        362.  During 1997, Intel CEO at the time, Andy Grove, adapted the plan as

23   a wealth creation opportunity and implemented it based on the lessons learned

24   from the IBM personal computer scheme, which divided the tying of personal

25   computer parts between multiple companies. Other companies, rather than Intel,

26   will use illegal tying between x86 cable modems and Internet subscriptions. One

27   of the arguments in favor of the plan was that the control over subscriber

28   connectivity that Internet service providers gain will make the entire Internet

segment more attractive to investors. Indeed, the plan planted the seeds and set the stage for the Dot-com bubble, which began to inflate in 1997 when Intel solidified the plan with its technical partners. This bubble swelled in February 1998 following a meeting between Andy Grove and, according to news reports, Hollywood moguls. In this meeting, Andy Grove took the lead, preaching to the chieftains of media companies that their future lies in controlling their audience behavior using the new tools Intel would provide them. The Dot-com bubble burst on March 10, 2000.

363.  Since independent Internet service providers had no incentive to force their customers to purchase the more expensive and unnecessary x86 cable box, the tying of x86 cable modems to Internet subscriptions would require a takeover of all Internet service providers, effectively extending the Consortium into the new Internet market. At the end of 1997 and the beginning of 1998, Andy Grove evangelized his wealth creation plan to cable TV and media moguls. Intel offered to withhold Internet-compatible modems from the x86 market in exchange for cable TV operators taking complete control of the Internet service provider market and tying the x86 CPU-based cable modem boxes with consumers' Internet access subscriptions.

364.  The plan would force every Internet subscriber, regardless of the type of computer used, to pay for an additional x86 CPU, but that was the least of its impacts. Andy Grove persuaded media moguls with the promise of a captive audience for their 500-channel cable services, offering a long list of additional benefits. These included conditioning consumers' Internet access to cable TV subscriptions, transferring networking control from consumers to providers, enabling the monetization of consumer data, increasing the cost of entry-level Internet access due to forced bundling with cable TV, and collaborating with the technology industry to develop methods and tools to monetize control over consumer data.

365.  By distributing the majority of the resulting vast wealth directly to individual decision-makers at a lower tax rate via the stock market, companies with a captured market could bypass corporations' taxable revenue. This strategy effectively led to the Dot-com stock market bubble and its subsequent collapse in 2000. It resembles the current situation where Consortium Participant are holding back competition that can distribute technologies equally and prevent concentration of computational power in the hands of a few providers that enjoy a stock market bubble as a result.

## P. MONETIZING ABDUCTED X86 FUNCTIONALITY

366.  After gaining control over Internet access, cable companies forced their subscribers to purchase or lease cable modems, which they then used to regulate their Internet connection usage. Internet service providers effectively lock in Internet subscribers, fostering monopolistic relationships with customers within a specific geographic area. The cable companies, Consortium Participants, took away the ability of x86-based computer users to use Plaintiff products and then offered the same functionality as services at a premium price.

367.  The cable companies established a profitable service known as Internet Business Service to provide businesses with essential direct two-way communication that replaces blocked Internet access for home subscribers, albeit at a substantial additional cost. They accomplished it by enabling x86-based computer users to manage the superfluous CPU that controls the cable box modem.

368. In what turned out to be the most lucrative part of that infraction, the cable companies began to collect and sell their subscriber information, laying the groundwork for a variety of intrusive strategies and undesired Internet-based activities like spam and intrusive targeted advertisement that follows Internet users private and confidential behavior. This, in turn, contributed to the DOT COM stock market bubble that deflated in 2000 and continued until 2003.

## Q. THE CABLE MODEMS TYING SCHEME

369.  The cable companies incorporated unique codes into their signals to force customers to use only modems housed in cable modem boxes, while Intel, through its control over the x86 OEM, removed the availability of x86 plug-in modems for x86 computers.

370.  Between 1998 and 2003, the market was transformed, forcing every home Internet subscriber to pay for a cable modem and submit to the cable companies control over their Internet access, and every business was required to pay for an Internet connection that provided it with the abducted x86 capabilities at a significant cost.

## XI. PREDATORY DESIGN AND ITS CONSEQUENCE

### A. LEGAL TEST: PREDATORY DESIGN AND MODULARITY

371.  When changes to a product's design, functionality, interface, or compatibility harm competitors or limit the product's usability, they can be considered predatory. The federal court recognized Microsoft's changes to its Windows operating system, which targeted the Netscape browser, as predatory designs. Microsoft modified its operating system to provide the same Internet browsing capabilities as the Netscape application, presenting it as a non-modular component of its Windows operating system, rather than an application that users of x86-based computers could install or remove. As part of the remedy in the 1998 government case v. Microsoft, the Microsoft was forced to reverse its design changes to its Windows operating system and provide its browser as a separate program that can be installed and enunciated by its users.

372.  Some of the x86 architectural peculiarities (ring 0, pipeline, dark silicon, lack of CPU dedicated memory, and individual CPU allocation) introduce unnecessary overhead, security vulnerabilities, deleterious effects on consumers and competition, and unfair advantages to Consortium Participants that are detrimental to Intel x86 customers. They supplanted efficient solutions and

1   technologies that would have empowered x86 consumers but limited the

2   Consortium's influence and profits.

3       373. Federal courts and regulators have recognized the importance of

4   modular design for both customers and competition, but they have also

5   acknowledged that a blanket prohibition on the integration and unification of

6   technologies can hurt consumers. Integration may enable significant product

7   improvement for consumers, including power consumption reduction, increased

8   computational power and speed, and lower cost. In a case that was brought

9   against Intel by the FTC regarding the design of its programming tools, Intel

10  agreed to a consent decree on July 28, 2010, and the FTC issued its decree on

11  October 29, 2010. as to the product-design claims generally, the consent decree

12  required that Intel not make any engineering or design change to its products if

13  the change (1) degrades the performance of a product sold by a competitor of

14  Intel and (2) does not provide an actual benefit to the Intel product. The decree

15  further put the burden of showing such a benefit on Intel. The FTC explained in a

16  notice accompanying the proposed consent agreement that merely showing

17  "actual benefits" would be sufficient.

18      374. The FTC explanation, that merely showing "actual benefits would be

19  sufficient," reflects the potential benefits to consumers from Intel's ability to

20  combine its design and manufacturing to solve the most critical problems current

21  technology is facing, starting with unacceptable power consumption levels that

22  current computing requires.

23                  B. CROWDSTRIKE IN CIRCULAR OWNERSHIP

24      375. An x86 design flaw enabled a bug that led to a worldwide failure of

25  x86 computers on July 19, 2024. A distributed software update from a security

26  company named CrowdStrike caused the shutdown of numerous x86 computers,

27  stopping the operation of numerous companies around the world. The

28  CrowdStrike company was created to take advantage of Intel's and the

Consortium's manipulation of the x86 design.

376. CrowdStrike was founded by Intel employees who joined Intel after Intel acquired McAfee Antivirus software in February 2011. The Consortium Participants, who are currently Intel's major shareholders, control CrowdStrike. In late 2011, CrowdStrike started to provide software that will protect Intel x86 computers from security vulnerabilities resulting from x86 design choices. Intel's manipulation of its x86 technology, as well as its exclusionary actions, enable and protect CrowdStrike's exclusive ability to provide partial remediation for those vulnerabilities.

377. Intel's manipulation of x86 technology created the security vulnerabilities that allow the Consortium to turn predatory design and antitrust violations into billions in profits, while harming the x86-based economy without any consequences. CrowdStrike provides endpoint security and protection for computer network communication with clients. Computers, laptops, tablets, mobile phones, and wireless devices, along with wearable devices and equipment, are examples of endpoint devices that interact with corporate networks. The purpose of endpoint security is to avert breaches in these types of communications. Instead of allowing x86 programmers to continue to control and address network communication between x86 servers and x86 clients, Intel, at a significant cost to both Intel and its customers, segregated web-based network operations and withheld access to them from x86 programmers, introduced remote backdoor capabilities that are also obscure to programmers, and implemented built-in tracing and debugging of x86 computers' internal operations in real time that are only available to Intel collaborators and are withheld from x86 programmers.

378. The exclusionary acts and predatory designs outlined in this Complaint have resulted in billions in windfall profits for the Consortium Participants, both to individuals and companies. Those windfall profits to the

Consortium Participants that control Intel are the motivation for those actions that have caused significant harm and damage to Plaintiff, as well as trillions in losses to Intel itself, Intel's as well as AMD's x86-based computer users and corporations that depend on the x86 technology, consumers, and the U.S. economy that depends on that technology, and have dire implications for the U.S. global position.

## XII. CONSORTIUM PARTICIPANTS FRAUD ON CONSUMERS AND PLAINTIFF

### A. CPU, SOFTWARE AND TRADEMARK FRAUD

379. Two leading Consortium Participants, Microsoft and Qualcomm, are engaged in an effort to use product designations and trademarks to mislead and confuse consumers, professionals, and regulators as part of an effort to harm Intel as well as Plaintiff. Product designations and trademarks evoke consumer expectations, which consumers use to make their purchasing decisions. Consumers anticipate the ability to drive cars to their preferred destinations and assume that their cars will be compatible with fuel sold in gas stations. A company that will mislead consumers to buy its cars that were designed to use special fuel available only at that company store by using a trademarked name of a regular car it continues to sell will face legal action from regulators and consumers regarding the confusion and misinformation it introduces.

380. Consumers expect computers to run their software. Microsoft is selling devices marketed as Windows computers, that are not capable of running users' Windows programs. Microsoft designed those computers to exclusively run its store-bought applications and serve as gateways for its subscription-based services. Personal computer users reasonably expect to be able to run their chosen programs without mandated dependencies or limitations on their choices of programs and their ability to program and control their computers.

381. Microsoft created and used the "Windows" trademark to describe

products that run x86-compatible programs. Microsoft is deceiving its consumers by promising the benefits of the x86 semiconductor architecture, which include the largest selection of programs, a relatively open programming environment that fosters competition, variety, and lower pricing, as well as backward compatibility with Windows and x86 programs.

382. As part of the Consortium's effort to weaken Intel and destroy the x86 standard, Microsoft is using its Windows trademark to sell devices designed to be incompatible with x86. This move aims to convert the personal computing market to a centrally distributed model, similar to what the Consortium established in the smartphone market. The association of the Windows trademark with those devices is a clear breach of trademark laws and regulations, which aim to safeguard consumers from purchasing decisions based on such misrepresentation. Consortium Participants intentionally misrepresent their products and tradeearks in an attempt to suppress competition and coerce consumers to buy their services.

383. Consortium Participants sell products under a wide range of false pretenses and misleading claims that the products are compatible with standard personal computing, that they are compatible with the personal computers, a range of computer programs that offer privacy, security, dependability, and independence that consumers reasonably expect from personal computers, and that the technologies that customers to monetize both personal and communication information. consumers expect to be available on personal computers are available without the need to subscribe to toll-based centrally distributed services.

384. The Defendants Intel are engaged in effort to undermine the x86 standard in two ways. They have tolerated attacks on the x86 standard by Microsoft and Qualcomm without taking appropriate legal action, and they have collaborated with the Consortium to implement predatory design changes to the x86 architecture that are detrimental to x86 users in order to assist the Consortium in compelling consumers to depend on centrally distributed services.

## B. MICROSOFT FRAUD ON CONSUMERS AND INTEL

385. The Consortium's strategic objective is to eliminate autonomous personal computing, which includes users' ability to program their personal computing devices, and force the market to rely solely on toll-based online services offered by Consortium Participants. To that end, Microsoft and Qualcomm, two of the leading Consortium technology companies, engaged in consumer fraud as part of the Consortium's attack on Intel and the prevalent x86 personal computing standard.

386. Microsoft released a product line, presented as Windows personal computers, to force consumers to use toll-based, centrally distributed Consortium Participants services, despite the product line's incompatibility with personal computing standards and Windows programs. This deceit is harming both Plaintiff, consumers, and Intel. It eliminates independent programmers and companies' ability to compete, and it serves the Consortium's long-term strategic objectives of weakening Intel and destroying the x86 standard.

387. To that end, Microsoft is using its own Windows trademark, which is associated with x86 personal computing and indicates compatibility with a large number of programs and codebases created over more than four decades that provide invaluable functionality to personal computer users. By using the "Windows" Microsoft trademark and the product designation of a personal computer, Microsoft presents devices that are incompatible with Windows and personal computing to consumers as Windows-compatible personal computers.

388. Microsoft and Qualcomm developed the ARM-based so-called "Windows processor," misrepresenting the Windows trademark, as part of the Consortium's effort to destroy the x86 standard and weaken Intel to protect the decades-long Consortium's effort to replace autonomous personal and business computing with toll-based, centrally distributed services. Microsoft misleads consumers, including Plaintiff's customers, into believing they are purchasing

1    personal computers that are compatible with x86 PCs and the Windows operating

2    system. However, consumers are receiving ARM-based so-called "Windows

3    processors" that can only run a limited number of modified Microsoft programs

4    on ARM-based devices. Those devices are incompatible with non-Microsoft

5    programs written for Windows. The intention behind the design is to coerce

6    consumers to depend for their critical personal computing needs on Microsoft

7    toll-based, centrally distributed services while eliminating potential competition

8    from developers, including Plaintiff.

9        389. Following are four comments (a. to d.) from Amazon customers that

10    reflect the surprise and frustration of consumer who purchase those devices:

11    https://www.amazon.com/product-reviews/B0CXKYTQS2/ref = cm_cr_unknown?ie =

12    UTF8&filterByStar = three_star&reviewerType = all_reviews&pageNumber =

13    1#reviews-filter-bar

14        a. "Be aware that the Qualcomm Snapdragon CPU does not support AVX,

15    which is required for many photo/video processing and gaming programs. Really

16    wish I had know that since I specifically bought this to process photos while

17    traveling. So now I have a very expensive web browser I didn't need."

18        b. "However, what I have noticed is how many pieces of software simply

19    do not work on this machine due to the Snapdragon ARM architecture. Box

20    Drive, which I rely on for cloud storage, doesn't work, and my Plustek scanner,

21    which I bought only three months ago, also refuses to function. Both companies

22    told me they couldn't offer any help, and this has been a huge disruption for me.

23    If I had known about these major compatibility issues, I would never have bought

24    this laptop."

25        c. "I spent a fair bit of money on this new machine, and the marginal speed

26    increase does not make up for the loss of these mission-critical tools. I strongly

27    advise against purchasing a laptop with the new ARM chip unless you"re

28    prepared to lose access to key software you rely on. I expect it will take at least a

1    year for companies to catch up with support¨if they ever do."

2         d. "This has been a very bad upgrade experience, and I'm hugely

3    disappointed that Microsoft would release a top-of-the-line laptop with significant

4    compatibility problems that were not disclosed. Shame on Microsoft for not

5    addressing or warning users about these issues.

6                    C. MICROSOFT, AMAZON, APPLE, NVIDIA, QUALCOMM

7         390.  Microsoft, Amazon, Apple, Nvidia, and Qualcomm, along with the

8    three investment funds, Vanguard Group Inc., BlackRock Inc., and State Street

9    Corporation, and their leaders, are the Consortium's main conspirators and

10   beneficiaries. These entities established the Consortium by orchestrating the

11   manipulation of markets, technology, and consumers to generate profits for

12   themselves. The manipulation and suppression of the x86 standard and

13   technology enable the creation of the Consortium and its continuing operations to

14   the present. Controlling the x86 technology, its providers, and users is crucial

15   and paramount to the Consortium's continuing operations. The three funds own

16   the majority of shares of Intel, a provider and the standard-setter of x86

17   technology, and of AMD, the only other provider of x86 that must follow Intel's

18   and Microsoft's x86 standards, as its 10-K form reveals. The Consortium utilizes

19   this power to control, undermine, and, in recent decades, attempt to partially

20   succeed in destroying the x86 standard.

21        391.  As detailed in this Complaint, the x86 standard, as the lingua franca

22   of the Internet, enables competitive development of autonomous computing. It is

23   also the main revenue source of the U.S. high-end semiconductor industry. The

24   Consortium attempts to destroy it in order to withhold the benefits of the

25   semiconductor industry from non-Consortium independent developers and

26   consumers and redirect it to its own central distribution computing centers,

27   necessitating the destruction of the U.S. high-end semiconductor industry itself

28   and the forcing of the industry to outsource high-end semiconductor

manufacturing to foreign companies that are operated further from U.S.
regulators and professionals scrutiny. The Consortium aims to exercise a higher
level of control over the availability of semiconductor manufacturing to
competitors to lessen potential competition. The opening of Intel's fab services
division, which provides potential Consortium competitors such as Plaintiff with
integration with x86 design capabilities, is at the core of the conflict between the
Consortium and Intel.

392.  Vanguard Group Inc. and State Street Corporation collectively hold
the largest voting blocks within the companies that make up the entire U.S.
economy's technology sector. Compared to BlackRock, they invest less in
start-ups and projects that directly benefit from the manipulation of Intel's and the
x86 standard. However, they reap the greatest rewards from the Consortium's
illegal activities that require their explicit approval, which drive a sharp increase
in share value.

393.  A circular ownership corporate structure exists between the three
investment funds and their major vehicles, Microsoft, Amazon, Apple, Nvidia,
and Qualcomm. The Consortium's design hides the relationships between
Consortium Participants' investments and profits, which stem from illicit actions
such as breaking antitrust laws and financial regulations and manipulating stocks
to increase the index-based revenue of the three investment funds and individual
Consortium Participants' investments.

394.  Circular ownership refers to a company that owns a significant stake
in another, which in turn owns a stake in the original company. This creates a
loop or "circle" of ownership. The relationships between Consortium Participants
form a large, layered network of circular ownership. The Consortium structure
introduces an extra layer of profit sharing, where each individual Consortium
participant, without exception, invests and reinvests their salaries, remuneration,
granted shares and options, and gains from their direct employers in

Consortium-related publicly traded shares. Those shares appreciate in value due to the protection their actions provide. This motivates them to act in the Consortium's best interest against the companies they manage, as detailed in the Complaint.

395. The circular ownership structure between the five technology companies and the three index-based funds aims to enable money laundering, tax evasion, and circumvent regulatory oversight. The three funds and the five technology companies intertwine with Consortium Participants across all industry sectors to conceal their control over the design and supply of semiconductors, which determine the functionality available to consumers, Plaintiff, and the market.

396. The Consortium uses circular ownership to generate and then share windfall profit with Consortium Participants, as exemplified by the establishment of CrowdStrike. By exerting undue influence and control over Intel's x86 design, Consortium Participants introduce design modifications that create security flaws and vulnerabilities in x86-based computers, along with corresponding design changes to the Windows operating system. These design modifications compel users of x86-based computers to rely on products and services that only Consortium Participants, who are aware of these detailed modifications, can provide. Consortium Participants created CrowdStrike to offer such a security product and service, positioning it as an exclusive investment opportunity for Consortium Participants. Consortium Participants, including the three funds that own the majority shares of Intel and Microsoft, launched CrowdStrike as a public corporation. Intel and Microsoft are two Consortium Participants who create the demand for CrowdStrike products. The circular ownership between the owners of CrowdStrike and other Consortium Participants obscures the relationships between technology companies and a company that provides solutions to the design flaws they introduce.

1    397.   The Consortium gained undue influence and effective control over

2    Intel's board of directors and executives using the following two methods:

3    Firstly, Consortium Participants are violating the 1950 Celler-Kefauver Act by

4    purchasing and holding publicly traded shares with the intention of controlling

5    and influencing Intel's strategic decisions, as well as the appointment of Intel

6    directors and executives. They do this to shield the Consortium from competition,

7    compel consumers to purchase Consortium services, and establish their

8    dependence on the Consortium. Investments in Consortium-initiated companies

9    and projects that take advantage of the uneven marketplace are being used to

10   enrich Consortium Participants. Secondly, Consortium Participants leverage the

11   information about the uneven market their own actions create to invest in

12   companies they safeguard, confident that the protection they offer will boost the

13   value of these companies' publicly traded shares. With this knowledge, Intel's

14   directors and executives were able to acquire stakes in protected companies,

15   confident that the exclusivity and competition protection provided by Intel for

16   these companies' products and services would result in substantial profits for

17   themselves from the subsequent exponential growth of these companies and their

18   investments.

19              D. CONSORTIUM INFLUENCE ON INTEL AND AMD

20   398.   The Consortium, in violation of antitrust law, sets design parameters

21   for Intel and AMD x86 processors that include the predatory design of significant

22   parts of the x86 architecture. Those anticompetitive design parameters and

23   predatory changes to Intel's x86 devices serve its strategic goals and ensure

24   immediate and long-term protection from competition for Consortium services

25   and products. It contributes to the rapid growth of Consortium companies'

26   publicly traded shares. The Consortium is compelling both Intel and AMD to

27   cede control over their x86 product design parameters, with the aim of limiting

28   how users can utilize their x86-based products.

399. The Consortium-enforced restrictions and design decisions on the x86 architecture lead to inherent security flaws in the x86 design, which generate billions in revenue for Consortium Participants who provide solutions to these security failures.

400. Sinkclose is a name that was given to such a vulnerability in AMD chips. The Sinkclose vulnerability enables hackers to execute malicious code in the System Management Mode, a privileged memory access mode of AMD processors. This mode unnecessarily grants a portion of the x86 firmware unlimited control over all running programs. It affects all AMD chips dating back to 2006 or earlier. Both Intel and AMD design modifications are giving operating systems as well as hackers undue control over application memory, resulting in ongoing economic losses for the entire economy, similar to the losses caused by the Consortium-owned CrowdStrike in July 2024.

## E. DESTRUCTION OF INTEL SMARTPHONE AND SEMICONDUCTOR MANUFACTURING

401. Under the leadership of Intel CEO Paul Otellini, Intel developed mobile versions of its x86 semiconductor devices and made significant investments in the development of wireless and smartphone modem technology. The rapid shift in consumer usage of computing from personal computers to smartphones put Intel in a unique position, allowing it to empower consumers and the economy with unrestricted open wireless personal computing, taking advantage of the x86 standard and low-power semiconductor technologies that were developed at Intel for two decades but were shelved with Defendant Bryant's active role to prevent that exact empowerment. In the two decades before taking control of Intel in 2012, the Consortium, with Defendant Bryant's active role, removed from the market low-power x86 technologies and ran a propaganda campaign, coordinated with the manipulation of Intel x86 design decisions, to mislead the market and technologists into the wrong assumption that

x86 architecture inherently consumes more power than ARM-based architecture, a fundamentally wrong supposition. With a technology breakthrough that was achieved at ASML, a Dutch company that designed in collaboration with Intel EUV semiconductor manufacturing machines, Intel's strategy and technology ran into direct conflict with the Consortium that in the previous decade, with Defendant Bryant's active role, suppressed low-power computing to prevent that exact empowerment of consumers and designed the smartphone market to force consumers to rely on central services and eliminate independent autonomous computing and programming that can compete with those services. The Consortium moved to separate Intel and the x86 standard from the advanced semiconductor technology developed by ASML and Intel with disastrous consequences for the American semiconductor industry.

402. The conflict between Intel and the Consortium dates back almost two decades, stemming from the suppression of low-power technologies that Intel either developed or acquired, with Defendant Bryant serving as the Consortium's representative at Intel. The conflict reached its peak in April 2012 when Intel introduced x86-based smartphones, which allowed users of mobile devices to use them without a Microsoft operating system. This move potentially created compatibility between smartphones and personal computers, exposing the dominant Consortium companies, Microsoft with its x86 operating system and Apple with its dominant smartphone, to competition that could have resulted in significant improvements and savings for consumers.

403. In 2012, the Consortium had taken direct control of Intel by positioning Defendant Bryant as Intel Chairman and subsequently, on May 16, 2013, replacing Intel CEO, Paul Otellini, with Brian Krazanich. Intel effectively discontinued support for x86-based smartphones, but due to the conspicuous contradiction with the rapidly shifting market from personal computers to smartphones, Bryant and Krazanich delayed the official announcement of

abandoning Intel's x86-based smartphone until 2016.

404. As the computing technology landscape rapidly shifted from personal computing to smartphones, Intel, with its line of x86 smartphones and its unparalleled advanced semiconductor manufacturing, was in a unique position to shift the market into a higher level of autonomous computing for consumers and companies, unify personal, business, and mobile computing, and open the market to competition, significantly lowering costs to consumers and improving the economy. For the Consortium, it meant relinquishing key achievements that were achieved with the establishment of smartphone standards that were designed to first drive and then normalize the market shift towards centrally distributed computing. Bryant moved in earnest to protect the Consortium objectives by gutting Intel. The Consortium plan that was executed by Defendant Bryant can be summarized in the following four paragraphs.

405. Firstly, implementing predatory design and additions to the x86 architecture coordinated with exclusionary policies that dedicated a significant portion of the x86 architecture to features that created an uneven field to give Consortium Participants unfair technological advantages using x86 devices and preventing non-Consortium developers, including Plaintiff, from competing with Consortium services. These predatory designs gives unfair advantage to Consortium Participants but harmed x86-based computer users by introducing security defects, higher energy consumption, overheating, and increased costs.

406. Secondly, abandoning Intel's x86 Atom-based smartphone product line, reneging on Intel's agreement with Plaintiff to bring his technology to Intel's x86 customers, and selling Intel's smartphone modem department to Apple to make it more difficult for a new leadership that would inevitably replace Defendant Bryant team to restore Intel's combativeness.

407. Thirdly, hindering Intel's competitive edge by undermining Intel's investments and upgrades of its semiconductor manufacturing with advanced

ASML EUV machines that were developed with Intel's collaboration and finance. It pushed Intel manufacturing back from being two years ahead of TSMC to at least 6 to 10 years behind it. Consortium Participants inside Intel, led by Defendant Bryant and CEO Krazanich, campaigned to undermine Intel's investment in ASML, ejecting from Intel top engineers and managers with the ultimate goal of separating Intel from its high-end manufacturing and forcing it to outsource its semiconductor manufacturing to TSMC, following a scenario that forced AMD to abandon and outsource its manufacturing. Intel held back on adapting next-generation equipment used in the extreme ultraviolet lithography (EUV) technique, instead redirecting the fruits of Intel's investment and collaboration with ASML to TSMC in Taiwan. It sets back Intel's and the American semiconductor industry for at least a decade and may have caused irreparable damage beyond Intel and the computing industry.

408. Fourthly, installing Consortium Participants at Intel's key positions in preparation for the inevitable backlash and the replacement of Intel's management to allow the Consortium to continue to control Intel and protect its centrally distributed services and stock market scheme that was enriching Consortium Participants, including those inside Intel.

409. In the aftermath, Intel lost its primacy and relevancy in the market. After selling his approximately 3 billion dollars in Intel's shares, Defendant Bryant resigned from Intel.

410. The primary objective of the Consortium scheme is to enforce a uniform prohibition on independent programming for critical functionality on x86-based computers. That critical functionality is then replaced with centrally distributed services that are provided exclusively by Consortium Participants. Consumers are required to rely on and subscribe to these services. The Consortium Participants reap the benefit from the appreciation in value of Consortium publicly traded shares that appreciate in value due to the market's

1   dependency on these exclusive Consortium services.

2       411. The Consortium's suppression and manipulation of Intel's technology

3   and consumer access to the Internet have an additional significant impact beyond

4   the mere protection of central Consortium services, making the control of Intel

5   and the x86 standard paramount to the Consortium's profits and further

6   motivating the Consortium to safeguard its control over Intel. With parallel

7   computing and low-power semiconductor technology that is being withheld from

8   the market, consumers will be able to communicate freely with any number of

9   users over the Internet without being dependent on massive infrastructure that is

10  only available from Consortium Participants. Parallel computing and low-power

11  semiconductor technology will also allow small operators to engage in online

12  marketing without having to depend on massive infrastructure. This reliance on

13  massive infrastructure enables service providers to selectively employ social

14  algorithms, exposing consumers to a wide range of addictive technologies at

15  significant economic and social costs.

16      412. Intel has the technology and market position to end the Consortium

17  Participants' scheme in two distinct ways, pursuing both long-term and

18  short-term strategies concurrently. The first short-term path open to Intel is to use

19  its existing CPU design to offer x86 users unrestricted access to x86 capabilities

20  that enable competition by independent x86 developers, such as Plaintiff, and

21  allow them to freely utilize the x86 CPU's full computation, communications,

22  and development resources to provide consumers with savings and better and

23  safer functionality. This would require minimal changes while maintaining

24  compatibility with existing x86 standards and conventions. Plaintiff technology

25  enables better utilization of the large number of transistors that in current devices

26  are either wasted or detrimental to efficient usage. The technology makes it

27  possible to use those transistors to reduce power consumption and increase

28  functionality and performance.

413.  The second longer-term path open to Intel is to use the large transistor count that resulted from Intel's enormous investment in manufacturing that was required for keeping up with Moore's law and is underutilized in current semiconductor architectures in a new inherently parallel optimal model of computation that can provide critical functions that were effectively "abducted" by the Consortium as an inherent functionality. Like the first optional path, it would reduce consumer costs and resolve the security and power issues that plague current computing, but its impact is more significant.

414.  Both the short-term and the long-term paths that are open to Intel were designed for Intel's existing manufacturing and design methods defined by current PDKs (Production Design Kit).

## F. PREDATORY DESIGN UNDER THE CONSORTIUM INFLUENCE

415. In 2012, less than two years after Intel settled an antitrust case brought by the FTC agreeing to avoid predatory design that (1) degrades the performance of a product sold by a competitor of Intel and (2) does not provide an actual benefit to the Intel product, Defendant Bryant, as newly installed Intel's chairman, moved the company to dedicate a significant allotment of x86 devices to architectural features designed to give a competitive advantage to Consortium Participants by giving them access to x86 architectural features that only partially mitigate significant degradation that Intel designed into its x86 architecture. That design degrades x86-based computers performance, security, reliability, and efficiency and significantly increases their electrical power consumption.

416.  The degradations that Intel designs into its x86 architecture have an impact on the market as a whole, serving the objectives of the Consortium to compel consumers to rely on centrally distributed services. Only Consortium's companies, equipped with massive energy infrastructure are capable of supporting the level of electrical consumption require to provide these services.

Intel's design of its high-end x86 processors requires unnecessary higher electrical energy that can only be obtained with massive investment, making it difficult for independent, smaller companies to obtain or offer intensive computations like AI (artificial intelligence) or online database services that include online marketing. It increases the Consortium's hold on the market by forcing companies to depend on Consortium resources for entering the market and forcing consumers to rely on large Consortium Participants that can provide the necessary electrical energy.

417. Intel's predatory design results in excessive energy consumption of Intel x86 devices that lead to overheating, necessitating noisy, high-speed cooling fans for Intel high-end x86 processors. It compels consumers to avoid using these computers in favor of online services offered by large Consortium Participants that use those computers in dedicated facilities.

418. Intel's predatory design falls into two categories. In the first category, include predatory changes to the x86 architecture device that degrade x86-based computers performance and functionality. The second category implements predatory technologies and form factor extensions to the x86 architecture that are only available to Consortium Participants giving them an unfair competitive advantage while withholding access from Plaintiff, other developers, and users and keeping them in the dark about these same x86 technologies. Consortium Participants receive exclusive access to predatory design features with special tools that allow them to partially mitigate some of the loss in performance to give unfair advantages to their operating systems and centrally distributed services.

419. Some examples of such predatory design cases are the x86 multi-core thread and management system, the pipeline execution system, and dark silicon. Those designs claim to accelerate program execution by increasing parallel programming and accelerating execution. In actuality, they prevent programmers from implementing parallel programming, increasing security vulnerabilities that

1    cannot be mitigated, degrading performance for all users. Intel provides
2    Consortium Participants with the ability to partially mitigate a small portion of
3    this performance degradation.

4        420.   Executing multiple program instructions simultaneously on multiple
5    CPUs can accelerate program execution. However, simultaneous execution of
6    CPU operations can only be performed on those instructions that do not rely on
7    the updating of memory values by previous instructions. When writing program
8    instructions, program designers take into account the dependencies between them
9    and can group them into segments that can be executed simultaneously on
10   multiple CPUs. Intel, however, as part of its predatory, degrading design effort
11   aimed at protecting Consortium Participant's products and services, has taken
12   away the ability of programmers to select which CPU a specific code segment
13   runs on. Instead, Intel has designed a complex, inefficient, energy-intensive, and
14   insecure mandatory mechanism that performs additional instructions in an
15   inefficient attempt to determine the dependency information known to the
16   program author at the time the program was written. The inefficient automated
17   CPU and thread allocation manager is designed to receive signals from exclusive
18   Consortium Participants operating systems, allowing Consortium Participants to
19   accelerate certain functionality in their products but preventing implementation of
20   parallelism from general programmers such as Plaintiff. The predatory design
21   binds consumers to Consortium Participants' products and services, thereby
22   significantly increasing the cost of computing across the entire economy. It also
23   gives Intel total control over entry to the x86 OEM market.

24       421.   Intel's design of its x86 CPU allocation and thread management
25   semiconductor architecture is predatory by all means, as it is intended to force its
26   x86 customers dependency on Consortium Participants operating systems and
27   programming tools by mandating overhead, unnecessary energy consumption,
28   security flaws, and performance degradations on x86-based computers, including

1   Plaintiff. It also increases costs to Intel consumers, who are locked into a shorter

2   upgrade cycle as the computational power provided by their purchased products is

3   limited by design.

4       422. Intel predatory design that is done in collaboration with Microsoft.

5   Both companies are in violations of is in violation and courts orders. Intel agreed

6   to a consent decree on July 28, 2010;(244) and the FTC issued its decree on

7   October 29, 2010. (245) As to the product-design claims generally, the consent

8   decree required that Intel not make any engineering or design change to its

9   products if the change (1) degrades the performance of a product sold by a

10  competitor of Intel and (2) does not provide an actual benefit to the Intel product.

11  (247) The decree further put the burden of showing such a benefit on Intel. (248)

12  The FTC explained in a notice accompanying the proposed consent agreement

13  that merely showing "actual benefits" would be sufficient. (249).

14      423. Intel's predatory design includes an implementation of technologies

15  and form factor extensions to the x86 standard, which are exclusively available to

16  Consortium Participants using a redundant hardware interface to the x86

17  architecture USB. The design is incompatible with the standard form factor of

18  x86 consumers, preventing independent x86 programmers and users from

19  accessing it without the restricted, secretive hardware that Intel provides to

20  Consortium Participants. The interface that is available exclusively to Consortium

21  Participants gives them the ability to trace and debug x86 CPU operations, which

22  is essential for programming, debugging, optimizing, and securing programs for

23  x86-based computers. These predatory design changes consume a significant

24  portion of Intel's R&D design budget, occupy a significant portion of each device

25  purchased by Intel's customers, while degrading all aspects of x86 products for

26  consumers and giving an unfair advantage to the Consortium Participants as part

27  of the scheme to increase costs to consumers and eliminate competition by

28  Plaintiff and other programmers.

1    424.  Intel is aware that the undue access that Intel grants to Consortium

2    Participants but withholds from x86 consumers, users, and developers like

3    Plaintiff, is being reverse-engineered by hackers and malicious software creators,

4    including state-level nefarious actors who can dedicate the resources to such

5    endeavors. These criminal actors use this access to create viruses, ransomware,

6    and security-breaching tools, which increases the demand for protection services

7    from Consortium companies.

8    425.  With the Consortium coordination and under the Consortium undue

9    influence on AMD, the exact nefarious features, mechanisms, and exclusionary

10    acts were implemented by AMD in its own x86 devices with similar effects. This

11    prevents AMD from competing with products that could potentially mitigate and

12    provide remedy to consumers for this predatory design.

13                G. INTEL BREACH OF CONTRACT

14    426.  During September and October of 2016, Plaintiff communicated with

15    Arrow Electronics, a general electronic component distributor who is also an

16    official Intel representative and distributor, regarding the purchasing of

17    components for a development project. After sharing information about his

18    technology and intended product, Plaintiff was surprised to receive a call from an

19    Arrow executive suggesting that Intel might be interested in collaborating to bring

20    Plaintiff's technology to the market using Intel x86 technology. As it turns out,

21    that suggestion was part of an elaborate scheme to prevent x86 independent

22    developers, such as Plaintiff from developing x86 capabilities that can compete

23    with the Consortium's revenue stream and risk the Consortium's hold on the

24    market. After suggesting a meeting with Intel about collaboration, and

25    participating in the first meeting, the Arrow Electronics executive withdrew

26    himself from further communication with Plaintiff.

27    427.  A telephone conference meeting between Plaintiff and Intel executives

28    took place on Thursday, October 27, 2016 at 4:00 PM. Intel expressed interest in

collaborating with Plaintiff, in using Plaintiff technology to prepare a mobile operating system for existing x86 technology and, in the longer term, using Plaintiff technology with custom x86 devices that can offer advantages beyond current standards. Intel agrees to collaborate with Plaintiff in bringing Plaintiff's x86-based technology to the market by unifying computing and smartphone functionality in order to maximize the value of Intel's x86 technology to consumers.

428.  Intel announced the discontinuation of its Atom processor line for mobile phones in April 2016. During the October 27, 2016, conference call, both Plaintiff and Intel made it clear that Intel will prepare an x86 processor and modem for the system that Plaintiff will develop, ensuring full compatibility with the x86 standards.

429.  Both parties signed a mutual NDA (Non Disclosure Agreement) (Intel's CNDA NUMBER 004846) to provide Plaintiff access to crucial development information and tools.

430.  After a period that was used for preparations, studying Intel development options, and establishing contacts, Plaintiff realized that Intel's intentions were insincere and that Intel executives are not free to act in Intel's and its customers best interests to maximize its profits. Instead of providing Plaintiff with information about the various development programs that Intel made available to Consortium Participants and other Intel partners and revealing the x86 development tools that are not publicly known, Intel granted Plaintiff access to individual documents by requests for approval while withholding from Plaintiff access to the essential development tools available to Consortium Participants and apparently even developers who do not challenge the Consortium, including possible hackers. Communication with Intel resulted in ambivalent, noncommittal responses and refusal to provide any level of development support.

431.  Through external sources, Plaintiff discovered that Intel has built into

its x86 architecture a dedicated real-time debugging and reporting system of CPU instructions and an internal operations design to provide developers with real-time detailed reporting of the internal operation of Intel x86 devices to allow program development, analysis, and debugging. Only special Intel devices, disclosed and sold under Intel's CNDA, can utilize this feature. Despite signing the necessary NDA, Intel never informed Plaintiff about the existence of such reporting capabilities and devices. Upon discovering by chance the existence of x86 built-in reporting, Plaintiff procured from Intel the necessary equipment to utilize the built-in reporting system in accordance with the terms of Intel's CNDA-signed contract, submitting his NDA contract information. Intel, however, prevented Plaintiff from using these devices by blocking Plaintiff access to the support and software that are necessary to use those capabilities.

432. After Plaintiff submitted detailed suggestions for further development under the mutual nondisclosure agreement, as explained below, Plaintiff access to information and support was cut with no explanation. Between 2016 and the beginning of 2019, Plaintiff disclosed to Intel, under the terms of the mutual nondisclosure agreement, a design and methods for smartphone communication that rely on geographical positioning instead of stationary infrastructure. This approach eliminates the need for stationary cellular infrastructure, leading to significant savings for consumers. Plaintiff urged collaboration in bringing the technology to the market. Intel informed Plaintiff that they shared the information with their Modem division, but Intel did not follow up with further communications.

433. After disclosing to Intel information about its intended design, Plaintiff received confirmation that the information was received by Intel and was shared with other Intel executives and with Intel's modem division. That was when Plaintiff found out that Intel had blocked his access to its documentation. The denial of Plaintiff's support request completely contradicted previous

1   agreements and communications.

2       434.  In July 2019, Intel announced that it would sell a portion of its

3   modem division to Apple for about $1 billion. This acquisition included Intel's

4   smartphone modem technology, talent, and patents related to 5G technology. In

5   October 2019, Apple unveiled the capability to track stolen iPhones through

6   Bluetooth, coinciding with the release of Apple's iOS 13. This feature was based

7   on the design and method that Plaintiff had disclosed to Intel under the

8   non-disclosure agreement. Intel then shared this design and method with its own

9   modem department, prior to the sale of the modem division's smartphone

10  segment to Apple. This new feature allows users to locate their devices even

11  when they're offline by leveraging Bluetooth signals from nearby Apple devices.

12      435.  Arrow Electronics, Intel, and Apple actions highlight the complex

13  interplay of corporate strategy and anticompetitive dynamics within the tech

14  industry. Intel removal of its open x86 technology from the smartphone market,

15  despite its adherence to the Apple-Google centrally-locked non-open operating

16  system standard that maintained compatibility with existing Android mobile

17  applications, the decision by an Arrow executive to collaborate with Intel in

18  blocking projects that designed to bring back open standards to the smartphone

19  market and the sale of Intel's modem department to Apple at a financial and

20  technological loss despite against the most obvious business sense in a market that

21  is fast shifting from personal to mobile computing reflect the methods used by the

22  Consortium to safeguard its revenue streams against x86 independent developers

23  such as Plaintiff as well as against any technology that reduce cost to consumers

24  and hence could stop the Consortium gravy train. In reality, all executives and

25  managers in the industry invest in the Consortium companies' public shares and

26  benefit from such activities. They are aware to a certain extent about those

27  methods and support them with the knowledge that their careers are dependent on

28  that support.

436. Those actions not only reflect a desire to maintain market dominance and protect the increase in share value of the dominant Consortium Participants, such as Apple with its close applications, Microsoft with its exclusive personal operating system for x86, cellular companies, and Internet service providers, but also raise questions about the implications for innovation and competition that impact the entire economy. Financial interests of Consortium Participants clash with technological advances, and without antitrust law protection, they will ultimately shape the future of technology to the detriment of consumers, the economy, and national interests.

## H. H. RELATIVELY OPEN X86 STANDARD DESTRUCTION VIOLATING 1950 CELLER KEFAUVER-ACT

437. The x86 standard is widely used and is relatively open. However, Consortium Participants both inside and outside Intel, including Microsoft and other x86-dominant operating system providers, confine and limit x86 functionality and availability in an effort to lessen competition. To that end, the Defendants purchased publicly traded shares by acquiring them in the stock market or receiving them in exchange for services.

438. The goal of the Consortium Participants is to block, limit, and interfere with the ability of Intel x86-based personal computers, servers, and smartphones, programmers, and independent developers to create and market features that reduce users' dependency on toll-based, centrally distributed services, which are at the core of the Consortium's scheme. Such competition from programmers and independent developers, which would have been made possible by an open x86 standard, would have reduced the cost to consumers. This, in turn, would have limited the appreciation of Consortium Participants' publicly traded shares, an appreciation that depend on the increased cost to consumers and the dependency of consumers on the services the Consortium's Participants provide.

439. This Complaint details how the information service industry has been manipulating semiconductor technology since the inception of semiconductor-based CPUs and personal computing in the 1970s to limit competition from independent companies. The PC industry violated antitrust law by imposing an artificial division between software and hardware companies, concealing the illegal tying that aimed to limit consumer functionality. As semiconductor technology advanced, a growing disparity emerged between competitive market forces and the limited functionality available on the market due to illegal tying. This led the Consortium to suppress and destroy efficient technologies and implement predatory designs in x86 devices, in addition to illegal tying, in its continued effort to restrict consumers' use of x86-based computing to protect its growing scheme.

440. The Consortium's ability to maintain its scheme, which has resulted in the meteoric rise of Consortium Participants' share value and their executives' windfall, hinges on its ability to control competitive market forces, which are enabled and facilitated by the unavoidable advancements in semiconductor technology. The Consortium concluded that advances in semiconductor technology, which enable competitive market forces, necessitate the destruction of the x86 standard and Intel itself.

441. The effort anticompetitive acts began at Intel in small steps, starting with the firing of semiconductor engineers who resisted the implementation of predatory design, the purging of employees who resisted exclusionary policies, the destruction of competitive low-power and efficient technologies, the ousted of Intel-qualified semiconductor experience professionals and the gradual poisonings of Consortium Participants as Intel directors, officers, and managers. Defendant Bryant was appointed as Intel's chairman in 2012, marking the culmination of the Consortium's takeover. In an attempt to force Intel to outsource the manufacturing of its devices and lose its market advantage, the Consortium

proceeded to destroy Intel's semiconductor manufacturing, weakening the x86 standard that supports independent programming, and aborting Intel's x86-based smartphone product line. This was done to protect the Consortium's establishment of centrally distributed computing and its normalization in the smartphone market.

442. Prior to the takeover of Intel by the Consortium, two leading Consortium Participants, Microsoft and Qualcomm, started a parallel coordinated effort to weaken the x86 standard by introducing a line of computers that were fraudulently misrepresented as containing a "Windows Processor" incompatible with Windows and the x86 standards the Windows trademark implies. Microsoft and Qualcomm's scheme was designed to compel Intel customers to abandon Intel x86 products and use an inferior substitute that would lock them to Consortium Participants operating systems and toll-based centrally distributed services offered by Consortium Participants while preventing independent programmers, including Plaintiff, from competing with Consortium Participants services. As part of the Consortium takeover, Consortium Participants were positioned inside Intel to prevent Intel from appropriately responding to this attack on its intellectual property and customer base.

443. But a much bigger threat to the Consortium scheme's survival could come from Intel itself, which could use its unique position, technology, integration, and the widely used, relatively open x86 standard to go into direct competition against the leading Consortium Participants. The potential that becomes obvious with advancements in semiconductor technology is not limited to Intel alone; that was why, supposedly, Intel approached Plaintiff and initiated a purported collaboration on the development of a unified x86 mobile and personal operating system. Intel, more than any company but not alone, has the potential to significantly lower costs to consumers, solve security vulnerabilities, increase efficiency and productivity for the entire economy, and remove impediments to

competition. Intel can increase its market share, revenues, and market capital value, benefiting its shareholders, stakeholders, consumers, and the market as a whole. However, such a move must rely on the transparent unification of personal, business, and mobile computing, emphasizing the open aspects of the x86 standard directly attaching the fragmentation and limits that Consortium consortium depends on. It would end the Consortium scheme, which is based on increasing consumer costs by restricting their ability to freely use their products.

444. Consortium Participants, both outside and inside Intel, purchase shares in Consortium companies knowing that their past and future illicit actions increase the value of their private investments. Then, to safeguard their scheme, assets, and illicit gains, they engage in actions that hinder competition, such as obstructing Intel's collaboration with Plaintiff and destroying Intel's technologies. This is a violation of the 1950 Celler Kefauver Act, which forbids the purchase of shares for the purpose of lessening competition, as the purchase of shares in Consortium companies by Consortium Participants cannot be separated from their acts of lessening competition as well as antitrust laws and the RICO statute. Dismantling their anticompetitive practice is essential.

I. CONCEALING CONSORTIUM'S INFLUENCE

445. The Consortium leading technology companies, Microsoft, Apple, Amazon, Nvidia, and Qualcomm, exorbitantly, market capitalization rise is a direct result of withholding from consumers technological advancement in personal and Internet-based computing that Intel and AMD are forced to deny to x86 users. Intel, AMD, and the x86 standard are controlled and manipulated by those companies to enrich those companies and their executives through public ventures or as angel investors in technology companies that provide the withheld technologies that make a windfall profit. The Consortium scheme finds functionality that is important to x86 users, blocks it, and then forces people to buy similar but less useful technology as a centralized, subscription-based

service. Participants in the Consortium accumulate and distribute the windfall profits through three methods.

448. In the first method used by the Consortium companies that benefit from the illicit activities carried out by the Consortium are bought by larger Consortium Participants companies at exorbitant valuations justified by the exclusivity and protection that they received from the Consortium.

449. In the second method used by the Consortium, such companies raise capital from additional investors also at exorbitant valuations justified by the exclusivity and protection that they received from the Consortium and are groomed to become public companies, issue publicly traded shares, and are listed on the indexes that are offered to index-based trade fund investors, where they generate exorbitant profits for the index-based trade fund. Examples of such companies are CrowdStrike and Smartsheet.

450. In the third method used by the Consortium, Consortium Participants, who may include the index-trade funds as well as other investors, set up partnerships that are designed to take advantage of the technological manipulation the Consortium is engaged in to boost market segments that are protected by manipulation of and undue influence on potential competitors. In some cases those partnerships are bought outright by a Consortium Participant as payment for illicit services.

## J. UNNECESSARY AI POWER CONSUMPTION: MICROSOFT AND BLACKROCK GAIIP

451. A third method case in point is the Microsoft and BlackRock partnership that was created to invest in artificial intelligence (AI) infrastructure, including energy. Known as the Global AI Infrastructure Investment Partnership (GAIIP), it aims to establish a $30 billion fund focused on building and expanding data centers and supporting energy infrastructure to meet the growing computational demands of AI technologies. The GAIIP initiative is expected to

mobilize up to $100 billion in total capital when factoring in additional debt financing. Key collaborators in the partnership include Nvidia and the investment firm MGX.

452. The justification for the enormous investment in GAIIP that the Consortium is making is the exclusivity that will result from the massive amount of electrical power that, under current technology, is required to provide AI as a centrally distributed service. The scale of the energy infrastructure for such a project precludes any possible competition. Those excessive energy requirements are the result of undue influence on Intel that force it to abandon low-power semiconductor technologies such as Plaintiff's. It is the same advantage that Amazon Web Services (AWS) and Microsoft Azure cloud services enjoy by being able to provide exclusively massive computing that smaller companies cannot. Providing online services even for a small operator requires massive computing power due to a worst-case scenario design flaw in current computing. This flaw is a result of the Consortium's manipulation of computing technology across the entire industry.

453. At the core of the Consortium's ability to generate and distribute exorbitant profits to its Participants is the protection from competition that stems from the Consortium's manipulation of technology. As in the case of the Global AI Infrastructure Investment Partnership (GAIIP), Microsoft and BlackRock have a significant partnership to invest in artificial intelligence (AI) infrastructure. The companies aim to establish a $30 billion fund focused on building and expanding data centers and supporting energy infrastructure to meet the growing computational demands of AI technologies. The initiative is expected to mobilize up to $100 billion in total capital; the exclusivity and protection stem from predatory design modifications to semiconductor architectures, which lead to excessive electrical power consumption. Those predatory design modifications to the semiconductor architectures are not limited to the x86 architecture at Intel and

AMD; they affect all current semiconductor architectures, as the semiconductor industry in its entirety is controlled by the Consortium, resulting in a vast amount of underutilized transistors. Semiconductor devices contain billions of transistors. Their level of utilization determines the fate of the Consortium schemes. Transistors can be combined and used in an infinite number of ways to achieve various technological functions and design goals, which could either add significant value to products or be used in a predatory design scheme to introduce problems such as increasing costs and producing excessive heat with an excessively large amount of electrical power consumption.

454.  The consumption of unnecessarily large amounts of electrical power makes the Global AI Infrastructure Investment Partnership (GAIIP) between Microsoft and BlackRock attractive to investors. The Consortium manipulated technology over more than three decades and suppressed low-energy semiconductor technologies in order to stave off potential competition from independent companies and developers such as Plaintiff. This manipulation led the market to mistakenly believe that large-scale energy infrastructure, such as the $100 billion capitalization targeted by the Microsoft-BlackRock GAIIP partnership, is an essential requirement for enabling large-scale AI or any intensive computing.

455.  Two Consortium companies that exorbitantly benefited with unprecedented appreciation of their value as a result of being associated with AI are Microsoft and Nvidia. However, AI is not an intrinsic part of their technology. Microsoft invests in OpenAI and leverages Microsoft's size and dominance over x86-based computer users to dominate distribution of AI to consumers, while Nvidia is among a few semiconductor design companies that create parallel numeric processing devices suitable for AI processing. AMD is another company that manufactures these devices, and if permitted to freely compete in that market it have products that are in principle similar to Nvidia.

Intel which posses comparable technology may also produce them. Microsoft and Nvidia take advantage of the excessive electrical consumption of current semiconductor technology to maintain their relatively exclusive market position and consequently their valuation. The destruction of low semiconductor power technologies at Intel, carried out by Consortium Participants, enables them to do this.

456. Continuing to manipulate the semiconductor technology in order to maintain exclusivity over the distribution of AI to consumers is the only way Consortium companies can carry forward the exorbitant valuation they enjoy. Intel and AMD can more than make a dent in that scheme, but only Intel, thanks to its design and manufacturing integration, can lead that change, which can be helped by Plaintiff's technology.

457. As the largest shareholders of both Intel as well as AMD, who, besides Intel, is the only other source of x86 devices and who is limited by Intel's and Microsoft's anticompetitive restrictions on its designs, the index-based funds, VanGuard, BlackRock, and State Street, exert control over Intel to protect and carry on their scheme, which is reliant on the undermining of Intel's and AMD's competitive advantages and hindering their x86-based customers' ability to compete with the schemers' products and services. The destruction of Intel's technology, especially low-power semiconductor technologies, carried out on their behalf and under their oversight, enabled the GAIIP financial scheme, which was designed to enrich Consortium Participants and further the Consortium's objective of concentrating computational power in Consortium Participants hands while withholding it from competitors such as Plaintiff.

K. THE CONSORTIUM GROUNDWORKS

458. During the 1970s, IBM began to safeguard its business against the invention of VLSI technology and the development of the CPU, which allowed independent developers to create personal computers that replaced much more

expensive devices. IBM was concerned that in a free market, VLSI technology in the hands of consumers poses a significant risk to its profits from its dominant line of computers.

459. Beginning in the 1970s, the inventors of modern personal computing, particularly Allan Kay, Xerox Park's leader, educated Intel's founders and executives, who were material engineers with no knowledge about computers and the computing industry, about the competitiveness of their semiconductor VLSI technology and its potential in the market. Intel, however, has chosen to avoid the risk that introducing new product form factors to the market by a manufacturing company entails and instead collaborate with IBM, which sponsors the IBM x86-based computer and designs it to protect IBM's profitable business model from competition. This decision, effectively an agreement to join a protection scheme, provided Intel with the financial stability it needed to expand with less risk, but it also limited its options by incorporating it into an antitrust protection scheme that outlined its strategies and tolerance to infractions.

460. IBM successfully lobbied Intel and Xerox to prevent the release of a computer based on the Xerox Park design, which was in many ways more advanced than current computing. Software and hardware that allow secure Internet communication between Internet subscribers and computers over networks were invented at Xerox Park by the late 1970s and became public domain in the 1980s. Over time manipulation and tying make it impossible for Internet subscribers to communicate directly or even connect computers running the same operating system side by side when one of the computers is running an older version of the same software. Intel manipulated x86 peripherals using its dominance over x86 OEMs and lobbied the cable and media companies to take over the Internet service providers and restrict Internet access by tying its products to their services. Microsoft and Intel lobbied companies such as Borland International to discontinue more efficient DOS x86 programming tools and

software products that enabled more efficient programming than Windows-based tools and required fewer hardware resources, resulting in increased costs to consumers and the economy.

461. In 1981, IBM established the contractual structure between Intel, Microsoft, and IBM that was designed to contain Intel's VLSI technology to protect IBM's business from competition. It put the control over consumer access to Intel's VLSI technology in Microsoft's and IBM's hands to make it possible to control and limit consumer functionality. To hide the tying that was meant to control consumer functionality and limit competition, it split the product between three companies. This created an envelope around Intel that limited its growing VLSI manufacturing capacity by controlling consumers' access to that functionality. Consumer access to Intel's own functionality was taken away from Intel in order to prevent Intel from empowering its customers and the economy and monetizing its technology directly to safeguard the enormous profits from IBM's computing products. The protection was enabled by tying in violation of antitrust law, making a mockery of free market rules.

462. After structuring the tying and control over the Intel x86 PC in 1981 by positioning Microsoft as a gatekeeper that can limit the PC usage, IBM moved to increase its influence on Intel by buying 12 percent of Intel's shares for 250 million dollars. By 1982, less than two years after the release of the IBM PC, it made IBM Intel's largest shareholder. Intel agreed to IBM's demands to limit the distribution of its own operating system, restrict information about its X86 devices, and make predatory design modifications to the X86 architecture, which resulted, among other things, in a defect in its X286 devices that limits programmers' ability to compete with IBM products. An inevitable conflict arose almost immediately when Intel moved to build on its investment in VLSI manufacturing with the development of a 32-bit processor that IBM refused to use because it would have competed with IBM's larger computers. Intel moved to

collaborate with Compaq in bringing the 32-bit processor to the market, and IBM lost its influence on Intel and its position in the market.

463. Microsoft's control of licensing for both manufacturers and end-users¨an unprecedented situation as no other product makers restrict their usage beyond the established copyright fair use doctrine¨gave it unparalleled power over the market. Microsoft increases that power over time, collecting revenue from manufacturers to end users. Intel, on the other hand, sold a physical product, mostly to manufacturers, which limited its direct relationships with end users and gave it less power and opportunity to influence consumer behavior and monetize it as Microsoft has done. Both Microsoft and Intel, identifying that dominance accumulates over time as companies must invest in compatibility with their products, turn to predatory design to increase their dominance and the ability to monetize it

464. As Microsoft gained market dominance, it also gained dominance over Intel. It achieved this by positioning itself as the guardian of compatibility and accessibility to the x86 that hardware and software makers must depend on. Intel tolerated that position as it was used by the Wintel Cartel to increase its executives profits by increasing costs to consumers, limiting competition to Intel's advantage, and withholding functionality that was monetized as investment opportunities and providing protection to database and information technology companies, as in the case of withholding 32-bit programming tools from personal users of the Intel 32-bit 386 processor for 10 years.

465. Around 1983, with the launch of Compaq Computers and other PC clone makers, IBM lost its exclusive position in the PC market, and the "Wintel Cartel" became the standard-setting bearer in the market. Microsoft and the emerging Consortium supplanted IBM as the primary financial backbone that enabled Intel's expansion. As IBM lost its exclusive position in the PC market, the "Wintel Cartel" became the standard-setting bearer in the market. Microsoft

and the emerging Consortium supplanted IBM as the primary financial backbone

that enabled Intel's expansion. As PC clone makers increased their reliance on

Microsoft due to IBM's declining share of the PC and Intel's products, Intel

firmly committed to joining the Consortium to secure its financial stability.

466. By 1984, Intel's investment in manufacturing, following Intel's own

Moore's Law, brought Intel VLSI technology to a level that exceeded market

demand and expectations for hardware computational power. In 1985, Compaq

computers introduced the x386 32-bit processor to the market. The ability of Intel

to provide the market with lower-cost critical functionality replacements to the

most profitable computational products had to be contained by an industry that

became dependent on holding back Intel technology in order to protect its profits.

That conflict has culminated in 2012 with the effective takeover of Intel by the

Consortium.

467. With the release of Windows, the Microsoft software that was being

tied with the x86 processor, bounding the market to Microsoft, became a

bottleneck that prevented the computational power available on Intel x86

processors, demanded by consumers and essential for the economy, from being

used by x86 computer users. Since 1985, when Intel released its 32-bit x386 to

the market, until today, Intel's investment in manufacturing and design has made

it possible for Intel to use the unused computational power in its products in the

form of transistors and design capabilities to replace Microsoft's limited and

flawed software with more efficient, secure, and capable hardware and firmware

provided by Intel itself. Technology that exists in Intel but is being withheld from

consumers.

468. Intel x86 business users were forced to wait for 8 years, from 1985,

when the x386 32-bit was released, to 1993, when Microsoft Windows NT 3.1

became the first Windows operating system to be able to use 32-bit programming

on their x86 computers. Personal users of Intel PCs had to wait 10 years until the

1    1995 release of Windows 95 to access the x86 32-bit capabilities.

2         469. As the Wintel Cartel acquired dominance over the new industry, the

3    Wintel Cartel gains the influence that IBM tried to gain with its investment in

4    Intel. The Wintel Cartel moved to destroy its competitors and coordinated

5    anti-competitive policies, establishing a pattern that, over time, grew to impact

6    the entire economy, including Internet Service Providers and smartphones

7    makers. Index-based funds and dominant technology companies have taken over

8    the Wintel Cartel scheme, which has expanded beyond personal computing. It

9    eventually impacted the entire market but is still dependent on the control of

10   VLSI technology and, as a result, is still focused on Intel.

11        470. As the Consortium developed its profiting formula, positioning

12   multiple initial public offerings enabled by its members' exclusionary and

13   protection acts, Intel's priorities changed from innovation to anticompetitive and

14   protection, with its design's primary aim to provide protection that carries on the

15   Consortium's scheme.

16        471. Through the years, the growing gap between Intel's products potential

17   computing power, which came from the huge investments it made in its

18   manufacturing capabilities that resulted in matching increases in the transistor

19   count in its devices, and the limited amount of computing power that the

20   Consortium made available to x86 users created tension that finally broke at a

21   few key points.

22        472. After a meeting between Intel CEO Andrew Grove and Jerry Kaplan,

23   the designer of a popular software product named Lotus' Agenda and the founder

24   of a well-funded start-up, Go Corporation, Intel agreed to invest in Go

25   Corporation and provide it with access to its semiconductor powers. The

26   Consortium response was abrupt. Bill Gates demanded that Intel cancel its

27   investment in and withdrew its collaboration with Go Corporation. Intel complied

28   according to testimony and a letter from Microsoft's Bill Gates to Intel's CEO,

Andrew Grove. This letter was discovered in the 1998 case, Gov. v. Microsoft, but it was actually written after the fact to conceal the blackmailing aspect in that communication.

473. In the same 1998 Gov. v. Microsoft case, a testimony by an Intel engineer revealed the removal of graphics functionality that was designed to optimize X86 displays. The functionality was removed after Microsoft CEO, Bill Gates, demanded it from Intel CEO, Andrew Grove, reasoning that such functionality "belonged" to Microsoft. Grove apologized to the engineers who designed and implemented the architectural optimization, saying that he was not in a position to say no to Bill Gates. The word "belong" that Gates used indicated the existence of an unofficial agreement going back to the establishment of the relationship between Microsoft and Intel that defined the division of the influence sphere and the illegal tying between the company's products. To illustrate the effect and the legal implications of the removal of that optimized design from Intel's x86 architecture, consider an imaginary scenario where Ford engineers have designed and integrated a device into their cars that increases power while reducing fuel consumption and simplifies maintenance, and the CEO of Exxon would reach out to the CEO of Ford, insisting on the removal of this design, as it may have a negative impact on Exxon's financial performance. In response, Ford would comply with this demand.

474. In 2009, Intel's chief technology officer, Pat Gelsinger, who later served as Intel CEO, was pushed out of the company by the board and Intel's top executives after attempting to dedicate some of the available transistors to functionality that would compete with a Consortium Participant, Nvidia In 2024, Gelsinger, who had returned to Intel as CEO, was pushed out of the company for attempting to avail Intel's VLSI technology to competitors, including Plaintiff, that intended to challenge the same Consortium Participants with competitive products.

475. In 2009, the Consortium came to the conclusion that Intel's increasing capacity to empower the market was in direct conflict with its plan. The ability to make billions of transistors available to x86 users, combined with technologies such as Plaintiff's, could make the Consortium companies' exclusive products and services less relevant and endanger their survival. The Consortium would have lost its source of power and profits as it would lose control over users information and behavior. Intel's computational capacity and design cannot be withheld without destroying Intel's ability to implement and monetize it.

476. With the mission to destroy Intel's ability to implement and monetize those capabilities in order to save the Consortium, Defendant Andy Bryant was installed by the Consortium as Intel's board of directors chairman in 2012 and proceeded to execute the Consortium goals, weakening Intel semiconductor manufacturing technology.

## L. THE CURRENT STATE OF TECHNOLOGY AND IMPASSE

477. Antitrust and racketeering violations that have taken place at Intel and its business relations were common in American companies since the modernization of the economy with mechanized transportation and energy distribution that necessitated the enactment of antitrust law. These violations lead to catastrophic consequences, some of which, as outlined below, have gone unnoticed. When cutting-edge technologies that move society forward are illegally altered in order to harm competition, it hurts the free, competitive economies that create those cutting-edge research and technologies. It makes free economies vulnerable to unfair economic competition from oppressive societies that take advantage of the weaknesses introduced by the illegal manipulation of cutting-edge technologies and their own exploitative forms of labor that can be used for low cost manufacturing as well as reverse engineering with disregard for intellectual property rights to gain an economic advantage with dire implications for the U.S. work force, innovation, and the economy as a whole. These illegal

practices undermine a competitive free market, causing irreversible long-term damage and destroying the very industries that once thrived on the principles of free competition. The details of the suppression of U.S. electric cars and battery technology outlined below demonstrate this.

478.  The type of violations that Intel's officers and directors and Consortium Participants engaged in started prior to the 1981 release of the IBM PC, which established the x86 as the prevalent market standard. Under the cover of rapid advancement in technology, egregious antitrust violations that dominated the U.S. major industries were carried on with minimal compliance with insignificant enforcement despite unambiguous laws, court decisions, and regulations.

479.  The violations by past and present Intel's officers and directors and Consortium Participants outside Intel alleged by Plaintiff in this action on behalf of himself include: aiding and abetting in implementing exclusionary and tying policies to lessen competition; destruction of Intel's advance technologies including low-power semiconductor technologies; implementation of predatory design modifications to the x86 architecture; conspiring to weaken the x86 architecture; misleading Plaintiff and breaching Intel agreement with Plaintiff in order to block Plaintiff's technology from competing in the market; destruction of corporate assets; and in taking those actions as a part of a vast conspiracy with officers and directors of companies they protect from competition in violation of antitrust and racketeering laws to a enrich themselves from their investments in the companies they protect and further their beneficial relations with those companies. Plaintiff makes these allegations with firsthand personal knowledge.

480. The communication that have taken place between officers of companies involved in antitrust coordination conspiring to lessen competition, introduce predatory design, and increase cost to consumers were not unlike a telephone call made in February 1981, in which American Airlines CEO, Robert

1    Crandall suggested to his counterpart in Braniff Airline to raise the price of their

2    flights. Crandall was arrested by the FBI for violation of antitrust law. The DOJ

3    however made its position regarding such breach of law clear by agreeing to give

4    Crandall a slap on wrist, signaling to industry captains that coordination between

5    companies of policies designed to limit consumer choices and increase products

6    cost will not be investigated and prosecuted.

7        481.  Antitrust schemes between dominant companies, like those that were

8    carried on within the Wintel Cartel and then extended to markets exposed to

9    computing and the Internet, date back more than a century to the practices that

10    initiated the U.S. antitrust laws. They typically focus on critical consumer

11    consumable besides food, such as those associated with local monopolies,

12    utilities, and public regulations. Energy, transportation, communications, and

13    computation are central to those practices. The Standard Oil scheme, which

14    involved the railroad industry, led to the enactment of Sherman Act antitrust law.

15        482.  In the early 1900s, Thomas Edison's company, Edison Electric,

16    created technology that necessitated local electrical generation. It ran into a

17    conflict with J. P. Morgan, who schemed to protect his monopolies and

18    oligopolies control of national distribution of gas, transportation, and metals and

19    favored technologies that impede local generation and electrical transportation and

20    required national-scale investments in cooper and vast public energy

21    infrastructure design to concentrate power over distribution and pricing. Laws

22    requiring the combined use of gas and electricity were enacted, burdening

23    consumers with higher cost and resulting in fatal fires that led to years-long

24    delays in the electrification of numerous localities. Under financial manipulation,

25    Edison was forced out of his own company. Edison Electric became General

26    Electric, and the destruction of private and public local electrical generations and

27    electrical transportation that ensued lasted more than half a century and is

28    impacting negatively national standards, regulations, and availability of

technology to this day. The "War Of The Currents" that included a war over transportation that was carried out between Edison and Morgan is only now being won by Edison's DC (Direct Current) and electrical transportation, after more than 100 years of catastrophic climate and economic harm. A century of market dependency on monopolistic central control of energy contributed to the Great Depression and to most economic maladies since. It also impede involution with significant delay in bringing advanced technologies to the market. It delayed research that resulted in semiconductor innovation by decades and the resurrection that resulted in renewable electrical generation by a century.

483. In 1996, top executives of Exxon Oil, Chevron Oil, and General Motors schemed to remove a scientific breakthrough in battery technology that, given time, would allow electric cars to compete favorably with gasoline cars. The material technology breakthrough that could be applied to all kinds of batteries was being implemented in nickel hybrid batteries. General Motors removed their electric cars from the market while collaborating with Exxon and Chevron to remove the Ovonic Battery Company technology. Ovonic Battery developed nickel metal hydride (NImH) battery breakthrough technology. Executives from Exxon, Chevron, and General Motors coordinated the removal of the technology from the market after receiving an assessment that competitive electric cars with similar ranges to gasoline cars and significant economic benefits to consumers and the economy can be made within a few years using the new advanced materials in batteries. Their actions stopped the availability of more economical and safer battery technology that started in the U.S. during the 1980s and 1990s, pushing green energy development to foreign countries that focused on lithium-based batteries and moved foreign companies to the forefront of hybrid and electrical car manufacturing. Only in the last few years has American industry been catching up with foreign companies, focusing again on NIH as a safer and more economical alternative to lithium that famously started fires on

Boeing airplanes. GM and Exxon schemes induced thirty years of delay and losses with untold damage to the American economy and consumers and put the American car industry at risk.

484. During the 1990s, the Consortium, led by financial and technology executives motivated by their stock market enormously profitable scheme, moved to suppress Intel's low-power semiconductor technologies in order to monopolize computation as central services under their companies control by preventing the relatively open x86 hardware and software standard from competing in the mobile computing market. The action was designed to shield Qualcomm, Apple, and Google from x86 developers such as Plaintiff that could be enabled by advances in Intel's semiconductor technology to compete in the mobile computing market on a massive scale. The suppression of Intel low-power technologies and their removal from the market by independent companies resulted in the transfer of mobile computing hardware dominance to foreign companies. Qualcomm lost its primary position to Chinese companies, and no significant mobile technologies are currently being manufactured in the U.S.

485. A significant number of hardware and software companies with technologies and products that reduced costs for consumers and challenged dominant PC companies with competitive products were removed from the market in a coordinated violation of antitrust law and financial regulations by the Consortium. Intel removed a significant number of these companies and technologies from the market. It took place despite conspicuous observation that it deprived American industry and consumers of essential efficient technologies and that the elimination of competition in the U.S. enabled the rising of competitive products outside the U.S. and put foreign companies in control of significant parts of the U.S. economy.

486. During the 1980s and 1990s, Plaintiff's calls to the DOJ antitrust division to report such acts went unheeded. In one such phone conversation, a

DOJ antitrust division lawyer conveyed to Plaintiff the DOJ's stance at the time: "It is their product, and they have the right to do anything they want with it." By the time the DOJ took action at the end of the 1990s, dozens of companies and their more efficient technologies had vanished from the market, and inefficient standards, which were costly to consumers and the economy, had become so entrenched that the action effectively had no impact.

487. The stifling of competition in the U.S. enables American technology companies to coerce consumers into adopting inefficient technologies while simultaneously destroying more efficient ones that would otherwise save consumers' costs. This destruction makes the U.S. economy less competitive and less productive, allowing foreign companies to replace U.S. companies. The AI sector is currently experiencing a similar pattern, where the loss of low-power semiconductor technologies and the destruction of Intel's competitiveness detailed in this Complaint enabled Chinese companies to reach AI performance levels similar to those of American companies, at a fraction of the investment American companies have made. They do it by leveraging proven models to reduce their research and development cost, while exploiting the inflated pricing that results from the protection scheme the Consortium orchestrated to expand their market share both within and beyond the American sphere of influence.

488. Recently a Chinese startup, DeepSeek, released a new AI model that rivals OpenAI's. Such leapfrogging has taken place in numerous technologies, from electric cars to cellular wireless communications. It is only possible because the cutting-edge research and creativity spawned in the free-thinking American market is packed into manipulated products designed to control usage and distribution. In the case of AI, the blatant centralization of distribution by the destruction of low-power semiconductor technologies does enrich Consortium Participants participating in a stock market run but leaves the American economy holding an empty bag.

489. Only a competitive marketplace can stop foreign companies from taking over advance technologies. After the destruction of AMD's semiconductor manufacturing removing the Consortium control over Intel is the only thing that can prevent the loss of massive computation and AI to the U.S. economy that would repeat the loss to the U.S. economy in other industries. Intel is critical to the ability of the U.S. to remedy that situation, as companies such as Nvidia and OpenAI are limited to a narrower design range that is segregated from the physical effects behind their technologies.

490. Propaganda campaigns that disseminate false technical and scientific information always support the industry's nefarious agendas. Common to all those hidden agendas is a predatory effort to justify an increased cost to consumers. A number of misleading concepts supporting predatory agendas go back to the origin of the IBM PC and the founding of the Wintel Cartel. They include: (a) the artificial separation between hardware, software, operating systems, and applications. (b) The false justification of complexity and lack of modularity between parts of operating systems. (c) False misconceptions about computing efficiency, power consumption, and computational models falsely claim higher power consumption than necessary. (d) The misleading arguments for the separation of the x86 architecture from the smartphone market. (e) Artificial fragmentation between various types of hardware models, such as programmable hardware (FPGA) and general computing processors. (f) Artificial separation between general programming tools and EDA (Electronic Design Automation) as well as (g) misconception about the need for outsourcing and high-skill labor. Artificial fragmentation were designed to hide illegal ties that are used to restrict and control computing product usage and raise their cost. Those campaigns help hide predatory design by making its effects seem like an unavoidable part of the technology, like the notion that massive computing and AI require an extremely high level of power.

## M. MICROSOFT

491.  Both Microsoft and the Consortium have as their primary objective the development and application of predatory technologies that enable the imposition of costly fees on routine operations. Those fees are in the form of centrally distributed toll-based services. Microsoft and the Consortium use "predatory technologies" to keep those services safe from products and technologies that could make people less reliant on toll-based services and lower prices for customers. Paragraphs 502 and 503 at the end of this section detailed how Microsoft uses predatory design to accomplish those objectives and provide such predatory design to other Consortium Participants. Microsoft and the Consortium use these methods in tiny doses to conceal their cumulative impact, which raises customer costs over time by thousands of percent. In the Microsoft and Consortium system, the consumer represents a living frog undergoing cooking. As the heat gradually increases, the frog remains in the saucepan and eventually cooks. The frog would have leaped out if the temperature rose too fast. By letting other Consortium Participants to control, degrade, and lessen competition for products consumers purchased or leased, Microsoft preserves its dominant position inside the group, in efficient technologies and x86 design element extensions and improvements that would have significantly lower costs to consumers and empower consumers by ending their dependency on the Consortium's centrally distributed services. creation of mostly unnecessary electrical generation capacity that would be provided to Consortium Participants that currently maintain defiance of the 1936 Supreme Court's clarification of the 1914 Clayton Act, as detailed below.

492.  As outlined below, Microsoft maintains its position as the biggest beneficiary of the Consortium's illicit activities by employing predatory design in its own products while working with Intel to incorporate matching predatory design elements into the x86 architecture. These predatory design features and

elements hinder the x86-based computer's overall performance for all users in order to give Microsoft products an unfair competitive edge. These predatory design features and elements eliminate competition from more efficient products and technologies, forcing consumers to depend on Microsoft and the Consortium's centrally distributed products. The resulting increase in consumer and economic costs significantly increases the Consortium Participants' profits and market valuation. BlackRock's and other Consortium Participants' undue influence over Intel is crucial to Microsoft's and the Consortium's scheme profitability and survival because it is used to force Intel to stop x86-based computers from running more efficient technologies that would have replaced Microsoft products in a free, competitive market. It is also used to force Intel to remove and hold back its own more exclusive ability to provide AI as a service as a result of the destruction of Intel's low-power technologies. This collaboration, known as the Global AI Infrastructure Investment Partnership (GAIIP), aims to establish a $30 billion fund focused on building and expanding data centers and supporting energy infrastructure to meet the growing computational demands of AI technologies. The initiative is expected to mobilize up to $100 billion in total capital when factoring in additional debt financing..

494.  Microsoft maintains a strategic business relationship with another index-based fund, State Street, which owned a large block of shares of Intel and AMD. The relationships primarily focus on cloud and technology solutions, remunerating State Street for its influence and interference with Intel. State Street utilizes Microsoft Azure as a platform to modernize its infrastructure and enhance its services. This collaboration supports State Street's Charles River Investment Solution and other business operations by leveraging the unfair advantages that enable Azure's advantages in scaling of centrally

489. Only a competitive marketplace can stop foreign companies from taking over advanced technologies. After the destruction of AMD's

semiconductor manufacturing, removing the Consortium control over Intel is the only thing that can prevent the loss of massive computation and AI to the U.S. economy that would repeat the loss to the U.S. economy in other industries. Intel is critical to the ability of the U.S. to remedy that situation, as companies such as Nvidia and OpenAI are limited to a narrower design range that is segregated from the physical effects behind their technologies.

490. Propaganda campaigns that disseminate false technical and scientific information always support the industry's nefarious agendas. Common to all those hidden agendas is a predatory effort to justify an increased cost to consumers. A number of misleading concepts supporting predatory agendas go back to the origin of the IBM PC and the founding of the Wintel Cartel. They include: (a) the artificial separation between hardware, software, operating systems, and applications. (b) The false justification of complexity and lack of modularity between parts of operating systems. (c) False misconceptions about computing efficiency, power consumption, and computational models. (d) The misleading arguments for the separation of the x86 architecture from the smartphone market. (e) Artificial fragmentation between various types of hardware models, such as programmable hardware (FPGA) and general computing processors. (f) Artificial separation between general programming tools and EDA (Electronic Design Automation) as well as (g) misconception about the need for outsourcing and high-skill labor. Artificial fragmentation were designed to hide illegal ties that are used to restrict and control computing product usage and raise their cost. Those campaigns help hide predatory design by making its effects seem like an unavoidable part of the technology, like the notion that massive computing and AI require an extremely high level of power.

493. Microsoft and BlackRock maintain extensive circular relations that are based on the extinguishing of technologies that would have lower costs to consumers by empowering them with better technologies that would have freed

them from their dependency on needless Consortium's centrally distributed services. As part of those relations, the two companies have entered into a partnership aimed at taking advantage of the destruction of Intel's low-power technologies. They do that by investing in electrical power generation infrastructure, serving the Consortium's centrally distributed computational services. These efforts are a part of state street's broader technology strategy, which, when combined with the Consortium's long-term objectives, gives state street a competitive advantage based on its influence on Intel.

495. the vanguard group owned approximately 665 million shares of Microsoft, which is about 9 percent of the company. this makes vanguard a major beneficiary of Microsoft's unprecedented rise in market share and valuation, which largely depends on the protection and unfair advantage Intel provides to both Microsoft and the Consortium. The ability of Microsoft to provide that protection largely depends on Intel. By volume, Vanguard is likely the largest non-technology Consortium, and with State Street and BlackRock, they hold the largest block of Intel shares. As a Consortium Participant Vanguard is less visible and influential than BlackRock with its investment initiatives and its direct involvement in Intel management, but its tacit collaboration in the control of Intel and its conflict of interest as a beneficiary of Intel's demise resulting from that control cannot be ignored.

496. Both Microsoft's operating system and Intel's modifications to its x86 architecture feature a predatory design that blocks program's direct access to the x86 CPU to hinder the creation of efficient parallel programs that could utilize the multiple CPUs available on x86-based computers for efficient parallel operations. Microsoft's operating system, however, has sole access to an inferior Intel x86 architectural interface and thread management that provides Microsoft an unfair competitive unfair advantage by allowing Microsoft products to partially compensate for that obstruction.

497.   Microsoft is the largest provider of toll-based online services and applications that replace x86 functionalistic that are being blocked by Intel from running on x86-based computers, therefore preventing competing technologies and products such as Plaintiff from running on the x86 architecture for which they were designed.

498. Microsoft's extraordinary revenue and valuation increase is the direct result of the Consortium's continued manipulation of Intel. The Consortium is forcing Intel to provide Microsoft with (a) sole control over the x86 architecture, (b) unfair access to x86 architectural elements that give Microsoft products an unfair competitive advantage, (c) the destruction and removal from the x86 architecture of efficient Intel technologies and architectural elements that in a free market would have replaced Microsoft's products and empowered consumers and the economy by lowering costs and freeing consumers from reliance on central services that are at the heart of Microsoft's growth, (d) maintainning x86 architecture's flaws and vulnerabilities that force users to buy otherwise unnecessary Microsoft and Consortium's products and (e) preventing competing products such as Plaintiff's from running on x86 systems.

499. Microsoft is currently engaged in an attack on the x86 open standard with an attempt, which seems to have failed until now, in partnership with another Consortium leader, Qualcomm, to create an exclusive non-open custom-built x86 that will allow Microsoft to adapt the illegal business model of the main smartphone operating system providers, Google and Apple, and restrict as well as monetize applications that will run on its Windows operating system by mandating that all programs that run on the Windows operating system will be accepted and distributed by its own application store.

500.  This Complaint details more than four decades of suppression and destruction of competing superior technologies and products. Over those four decades, the disparity between technologies that are banned by Intel and

1    Microsoft from accessing the market and the products that are currently available

2    to consumers has widened to extreme levels. Microsoft products are inefficient,

3    inherently insecure, require unnecessarily large hardware resources, are

4    failure-prone, frequently require unpredictable time-consuming updates, lack

5    redundancy backup, and compel users to depend on costly remote service.

6    Microsoft and its stakeholders are aware that their continued market dominance

7    depends on the uneven playing field protection Intel and AMD are forced to

8    provide and that better existing technologies jeopardize the survival of the

9    company and its objectives.

10       501. Microsoft's abuse of x86-based computer users by misapplying the

11   Windows trademark to products that are designed to be incompatible with

12   Windows and block non-Microsoft products from running on personal computers

13   is described in this Complaint, section A. CPU, SOFTWARE AND

14   TRADEMARK FRAUD, page 127.

15       502. Microsoft is actively designing and implementing in its Windows

16   operating systems predatory code that blocks functionality and cripples

17   non-Microsoft products running in Windows operating systems. In one such case,

18   programs, including Plaintiff's programs that must be run in an older version of

19   Windows because of incompatibility that was introduced by Microsoft in newer

20   versions, were run on an older version of Windows within a Microsoft Windows

21   virtual machine. The program's inability to reach the Internet and communicate

22   with the host machine rendered it useless. However, Microsoft products running

23   at the same time in the same virtual machine are able to connect to Microsoft web

24   pages over the Internet. The difference in the program's behavior is direct proof

25   that Microsoft implemented code made just for stopping non-Microsoft programs

26   from communicating with the host machine hardware, even though the settings

27   were supposed to let them and indeed allow the Microsoft product to

28   communicate.

503. Microsoft grants access to its predatory design to other Consortium Participants, enabling them to illegally control product usage and reduce competition through the Windows operating system, in violation of the 1936 Supreme Court ruling. In one such case, HP (Hewlett-Packard), which is selling printers that require ink cartridges to print, sold consumers an inkjet printer for which a third-party company supplied matching ink cartridges. Consumers, aware that they could purchase and use matching ink cartridges from a third party, purchased the printer. After using the printer for a while with the third-party ink cartridges, HP used the predatory design feature in the Windows operating system to replace part of the software that provides communication between programs and the printer with software that identifies the third-party ink cartridge and stops the printer from printing in an attempt to force the printer owner to purchase HP-made cartridges. The parallel between HP's action and Microsoft's enablement of lessening competition in an effort to prevent computer and printer owners from using third-party supplies is a direct parallel to IBM's actions that were found to be illegal in the Supreme Court 1936 ruling.

N. AMAZON

504. Amazon's extreme size, its dominance, its exclusivity, and the high profit margins its online services generate are the direct result of the protections it obtains from the manipulation of Intel and the x86 technology.

505. Intel's x86 technology governs Internet server utilization, and the limitations imposed on x86 architecture by both Intel and AMD made the rise of Amazon possible. Before the advent of smartphones, the majority of consumers made online purchases using Intel and AMD's x86 technology. Smartphones currently account for 72% of all online purchases, a market that the Consortium forced Intel to abandon. Less than 28% of online purchases utilize x86 technology, but the unfair advantage Amazon enjoys stems from the impact the Consortium manipulation has on the utilization of x86 servers. Intel and x86

1    technology dominate the server market, but the Consortium also enforces similar

2    limitations not only on x86 architecture at Intel and AMD but also on companies

3    that use the alternative ARM architecture, like Marvel and Ampere, which it is

4    dominating. To enforce the same limitation on non-x86-based servers, Oracle

5    took control of Sun Microsystems, an independent server company that was in a

6    position to further optimize server technology when it was taken over, as well as

7    Ampere, a non-x86 server company that was started by a former Intel executive.

8        506.  In a free market devoid of the Consortium manipulation of Intel and

9    the x86 technology, the utilization and availability of the Internet would have

10   optimized and lowered the cost of marketing paths between manufacturers,

11   sellers, and consumers. The manipulation of x86 technology is giving Amazon an

12   unprecedented unfair advantage in online marketing that is based on its size while

13   impeding the rest of the market resulting in an increase cost to a significant

14   portion of the economy. One recent unfair market advantage that Amazon is

15   receiving from the Consortium is the blocking of relatively open x86 standards

16   from participating in the smartphone market, which allows Consortium

17   Participants to capture and redirect the behavior of online consumers. This

18   advantage strengthens the initial and fundamental protections the Consortium

19   provides that drive Amazon's growth and exclusivity from its inception. The

20   Consortium's manipulation of x86 architecture increases power consumption,

21   while the manipulation of x86 servers form factor makes it more difficult and

22   expensive for companies that to support their own online server operations.

23   Predatory design and modifications made by Intel to the x86 architecture and

24   operating system, along with the tying and exclusionary acts that go with them,

25   make it too expensive for businesses to provide flexible, scalable remote

26   computing that is needed for online service provision to consumers. The

27   elimination of programmatic control over CPU allocations and direct control over

28   CPU operations has left the handling of worst-case scenarios associated with

online server operations dependent on costly infrastructure and unreliable,
expensive software, necessitating significant maintenance and infrastructure that
make competition with Amazon impossible.

507. Amazon built its business model around the protection the
Consortium granted it. Amazon achieved this by merging its online services with
its AWS (Amazon Web Services) platform, thereby leveraging its size to gain an
artificial advantage in the marketplace. It supported the Consortium's objective of
replacing autonomous consumer computing with centralized subscription-based
services for decades, working with a "dump-level" profit margin to capture
market share. Manipulation of the x86 architecture and servers left retailers and
most companies dependent on a few massive central computing service providers,
enabling Amazon to charge businesses that use its services 40 percent of their
receivables. This effectively taxed consumers and economies at a higher rate than
any government tax used to cover the cost of essential services and is a direct
result of the suppression of competitive technologies, including Plaintiff's, by
Intel.

508. Retailers are being forced to use Amazon's exorbitantly-priced online
selling service by a intentional predatory design flaw in the x86 architectures that
prevents online servers from providing scalable service that can dynamically
support a sudden increase in the number of clients accessing their server
simultaneously. The same design flaws increase the vulnerability of small-scale
services to DOS (Denial of Service) attacks carried out by illicit operators over
the web, as well as false access to advertisements by unscrupulous competitors.
These flaws benefit the Consortium by increasing the cost of autonomous
computing for consumers and the market as a whole, thereby promoting centrally
distributed computing. Despite the fact that the original x86 standard provided
programmers with control and facilities for optimal and cost-effective scaling
when the architecture was updated to provide multi-core devices, Intel

implemented changes that prevented direct programmatic CPU selection. With that limitation, the tying of operating systems that limit functionality and mandate unnecessary overhead and exclusionary acts that limit Plaintiff access to essential x86 resources is Intel inflicting significant harm on Plaintiff and its clients while serving the Consortium and protecting Amazon.

509.  Although the cost of raw computing power for x86-based computers is extremely low, the Consortium's restrictions on how x86-based computer and server owners can use their computers and the blocking of competing, more efficient technologies and products, including Plaintiff's, from accessing the market increase the cost of online services and the infrastructure it requires. This imbalance in the market renders online marketing economically unfeasible for small businesses, as it imposes exorbitant tolls based on monopolization and centralization, which lack economic justification. Retailers are forced to rely on Amazon for online marketing, even though the cost of doing business through it can potentially account for as much as 50 percent of their total revenues. The Consortium compels Intel to implement predatory design and practice and withhold the computational power of its products from developers such as Plaintiff to create and maintain that uneven market. Consortium Participants obtain their influence and control over Intel by purchasing publicly issued shares to lessen competition in violation of the Celler-Kefauver Act of 1950, which was designed to prevent the lessening of competition by doing just that.

O. APPLE

510.  Participation in the Consortium directly benefits Apple in numerous ways, leading to a meteoric rise in its share value, which is significantly higher than that of similarly situated market operators like Samsung. For illustration purposes, the entire Samsung Group market cap, which represents close to 20 percent of South Korea's GDP, is estimated to be in the 500 billion dollar range. As a Consortium participant and a vehicle for profiting from its shares' rise due

to the protection granted by the Consortium, Apple, which competes with
Samsung's electronics division and has a market share comparable to but smaller
than Samsung's electronics market share, arrives at a valuation that is at least six
times that of Samsung's entire group.

511.  Apple directly benefited from Intel's manipulation of its x86
smartphones prior to their removal from the market. Intel restricted its x86-based
smartphone version to prevent autonomous programming and applications from
running on those x86 devices, as well as to prevent compatibility with x86-based
personal computers and server applications. Intel achieved this by tying the x86
smartphone with operating systems that hindered autonomous programmability
and compatibility with x86-based competitors. The main beneficiaries of that
predatory design, illicit tying, and exclusionary actions were Apple and Google.

512.  Apple directly profited from Intel's discontinuation of Intel's x86
smartphone line at the time the computing market was accelerating its shift from
personal computing to smartphones. Apple regarded a potential move by Intel to
enable transparent compatibility between x86-based personal computers and
smartphones as a grave and catastrophic threat to its business model and market
position. Apple was assured by the Consortium that such a move would never
take place, as the Consortium's main source of revenues via the appreciation of
publicly traded shares would continue to use Apple as its main vehicle for
profiting from the appreciation of Apple's shares and that Intel shares would not
be allowed to rise, as Consortium Participants personal investments reflected.
The discontinuance of Intel's x86 smartphone line was done to assure Apple and
other Consortium Participants that such a move could never take place.

513.  Apple directly profited from the sale of Intel's smartphone modem
division to Apple after the division achieved a commercial presence supplying
modems for Apple's smartphones. Reinforcing the assurance to Consortium
Participants, including cellular service providers, that Intel will not allow Plaintiff

1    and other x86 developers to compete in the smartphone space, the division was sold at a

2    loss to Apple, impairing Intel's future recovery and competitiveness.

3        514.  A technology concept that was described by Plaintiff to Intel and

4    shared with its modem division was released by Apple to consumers following

5    Apple's takeover of Intel's smartphone modem division. The timing of that

6    concept release makes it likely that it originated at and by Intel based on Plaintiff

7    sharing of information with Intel under the non-disclosure agreement, although it

8    is possible that the concept originated independently.

9        515.  Apple imposes control and limits over applications programming and

10    usage on its smartphones, restricting the ability of smartphone users and

11    programmers, including Plaintiff, to use those devices in violation of the 1936

12    Supreme Court stipulation that explicated the Clayton Act. This restriction stifles

13    innovation and undermines consumer choice by forcing users to conform to

14    Apple's ecosystem and its associated costs. What directly enabled Apple's

15    dominance and bold anticompetitive practices was the destruction of Apple's most

16    significant competitor, the Intel x86-based smartphone, which opened the gate to

17    a non-Microsoft, efficient, and competitive and relatively open x86 computing

18    environment. That was the direct motivation of the Consortium move to destroy

19    Intel's smartphone investment and product line and the investment and the sale of

20    Intel's modem division to Apple before Gelsinger returned to the company.

21        P. NVIDIA

22        516.  Graphic processing represents a significant opportunity for

23    parallelism. Semiconductor architectures and parallel infrastructure can provide a

24    significant opportunity for optimization through parallel processing and parallel

25    programming. The withholding of parallel processing from the x86 architecture

26    and the blocking of x86 programmers, including Plaintiff from enabling parallel

27    programming on x86-based computers gave Nvidia an unfair advantage in the

28    market that allowed its unprecedented growth and market valuation increase.

517. The direct control of efficient parallel programming in personal x86 computers would have increased the already large competitive advantage that local applications have over centrally distributed applications, which would have conflicted with the Consortium's long-term objective of forcing consumers, companies, and ultimately the entire economy to rely on centrally distributed computing. Intel engineers responded to market demands and implemented a parallel infrastructure update to the x86 architecture, but their efforts were cut short and, in 2009, destroyed by Intel's board of directors following Consortium policies and directives that were designed to protect NVIDIA's unprecedented market valuation growth.

518. Intel paid Nvidia 1.5 billion dollars in patent license fees and signed a cross-license agreement accommodating the Consortium's long-term objectives in 2011. This took place after Intel's board and top executives, acting on behalf of the Consortium and for their own personal gain as investors in Consortium Participants, removed several Intel-developed improvements to the x86 architecture that would have competed with Nvidia, including Project Larabee in 2009, which involved the forced departure from Intel of a candidate for the CEO position, Gelsinger, who championed it as a way to free Intel from the Consortium's anticompetitive influence and limitations. The Consortium enforces the resulting market structure through various means, such as manipulating AI technology and agreements between Microsoft, OpenAI, and BlackRock, thereby restricting AMD and Intel and strengthening Nvidia's market position.

519. The Consortium's protection of Nvidia, which serves its objectives in multiple ways, directly contributes to its meteoric rise. BlackRock, State Street, and Vanguard gain vast amounts of profits from the appreciation of Nvidia shares, while Intel, which they are controlling, suppresses technologies that directly compete with it. AMD offers alternative technologies to Nvidia, but the Consortium's limitations on AMD's x86 interface, imposed by the Windows

operating system, make those technologies less competitive. After setting its own path with the x86 64-bit standard and discussions with Plaintiff regarding technology that would have replaced Microsoft's Windows, AMD was forced to sell its manufacturing facilities, losing its integrated design and manufacturing as well as market independence. This, along with Microsoft's effective monopoly on x86 personal operating systems, has left AMD reliant on the Consortium in all aspects of its business.

520.  AMD is a direct competitor of Nvidia in graphics and AI, but AMD's access to consumers depends on Microsoft; its access to manufacturing depends on the allocation of limited manufacturing capacity by TSMC in direct competition with Nvidia and Apple for that precious resource, and its financial investment options are limited by a financial market dominated by the Consortium. It makes competing with Nvidia, despite having comparable and, in some cases, superior products, impossible. Nvidia supports the Consortium's long-term goals of controlling AI as a central resource and monetizing it with a high degree of exclusivity by offering it as a subscription-based service to consumers and companies.

521.  Nvidia does not play a crucial role in creating the current form of AI beyond providing the high-capacity numerical processing that can be provided by Intel and AMD with an integrated interface to the x86 architecture that would open the market for competition. The Consortium's undue influence on Intel and AMD, along with the special relations between OpenAI and Microsoft that are currently under litigation, enables Nvidia to exclusively provide the high-capacity numerical processing necessary for the current form of AI. Eliminating the Consortium's influence would allow Intel and AMD to provide the same power and open the AI market to competition. Nvidia AI-targeted processors consume unnecessarily large amounts of energy, which serves the Consortium's strategic goal of making AI dependent on power infrastructure that can only be provided

by the largest companies, giving Consortium Participants an advantage in obtaining exclusive control over AI. Stopping the Consortium's influence on Intel would allow low-power technologies such as Plaintiff's to compete and eliminate the need for exorbitant investments in energy infrastructure such as the GAIIP Microsoft and BlackRock partnership.

### Q. QUALCOMM

522. Qualcomm is a Consortium Participant with its entire business model dependent on Consortium protection. Qualcomm was a direct beneficiary of Intel's discontinuation of its x86-based smartphones at a time when the computing market was shifting from personal computing to smartphones. Qualcomm was a direct beneficiary of Intel's sales of its smartphone modem division to Apple. Both of those decisions that were made by Intel's board members, who are Defendants in this case, damaged Intel, harmed Plaintiff and were made in order to eliminate direct competition with Qualcomm, which is a provider of a base processor and modems for smartphones.

523. Qualcomm effectively maintained a kind of partial monopoly over a significant part of the smartphone and cellular markets. Qualcomm shares this monopoly with Apple through legal wrangling and various agreements. An Intel presence in that market has the potential to open up the market to independent x86 developers, such as Plaintiff's, and technologies like Plaintiff, which offer transparent compatibility between personal computers and smartphones as well as significant power and cost savings. Independent developers competing with Qualcomm's smartphone processors could have lowered the market's reliance on cellular networks by using other available technologies, which would have been a big challenge for Qualcomm.

524. Qualcomm is a direct competitor to Intel as part of its effort with Microsoft to replace the open x86 standard with a closed chip that claims to be a Windows device but is incompatible with x86-based Windows applications. The

Qualcomm-Microsoft processor aims to shield independent programmers, such as Plaintiff, from competing with Microsoft and other Consortium Participants' centrally distributed services.

## XIII. PREDATORY DESIGN PROFITEERING. HARM AND RIGHTING.

### A. PROFITEERING SLOWS AND IMPEDES PROGRESS

525. This segment encapsulates the contextual background, implications, and ramifications of the illicit activities detailed in this Complaint. Consortium Participants, motivated by profits, may not be aware of ramifications, which extend beyond the increasing dependence of the U.S. economy on foreign imports, putting more than the economy in peril.

526. The freedom to create and use technology determines humanity's nature and progress. Humanity's advancement from fire-making and stone tools to Kepler's and Galileo's observations and laws, which initiated the scientific revolution, is driven by freedom of thought and innovation. The church's effort to stop Kepler and Galileo's new ideas and models from challenging its authority would have succeeded if, instead of arresting and censoring people, it had taken control of the few glass makers in Europe at the time and stopped Kepler and Galileo from obtaining the clear glass they needed for their telescopes. VLSI and semiconductors are today's equivalent of the 15th-century glass and lens making. A small group of people has taken control of this technology, striving to maintain their billionaire status and succeeding in what the church failed to achieve in the 15th century.

527. As this Complaint details, the Consortium's ongoing efforts to stop the exponentially increasing computational power that Intel's engineers and its large R&D budget enabled and created from reaching Intel's clients. The attempt to control the economy by limiting VLSI, which served as a prelude to the control, manipulations, and impediment of the x86 standard, began in the 1970s.

At that time, the IT industry, led by IBM, aimed to keep the new CPU technology from being freely available in the market. The Consortium that evolved from the Wintel Cartel, which dominated the PC market in the 1980s, is an unofficial coalition of computing, communication, media, and finance companies and their individual stakeholders. They profit from controlling all aspects of computing technology, including its usage by consumers, and monetize this control through the accelerated appreciation of the unfairly protected companies' they safeguard. They use financial instruments, such as index-based trading, to conceal their undue influence and their manipulation of technologies and markets. They exploit the issuance of publicly traded shares to monetize their predatory designs and illicit strategy. Under the pretense of false technological constraints and misleading business prudence, Consortium Participants are accumulating vast financial benefits from their illicit activities.

528.   The comparison to the 15th-century effort to preserve an exploitative order in place is not an empty one. It explains why IBM built its tying relationships around the IBM PC and resisted the move from 16-bit computing to 32-bit. It explains the priority that BlackRock and Microsoft put on impeding Intel, AMD, and the x86 standard. The creation and positioning of the EDA industry serves as a barrier to competition. The manipulation of semiconductor architectures with dark silicon, It explains HP's takeover of TI and TI's subsequent downsizing after Plaintiff suggested a technology that would significantly lower computing costs. This also explains Oracle's acquisition and effective shutdown of SUN, which occurred when technologies enabling more efficient, cost-effective massive data processing became available. Oracle also retains control over Ampere, a chip design company that was capable of achieving a high level of optimization in its new design but has chosen to stick to the industry's dark-silicon high-power formula instead of implementing a parallel architecture that would make the best use of and control the billions of transistors

1    that are in its chips. Marvel Technology, the other significant server chip

2    company in the market, follows that same design directive that was chosen to

3    safeguard the Consortium's profiteering interests. The Consortium occupies every

4    available slot of manufacturing capacity and design resources to ensure its

5    profiteering and stock market scheme stays intact and protected from competition.

6        529.  Galileo's ability to see the earthly character of heavenly bodies and

7    Kepler's transition from being an astrologer to being an astronomer were both

8    made possible by the invention of the telescope. That innovation also marked the

9    beginning of the transformation of western civilizations from collective colonies

10   to individual partnerships. The Supreme Court's 1936 ruling that clarified the

11   Clayton Act upheld the degree of freedom necessary for that progress.

12   <div align="center">B. THE IPO INDUSTRY SCHEME</div>

13       530.  Consortium Participants spearheaded the ongoing scheme to convert

14   x86 features into toll-based products and services forced on consumers and were

15   behind the board and its executive decisions. The scheme operated as an IPO

16   "industry," promoting multiple initial public offerings of companies that could

17   never exist without the manipulation of the x86 semiconductor design.

18       531.  One example is a company named CrowdStrike that on 19 July 2024

19   caused a world-wide security disaster, costing billions in damage to companies

20   and consumers. CrowdStrike was created by the Consortium to take advantage of

21   and provide solutions to x86-based computer users for problems resulting from

22   changes to the x86 architecture that the Consortium forced Intel to implement.

23       533.  CrowdStrike's illustrates how the Consortium' control of Intel is

24   translated into an exorbitant windfall of profits in the form of publicly traded

25   shares appreciation. As of recently, Vanguard owned 21.19 million shares valued

26   at $5,564,063,696, BlackRock owned 18.46 million shares valued at

27   $4,845,728,241, and State Street owned 9.36 million shares valued at

28   $2,456,077,269 of CrowdStrike publicly traded shares.

535. The market's dependency on the critical computing capabilities that the Consortium manipulates for its Participants benefit is absolute, leaving no alternative for consumers, businesses, institutions, and governments. By the end of July 19, 2024, after the damage caused by CrowdStrike became apparent, CrowdStrike shares had lost only 11.10% of their value, and the company's continued profitability was guaranteed despite the fact that its very existence is the result of the manipulation of the x86 semiconductor architecture. The potential for even larger disasters cannot be mitigated without ending the Consortium and its scheme.

## C. ANTITRUST ENFORCEMENT THAT IS TOO LATE TO RIGHT THE DAMAGE

536. The enactment and evolution of antitrust law aim to safeguard against the incorporation of increasingly powerful technological advancements by massive businesses that use that power to take away the free market freedoms that enable competition, technological advancement, and progress. Standard Oil monopolized the distribution of oil using trains, and AT&T monopolized telephone communication using electromechanical devices. A loose group of companies, along with their stakeholders, officers, and some of their employees, have formed a Consortium under the leadership of dominant technology companies and their financial partners. That Consortium uses predatory design, destroys competing technologies, products, and businesses, and manipulates finances to turn computing into a tool that controls people's behaviors and organizations' policies, eliminates competition, and, by doing so, inflates the value of publicly traded shares issued by companies associated with that Consortium.

537. In the 1990s, Microsoft and the Wintel Cartel became the focus of antitrust enforcement. However, the antitrust action of the 1990s failed to acknowledge the unprecedented destruction of critical technologies and

companies, which began during the preceding decade of the personal computing

rise in the 1980s and continues to this day. That failure to enforce antitrust law

when the destruction of competitive, more efficient, and critical technologies and

products with the abuse of consumers and competitors is taking place in plain

view enabled the takeover of the entire economy by computing technologies

during the 2000s and may explain Judge Bork's approach to antitrust, which opts

for regulators to wait and see the impact on the market before taking action. By

the time the impact on the market becomes apparent, the loss of technologies,

companies, and the life efforts of inventors and engineers has already occurred,

making it difficult, if not impossible, to replicate critical knowledge and

know-how. This has resulted in significant economic losses and consumer harm.

A case in point is the destruction of low-power computing that was carried out by

the Consortium over decades to protect and justify the Consortium's centrally

distributed toll-based services.

538. The majority of computing technology-related antitrust cases in the

U.S. Department of Justice were initiated after a period of waiting to see what

would be the effect of possible antitrust violations on the market, delaying

antitrust enforcement too long after significant harm was done to competitors and

consumers. That approach cements the irreversible damage that antitrust

violations leave behind. It also contradicts the intention and the language of the

law. Indeed, the impact of the 1998 DOJ v. Microsoft antitrust case and the 1999

consent decree that Intel agreed to on July 28, 2010, was negligible, as this

Complaint documents, and Microsoft's CEO at the time, Bill Gates, publicly

stated in relation to Microsoft's conduct that includes Microsoft's special

relationship with Intel.

539. The failure of antitrust regulators to recognize the unprecedented

destruction of critical technologies and companies, which began in the 1980s and

continues to this day, is only a part of a larger failure to recognize how the

Wintel Cartel transformed from a technology operation driven by economic forces into a stock market scheme driven by technology combined with financial manipulation.

## D. MONETIZING ANTITRUST VIOLATIONS, COMPETITORS ENTRAPMENT TO PROTECTS UNICORNS' STOCK

540.  The Consortium's ultimate goal, aside from its self-preservation, is the monetization of its illicit market advantages. Exclusive control and dominance of critical technologies increase the profits from the issuance and appreciation of publicly traded shares. Multiple companies that share a competitive market can never generate the windfall stock market appreciation that can be generated by a single unicorn company with little competition. That monetization provides the individual Consortium Participants their most significant gain in the form of the appreciation of public shares of protected "unicorn" companies. The Consortium accelerates the appreciation of its unicorn companies shares through illicit antitrust and financial violations that shield them from competition, which would offer lower costs and superior technologies. The Consortium uses Intel as an entrapment mechanism to eliminate competitive technologies from the market. Intel disguises the intentional destruction of those technologies and products as unfortunate mistakes, legitimate failures, or miscalculations.

541.  In 2019, when Intel moved to acquire Habana Labs, an AI chip design company, Nvidia had only two potential competitors designing the type of chips that support AI: AMD with its ATI-based Graphic Processing Units (GPU) and Habana Labs with its custom AI chips. Google's AI processors prioritized internal usage, rendering them incapable of challenging Nvidia's dominance. Under the Consortium's control, AMD posed only a small risk to Nvidia's dominance and its positioning by the Consortium as a stock market unicorn; the design of Habana Labs' Gaudi chips prioritized performance per dollar and specifically targeted AI machine learning. This made Habana Labs a significant

1   potential competitor to Nvidia. Protecting Nvidia as a unicorn and preventing the

2   spread of low-cost and low-power AI capabilities that would have reduced market

3   dependency on centrally distributed AI provided as a service by Consortium

4   Participants became a top priority. Habana Labs had to be brought into the

5   Consortium fold in order to stop it, and Intel was moved to entrap it, employing

6   the same tried-and-tested formula that had previously stopped numerous

7   low-power competitive technologies, including Plaintiff's.

8       542. Just as the Consortium-dominated Intel board acted in 2009 to curtail

9   Intel from competing against Nvidia by eliminating the parallel processing and

10  GPU functionality that was added to the x86 architecture and forcing the

11  departure from Intel of Gelsinger for initiating that effort, Intel directors

12  operating as Consortium Participants moved in 2019 to protect Nvidia from

13  Habana Labs by bringing it into the Consortium's fold and entrapping its

14  developers. Intel acquired Habana Labs in 2019 for two billion dollars and

15  trapped its developers with a four-year contract that locked them to the company

16  regardless of resources and backing for their design effort. It then moved to

17  cripple the development effort and curtail the development of the necessary

18  elements required to bring Habana Labs products to the market.

19      543. However, the 2009 attempt to safeguard Nvidia did not eliminate the

20  existential threat to the Consortium posed by the combination of Intel

21  manufacturing and the x86 standard. As the forced resignations of former CEO

22  Krazanich and Defendant Bryant demonstrate, the Consortium lacks omnipotence.

23  Consortium Participants has remain vigilant in safeguarding their illicit gains.

24  The 2009 effort to protect Nvidia was followed by an effort to separate Intel from

25  its manufacturing, which involved the intentional destruction of Intel

26  manufacturing and the carefully planned weakening of the x86 standard, as

27  detailed in this Complaint. The destruction of Habana technology that started in

28  2019 is being followed at the current time in a continuing effort to separate Intel's

products fill a void but are strategically designed and positioned to safeguard the Consortium Participants' unicorns from competitive products that would provide consumers with compatibility to the dominant standards.

546. One example is the low-cost Raspberry Pi computer, which Broadcom designed and positioned to be incompatible with common computing and consumer mobile standards. It is dumped strategically to eliminate potential competition that the Consortium's manipulation of technology creates. Its positioning and distribution were designed by Consortium Participants to neutralize the demand for low-cost alternatives that are compatible with existing standards by dumping a capable product that is designed to be incompatible with the Consortium's bread and butter. It protects personal, business, mobile, and smartphone computing. Being strategically dumped at list prices below the cost of manufacturing and distribution, it is mostly unavailable at its advertised pricing but nevertheless makes competition against it unprofitable. Broadcom is refusing to sell the chip for targets that challenge the Consortium, even though it is a capable potential competitor against Apple iPhones and Google Android, Microsoft Windows, and Nvidia processors used in Android tablets. Broadcom's interest in impeding competition to protect the current high pricing of computing resulting from the exclusivity of unicorns is due to its being a major supplier of support and infrastructure chips to those unicorns.

547. The effort to undermine competition dominates every aspect of Consortium Participants activities. Intel OEMs refuse to discuss any release of x86 products with capabilities that can challenge Microsoft's Windows even when presented with technologies that can improve their existing product usage with Windows by their customers. Technology is being used as an entrapment tool of competitors and consumers rather than to fulfill free market demands. Straightforward technological and business market conditions are distorted, falsified, and misstated to cover it up. With the backing of Intel and Amazon,

which provide machine learning resources as a service to Amazon's massive
AWS (Amazon Web Services) customer base, Habana Labs was in a position to
offer an alternative to Nvidia AI chips that would eventually be manufactured at
Intel and potentially deliver a multi-level interface and integration with x86
standards that benefit Intel, its customers, and the market. Consortium
Participants at Intel acted to withhold the critical elements that were required for
the Habana Labs AI chips to be adapted by the market. Resources required for
the Habana Labs chips development environment were withheld by layers of
bureaucracy that paralyzed the development effort. Amazon had to rescind its
choice to utilize Intel's Habana AI chips, and Intel refrained from releasing the
compromised products onto the market.

548. Splitting Intel and "containing" its parts under the control of a
Unicorn or Semi-Unicorn Consortium Participant is the Consortium's ultimate
goal. It will end the possibility of any potential competition against the
Consortium with dire consequences to the U.S. economy and its future.
Consortium Participants at Intel are actively engaged in an effort to achieve that
after destroying Intel semiconductor technology and its market valuation and
stopping the recent recovery achieved by Gelsinger, who has been striving to
revitalize the company's position in the global semiconductor landscape while
opening it to competitors. By undermining his initiatives, the Consortium aims to
consolidate power and maintain its dominance over critical technology sectors,
thereby stifling innovation and jeopardizing the competitiveness of American
firms on the world stage.

549. For the Consortium Participants, technology is an instrument for
producing windfall profits via the stock market. That by itself is not illegal, but
the predatory design, exclusionary acts, tying, undue influence, conspiracy, and
financial manipulation that are carried out to produce the stock market windfall
are.

550. The technologies that were destroyed or barred by the Consortium include low-power semiconductor architectures that would have reduced the market's dependency on computing centers that consume vast amounts of energy and would have improved and lowered the cost of mobile computing. They include Direct communication between Internet subscribers which would have freed consumers from dependency on centrally distributed services, programmatic control of CPU selection in multi core that would have solved the online worst case scenario that force consumers to rely on massive server farms; x86-based smartphone that could have unified personal and mobile computing and eliminate the market dependency on centrally distributed mobile applications; semiconductor architectural features that would have eliminate security vulnerabilities and prevent computers failures as well as software tools and platform that enable full access to x86-based commuters resources that would have removed the limits and overhead that tied products such as Windows imposed on x86-based computer users.

551. A significant number of tried and tested technologies that were successful in the market were removed from the market under protest from consumers and developers by various methods enabled by the protection that includes predatory design Intel provides to Consortium Participants. Intel can enable each of those technologies, which represent significant advancements in personal, mobile, and business computing. All of those technologies represent a danger to the Consortium's ability to continue its scheme.

552. The IBM Personal Computer scheme, which divided control over the product and its consumer dependencies among three companies-IBM, Intel, and Microsoft-to conceal the illicit tying that protected IBM products and services from the newly invented CPU and personal computing, inspires the Consortium's methods of operation. The division of tasks between Consortium Participants conceals their methods of operation.

553.  Defendant Bryant and the other Consortium Participants on the Intel board of directors used false business reasoning at Intel to present decisions that deteriorated the company's x86 product line and semiconductor manufacturing, with the intention of providing enormous benefits and protection to Apple, Google, Microsoft, Amazon, Qualcomm, and Nvidia, as well as the numerous Consortium projects monetized through the issuance of publicly traded shares. Those decisions were the result of a meticulous strategy and detailed planning by Consortium Participants outside and inside Intel against the better judgment of Intel engineers and honest stakeholders, enabling the Consortium's ultimate goal: converting its control and manipulation of technology into publicly traded shares that are sold at inflated prices.

554. The deliberate implementation of flawed, superfluous architectural design features, such as the unrestricted access to the entire memory (known as ring zero mode), enabled by privileged programming instructions rather than a physical protection of exclusively allocated memory areas, contravenes security and design principles and was carried out with malicious intent. That design was intended to make it possible for Consortium Participants to force consumers to replace their computers and software by introducing triggers in critical services that will cause their computers to fail, resulting in loss of data and time and requiring a reboot. Microsoft and Google are currently implementing triggers that force older computers to malfunction and reboot when accessing certain popular websites. However, this intentional nefarious design also affected Windows 10 and 11, enabling the catastrophic worldwide failure that occurred in July 2024 as a result of the CrowdStrike upgrade.

555.  The Consortium employs its financial index-based trade scheme to exert influence over FPGA companies, EDA companies, and fab service provider companies. These companies do market to consumers but play a crucial role in the manufacturing from the x86 standard and cement the Consortium's protection

from optimized low-power technologies that would end the gravy train

Consortium Participants, including Intel directors, engaged in that effort, enjoy.

The modest success achieved by Intel's manufacturing engineers under Gelsinger

in repairing the damage to Intel manufacturing that was done by the same

Defendants between 2012 and 2021 before Gelsinger returned to Intel is under a

risk as the Defendants are actively engaged in an effort to reverse that success

before it can be finalized and outsource the manufacturing to TSMC in Taiwan

with disastrous consequences to American competitiveness and security.

544. Historically, American dominant companies acted to increase their

own control and dominance in their own respective markets. The U.S. antitrust

laws were enacted to address that threat to the free economy. The progress in

science and technology that changed modern technology from relying on manual

control systems to automation sped up the mixing of anti-competitive efforts

across industries. For instance, J. P. Morgan's gas distribution monopoly

removed from the market Thomas Edison's local electrical generation

technologies. In the last four decades, however, advances in semiconductor

manufacturing and design and the forming of the Consortium changed the

anticompetitive efforts of dominant companies from being directed at their own

markets to the manipulation of the entire economy and the fundamental

technologies that drive it.

545. So-called technologies that pretend to be "open" are used to protect

the existing dominant standard. The "dumping" of "free" or low-cost products

and codes is initiated by Consortium Participants to occupy the slots of demands

that the Consortium manipulation creates. The Consortium Participants initiate

the "dumping" of "free" or low-cost products and codes to fill the void created by

the Consortium manipulation, which otherwise would have supported the creation

of competitive alternatives compatible with dominant products. The low-cost

supply chain that facilitates competition by enabling access to VLSI

semiconductor design and manufacturing. By withholding critical information, ignoring communication, and refusing to deal with independent developers, these companies create obstacles for developers seeking to bring products that challenge the Consortium's strategic goals to the market. They act as gatekeepers against entry into the market of competitively efficient technologies and products. Plaintiff experienced that treatment from Altera, an FPGA company, before it was taken over by Intel, from EDA companies and from semiconductor fab service companies, Global Foundries and TSMC, that as part of a strategy devised by the Consortium, use the EDA companies as a barrier to competition as detailed below in this Complaint.

556.  The Consortium invites Participants to buy publicly traded shares of its companies and earn a profit commensurate with their investment. However, Consortium Participants in key positions have exclusive access to investment opportunities in initial public offerings, which yield a higher reward.

557.  Under the Consortium's control, investment in technology driven by technology and market demand would typically be reversed to protect the Consortium. Intel's CEO Andy Grove's 1987 decision to invest in Go Corporation, a startup company that introduced efficient portable computing, was started by Robert Carr, the designer of Ashton-Tate's Framework software product, and Jerry Kaplan, the designers of Lotus' Agenda software product. The two companies and their immensely popular products were removed from the market by the Consortium "in the interest of the industry," to quote executives who were involved in removing the companies from the market and explained their actions to Plaintiff using those words. After the Framework product was taken over by Plaintiff as a result of Plaintiff's antitrust efforts, Lotus approached Plaintiff and requested he take Lotus' Agenda product to accommodate the Consortium's pressure on Lotus to stop updating and supporting it. The pressure was put out in the open with Microsoft informing companies that supporting

non-Windows legacy products would preclude them from using the Windows trademark in advertisements for their Windows-based products. Even more egregious, updating products such as Lotus' Agenda for Windows was deemed "against the interest of the industry.". Intel promptly canceled the investment in Go Corporation, giving in to Microsoft CEO Bill Gates's demand, who understood very well that Microsoft Windows, which is designed to limit its users functionality and relies on illicit tying to achieve total market dominance, can never compete in a free market against products designed to fulfill consumers expectations. As revealed in the 1998 Government v. Microsoft antitrust case, Gates made the demand explicitly and directly, in direct violation of antitrust laws. Gates moved to become the largest investor in AT&T, which took over Go Corporation and promptly removed it from the market.

558. In 1991, Lessely Vadasz, one of Intel's founders, established Intel Capital, a venture capital division positioned to monetize the Consortium's fundamental formula through investments that focused on the scheme. Intel Capital invests in numerous companies, many in China, that make minimal contributions to Intel, its customers, the majority of its shareholders, or the market, yet generate windfall profits for Consortium Participants when they are purchased by Consortium companies. In effect, Intel Capital and other venture capital and investment firms define their missions as creating companies that are either positioned to become monopolistic unicorns by fragmenting existing technologies or entrapping technologies that challenge the Consortium into the Consortium fold. They do it while generating windfall profits from various public investments that are costly to consumers and the economy.

559. The Consortium uses numerous illicit methods that violate U.S. antitrust laws and regulations. It distributes its profits to Consortium Participants in the form of windfalls from publicly traded shares and investment opportunities exclusively available for Consortium Participants. To generate its profits and

1   maintain its control, it employs the following methods, among others:

2       a. Erect barriers to competition against Consortium Participants products

3         and services.

4       b. Maximize the cost to consumers.

5       c. Creating an uneven field for competition.

6       d. Employing predatory design to block competitive technologies.

7       e. Starting publicly traded companies based on manipulated technologies.

8       f. Purchase and manipulate publicly traded shares to lessen competition.

9       g. Interfere with the management of companies to lessen competition

10      h. Use bribery, blackmail, entrapment, and intimidation to lessen

11        competition.

12      i. Fragment technologies to increase cost, control, and hide illicit tying.

13      E. CONSORTIUM SCHEME INHERENT CONFLICT WITH VLSI

14      SEMICONDUCTOR TECHNOLOGY.

15  560. As this Complaint details, the development of the

16  semiconductor-based CPU became an urgent concern for the IT and computing

17  industries in the 1970s and 80s. IBM took action to curb this development, which

18  resulted in the destruction and delays of efforts to harness the power of VLSI for

19  the empowerment of consumers and the economy. As IBM feared, it eventually

20  lost its dominance. By 1990, the concern of the Consortium that replaced IBM

21  shifted from the CPU itself to the increasing power of the exponential increase in

22  semiconductor device transistor count piloted by Intel's R&D investment. The

23  Consortium, with Microsoft and the financial companies leading it, moved to

24  protect their meteoric rise by limiting the power that the increase in

25  semiconductor device transistor count can provide consumers and the economy.

26  The effort to contain the CPU was replaced with the effort to contain the

27  inevitable results of Intel's R&D significant investment that drove the entire

28  semiconductor industry.

561.  A dichotomy between Intel's founders, directors, and top management on one side and its design engineers on the other arises in the 1970s when Intel leadership chooses to collaborate with the IT industry and reject efforts by the developers of personal computing at Xerox Park to empower educational and consumer markets with competitive technology, setting in place a precedent that defined Intel dynamics. By the 1990s, the inevitable exponential increase in the number of transistors per device resulted in an exponential increase in potential consumer and economic empowerment, which the Consortium had to stop in order to preserve its scheme. The mass production of semiconductor devices turns them into a commodity, with supply and demand controlling their pricing. Commoditized products that empower competitors and consumers would have stopped the Consortium stock market unicorn scheme. Trapping Intel and the semiconductor industry became the Consortium's top priority. The Consortium moved to erect barriers to competition, first, by forcing Intel engineers to implement predatory design that hinders effective utilization by competitors and usage by consumers of the increasing transistor count growth that Intel's R&D drove, and secondly, by transforming Intel and the rest of the computing and semiconductor industry under the Consortium's undue influence into an entrapment system of competing technologies and their creators.

562.  The EDA companies, Cadence, Synopsys, and Mentor, were created and positioned by the Consortium to enact barriers to semiconductor manufacturing by independent semiconductor design developers and companies. Access to semiconductor manufacturing, which led to the academic innovation that led to VLSI, was limited by artificial barriers set up by EDA companies. These barriers raised the cost of prototyping commercial-grade semiconductor devices by a factor of thousands over a ten-year period while also removing competition that would have made VLSI design and semiconductor devices more efficient and put the Consortium's scheme at risk.

563. Payments directed at academic institutions motivated them to participate and protect the windfall generation machine that the Consortium created. Academic institutions move to operate as arms of the venture capital industry. The academic curriculum tilted to protect centralized control over computing usage and justify fragmentation that served the Consortium's objectives. Academic institutions, enticed by financial rewards, enabled the use of illusive technologies such as quantum computing as a financial scheme offering illusive empowerment that is used as a stock market lure. Academic institutions are also passively turning a blind eye that provides a cover-up for the current high-power AI and massive computation investment scheme that is carried out by companies such as BlackRock with GAIIP detailed in this complaint that is carried out to justify the centralization of computational power.

564. Predatory design that Intel and other device makers were forced to implement by the Consortium transformed the increased number of transistors in semiconductor devices from an invaluable computational resource into overhead heat-producing dead weight. Dark silicon, pipeline, and the dedication of a large number of transistors to exclusive functionality that gives Consortium Participants an unfair advantage in compensating for the impeded performance resulting from that predatory design transformed the costly investment in R&D that enabled Moore's Law high density, paid for by the entire economy, into a barrier to entry to the market, cementing the Consortium's hold on the economy while holding back efficiency and productivity, leaving the U.S. economy as a whole at a disadvantage.

565. The Defendants have limited or no understanding of the implications and consequences of design on the market. With a superficial understanding of the technology that their actions impact, they protect the Consortium for their own personal gain, as the value of their investment increases with the protection they are awarding to the Consortium Participant companies they invest in.

## F. COMPUTING FRAGMENTATION RACKETEERING

566. Until the early 1990's the cost of bringing to market a semiconductor chip that perform computation and communication in a personal computing device was less then one hundred thousands dollars. Such a project was completed by Plaintiff but was blocked from reaching the market by barriers to marketing. During the following decade, the cost increased to hundreds of millions as a result of coordinated racketeering that fragmented industries and erected barriers to competition to protect the Consortium.

567. The fragmentation of the computing market into operating systems, software, semiconductor design, semiconductor manufacturing, EDA, and service providers is imposed on Intel and the rest of the industry by the Consortium to control the computational power and functionality that consumers and organizations can access on their own computers as well as maximize costs to consumers and the economy. That fragmentation allowed the Consortium to withhold optimality and reliability from the market, create artificial demand for unnecessary corrective technologies that compensate for incompatibilities, defects, and vulnerabilities, and monetize those disadvantages for consumers and the economy, resulting in unprecedented profits.

568. In the 1998 antitrust case of the Government v. Microsoft, the government discovered that Microsoft's CEO, Bill Gates, approached Intel with a demand that Intel remove a part of its x86 semiconductor architecture that was designed by Intel engineers to optimize the allocation of graphic memory and rendering, a functionality that Bill Gates claimed "belonged" to Microsoft. Bill Gates' demand to Andy Grove, Intel's CEO, led Intel to promptly remove the graphic rendering component from the x86 architecture, even though it enhanced the functionality and optimality for x86-based computer users. This action mirrors the illegal, unofficial plan IBM's legal department devised with the introduction of the IBM PC: to divide between software and hardware, with the

aim of controlling the functionality available to computer users.

569.  Artificial fragmentation of a technology, whose optimization and efficiency rely on unified design, allows companies to engage in illicit tying, enabling the Consortium stock market unicorn scheme that depends on withholding computational power and functionality from consumers, suppressing competition, and forcing the market's dependency on central services. It allows the Consortium to monetize the increased costs for the market. The invention of VLSI made it possible to design optimal digital control systems and bring them to market at an unprecedentedly lower cost. The factitious separation between software, design, manufacturing, and EDA was corruptly imposed on the market by the Consortium to withhold that optimality from the market.

570.  The industry does not uniformly enforce the factitious separation between software, design, manufacturing, and EDA. Altera (acquired by Intel) and Xilinx (acquired by AMD) dominate the FPGA industry. FPGAs are semiconductor programmable devices, and both Altera and Xilinx provide their own in-house EDA development systems with their end products since not doing so would have impeded the use of their products. EDA's illicit ties with fab services and unreasonably high pricing restrict access to semiconductor manufacturing for non-Consortium developers.

571.  The spurious separation of exclusive control of Microsoft's software and Intel's hardware that was devised to hide illicit tying, predatory practices, and designs and conceal the anticompetitive acts of the Wintel Cartel was adapted by the Consortium for building an anticompetitive wall around semiconductor manufacturing. By concealing ties, exclusionary practices, and excessive pricing, the spurious separation between design and manufacturing grants the EDA companies control over access to semiconductor fab services, thereby preventing competitive semiconductor architectures and technologies that could challenge the Consortium with higher efficiency, better functionality, and lower cost from

1    entering the market. Agreements and arrangements between the fab and EDA

2    companies prevent semiconductor designers from building or using their EDA

3    design software that supports more efficient technologies in violation of 15

4    U.S.C. § 1 (1976). This Complaint section I. DEFENDANT LIP-BU TAN

5    describes the role at Intel fab and the preservation of that anticompetitive wall.

6       572.  In the 1998 Government v. Microsoft case, the government

7    discovered an intervention by Microsoft's CEO, Bill Gates, in Intel's affairs in

8    which he demanded that Intel remove a particular part of its x86 semiconductor

9    architecture that was designed by Intel engineers to perform in an optimal way

10   the allocation of graphic memory and rendering, a functionality that Bill Gates

11   claimed "belonged" to Microsoft. Bill Gates' demand to Andy Grove, Intel's

12   CEO, led Intel to promptly remove the graphic rendering component from the

13   x86 architecture, even though it increased efficiency and functionality of

14   x86-based computers. This action mirrors the illegal, unofficial plan IBM's legal

15   department devised with the introduction of the IBM PC: to divide between

16   software and hardware, with the aim of controlling the functionality available to

17   computer users. Spurious fragmentation that is maintained by hidden illicit

18   agreement and arrangement enable illicit software tying.

19      IXV. CONSORTIUM INTERFERENCE IN INTEL DESIGN

20        A. INTEL X86 PART REMOVAL TO PROTECT MICROSOFT

21      573.  In the 1998 Government v. Microsoft case, Plaintiff submitted a

22   motion to intervene, proposing the division of Microsoft into two companies, an

23   operating system company and a separate application company. Plaintiff's

24   intervention can be referenced at:

25      https://web.archive.org/web/20010515200354/http://views.com/

26   While the government adapted Plaintiff proposed remedy, and the court ordered

27   it, the decision was reversed on procedural grounds, and the case ended with no

28   significant effect on Microsoft and Intel, according to Microsoft CEO Bill Gates,

1   who declared publicly after the conclusion of the case that no Microsoft employee

    changed anything he did as a result of the case.

2       574. In the discovery that took place in the same 1998 case, a letter from

3   Microsoft's CEO, Bill Gates, to Intel CEO, Andrew Grove, demanded that Intel

4   remove part of the x86 architecture designed to optimize graphic display in

5   x86-based personal computers because it competed with Microsoft's Windows

6   functionality. Intel CEO Andy Grove complied with the demand and ordered Intel

7   engineers to remove those parts, resulting in a significant loss of efficiency, ease

8   of programming, and a limit on functionality for users of 86-based Intel

9   computers. The removal protects Microsoft as it makes it more difficult to use

10  x86-based computers without Windows. It also provides protection for graphic

11  companies such as Nvidia, which could offer such functionality at an additional

12  cost to consumers.

13      575. An Intel engineer testified in that 1998 court case that after the

14  removal of that part of the x86 chip design, Intel CEO Andrew Grove

15  approached him at a company party and apologized for the removal, explaining

16  that he had no choice but to give in to Bill Gates's pressure.

17      576. On information and belief, that said letter obtained in the discovery

18  was created retroactively by Microsoft after it became known to the Microsoft's

19  legal team during said court case that a testimony given by an Intel engineer

20  revealed that Bill Gates demanded that Intel CEO Andrew Grove, will remove a

21  part of the x86 architecture that would have eased competition with Windows, in

22  what was possibly a threatening phone conversation and Grove related that he

23  was in no position to say no to Bill Gates. The purpose of creating that letter was

24  to portray Bill Gates' demand from Andrew Grove in a manner consistent with

25  corporate behavior, which could be interpreted as corporate activity under the

26  corporate veil legal doctrine. Microsoft's legal team was well aware of the 1981

27  arrest of American Airlines CEO Robert Crandall, following a less egregious

28

1      phone call where he proposed a coordinated price increase to the CEO of Braniff

2      Airlines, who reported the conversation to the FBI, resulting in the arrest and

3      persecution of Robert Crandall.

4           577.  The x86 design part that was removed as a result of Bill Gates'

5      demand was added by Intel's engineers to provide x86 programmers with an

6      efficient interface for graphic memory allocation and graphic rendering. Given

7      appropriate access to the x86 instruction set, programmers can build such

8      functionality. However, the Windows operating system's tying to x86 computers

9      has taken away this access, and Windows now provides this essential

10     functionality for writing programs in a cumbersome and complex way, adding

11     significant overhead and increasing the likelihood of bugs. Microsoft's demand

12     and Intel's removal increase costs to consumers as well as competitors, including

13     Plaintiff, that compete against Microsoft products.

14          578.  The addition of that part by Intel to x86 semiconductor devices

15     significantly improved and accelerated all x86 computer operations, reduced

16     energy consumption, and simplified x86 programming. It also made it possible to

17     create better software products such as 3D CAD and games, improve data

18     processing by reducing the CPU overhead, and lower costs for consumers at

19     every level of the economy.

20          579.  Years after Intel's CEO, Andrew Grove, ordered the removal of the

21     x86 rendering part, giving in to Bill Gates's demand, a similar, much more

22     significant situation has taken place at Intel. The "Larrabee(2)" project was part

23     of Intel's effort to give x86 programmers an improved level of graphic

24     programming and parallelism, which would significantly increase x86 efficiency

25     by leveraging the enormous investment Intel has made in its manufacturing and

26     design capabilities under the Moore's Law formula. Information about the project

27     can be views at:

28          https://en.wikipedia.org/wiki/Larrabee_(microarchitecture)

580. Project Larrabee culminated Intel's accumulated experience in semiconductor design and the vertical integration of its local semiconductor manufacturing, aiming to enhance Intel's x86 platform to rival the most profitable product of Nvidia, one of Intel's stakeholders. Additionally, it empowered x86 developers with computing power that would have challenged Microsoft Windows and the stakeholders' entire scheme, causing significant concern among stakeholders. Intel's Senior Vice President and Chief Technology Officer at the time, Pat Gelsinger, initiated Project Larrabee. Gelsinger's approach would have optimized critical x86 capabilities by embedding them as semiconductor intrinsic traits, which would have made it more difficult for an operating system such as Windows to restrict or block access to them.

581. The aftermath of project Larrabee was similar to the previous attempt to improve x86 described above. In 2009, the project was terminated, and Gelsinger, to quote his own words, was "pushed out" of Intel, which had taken place after working at Intel for 30 years and rising to the position of senior vice president.

582. Gelsinger was pushed out of Intel because he did not agree to carry the ongoing scheme that was designed to protect Consortium Participants' products and services by manipulating and weakening Intel's semiconductor technology to the detriment of Intel's customers and the silent majority of Intel's shareholders who are not Consortium Participants that were profiting from investing in Consortium shares, as all Defendants in this case did.

583. The Larrabee project was not the first attempt by Intel engineers to break out of the anti-competitive jail imposed on Intel by the Consortium via its largest shareholders. As detailed above, an improvement to the x86 semiconductor design was removed after Bill Gates, Microsoft CEO, demanded its removal because it was competing with the Microsoft Windows operating system and easing competition against Microsoft products. Those two significant

x86 architectural parts that were removed by Intel were projects created by Intel engineers and managers in an attempt to restore, at least partially, Intel's ability to compete freely in the market by improving the x86 architecture to serve Intel's customers rather than limiting it to serve the anticompetitive interests of the Consortium.

584. Intel invested significantly more than other companies in research, development related to semiconductor manufacturing and IP design. However, the undue involvement of the Consortium in Intel's decision-making processes, as demonstrated by Bill Gates' letter to Intel CEO Andrew Grove, deprives Intel's customers and the economic sectors impacted by computing and x86 technology of the benefits of this substantial investment.

585. The removal of those x86 architectural parts is only part of the predatory design that the Consortium forced Intel to apply to the x86 architecture. It limits access to the market, resulting in the detraction and loss of technologies and designs that would have empowered both consumers and competitors. That predatory design furthers the shift of x86 functionality into toll-based, centrally distributed services and enables its stock market unicorn scheme that is based on the offering of blocked x86 technologies by Consortium Participants to enrich their share value.

586. The 2009 dismissal of Gelsinger from Intel coincided with the selection of Jane Shaw as Intel's chairwoman. During her tenure as chairwoman, Jane Shaw ignored flagrant antitrust violations by Intel and its stakeholders, particularly against AMD. She later assisted in positioning Defendant Bryant as her successor and in promoting Krazanich as a candidate to replace Ottelini as Intel CEO. Both Bryant and Krazanich proceeded to advance the ongoing Consortium's scheme to weaken the x86 standard and remove it from the smartphone market despite its advantages for consumers and moved to destroy Intel's semiconductor manufacturing and its position in the market to

cement the Consortium's scheme by preventing competition against the

Consortium companies and services.

### B. THE EFFORT TO END INTEL'S COMPETITIVE EDGE

587. By 2012, Intel had on the market several high-end x86-based

smartphones that used a variety of efficient x86 devices.

588. Consortium Participants' were adamant in preventing integration,

unification, and transparent compatibility between smartphones and x86 personal

and business computers to maintain the fragmentation that is a key to the

Consortium's control and scheme. x86 smartphones allow independent developers

to enter the smartphone application market, thereby undermining the current

fragmentation between personal and business computing, the smartphone market,

and the Consortium's control over exclusively server-based and centrally

distributed smartphone applications. The relatively open and powerful x86

resources have to be removed and prevented from competing in the smartphone

market.

589. The mere existence of efficient x86 devices and the rapid

advancement of the Intel semiconductor manufacturing cycle endangered the very

existence of the market structure that was bringing a windfall to Consortium

Participants. The Consortium moved to destroy both Intel's investment in mobile

devices and its ability to rapidly advance its semiconductor manufacturing.

590. In 2012, the Consortium moved to take advantage of the resignation

of Intel CEO Paul Otellini, and as a part of the Consortium scheme, installed

Defendant Bryant, who was hired in 1981 by Intel to build and manage the

Wintel Cartel and the relationship with Microsoft and was responsible over the

years for antitrust violations admitted by Intel against other x86 CPU makers, as

Intel's board chairman.

591. Defendant Bryant proceeded to force the resignation of Intel's

highest-level semiconductor design and manufacturing experts and install

Consortium Participants in key positions. He also cancelled the most critical planned upgrade to Intel semiconductor manufacturing, which was crucial for maintaining Intel's leadership in the semiconductor market. Additionally, he destroyed Intel's and its customers' investment in the mobile x86 versions by exiting the smartphone market and selling the Intel mobile modem department to Apple.

592.  Simultaneously, the Consortium engaged in a push to transform Intel into a design company that would outsource its manufacturing. Such a move, which would have permanently eliminated the risk to the Consortium's and its scheme, was not unprecedented. Anticompetitive actions by Intel, a prominent member of the Wintel Cartel before its transformation into the current Consortium, threatened AMD's existence only a few years prior. The action forced AMD to relinquish and outsource its own manufacturing, thereby limiting its competitiveness and limiting its ability to benefit from closely integrated design and manufacturing as detailed in this Complaint.

593.  At the same time, two of Intel's largest competitors and Consortium Participants, Microsoft and Qualcomm, launched a partnership effort to develop a version of a custom processor to replace x86 processors by using Microsoft's Windows trademark to mislead consumers, abandoning the relatively open x86 standard by falsely claiming that it will provide Windows and personal computing compatibility while designing it to coerce consumers to depend on centrally distributed services and be incompatible with Windows and personal computing applications.  The goal of that effort is to harm Intel, undermine the freedom of programmers to compete, and restrict consumers' ability to select the software that runs on their computers. Microsoft has already introduced the practice of restricting the software that can run on certain versions of Windows to the market. Microsoft artificially lowers the price of these Windows versions that are designed to violate antitrust laws in order to establish new market standards,

1    strengthen its market dominance, and reduce competition for its toll-based,

2    centrally distributed products and services.

3    594. Microsoft's pairing of a Windows-incompatible operating system with

4    a Windows-incompatible Qualcomm processor under the Windows trademark is a

5    blatant attempt at misleading consumers into abandoning x86 products from Intel,

6    AMD, and x86 developers such as Plaintiff, replacing them with an inferior,

7    limiting, and costly standard that forces consumers to rely on centrally distributed

8    applications from Microsoft while blocking their return path. Microsoft and

9    Qualcomm are taking advantage of years of technical and market abuse that

10    prevented Intel from introducing design improvements enabled by Intel's

11    significant investment in design and manufacturing. They are removing some of

12    the significant unnecessary Windows overhead that was designed to impede

13    non-Microsoft software that runs on Windows X86 computers from competing

14    with Microsoft products to create the impression of efficient design while closing

15    the segment of the they commandeering by misleading consumers to competition.

16    595. Microsoft's misuse of its Windows trademark is weakening the ability

17    of Intel and x86 programmers such as Plaintiff to compete by preventing software

18    that is not approved by Microsoft from running on that chip. The dual purpose of

19    this effort was first to weaken Intel by sabotaging the established x86 user

20    standard and, second, to build a chip that, unlike Intel x86, which required only

21    Intel to support any operating system, would only run Microsoft's proprietary

22    operating systems and Microsoft-approved software.

23    596. Defendant Bryant, along with his collaborators in management

24    positions at Intel, hindered efforts by Intel engineers to optimize the x86

25    architecture, which would have enabled x86 programmers to more effectively

26    compete against products from Intel's main shareholders, including Apple,

27    Qualcomm, and Nvidia. That blocked effort compelled the group of Intel

28    engineers to relocate to Apple, leading to the development of the proprietary M1

chip. Apple, a major Consortium Participant, then ended its usage of Intel x86,

replacing it with the more efficient technology that originated at Intel.

597. The design effort of Apple's M1 chip gave Apple complete control

over software that can run on its devices, further weakening competition and

advancing the Consortium's strategic objectives, while also weakening Intel's

position in the market. This is the same level of control that Microsoft is

attempting to impose by tricking Windows users into using Qualcomm's so-called

Windows processes, which are incompatible with Windows.

598. The Consortium's ultimate goal is to replicate the damage done to

AMD when it was forced to sell its semiconductor manufacturing facilities by

splitting Intel manufacturing from its design. Splitting Intel would eliminate the

risk to the Consortium scheme, which brings trillions of dollars in windfalls to

those companies and their executives and will effectively end any possible

competition and independent computing that is not dependent on

Consortium-controlled central services.

C. PLAINTIFF'S TECHNOLOGY

599. Plaintiff's technologies directly conflict with the Consortium's

business model, methods, and strategic objectives. The conflict arose from

Plaintiff's design principles, which view tools, machines, and technology as an

extension of the human body and therefore design computation devices to amplify

and empower human capabilities. It conflicts with the Consortium's positioning

of computing as centrally distributed services that are fragmented and restricted

to increase costs and profits. Plaintiff's design supports the creation, acquisition,

and internalization of knowledge as well as the internalization of that knowledge

into a skill. Use of tools and machines involves the acquisition and development

of knowledge and skills. Computational devices are tools that provide general

programmability to their users. The restrictions and limits that are imposed by the

Consortium on users, illicit tying, exclusionary practices, restrictions, and the

1    dependency on central services directly conflict with the unification,

2    transparency, and unlimited freedom of usage and control that Plaintiff's products

3    are designed to provide. The 1936 Supreme Court interpretation of the 1914

4    Clayton Act stipulated that the usage of machines, leased or patented, should not

5    be limited in order to lessen competition or create a monopoly, which, as detailed

6    in this Complaint, is the Consortium's business model methods of operation and

7    strategic objectives.

8        600. The right for free, independent, unrestricted usage of computational

9    devices is based on a "linguistic" conception of human activities. Language

10    knowledge and skills are acquired by using it. Human usage of tools and

11    machines creates knowledge and skills just as learning to walk, speak, read, and

12    write does. Acquisition of complex skills is based on the same biological learning

13    and growth process known in linguistics as "internalization.". In free societies,

14    the fundamental freedom to acquire and use knowledge can only be restricted

15    when an intent to cause harm exists. The restrictions that Consortium Participants

16    imposed on the usage and programming of computational devices, from

17    x86-based computers to smartphones, are a violation of the law and the 1936

18    Supreme Court stipulation, just as restricting their usage for writing certain

19    content, which is not much different from the restrictions the Soviet Union

20    imposed on obtaining and using typewriters. The dependency on centrally

21    distributed services that the Consortium imposes makes such physical restrictions

22    obsolete, as the current situation in totalitarian states demonstrates. Unlimited use

23    of technology and tools should be protected when such use causes no harm to

24    individuals or society.

25        601. The constitution enshrines this protection: the right to exercise free

26    speech is a right to linguistic freedom. Similar to linguistic freedom, protection of

27    usage is not absolute and can be subject to limits due to potential harm resulting

28    from specific behavior. Existing antitrust laws and court decisions address the

freedom of machine usage, supporting Plaintiff's views on the matter. The 1936
Supreme Court Decision clarifies the Clayton Act, protecting commerce from
manipulation and undue limits on the use of machines.

602.  The term "language" describes a set of tokens and grammar rules that
automate the writing of computer programs. Programs written in a computer
language can be translated by a computer into a list of CPU instructions or be
used like any other language to communicate ideas and information between users
of such languages. The term "language" refers to the fact that learning and
mastering these protocols requires the acquisition (or internalization) of tokens
and grammar, just as in human language. Computer languages are akin to the of
human languages, as they convey knowledge and information.

603.  A CPU by its nature is a "language machine." As a Turing machine,
it is designed to process mathematical notations and solve mathematical
expressions and formulas. It is defined as a language machine since mathematics
can be defined as a language, and any human language expression can be
translated to a mathematical expression as any expression in any language can be
translated to any other language.

604.  That linguistic nature of CPU devices conflicted directly with the
original business model of the computing industry that was founded to provide
information services and kept access to programming in the hands of
professionals rather than providing support for unlimited use of programming
languages. The development of semiconductor technology enabled the emergence
of personal computers and placed semiconductor-based CPUs, or language
machines, in the hands of consumers, igniting a conflict between industry and
consumers that persists today. Companies that provide information services
control the design and manufacturing of consumers' language machines,
necessitating the enforcement of antitrust laws with more scrutiny than in other
industries.

605.  The invention of the semiconductor-based CPU not only facilitated easy access to computational power, but also "commoditized" it. The conflict stems from the linguistic nature of the CPU, which functions as a general computing machine with general programmability capabilities. This linguistic nature facilitates competition with services offered by the same companies that control the design and manufacturing of these language machines, thereby enabling competition with their own offerings. Imposing limits on CPU usage by its owners, from individual consumers to large corporations and government agencies, serves the industry agenda and is the key to the Consortium's very existence.

606.  The conflict arises between the merchandising of knowledge, which formed the foundation of the computer industry, and the explicit freedom of consumers to use their machines freely, as stipulated in the 1936 Clayton Act decision by the Supreme Court.

607.  Free usage encompasses the utilization and production of knowledge, such as the development of programs. Under the Consortium's control, the computer industry monetizes, withholds, packages, and sells this knowledge itself, including knowledge that is critical for the use of consumer machines, rather than selling the products that process knowledge without limiting their usage as the law requires.

608.  There is an unambiguous difference between knowledge that enables the design and creation of a product and the knowledge required for that product's usage and repair. Trade secrets, patents, or copyrights may protect knowledge pertaining to the design and creation of a product. Such knowledge is typically not necessary for the usage of products. Knowledge that enables the usage and repair of a product should not be withheld from its users. Nor should there be a limit on the ability of users to create knowledge that enables, expands, or automates the usage of their devices.

609. The Consortium regularly imposes such limits on x86-based computer users, disguising them as updates that purposefully cause incompatibility. Security flaws that were intentionally designed to justify such updates are used to force consumers to abandon their hard-earned knowledge and pay for expensive product designs by the Consortium not to satisfy market demand but to increase the Consortium's profits and to limit the creation of knowledge by x86-computer users in order to cement the Consortium's market dominance and its hold on technology.

610. This Complaint details two flagrant examples of this practice: the blocking of programs written by non-Consortium programmers from accessing x86 CPU interrupt instructions, which the Consortium achieved by tying Microsoft Windows with x86-based computers. Meanwhile, operating system and server-based programs, which are the Consortium's main monetization method, enjoy significantly more efficient access to the x86 CPU due to their design. The other flagrant example is the tying of CPUs and modems in the cable modem that Internet Service Providers, who are Consortium Participants, are forcing consumers to use in order to block direct communication and data sharing between Internet users.

611. Before personal computers arrived in the late 1970s, IBM's business model included monetization of the knowledge required for usage of their computers. The consulting-oriented model, which utilizes knowledge control to influence consumer purchasing decisions, is in conflict with antitrust law, as stipulated by the 1936 Supreme Court. The widespread availability of personal computers to consumers eliminated the "consulting" aspect of this model, leaving only the manipulation of product design and market to restrict consumers' freedom to use the machines they had purchased.

612. The application of antitrust law must be preemptive to prevent the destruction of innovation, competing technologies, and products that are

discriminated against and blocked. The events detailed in this Complaint illustrate why Milton Freedman's claim in his letter to the court in the 1998 case v. Microsoft that antitrust law suppressing innovation is the opposite of truth. By the time the government took action to enforce antitrust laws against Microsoft, it had irreversibly destroyed technology and innovation, causing damage to consumers across all sectors of the economy.

613.  The same argument applies to Judge Bork's approach to antitrust law, waiting to see the impact on the market before taking enforcement action. By the time the impact on consumers is evaluated, technologies and products were destroyed and lost. The law must be preemptive. Law that prohibits the attempting of murders cannot be interpreted to allow authorities to wait and see if the killing has actually occurred before taking action.

614.  The application of antitrust law should be most effective when brought up by competitors and consumers when it applies to specific technologies and practices. The fundamental protection consumers need should not be limited to less consequential violations that define additions to products, such as the addition of a Microsoft browser to Windows, as tying, but from the unfair advantage Microsoft enjoys that affects all its products and those of its competitors, as well as the fundamental right to freely use these products.

615.  Plaintiff's intervention in the 1998 Government v. Microsoft case was aimed at focusing the case on the primary damage to consumers, the limits on the usage of x86-based computers, rather than the mostly moot issue of competition in the operating system that, in practicality, has no relevance to consumers. Dominating standards, as demonstrated by the Intel-AMD x86 PC standard and the industry it created, offer distinct advantages to consumers, sometimes even extraordinary ones. The damage to consumers stems from deliberate restrictions that are imposed on that standard to limit and restrict usage of the product, x86-based computers, for the benefit of the standard setters, who become

gatekeepers of consumer-owned product usage, solely for their own benefit.

616. The Consortium's business model relied on restricting the ways in which consumers could use computers, thereby controlling and limiting the free use of language. This resulted in the intentional destruction of languages, despite their popularity and essentiality for consumers.

617. Incompatibility with x86 software products on x86-based computers are achieved by tying to x86-based computers software products that are designed to introduce such incompatibility, as is the case with Microsoft Windows. Incompatibility is the driving force behind Microsoft and Qualcomm's efforts to develop a new chip, which aims to supplant the relatively open x86 standard and the investment made by its users in the languages, knowledge, and software it supports. Microsoft, taking advantage of its monopolized operating system market, is misusing its Windows trademark to mislead consumers into purchasing incompatible computers, thereby robbing them of their knowledge and language, to the detriment of consumers and the economy, who rely on x86 standards. This effort violates antitrust, trademark, and consumer protection laws, targeting not only Intel and AMD, who support the relatively open x86 hardware standard, but also Microsoft's own customers, depriving them of their knowledge, investment, and languages that they purchased from and relied on Microsoft.

618. Microsoft and Qualcomm's attack on the x86 standard and its users is an attempt to replicate the illegal practices that Apple and Google established in the smartphone market and apply them to the x86-based personal computing market. The practices in the smartphone market were designed to harvest the usage of their products by mandating tied, centrally distributed services, while also preventing the competition that is the norm, albeit under attack, on x86-based computers. Apple and Google restrict smartphone programming by their owners, mandating centrally distributed applications that rely on Apple and Google services and enable the harvesting of customers' information and data.

Using various illegal tying methods, they protect their business model and profits by suppressing independent programming of consumers' smartphones' CPUs, in violation of the 1936 Supreme Court decision. They profit from this restriction on product usage, which forces consumers to purchase and use tied services and products. The Consortium is attempting to destroy the x86 standard in order to establish those practices in personal and business computing.

619. A recent court decision in a case against Google ordered the opening of its application environment to competing applications. However, the decision fails to address the fundamental definition of the CPU as a language machine, which implies that its use for general programmability warrants protection.

620. Plaintiff technology, by its nature, was designed and is used to eliminate the dependency on Microsoft and the Consortium. As this Complaint details, Microsoft is a founding Consortium Participant and one of its primary beneficiaries, and it has no ambivalence regarding its support for the Consortium. Intel and AMD, their shareholders, users of x86-based computers, and the overall economy suffer significant losses as the result of the Consortium's actions. Intel can reverse the Consortium wrong; thanks to the integration of its design and manufacturing, but it was "kidnapped" by the financial arm of the Consortium and is under attack aimed at ending any potential challenge to the Consortium. AMD, after losing its integrated design and manufacturing as a result of forcing the Consortium to accept its popular 64-bit x86 extension standard, its willingness to collaborate with Plaintiff in ending its dependency on Microsoft, and its current competitive position in regard to Nvidia, is operating literally under a hanging sword and is being forced to protect the Consortium by limiting its offering and competitiveness. The following two paragraphs, taken verbatim from AMD's 10-K 2024 filing, partially reference the risk AMD faces.

Economic and Strategic Risks (AMD 10-K)

Intel Corporation"s dominance of the microprocessor market and its

218

1    aggressive business practices may limit our ability to compete

2    effectively on a level playing field. Intel"s microprocessor market

3    share position, significant financial resources, introduction of

4    competitive new products, and existing relationships with top-tier

5    OEMs have enabled it to market and price its products aggressively,

6    to target our customers and our channel partners with special

7    incentives and to influence customers who do business with us. These

8    aggressive activities have in the past resulted in lower unit sales and a

9    lower average selling price for many of our products and adversely

10   affected our margins and profitability. Intel also dominates the

11   computer system platform and has a heavy influence on PC

12   manufacturers, other PC industry Participants, and benchmarks. It is

13   able to drive de facto standards and specifications for x86

14   microprocessors that could cause us and other companies to have

15   delayed access to such standards. We may be materially adversely

16   affected by Intel"s business practices, including rebating and

17   allocation strategies and pricing actions, designed to limit our market

18   share and margins; product mix and introduction schedules; product

19   bundling, marketing and merchandising strategies; and exclusivity

20   payments to its current and potential customers, retailers and channel

21   partners. We expect Intel to continue to heavily invest substantial

22   resources in marketing, research and development, new

23   manufacturing facilities and other technology companies. To the

24   extent Intel manufactures a significantly larger portion of its

25   microprocessor products using more advanced process technologies or

26   introduces competitive new products into the market before we do,

27   we may be more vulnerable to Intel"s aggressive marketing and

28   pricing strategies for microprocessor products. We also compete with

1    Intel in field programmable gate arrays (FPGAs) and Adaptive SoC

2    products. In the graphics processing unit (GPU) market, Intel has

3    developed and released their own high-end discrete GPUs, including

4    gaming focused discrete GPUs. Intel could take actions that place our

5    GPUs at a competitive disadvantage, including giving one or more of

6    our competitors in the graphics market preferential access to its

7    proprietary graphics interface or other useful information or

8    restricting access to external companies.

9         (and about Microsoft AMD's 2024 10-K filing)

10    If we lose Microsoft Corporation's support for our products or other

11    software vendors do not design and develop software to run on our

12    products, our ability to sell our products could be materially adversely

13    affected. Our ability to innovate beyond the x86 instruction set

14    controlled by Intel depends partially on Microsoft designing and

15    developing its operating systems to run on or support our x86-based

16    microprocessor products. With respect to our graphics products, we

17    depend in part on Microsoft to design and develop its operating

18    system to run on or support our graphics products. Similarly, the

19    success of our products in the market, such as our APU products, is

20    dependent on independent software providers designing and

21    developing software to run on our products. If Microsoft does not

22    continue to design and develop its operating systems so that they

23    work with our x86 instruction sets or does not continue to develop

24    and maintain their operating systems to support our graphics

25    products, independent software providers may forego designing their

26    software applications to take advantage of our innovations and

27    customers may not purchase PCs with our products. In addition, some

28    software drivers licensed for use with our products are certified by

1          Microsoft. If Microsoft did not certify a driver, or if we otherwise fail to

2          retain the support of Microsoft or other software vendors, our ability to

3          market our products would be materially adversely affected.

4          621. Operating under the Consortium, AMD fails to mention in its 2024

5 10-K filing that the x86 standard is an open standard. Intel, on the other hand,

6 does mention it in its 2024 10-K, adding to the conflict between the Defendant

7 and Gelsinger that ended with Gelsinger's ejection from the company.

8          622. The maintenance of x86 hardware compatibility by Intel and AMD,

9 despite Intel's past anti-competitive actions, has created the most valuable

10 technical asset available to consumers today. The Consortium's strategic

11 objectives directly clash with this valuable asset. The primary goal of this

12 Complaint is to liberate both x86 programmers from the illegal restrictions on

13 their ability to program x86-based computers, and the x86 semiconductor

14 companies from the Consortium's undue influence, which is attempting to destroy

15 the standard.

16          623. The five decades of technology manipulation and destruction of

17 semiconductor-related technologies created and widened a significant gap between

18 existing products and the potential products that the underlying technology can

19 enable. In an economy that depends on computational technology, that gap

20 reflects blatant violations of antitrust law and significant losses to consumers and

21 the economy.

22        **D. THE DESTRUCTION OF INTEL MANUFACTURING**

23          624. The Consortium's main technology Participants, Microsoft, Apple,

24 Amazon, Nvidia, and Qualcomm along with the three index-based funds that

25 own the largest block of Intel's shares, are acting to force Intel to give up its

26 unique technological advantage. Intel's advantage stems from having its design

27 and manufacturing combined under one roof and an unmatched accumulated

28 investment in R&D design and manufacturing. Intel is in a unique advantageous

position that is stated as the company's mission filed in the 2024 10-K form,
where its dominant x86 standard and its semiconductor fab services are
positioned to enable competitors that can challenge Consortium Participants and
the Consortium's long-term objective to centralize the market under the
dominance of Consortium Participants. To maintain their market position and
stock market gains and prevent entry into the market by competitive technologies
that could jeopardize their long-term goals the Consortium Participants started a
campaign in 2009 with an effort to weaken Intel and the x86 architecture. The
campaign intensified in 2012 with Defendant Bryant being positioned as Intel's
board chairman.

625.  Having both design and manufacturing in the same corporate entity
allows design and manufacturing engineers to share knowledge that is otherwise
considered highly secretive and protected as corporate secrets. That integration
makes it possible to achieve optimization levels and efficiency that would be
impossible without it. It also facilitates the implementation of original
semiconductor intellectual property (IP), which necessitates this level of
integration. That level of optimization and integration put the Consortium's
strategic objectives at risk as it allowed Intel to empower potential competitors as
well as reduce end users' dependency on the Consortium's services. Inefficiency
that leads to more power use protects the Consortium because it forces the market
to rely on centrally distributed computation by limiting powerful computation to
just a few Consortium Participants that are big enough to build the infrastructure
that is needed. Under the Consortium's undue influence, Intel participated in the
destruction of low-power semiconductor technology, as well a blocked Plaintiff's
technology from reaching the market.   .

626.  The shared engineering knowledge, experience, and flexibility that
stem from having both design and manufacturing in the same corporate entity
help fulfill consumers' expectations and give Intel a much stronger position in

dealing with competitors and collaborators alike. Intel's unique position is essential for solving critical issues faced by the semiconductor and computing industries, such as power consumption and manufacturing yield rates. Such technological advancements not only reduce the cost of computing for consumers but also empower them, thereby undermining the Consortium's long-term strategic objective.

627. AMD, which was forced by the Consortium to sell its manufacturing facilities, is currently outsourcing the manufacturing of its semiconductor devices to Taiwan's TSMC. As a result, AMD design engineers can only be exposed to limited information about the actual capabilities available in the TSMC semiconductor manufacturing mode used for a particular manufacturing node, as that information is shared with other semiconductor design companies that are using the same manufacturing node; hence, the tolerance for errors must limit the flexibility of the design.

628. TSMC provides its clients, AMD among them, with a Production Design Kit (PDK), which outlines the numerous design rules that the design must adhere to in order to prevent the failures due to designs that exceed these rules. To maximize yields, a PDK must restrict design flexibility. On the other hand, Intel engineers have unrestricted access to manufacturing information, which facilitates collaboration between design and manufacturing engineers that enable them to adjust the design to manufacturing and the manufacturing to the design, a level of collaboration that AMD and TSMC engineers are unlikely to achieve due to the need to update a PDK with any change to the manufacturing process that impacts other companies. Such separation makes it much more difficult and less economical to introduce new competitive IP.

629. AMD lost that level of integration when it came under attack by the Consortium and was forced to sell its manufacturing division and become a "fabless" semiconductor design company that outsources its semiconductor

manufacturing. Between 1999 and 2003, before AMD lost its manufacturing, it was able to introduce the 64-bit x86 update and forced Intel and Microsoft to accept it despite significant resistance from the Consortium that preferred more expensive technology at the 64-bit level. AMD is significantly more restricted in its power to compete as it must obtain manufacturing capacity from a single foreign supplier, TSMC. AMD must compete for this premium manufacturing capacity with its main competitors, Nvidia and Apple, both larger then AMD, who rely on the same single-source supplier for their main products. As a result, AMD is forced to follow standards dictated by the Consortium and enforced by Microsoft and Intel.

630.  The Consortium that forced AMD to sell its manufacturing is determined to do the same to Intel. The Consortium is using the same tried-and-tested methods that were used in the attack against AMD and other companies like Ashton-Tate and Borland International, which fell victim to antitrust violations by the Consortium. These methods include using financial clout to place executives and officers who act as Trojan horses inside the companies to further the Consortium's goals, using propaganda against the companies, and applying financial pressure and misleading financial offers. Intel is the target of the same methods. Plaintiff witnessed such deleterious behavior by Consortium Participants during the attack on Ashton-Tate that brought its demise. Investment companies, acting on behalf of the Consortium, positioned directors and executives to push out the company's most effective, productive, and experienced managers and designers.

631.  At the time of Defendant Bryant's appointment to Intel's chairman position, Intel's two top executives were Intel president Renée J. James and Intel's head of semiconductor architecture, David Perlmutter. In the attempt to weaken Intel by separating it from its manufacturing, the same exact tried-and-tested formula was used, and the two were forced out of the company.

632.  Defendant Andy Bryant succeeded Jane Shaw as executive chairman in May 2012. Bryant lacked manufacturing or design qualifications, and during his managerial tenure at Intel, the company engaged in blatant violations of antitrust laws. Bryant, however, matched the Consortium objectives. He was hired to serve as Andrew Grove's assistant to help Grove minimize his direct communication with Microsoft's Bill Gates while forming the "Wintel Cartel" and help in establishing official communications channels with Microsoft after the 1981 U.S. D.O.J. arrest of American Airlines CEO for a phone conversation that violated antitrust law.

633.  Defendant Bryant was responsible for numerous anticompetitive acts on behalf of Intel and the Wintel Cartel, resulting in significant DOJ fines for Intel. Defendant Bryant also contributed to AMD's near-death experience, which forced AMD to sell its semiconductor manufacturing facilities.

634.  Defendant Bryant was selected and positioned as Intel's chairman by the Consortium using the index-based funds' financial clout, and he was tasked with accomplishing the same separation at Intel that the Consortium forced on AMD, this time acting on behalf of the Consortium against his own company and violating its professional and fiduciary duties.

635.  In November 2012, Intel's president and CEO, Paul Otellini, announced that he would step down in May 2013. During a six-month transition period, Intel's board of directors commenced a search process for the next CEO, in which it considered internal managers and external candidates, including Patrick Gelsinger.

636.  Defendant Bryant positioned Brian Krazanich as part of the Consortium's scheme to undermine Intel, particularly its manufacturing capabilities. This was done to shield the Consortium from Intel's inherent growth, a result of its substantial R&D investments, and its established market position as the most advanced semiconductor manufacturing company in 2012,

1    with a two-year advantage over its nearest manufacturing competitor. The

2    resulting ability to place increasing amounts of computational power in the hands

3    of independent x86 developers like Plaintiff and consumers would have

4    effectively ended the Consortium's scheme and the meteoric share value rise of

5    its designated stock market stars.

6        637.  Before Intel's CEO, Otellini, and Intel's chairwoman, Jane Show,

7    departed, Consortium Participants, including Defendant Bryant, determined

8    Krazanich's choice for the CEO position and shared it with then-chairwoman

9    Jane Show. On May 2, 2013, Executive Vice President and COO Brian

10    Krazanich was selected as Intel's CEO, a selection that became effective on May

11    16, 2013.

12        638.  Defendant Bryant and the new CEO, Krazanich, proceeded

13    immediately to force out both Intel's manufacturing strategists and its most

14    knowledgeable leaders. Renée James, who was Intel president, and David

15    Pearlmuter, Intel chief technology and its highest semiconductor design and

16    manufacturing expert, were moved out of the decision chain and eventually

17    forced to resign.

18        639.  Defendant Bryant and CEO Krazanich proceeded to cancel Intel's

19    most important strategic investment in manufacturing, the latest ASML

20    high-density chip-making machine, which was being readied in collaboration with

21    Intel's engineers for delivery to an Intel manufacturing facility. That machine

22    represented a strategically crucial step for Intel's multi-year planned investment to

23    stay abreast of Moore's law at the front edge of the global semiconductor

24    manufacturing industry.

25        640.  Defendants Bryant and Krazanich stopped the delivery of the first

26    EUV (Extreme Ultra Violet) ASML semiconductor manufacturing machine that

27    was developed in collaboration with Intel engineers and was ready for delivery to

28    Intel. The machine was sent instead to Taiwan's TSMC. While TSMC moved

forward with the adaptation of EUV technology, Intel fell behind, creating a multi-year gap behind TSMC's high-density chip manufacturing capabilities. Defendant Bryant and Krazanich kept delaying Intel's adaptation of EUV technology, a technology that was developed with Intel collaboration and financing, demoralizing Intel's engineers and growing Intel's gap behind its competitors until their forced departure from Intel.

641. Eventually, the demise of Intel manufacturing was halted by a backlash. Concern about the destruction of Intel by Intel's shareholders that are not part of the Consortium and governmental agencies concern about the destruction of their semiconductor supply chain and the detrimental impact on security, economic, and geopolitical U.S. position stopped the effort to separate Intel from its manufacturing. It will take years to rectify the technological delay and damage to Intel's position, and these issues continue to impact both Intel and the US semiconductor industry today.

642. Defendant Bryant's and CEO Krazanich's actions were designed to prevent potential competition against the Consortium that required a level of integration between semiconductor design and manufacturing that only close collaboration under a single roof can provide. AMD, the only other x86 device manufacturer, had to sell its manufacturing operation, making the implementation of Plaintiff's technology, which AMD Chairman Jerry Sanders enthusiastically viewed, practically impossible.

643. Defendant Bryant and CEO Krazanich dismantled Intel's smartphone line and investment in the mobile versions of x86 devices, stopping Intel's move, against any sensible business judgment, into the largest computing market segment as that segment expanded taking market share from Intel's bread-and-butter x86-based computers.

644. Following a Plaintiff's presentation to Intel about potential competitive technologies that could have affected the smartphone market, the Defendants

moved to sell Intel's smartphone modem department to Apple. At the time, this department was selling smartphone modems to a Consortium Participant, Apple, and successfully competing with another Consortium Participant, Qualcomm, that also sold smartphone modems to Apple.

645. Defendant Bryant and CEO Krazanich effectively destroyed Intel's leadership position in the semiconductor market and destroyed its ability to participate in the smartphone market in order to protect the Consortium from potential competition and enable the continuation of the meteoric rise of Consortium companies shares that both invested in. That unprecedented and exorbitant rise benefited the individuals behind the Consortium's scheme, including Defendant Bryant and Brian Krazanich, by purchasing significant shares of the companies impacted by their actions.

646. As the Intel predicament became known, pressure mounted on Defendant Bryant and CEO Krazanich to resign and on Intel's main shareholders to take corrective action to correct what was in fact the result of their own intentional effort. After Krazanich departure an article in an influential professional mainstream magazine describe Bryant and Krazanich era at Intel as "Krazanich reign of terror."

647. Defendant Ishark was chosen by the Consortium to replace Defendant Bryant in order to try to complete the effort to weaken Intel by outsourcing its semiconductor manufacturing to the Far East. Omar Ishark was selected as Intel Chair based on his experience at Medtronic, a major U.S. company that, under Ishark's chairmanship, was moved to Ireland to avoid U.S. laws and regulators after a myriad of illegal activities in the U.S. and abroad.

648. The attempt to force Intel to outsource its manufacturing to the Far East, which started even before Jane Shaw was replaced by Andy Bryant as Intel's Chairman in May 2012, was supposed to end on January 13, 2021, when Intel announced the selection of former Intel's chief technology officer, Pat

Gelsinger, as its new CEO. That, however, did not stop the Consortium effort. Despite Omar Ishark's removal as Intel chairman, the Consortium persists in safeguarding the scheme that generates billions in corporate and personal profits by continuing to damage Intel. The damage to Intel that resulted from decades-long abuse documented in this Complaint is impossible to fix while Consortium Participants are Intel's largest shareholders that are continuing to benefit from the protection from competition Intel is being forced to provide, a protection that is shifting the market into dependency on toll-based, centrally distributed services and products.

### E. DEFENDANT BRYANT IMPACT ON INTEL

649. Defendant Bryant joined Intel in 1981 as then-CEO Andy Grove's assistant. His responsibilities included coordinating Intel's relations and product-tying coordination with Microsoft, which positioned him as the Wintel Cartel's and later the Consortium's point man at Intel. He eventually oversaw several Intel departments simultaneously, including the HR (Human Resource) department, where, to overcome resistance from engineers and managers to management directives to implement predatory design, he devised hiring strategies that prioritized the recruitment and promotion of engineers and managers who were inclined to follow such directives and the ejection from the company of personnel who resisted such directives. These strategies have influenced Intel's hiring practices to this day. Microsoft, encountering similar resistance, replicated those hiring methods.

650. Between 2008 and 2010, Intel started offering x86 IP as part of a turnkey custom foundry chip manufacturing service to semiconductor design companies under the name CIAF (Custom Intel Architecture Foundry). Intel wanted to open the market to the x86 standard, which became the Internet's common language. Allowing potential competition in the market by independent developers, including Plaintiff, the starting of CIAF escalated the conflict with

1   the Consortium's ultimate goal of locking the market into exclusive, centrally

2   distributed services that were monetized as publicly traded shares to enrich its

3   Participants. The Consortium recognized that Intel's technological advances, at

4   the time ahead of the industry, empowered the market and disrupted their

5   pre-existing strategy that was already succeeding in the smartphone market. The

6   Consortium moved to plan a complete takeover of Intel, a destruction of the x86

7   standards, and a weakening of U.S. semiconductor manufacturing to prevent any

8   challenges to their strategy. As part of this plan, Defendant Bryant, who, as an

9   Intel employee and, with the help of the Consortium, became Intel's largest

10   individual shareholder, was positioned to become Intel's chairman.

11       651.  With influence on Intel that came from holding the largest block of

12   Intel's shares, the Consortium positioned Defendant Bryant as Intel's chairman.

13   He assumed that position in 2012. As compensation for his actions, Defendant

14   Bryant amassed billions of dollars and rose to become the largest individual

15   shareholder of Intel, owning approximately three billion dollars of Intel's shares,

16   surpassing Intel's founders. He leveraged this position to further the

17   Consortium's objectives within Intel. His tenure as Intel's chairman started with

18   the appointment of Krazanich as Intel's CEO and the forced departure of Intel's

19   top engineers and managers. Defendant Bryant moved to eliminate the risk to the

20   Consortium by ensuring that Intel's semiconductor competitive position, which

21   was two years to three ahead of its nearest competitors, could not empower x86

22   PC and smartphone users and potential competitors, which would have stopped

23   the Consortium stock market scheme. Acting to protect Consortium Participants'

24   ongoing windfall profits, Defendant Bryant irreversibly harmed Intel's

25   semiconductor technology and competitiveness, the x86 standard, its users, and

26   Plaintiff. The destruction of Intel's semiconductor technology and

27   competitiveness weakened the U.S.'s global position and the U.S. economy while

28   simultaneously contributing to an unprecedented increase in the value of

1   Consortium Participants', including Defendant Bryant's, publicly traded shares.

2      652.  To enable the destruction of Intel's semiconductor manufacturing,

3   Defendant Bryant forced out Intel's top managers and semiconductor engineers,

4   including Renée J. James, who served as the company's president, and Dadi

5   "David" Perlmutter, who oversaw processor design. After Krazanich's departure,

6   an article in an influential professional mainstream magazine described Bryant

7   and Krazanich's era at Intel as the "Krazanich reign of terror." Defendant Bryant

8   and CEO Krazanich, who held the two top positions at Intel, were selling their

9   Intel shares in anticipation of the company's demise as they executed the

10   Consortium's strategy. By the time they both left the company, they owned a

11   negligible amount of Intel shares.

12      653.  As soon as Defendant Bryant and Krazanich pushed out Intel's top

13   business and semiconductor experts, they moved to hinder Intel's critical

14   investment in its Moore's Law cyclical manufacturing update by canceling a

15   delivery of the first ultraviolet semiconductor manufacturing (EUV) machine that

16   was developed by ASML in collaboration with Intel engineers and was ready for

17   delivery to an Intel site in the USA. Instead, they redirected the machine to

18   TSMC in Taiwan, aiming to undermine Intel's manufacturing capabilities and

19   compel the company to outsource its semiconductor manufacturing to TSMC.

20      654.  Defendant Bryant and Krazanich proceeded to discontinue and

21   effectively destroy Intel's significant investment in x86 smartphones, as well as

22   its competitive smartphone product line. Intel's 5G wireless modem unit was

23   subsequently sold to a Consortium company, Apple, in a move designed to make

24   it more difficult for a new management team to restore Intel's competitiveness in

25   a computing market and technology that is rapidly shifting with miniaturization

26   into mobile computing.

27      655.  As the government and the majority of shareholders became

28   concerned about the damage to Intel and the US semiconductor global position,

pressure to right the company by returning an experienced Intel engineer to the CEO position and replacing Intel's chairman was mounted. Pressure to turn the company around by restoring an experienced Intel engineer to the CEO position and replacing Intel's chairman grew, and dictation with Gelsinger about his return to the company started. In a desperate attempt to halt Intel's decline, the Consortium appointed a non-engineer CEO who lacked experience in semiconductor design or manufacturing, despite his brief tenure at Intel. Robert (Bob) Holmes Swan became the temporary CEO of Intel in January 2019 and served until February 15, 2021. A number of steps were taken by the Consortium to prepare for Gelsinger's return and prevent a successful recovery of the company, including the positioning of Consortium Participants in key Intel positions and the sale of Intel's 5G modem department to Apple before Gelsinger returned to the company.

656. Gelsinger returned to Intel as CEO in 2021 after concerns about Intel as well as the U.S. global position forced the Consortium to pretend to reevaluate its strategies. Under his leadership, Intel aims to regain its competitive edge in semiconductor manufacturing and innovation, focusing on advanced technologies and increased production capacity to meet growing global demand. Gelsinger's early impact on Intel after its return included repositioning semiconductor manufacturing and design and the x86 CPU standard as the highest priority of Intel, delivering on Intel's mission to allow semiconductor manufacturing to independent developers by the fab services department. Defendant Ishrak, who had replaced Defendant Bryant as Intel chairperson, was replaced after Gelsinger's arrival with Defendant Yeary. However, both Defendant Ishrak and Defendant Yeary participated with and followed Defendant Bryant in erecting barriers for a possible recovery and opening Intel to competition by placing Consortium participants in key positions and selling the Intel 5G modem department.

657. The damage done by the Consortium to Intel manufacturing, the U.S. semiconductor industry, the x86 standard, and the U.S. economy and global position between 2009 and 2021 is continuing because Consortium Participants have yet to lose their undue influence inside and outside the company and its environment. For Intel to recover and, with it, U.S. semiconductor manufacturing, the Consortium's power to influence the company and manipulate its decisions and strategy must end.

## F. DEFENDANT BARBARA G. NOVICK

658. Defendant Barbara G. Novick, a Consortium Participant as defined and detailed in this Complaint, joined Intel's board of directors in December 2022. As a co-founder of BlackRock, an index-based fund and the world's largest asset manager, she wields unparalleled influence over Intel's board members. BlackRock holds the largest, or nearly the largest, block of shares not only of Intel, but also of all or most of the other companies in which Intel directors hold various positions.

659. Defendant Novick's dual roles at BlackRock and Intel present an unparalleled degree of conflict of interest. Defendant Novick's conflict of interest arises from BlackRock's reliance on suppressing and manipulating Intel's technologies to protect its primary source of profitability¨the appreciation of companies that form the backbone of BlackRock's rising value. BlackRock is currently involved with lucrative companies such as Microsoft and Nvidia in massive projects that have the most to lose from competition and low-power technologies that Intel is not allowed to enable, including Plaintiff's technologies. The importance and criticality of suppressing and manipulating Intel's semiconductor technology and the x86 standard for BlackRock's ability to continue its stock market scheme, a scheme that justifies BlackRock very existence, was the reason that Defendant Novick joined Intel's board after Gelsinger returned to the company.

660.  BlackRock manages index-based funds, investment funds, and various business activities under one umbrella. Its clout as the holder of index-based shares gives it influence over all major companies. Intel's board members ignore Defendant Novick's conflict of interest because they benefit from companies where BlackRock wields significant influence. More than any other index-based fund, BlackRock manages direct investments in technology companies that rely on the suppression of competition in the U.S. semiconductor industry and on the protection that the suppression and manipulation of Intel technology and manipulation of its policies and products provide.

661. BlackRock's wealth is primarily derived from its holdings, investments, and partnerships with Consortium Participants companies that have grown and prospered due to the manipulation, suppression, and destruction of technologies and competition. It provided BlackRock's investments with an unfair market advantage that caused their value to soar. BlackRock has targeted the semiconductor, software, and lately AI and related energy infrastructure as its profit center. The manipulation of Intel technologies and products, as detailed in this Complaint, has resulted in the accumulation and appreciation of a vast amount of capital under BlackRock control. Microsoft, Apple, Amazon, Nvidia, Qualcomm, CrowdStrike, Smartsheet, the GAIIP AI energy initiative with Microsoft, Internet service providers, and cellular phone service companies publicly traded shares rise as a result of weakening Intel and competitors who depend on it, including Plaintiff. The rise in their share value represents a significant portion of BlackRock's capital. Its continued rise hinged on the suppression of Intel, the U.S. semiconductor industry, and competitors such as Plaintiff, who depend on Intel. Defendant Novick joined Intel's board to protect the continued growth of BlackRock's capital and consequently the survival of BlackRock's clout and the Consortium; both depend on the suppression of Intel's technology and competitive technologies such as Plaintiff's that depend on it, as

1    detailed in this Complaint.

2        662.  Defendant Novick, a co-founder of BlackRock, joined Intel's board

3    of directors at a time when the newly appointed CEO, Gelsinger, was reversing

4    the plan to force Intel to outsource its manufacturing. This plan was initiated with

5    the installation of Defendant Bryant as Intel Chair and was supposed to be carried

6    on by his replacement, Defendant Ishark. As a result of Gelsinger's appointment

7    to the CEO position and the failure of other board members to impede his efforts,

8    BlackRock found itself facing a risk that could reverse its fortune.

9        663.  Defendant Novick's position at BlackRock, a company that relies on

10    the exorbitant market cap growth of technology companies that depend on

11    suppressing Intel technology and competitors such as Plaintiff, has the ability to

12    provide her BlackRock colleagues with Intel's confidential information, which

13    could be divulged to and utilized for the benefit of BlackRock and her colleagues.

14    With BlackRock's continued rise in the balance, her role as an Intel director

15    clashes with her BlackRock position.

16        664.  The criticality of Intel technology to BlackRock's business goes back

17    to BlackRock's start in the 1980s. Its influence on Intel started long before the

18    Dot-com bubble burst in March of 2000, when Intel shares lost significant value

19    and became stagnant, forcing Intel officers and employees to invest their personal

20    investment portfolios in Consortium Participants shares.

21        665.  Intel's board actions served BlackRock and the Consortium objectives

22    when the most damaging decisions to Intel were taken. Based on his

23    communication with Intel's employees that started before his agreement with

24    Intel, Plaintiff assumes that some information about his plans was shared with

25    Intel's directors and that some of that information influenced some of the most

26    detrimental decisions to Intel, such as the abandonment of Intel's x86 smartphone

27    line during a market shift from x86-based computers to smartphones and the sale

28    of Intel's cellular modem division to Apple. Such decisions could not have been

1  carried out without BlackRock's approval. Defendant Novick joined Intel's board

2  following Gelsinger's return, which hindered the board's ability to make

3  decisions detrimental to Intel.

4       666.  Despite Intel's criticality to the global economy, in today's business

5  world, no company can operate without relying at least partially on Intel's

6  products, technology, or standards. Intel's market cap has stayed stagnant since

7  March of 2000, and its market value was only a fraction of the value of the

8  technology companies that constitute the dominant part of BlackRock's

9  investment portfolio. Intel, however, is the only company in the technology

10  sector to have a senior BlackRock executive on its board. Defendant Novick's

11  presence on Intel's board underscores the criticality of BlackRock's ability to

12  control Intel for the continuation of BlackRock and its scheme.

13       667.  Defendant Novick has joined the Intel board as part of a plan detailed

14  in this Complaint that was devised by the Consortium to harm Intel and weaken

15  Intel's manufacturing by compelling Intel, its shareholders, its clients, and the

16  government to agree to separate its semiconductor manufacturing from its design.

17  The Consortium devised the plan to protect its strategic objective, recognizing

18  that Intel's technological advantage, which before 2012 put Intel in the unique

19  position of being two years ahead of its nearest manufacturing competitor and

20  with the integration of design and manufacturing potentially enabled a higher

21  level of product optimization and lower power computing, was inevitably and

22  unavoidably empowering independent companies and developers who oppose and

23  resist the Consortium's objectives. Intel's advance, supported by Intel engineers

24  and enabled by the integration of manufacturing and design, jeopardized the

25  Consortium's ultimate goal of consolidating computational power among

26  Consortium Participants and forcing consumers and companies to rely on

27  centrally distributed services from Consortium companies to allow the

28  Consortium to profit from the increasing value of their publicly distributed shares

1    due to the market's dependency on their exclusive services.

2        668. As part of the plan, Intel's accounting was manipulated to contribute

3    to the current crisis and present Intel manufacturing as the main reason for the

4    crisis. A derivative shareholders lawsuit, Case 5:24-cv-09121 Filed 12/17/24 in

5    United States District Court Northern District Of California, that was filed on

6    behalf of Intel detailed some of the manipulation and the culpability of Defendant

7    Novick. As a member of the Intel's audit and finance committee Defendant

8    Novick was well informed about Intel's predicament and participated in hiding it

9    as part of a plan to entrap Gelsinger and force his resignation after a series of

10   accomplishments that jeopardized the Consortium's plan were completed during

11   the summer of 2024.

12       669. Defendant Novick's influence at Intel's board reflects BlackRock's

13   interests and TSMC, in which it owns a significant block of shares. The

14   Consortium's strategic objectives of controlling semiconductor design options

15   heavily rely on TSMC's market dominance. Although TSMC (Taiwan

16   Semiconductor Manufacturing Company) is not a U.S.-based company, it trades

17   on the New York Stock Exchange (NYSE) under the ticker symbol TSM and

18   features in several U.S.-based indices, such as S&P 500 and NASDAQ-100.

19   TSMC is primarily held by institutional investors, with the largest blocks of

20   shares owned by the Taiwanese government, TSMC's founding families,

21   BlackRock, Vanguard Group, and State Street Global Advisors. The exact

22   percentage of ownership by these groups can change over time due to stock

23   buybacks, share issuance, and trading activity, but institutional investors typically

24   own the largest share of the company.

25       670. Defendant Novick's actions at Intel also benefit Vanguard, State

26   Street, and their prospectus subscribers. The purpose of these actions was to

27   increase the wealth of index-based funds and their prospectus subscribers at the

28   expense of Plaintiff and his clients. Without the tacit consent of Vanguard and

State Street, the two other index-based trading firms that collectively own a larger block of Intel shares than BlackRock and that collectively own the largest block of shares in all the companies that benefited from the unfair advantages and protection that BlackRock's policies at Intel provided, those actions would not have been possible.

### G. DEFENDANT FRANK D. YEARY, INTEL'S CHAIRMAN

671. Defendant Frank D. Yeary, a Consortium Participant as defined and detailed in this Complaint, is the current Chair of Intel's Board of Directors. Defendant Yeary joined Intel's board in March 2009. Among his tasks was shoring up support for the protection of Nvidia, a Consortium's Unicorn stock market run that was dependent on holding back Intel from providing x86 users the ability to compete in the parallel computationally-intensive numerical processing. To that end, engineering improvements to the x86 architecture were removed from Intel's x86 architecture by Intel's board and management, and Intel's vice president at the time, Pat Gelsinger, who advocated that competitive design, was pushed out of Intel. Defendant Yeary was instrumental in the Consortium plan to take direct control of Intel by positioning Defendant Bryant as Intel Chairman. He participate in positioning Krazanich as Intel's CEO and the ejection of the top Intel design and manufacturing engineers, the impediment of Intel's adaptation of EUV manufacturing technology, the demoralization of Intel's manufacturing and design talent that was described a "rain of terror". That demoralization effort and the effort to impediment of Intel's EUV manufacturing is continuing at the current time as Defendant Yeary is acting to eliminate Intel as a potential competition to the Consortium. Defendant Yeary was instrumental in fostering the spurious crisis that was exploited to force Gelsinger out of Intel after Gelsinger overcome hurdles to the Intel's fab competitiveness that were put in Place by Defendant Yeary.

672. Defendant Yeary joined the Intel board to achieve the Consortium's most pressing goal: keeping the high-capacity and high-density semiconductor technology behind an anticompetitive wall to ensure that the Consortium's centrally distributed computing dominance remains unchallenged. Achieving this goal requires separation between the relatively open x86 standard and semiconductor manufacturing, which was achieved at AMD and is still Defendant Yeary's mission at Intel. To that end, Defendant Yeary prompted the destruction of both Intel's manufacturing and Intel's x86 standard.

673. Defendant Yeary has joined the Intel board as part of a plan detailed in this Complaint that was devised by the Consortium to harm Intel and weaken Intel's manufacturing. The plan was meant to protect the Consortium from Intel's technological advantage, which, before 2012, put Intel in the unique position of being two years ahead of its nearest manufacturing competitor and, with the integration of design and manufacturing and Intel's relatively open x86 standard, was, and recently after the reorganization of Intel's fab that took place in the second half of 2024, able again to enable competitors such as Plaintiff to challenge the Consortium's consolidation of computational power under the control of Consortium Participants. As part of the plan, Defendant acted to impede Intel's manufacturing and to erect an anticompetitive wall around it that blocked Plaintiff from competing in the market. As soon as Intel's CEO, Gelsinger, was able to overcome those hurdles in mid-2024, Defendant Yeary set a plan in place to dismantle Intel. Intel's accounting was manipulated to contribute to an apparent crisis that falsely presents Intel manufacturing as the reason for the crisis, which was then used as a ruse to oust Intel CEO Gelsinger from the company. A derivative shareholders lawsuit, Case 5:24-cv-09121 Filed 12/17/24 In United States District Court Northern District Of California, that was filed on behalf of Intel detailed some of the manipulation and the culpability of Defendant Yeary.

674. Defendant Yeary was aware of and provided protection for Microsoft's plan to weaken and ultimately destroy the x86 standard and Intel. This plan involved misusing the Windows trademark, which is associated with x86 compatibility, to force consumers to purchase ARM-based computers that are incompatible with x86 programming standards and abandon their Intel x86 computers, thereby harming Plaintiff. Microsoft's plan, part of the Consortium's long-term design that Defendant Yeary followed for his own financial gain, aims to force Intel's customers to purchase and use toll-based, centrally distributed services that, as detailed in this Complaint, are inferior to stand-alone applications in many respects and significantly increase consumer costs while shutting off competition by Plaintiff and Intel-based developers.

675. Defendant Yeary participated in the Consortium plan in 2012, to install Defendant Bryant, and then Krazanich as Intel's chairman and CEO. This plan involved pushing out Intel's highest experts, managers, and semiconductor architects and bringing in designers who align with the Consortium's objectives.

676. Defendant Yeary played a significant role in the downfall of Intel's manufacturing when the board and top officers of Intel redirected the first advanced high-density ASML EUV machine, designed in collaboration with Intel and ready for delivery to an Intel facility, to TSMC in Taiwan. This move aimed at compelling Intel to outsource its production and high-density semiconductor manufacturing, thereby ending high-density manufacturing in the US in order to protect the Consortium from competition from U.S.-based semiconductor designers who could potentially empower autonomous users by leveraging the x86 standard. This included Plaintiff's designs, which had already faced the same fate years before, when AMD was forced to outsource its manufacturing.

677. Defendant Yeary played a significant role in undermining Intel's investment in the smartphone market by abandoning Intel's smartphone product line during a market transition from Intel's traditional x86-based computers to

smartphones, marking a major economic shift as consumers and businesses increasingly depended on mobile devices for everyday tasks. The Consortium acted in this manner to safeguard the centrally controlled distributed application standard it had established. The Consortium's decision to discontinue x86-based smartphones, which outperformed their ARM-based counterparts and offered compatibility with x86-based computers, aimed to protect Microsoft's illicit tying and dominance of x86-based computers while also protecting the subscription-based, centrally distributed model the Consortium imposed in the smartphone market. It protected Apple and Google's effort to force smartphone users and developers into dependency on their centrally distributed store-based applications and blocked Plaintiff's products from running on smartphones. The decision was so controversial that Intel executives and engineers discussed with Plaintiff a revival of Intel's smartphones after the board and top officers discontinued the line, recognizing that the decision was detrimental to Intel's future and was done to accommodate Intel's competitors.

678. Defendant Yeary played a significant role in the sale of Intel's modem department to Apple, a primary Consortium participant and a critical asset to BlackRock's scheme. The sale took place after Plaintiff shared with Intel, under a nondisclosure agreement, the details of technology and design that would have allowed x86 programmers and users to compete with and complement the 5G cellular infrastructure using lower-cost existing fiber-based web communication infrastructure with Intel's existing WI-FI technology.

## H. DEFENDANT OMAR ISHRAK

679. Defendant Omar Ishrak joined Intel's board of directors in March 2017 and served as the board chair between January 2020 and January 2023. Following Intel's forced top management departure, which was intended to stop the damage to Intel manufacturing under Defendant Bryant, damage that was intended to protect the Consortium, the Consortium positioned Defendant Ishrak

1    to succeed him as Intel's chairman and continue the protection that Consortium

2    Participants inside Intel provided to the Consortium.

3        680. In anticipation of Gelsinger's return to Intel, the Consortium

4    positioned Defendant Ishrak as a board member and then selected him for the

5    chairman position at Intel. This decision was based on Defendant Ishrak's unique

6    experience and actions at G.E. Health Systems and at Medtronic, a company he

7    largely helped relocate from the U.S. to Ireland. Gelsinger posed a significant

8    threat to the Consortium since, during his first tenure at Intel, he opposed the

9    Consortium's goals and its meddling with Intel's competitiveness and the damage

10   it inflicted on Intel and the U.S. semiconductor industry and was adamant about

11   enabling Intel to be fully competitive, which would have ended the Consortium's

12   market dominance.

13       681.  Starting with Defendant Bryant's hiring in 1981, under Defendant

14   Bryant's charge, a system of anticompetitive walls, exclusionary practices, and

15   predatory design was erected to protect, first, Intel and Microsoft, then the

16   Wintel Cartel, and later the Consortium's ongoing efforts to prevent the

17   exponentially increasing computational power that Intel creates from empowering

18   non-Consortium Intel OEMs and developers who could use it to compete against

19   the Consortium. In 2017, facing pressure to replace Defendant Bryant due to the

20   damage caused to Intel and to return Gelsinger to the CEO position, the

21   Consortium selected Defendant Ishark, based on his role at GE and Medtronic, to

22   prepare for that eventuality. Allowing Intel to empower competitors to integrate

23   semiconductors IP with the relatively open x86 standard would have effectively

24   ended the Consortium's centrally distributed services dominance. The

25   preservation of Intel's anticompetitive wall was imperative. Defendant Ishark was

26   selected to accomplish it based on his past at G.E. Health and Medtronic, where

27   he successfully concealed technology, market, and corporate manipulation as

28   legitimate business practices in order to transform a manufacturing company into

financially lucrative schemes, overcome regulators and public scrutiny, and move Medtronic, a major health technology provider from the U.S. to a foreign country.

682.   The only way the Consortium could stop Intel from transferring the exponentially growing computational power to its clients, which include competitors such as Plaintiff, was to stop Intel from creating that power. Defendant Bryant, who stopped that growth of available computational power, faced his own forced departure as the result of his actions, and Defendant Ishark, with his unique experience, was positioned by the Consortium to take his place and continue the Consortium's mission. When Defendant Bryant was forced out as a result of the damage he caused to Intel's and engineers who created Intel's exponential computational power growth were called to return to Intel and take over its management, Defendant Ishark was positioned to carry out the impediment of Gelsinger's recovery plan and prevent the restoration of computational power growth and its distribution to Intel's clients and developers that would have ended the Consortium's scheme and potentially could have brought down the leading Consortium Participants.

683.   The Consortium anticipated that the effort to detach Intel's design from its manufacturing by outsourcing it to TSMC would stall with Gelsinger's return to the CEO position. Setting Gelsinger and Intel to fail became essential to the Consortium and was its reason for selecting Defendant Ishrak. At G.E. Health under Jack Welch, Defendant Ishrak helped to replace industrial parts of GE with foreign-based operations such as car leasing to low-income drivers in Thailand and unsupervised low-cost manufacturing in foreign countries. His role as chairman and CEO at Medtronic, where, after controversies in the U.S. and foreign countries, he successfully moved the largest U.S. medical technology company from the U.S. to Ireland despite significant resistance and scrutiny, would serve the Consortium well.

684. Under Defendant Ishrak's leadership, Medtronic faced scrutiny in India due to its "Healthy Heart for All" initiative, which promised affordable heart pacemakers and stents to lower-income patients through financing programs. The initiative included free heart screenings through partnerships with private hospitals, where patients could secure loans to afford procedures. However, this program raised concerns about potential misuse of medical devices and surgeries, with suggestions that it incentivized unnecessary implant surgeries for profit. The high markups on imported devices and concerns about ethical practices raised the scrutiny of Indian regulators, who also flagged Medtronic devices for safety issues. Investigations and reports revealed that the program may have resulted in needless surgeries, as hospitals and health care providers purportedly aimed to achieve Medtronic's recommended financial targets, potentially leading to the implantation of pacemakers in patients who didn't require them. They also asserted that patients leased or financed devices like pacemakers and stents at prices up to 12 times their initial cost, thereby burdening them with debt. Defendant Ishrak joined the Intel board in 2017, coinciding with the program's eventual discontinuation as a result of the Indian government's intervention.

685. During the time Medtronic, under the leadership of Defendant Ishrak, engaged in controversial activities in various countries, including the U.S. and India, and the subsequent move of the company to Ireland that garnered significant scrutiny from regulators and lawmakers, the Consortium three index-based funds, Vanguard, BlackRock, and State Street, owned between them approximately one-fifth of Medtronic shares and used their clout to smooth out Medtronic's turbulence. The Consortium's concerns about Gelsinger's return to Intel overshadowed Defendant Ishrak's controversial background, leading to his election to the Intel chair position in January 2020. 10 months later, Medtronic plc (NYSE:MDT), by that time an Irish company, announced on Oct. 6, 2020,

that he would retire as executive chairman and chairman of its board of directors on December 11, 2020. Two months later, on February 15, 2021, Gelsinger returned to Intel as CEO.

## I. DEFENDANT LIP-BU TAN

686.  Defendant Lip-Bu Tan joined Intel's board of directors in August 2022 and resigned from the board in August 2024 when the plan to manipulate Intel's accounting and use it as a ruse to oust Gelsinger from the CEO position was initiated after Gelsinger appointed new management to Intel fab. Defendant Lip-Bu Tan may have intended to position himself as a candidate for Intel's CEO position after the planned forced departure of Gelsinger.

687.  Before he joined Intel's board of directors, Defendant Tan ran Cadence, one of the three EDA (Electronic Design Automation) companies that were created in the 1980s with significant investment by the Consortium. EDA companies play a crucial role in protecting the consortium from potential competitors by limiting access to semiconductor manufacturing. The EDA companies erect barriers to competition that prevent non-consortium semiconductor developers from accessing large-scale semiconductor manufacturing. The EDA companies in collusion with the semiconductor fab service companies, all of them under Consortium influence, maintain a system of illegal tying between fab services and EDA products that secures the dominance and control of Consortium Participants over computing by creating hurdles for accessing the manufacturing information required for automating the designs of efficient systems that the EDA companies do not support while blocking access to large-scale manufacturing, resulting in precluding efficient technologies such as low-power computing from the market.

688.  The EDA companies strategically implement barriers against efficient semiconductor design, which could potentially undermine the Consortium's scheme of centralizing computing such as massive parallelism, autonomous and

1    low-power computing. The special relationships between the manufacturing fabs

2    and the three EDA companies grant them exclusive access to the information

3    necessary for semiconductor design, and the three EDA companies have

4    coordinated an unprecedented increase in the cost of access to VLSI

5    semiconductor manufacturing as part of the anticompetitive barrier they erect.

6         689.  For comparison, FPGA companies like Altera (a part of Intel) and

7    Xilinx (a part of AMD) provide their customers with a complete EDA toolset free

8    of charge for programming FPGA products. This arrangement is possible because

9    the initial development costs of EDA software were amortized long ago, and high

10    EDA costs would be a barrier to semiconductor consumers. In a truly free

11    market, providers of semiconductor fabrication services would have the same

12    economic incentive to offer EDA tools to their customers, just as FPGA

13    companies do. However, under the Consortium's undue influence, both EDA and

14    fabrication service companies maintain artificial barriers through illicit tying and

15    exclusionary practices. These barriers not only block potential competition that

16    would have improved products and lowered pricing but also increase the cost of

17    computing to consumers because the Consortium Participants that dominate their

18    markets pay artificially high prices for EDA tools and fabrication services as part

19    of the very system they designed and maintain to keep competitors out, and that

20    exorbitant cost is paid by consumers.

21         690. Defendant Tan was a key person in maintaining relations between

22    EDA and the fab companies, and as such, his conflict of interest as an Intel

23    director is significant. Unlike AMD, which lost its manufacturing, Intel provides

24    both FPGA (with Altera) and fab services. Intel, as AMD's 2024 10-K filing

25    clearly states, has a high level of control over the future of what is by far the

26    dominant personal and business computing, the x86 standard. In a truly free

27    market, Intel would have economic incentive to offer EDA tools to its fab service

28    customers in the same way it provides them to its FPGA customers, combining

1    those tools to simplify and lower costs to its customers and even integrate its x86

2    IP with them in accordance with Intel's 2024 10-K statements. Such a move

3    would end the sweetheart protection racket that the EDA companies enjoy and

4    may have been part of the motivation for Defendant Tan actions at Intel.

5         691. The same reasons that led the Consortium to impose limits on

6    computational power and functionality for consumers also drive its positioning of

7    EDA companies as gatekeepers to VLSI (Very Large System Integration) design

8    and manufacturing. If competitors such as Plaintiff had gained access to VLSI

9    manufacturing, they could have introduced low-cost chips and low-power

10   autonomous computing that would have disrupted and likely ended the

11   Consortium's scheme, which relied on excessive power consumption to centralize

12   computational control of a few large companies that provide IT services. By

13   limiting autonomous functionality, the consortium ensured consumer dependency

14   on its centralized computing infrastructure.

15        692. The three dominant EDA companies emerged in the 1980s to

16   commercialize design automation and system integration. Semiconductor design

17   automation began in the 1960s and evolved into VLSI in the 1970s in academic

18   institutions. The EDA industry was formed in parallel with the Wintel cartel and

19   evolved with it into the Consortium, providing it with essential protection for its

20   scheme. Mentor Graphics was founded in 1981, Synopses Incorporated in 1986,

21   and Cadence Design Systems was formed in 1988. The Consortium, having

22   acquired significant influence over the semiconductor manufacturing fabs,

23   supported the three companies by providing them with exclusive access to

24   semiconductor manufacturing. They increased the entry-level pricing for

25   semiconductor design and manufacturing, ensuring that only Consortium

26   companies that are already dominant in their respective market segments could

27   afford to produce consumer-grade semiconductor devices. The rise over a

28   ten-year period in the cost of bringing to market a typical CPU SoC (system on a

chip) consumer chip with similar user functionality illustrates the effect of that anticompetitive effort. The cost increased from approximately sixty thousand dollars in 1990 to 60 million in 1999.

693.  EDA companies develop and sell software tools that are based on software compilers, interpreters, and CAD (computer-aided design) technologies. EDA companies sell VLSI tools that were conceived and standardized by researchers in academic institutions. Just like software compilers that translate a computer language program into an ordered list of CPU instructions, EDA VLSI tools translate a computer language program into the ordered blocks referred to as "cells." that describe chip areas that perform certain functionality as well as the power, input, and output connections to it. Various cell types provided by IP vendors and referred to as "cell libraries" are designed to perform a range of functions and tasks. The standard interface between the cells makes it possible to combine different cells into blocks that are merged into an entire chip design.

694.  The cost of replicating and distributing software tools is low, while their initial development costs are amortized over time. This does not justify the excessively high prices that EDA companies, in collaboration with semiconductor fabs, impose on developers for access to manufacturing. Such collusion does not serve to protect copyrights, patents, or trade secrets. Instead, it safeguards dominant computing companies by restricting potential competitors' access to the most critical factor in the computing market: semiconductor design and manufacturing.

695.  The VLSI concept, which automates the drawing of semiconductor device layouts, was invented in academia. It automated computerized drawings, also known as CAD (computer-aided design), with software tools that combine pre-designed drawing blocks or "cells" into a complete design that includes the placement of the cells and the connection between them. VLSI makes it possible to write a computer program that describes that design, which associates

computer language expressions with the elemental cells that form the semiconductor design. Similarly, a software compiler or interpreter transforms a computer program into a list of CPU instructions and predefined program segments that form an executable program.

696. VLSI tools add one more layer of complication. While CPU instructions are readily applicable, the design and testing of semiconductor cells necessitate a meticulous, labor-intensive process, requiring close collaboration with the manufacturing fab for which the cell library is designed. VLSI tools access cells in a "cell library" that are provided by independent IP vendors that create cell libraries. EDA companies, however, monopolize this market by purchasing both these IP vendors and independent VLSI tool developers.

697. To understand how such a cover-up of noncompetitive exertion can take place in broad daylight, consider an equivalent situation. Writing software compilers requires information about the CPU that programs created by the compiler will run on. That essential information related to the x86 architecture is currently being withheld from Plaintiff despite the fact that he is providing his customers with an x86 compiler. Likewise, the writing of a VLSI design tool and cell libraries requires information about the semiconductor manufacturing process. Manufacturing houses standardize this information in a manual that describes the basic transistors offered by a particular design and the interface between them. Manufacturing companies prepare this manual, known as a PDK (Production Design Kit), for each manufacturing process.

698. Under the Consortium influence, EDA and fab companies collude by enforcing anti-competitive practices mandating the use of specific EDA companies' tools to access their manufacturing process while withholding the necessary information for EDA tool development from non-Consortium companies. Independent companies that create EDA VLSI tools are blocked from access to manufacturing fab information such as PDK or access to cell libraries

that are owned by EDA companies. Efficient technologies and products in that area are simply removed from the market by the EDA companies. The three EDA companies force designers to use their tools at unreasonable cost, thereby preventing non-Consortium companies from accessing high-volume manufacturing. The semiconductor fabrication service companies mandate that their clients submit their designs using the products of the three EDA companies, even though these tools are written by software companies and can be adjusted for any PDK with the necessary information from the semiconductor fab service companies. Independent chip designers who work as contractors for device makers like IBM or TI (Texas Instruments) are required to borrow their design tools from these companies for the duration of their projects because the cost of owning such tools is prohibitive for companies that do not already dominate their respective markets.

699. Numerous independent companies that provide semiconductor design tools for optimization that the Consortium considers detrimental for its strategic objectives were bought by the three EDA companies; their technologies and products were lost to potential competitors. The three EDA companies acquire independent cell library developers and integrate them with their EDA tools, thereby raising the entry cost level beyond the reach of independent developers and forcing them out of the semiconductor fabrication industry.

700. In its 2024 10-K filing, Intel states that its primary objective is to provide manufacturing services and support the x86 standard. This statement reflects the fact that x86 IP and semiconductor manufacturing are Intel's most valuable competitive assets. However, this creates an inherent conflict between Intel and the Consortium, as following this policy would threaten the Consortium's stock market scheme. This conflict is particularly significant given that Altera, Intel's FPGA division, already offers EDA tools that can be combined with Intel's IP to allow semiconductor designers to test their designs at

available to designers would result in additional savings and a substantial competitive advantage. None of these changes however have taken place because the current Intel board positioned Consortium Participants in key positions before Gelsingers return as CEO, to block non-Consortium developers from accessing Intel's fabrication services as demonstrated by Plaintiff's experience.

701.  When Defendant Tan resigned from Intel's board, he joined a group of former Intel directors who are eager to show their loyalty and support for the Consortium and its methods. In an attempt to promote the separation of Intel's manufacturing, the former directors, David Yoffie, Reed Hundt, Charlene Barshefsky, and James Plummer, published a letter in Fortune Magazine. However, they failed to explain how such a fabless manufacturing company could survive as a commodity supplier without access to Intel's intellectual property and without internal demand for its products. Such a company would immediately be taken over by Consortium Participants in the same way that Ampre, a semiconductor server design company that was started by Intel veterans and is controlled by Oracle as well as Marvel, another server design company influenced by the Consortium, follows the Consortium's guidelines and avoids empowering the market with technologies that would challenge the Consortium's long-term objectives, as detailed in this Complaint.

702.  Defendant Tan, who was put in charge of Intel's fab by the board, resigned from Intel's board of directors as part of the effort to weaken Intel and push Gelsinger out and as part of the Consortium's plan to position Defendant Tan as a candidate for the CEO position once the plan to push Gelsinger out succeeds. The timing of the resignation aimed to avoid a vote on Gelsinger's departure. As part of this effort, Intel's accounting was manipulated to contribute to the current crisis and present Intel manufacturing, which Defendant Tan was put in charge of, as the main reason for the crisis rather than the actual reasons detailed in this Complaint.

1  ## J. ALL INDIVIDUAL DEFENDANTS

2  703.  Defendant Andy D. Bryant who served as Intel Chairman between

3  2012 and January 2023, Defendant Barbara G. Novick who joined Intel's board

4  of directors in December 2022, Defendant Frank D. Yeary, Chair of Intel's

5  Board of Directors who joined Intel's board of directors in March 2009,

6  Defendant Omar Ishrak, who joined Intel's board of directors March 2017 and

7  serve as a the board chair from January 2020, until December 2020, Defendant

8  Tsu-Jae King Liu who joined Intel's board of directors in July 2016, Defendant

9  Gregory D. Smith who joined Intel's board of directors in March 2017,

10 Defendant Risa Lavizzo-Mourey who joined Intel's board of directors in March

11 2018, Defendant James (Jim) J. Goetz who joined Intel's board of directors in

12 November 2019, Defendant Dion Weisler who joined Intel's board of directors in

13 June 2020, Defendant Alyssa Henry who joined Intel's board of directors in

14 January 2020, Defendant Andrea Goldsmith who joined Intel's board of directors

15 in September 2021, Defendant Stacy J. Smith who joined Intel's board of

16 directors in March 2024, Defendant Lip-Bu Tan who joined Intel's board of

17 directors in August 2022 and resign from the board in Aug 2024, and other

18 Defendants referred to as DOE1 to DOE25 who are unknown to Plaintiff at this

19 time are Participants in a Consortium's plan, which is described in this

20 complaint. The plan was designed to protect Consortium Participants from

21 competition by independent developers like Plaintiff, who could use Intel's

22 technology to overthrow the Consortium's control over all aspects of computing.

23 The plan was also designed to stop Intel itself, which is the only company that

24 can currently upend the Consortium's command of computing markets, from

25 competing against it. To achieve their plan objective, the plan Participants are

26 engaged in an effort to dismantle Intel and sell its parts at an absurdly low

27 valuation to Consortium Participant companies that are positioned to cement the

28 Consortium continues hold on computing markets.

704. The plan dates back to before 2012 with the positioning and subsequent appointment of Defendant Bryant as Intel chairman and the selection of Krazanich as CEO. The plan aims to halt Intel's technological progress and bring the company under the Consortium's control. The plan relied on terrorizing its talent pool and its workforce, as well as its independent shareholders, to stop its technological advancement and diminish its market value. The key to implementing the plan was positioning directors, officers, executives, and managers who would accomplish its objectives. Strategic decisions that include the debilitating of the x86 standard inside Intel as well as by Microsoft and Qualcomm with tacit approval by Intel, the abandonment of Intel's x86 smartphone product line, the impediment of Intel adaptation of EUV semiconductor manufacturing, the recruitment and assignment of abusive managers to manage critical projects development team that doomed such projects to failure, the inadequate and inappropriate response to the release of Intel's CPU's with bugs, defects and security vulnerabilities, the entrapment and blocking of Plaintiff's technology that was designed to eliminate such vulnerabilities and advance Intel's technology, as well as the hindrance of Intel's CEO, Gelsinger's recovery plan, his entrapment and subsequent dismissal from the company, reflect some of the actions that were part of the plan to demoralize Intel workforce and its shareholders in order to dismantle the company and bring its part under the Consortium control.

705. The Consortium's leadership devised the plan in 2012, perceiving Intel's advanced manufacturing and unused technologies, its integration with its relatively open x86 standard, and its smartphone technology as a threat to the Consortium's survival and its Participants' ability to continue their stock market scheme. They devised the plan to wreck the company's semiconductor manufacturing, design efforts, and smartphone technology to lower the company valuation and use that to compel Intel, its shareholders, its clients, the public, and

1    the U.S. economy's stakeholders who depend on Intel's x86 standard to accept

2    the dismantling of the company by separating between its design and

3    manufacturing and either outsourcing or selling its operations to end its

4    independence and degrade its operations. The plan was designed to force the

5    move of the key technology that drives the U.S. economy to a foreign company

6    under the Consortium's influence to make it easier to block independent

7    developers from breaking the Consortium's anticompetitive wall that prevents

8    such developers, including Plaintiff from bringing essential technologies,

9    including low-power computing, to the market. The plan is preventing Intel from

10   fulfilling its obligations to Plaintiff. With the return of Gelsinger to the CEO

11   position, the plan prevented Intel from fulfilling its mission as defined in its 10-K

12   form and impeded Gelsinger's recovery plan. The plane was put into place after

13   the recognition, in 2012, that Intel's technological advantage, which, until 2012,

14   put it at least two years ahead of its nearest semiconductor manufacturing

15   competitor and by now is again on par with its competitors thanks to the recovery

16   that was implemented by its now-dismissed CEO, Gelsinger, could empower

17   independent companies and developers such as Plaintiff to use their technologies,

18   including low-power computing, to end the monopolization and centralization of

19   computing that is dependent on unnecessarily high power consumption.

20       706. The Consortium plan involved the manipulation of Intel's accounting

21   and public shares to fuel the current crisis and portray Intel manufacturing as the

22   primary cause for that crisis, then used as a ruse to oust Gelsinger from the Intel

23   CEO position and is still being used to dismantle the company.

24       707. The plan relied on the demoralization of Intel engineers to impede

25   their development efforts and to take advantage of the integration of its

26   manufacturing and design to achieve a higher optimal level of its products that

27   would have jeopardized the Consortium's ultimate goal of consolidating

28   computing in the hands of Consortium Participants and forcing the market to rely

on centrally distributed services provided by Consortium Participants to allow the Consortium to profit from the increasing value of their publicly distributed shares that rise as the result of the market's dependency on their exclusive services.

708.  The plan relies on maintaining a layer of Intel managers that are tasked with trapping and blocking independent developers, including Plaintiff, from bringing to the market efficient, low-power, secure, more reliable, and lower-cost x86-compatible computing that would compete with Consortium Participants services and products. from accessing Intel manufacturing and x86 essential resources, contradicting Intel presentations, its contract with Plaintiff, and the company 10-K form.

709.  The plan relies on Intel managers that are tasked with preserving and implementing predatory designs and flaws in Intel's x86 architecture that protect Consortium Participant services, causing failures, resulting in excessive energy consumption, and producing excessive heat.

710.  The plan relies on and employs methods that Defendant Bryant initiated while he simultaneously managed multiple Intel departments, including H.R., when he put them in place to protect the Wintel Cartel and later the Consortium. Those methods of intimidation and demoralization were used to control and force Intel engineers to implement predatory design that served anticompetitive objectives as detailed in this Complaint.

711.  The plan includes the dedication of the majority of the x86 architectural area, using transistor count as a yardstick, to various restricted functionality and design features that undermine efficient and autonomous usage of x86-based computers and their developers, including Plaintiff, x86 programmers, and users. The plan provides unfair advantages to Consortium Participants who can access those restricted x86 parts over non-Participants who cannot access them. The plan degrades the efficiency of x86 computers to give Consortium Participants a competitive edge in services offered by large server

1       farms. The plan, in all its aspects, harms Plaintiff.

2           712. The plan protects Microsoft's and Qualcomm's attempt to destroy the

3 x86 standard and weaken Intel by misusing the Windows trademark, which is

4 associated by consumers with x86 compatibility, to force consumers to purchase

5 ARM-based computers that are incompatible with x86 programs. Microsoft

6 replaced superior x86-compatible low-cost computers with ARM-based

7 computers that are incompatible with x86 programs, compelling consumers to

8 abandon their Intel x86 computers and forcing them to use Microsoft online

9 services, thereby harming Plaintiff and x86 developers who find that their

10 customers are being misled by Microsoft to purchase machines that cannot run

11 software products they own that were created to run on Windows x86 computers.

12           713. The plan included the sale of Intel's smartphone modem department

13 to Apple during a market transition from personal computers to smartphones. The

14 sale was done in order to make it difficult for Intel's incoming CEO to recover

15 Intel by roistering its position in the x86 smartphone market and compete in that

16 market taking advantage of Intel ability to unified computing and mobile

17 operations. Intel Discontinues its smartphone line to protect Consortium

18 Participants, Qualcomm, Apple and Google and especially Microsoft that faced

19 the sharing its exclusive x86 position and development information with

20 smartphone developers. The sale shielded Qualcomm from direct competition

21 with its products, and it shielded Apple and Google's application stores from

22 competition from independent x86 developers like Plaintiff, who could challenge

23 the Consortium's efforts to compel consumers to rely on its central services and

24 appreciate its Participants' shares.

25           714. The plan was designed to mislead and harm Plaintiff by poisoning and

26 maintaining a layer of Intel managers that were tasked with entrapping, barring,

27 and stopping technologies that challenge the Consortium's objective. Those

28 managers who acted on behalf of the Consortium with the support of Intel's

board members do not follow standard corporate procedures and reporting. They misled and harm Plaintiff following the board plan to protect the Consortium as any cost violating an agreement with Plaintiff, with the aim of keeping his technology off the market to protect the Consortium, as detailed in the Complaint.

715.  The plan included the positioning of Medtronic veterans who were brought in for their experience in moving Medtronic to a foreign country as Intel's board directors. They were positioned as part of the Consortium's plan to compel Intel to separate its design and manufacturing by destroying its manufacturing and forcing it to outsource it to a foreign company, Taiwan TSMC.

716.  The plan included the positioning of former Medtronic CEO, Defendant Omar Ishrak, as Intel chairman, which was done for his experience in moving Medtronic to a foreign country. He was positioned as part of the Consortium's plan to compel Intel to separate its design and manufacturing by destroying its manufacturing and forcing it to outsource it to a foreign company, Taiwan TSMC.

717.  The plan included the positioning of a BlackRock co-founder, Defendant Barbara G. Novick as an Intel director. She was brought in for her experience at BlackRock in taking over companies and implementing controversial policies and strategic decisions, overcoming resistance from stakeholders as well as the BlackRock clout over other members of the board that presents a significant conflict of interest.

718.  The plan included the positioning of an ex-CEO of a major EDA company, Cadence, Defendant Lip-Bu Tan, who was brought in for his experience in maintaining an anticompetitive wall around the semiconductor fab services industry, representing a significant conflict of interest with Intel's mission, and who was appointed by the board to supervise Intel fabs in a

significant conflict of interest.

719. The plan Participants engaged in cover-up, misrepresentation, and deception, trying to hide the plan and present their actions and intentions as typical business conduct while they were acting to lessen competition.

720. The plan participants acted for personal gain when they acquired shares of Consortium companies while acting to protect them and violated the 1950 Celler-Kefauver Act when they acquired Intel shares to enable themselves to act to lessen competition.

XV. CONCLUSION

A. DESTROYING INTEL AND THE U.S. SEMICONDUCTOR
MANUFACTURING.

721. To preserve their ill-gotten gains and compensation from the appreciation of publicly traded shares and profits of Consortium Participants companies, resulting from unfair market advantage and the protection from competition the Defendants provide to those companies, the Defendants engaged in a wide-ranging conspiracy and effort to lessen competition and block Plaintiff's and other low-power semiconductor and computing technologies from reaching the market.

722. That illegal effort includes, but is not limited to, the destruction of U.S. semiconductor manufacturing by ending Intel's operations as an independent company to weaken and put it under an anticompetitive wall. Intel is currently the only U.S. provider of the state-of-the-art semiconductor manufacturing services and capacity that modern economies depend on. Intel, in fact, is technologically ahead of the only other two companies that offer comparable technologies, both foreign, and both are technically behind Intel, offering less powerful and less effective technologies, as detailed below.

723. Intel with its independent fab service (IFS) is currently the only in the world that has the full stack of manufacturing capabilities, intently property (IP),

1    system level software IP support, and integrated design and manufacturing that

2    can support access to the market to competitors such as Plaintiff that can

3    challenge the Consortium's control over computing.

4        724.  The Defendant has built and maintained an anticompetitive wall

5    around the semiconductor and computing industry that provides the Consortium's

6    dominant companies with complete control over computing and creates a market

7    dependency on central services provided by a few companies. That

8    anticompetitive wall provides those companies total protection from smaller

9    competitors that cannot afford the infrastructure cost and energy consumption

10   required to compete with their services and from potential competitors that could

11   have replaced their services with low-power and lower-cost better technologies

12   but are blocked from entering the market.

13       725.  The destruction of Intel was critical for the creation of that uneven

14   market. It involved spreading false information. For instance, the Defendants

15   present Intel's semiconductor manufacturing as currently lagging behind TSMC

16   and experiencing financial losses. In fact, after a recent recovery, Intel's

17   manufacturing yields (the percentage of flawless chips per wafer) are comparable

18   to TSMC, while Intel's technology in terms of Moore's law, density that is based

19   on transistor size, is ahead by approximately 100 percent. Intel's Latest Process

20   Node: Intel 18A Transistor Gate Length is Approximately 1.8 Nanometers (nm).

21   TSMC's Latest Process Node: N3 (3nm) Transistor gate length is approximately

22   3 nanometers (nm). After 4 years of recovery under Gelsinger, Intel is, in fact,

23   ahead in every technological aspect with distinct structural design advantages over

24   TSMC that give Intel a significant handicap in future scaling. Intel's

25   Gate-All-Around (GAA) transistor enhances electrostatic channel control,

26   improving performance and reducing leakage currents with a higher level density

27   of approximately 238 million transistors per square millimeter (MTr/mm²).

28   TSMC's 3nm (N3) process transistor structure continues to utilize older FinFet

1    `(Fin Field-Effect Transistor)` architecture that is harder to scale to

2    higher density. Intel's architecture facilitates a higher transistor density compared

3    to TSMC's, offering advantages in performance and power efficiency.

4    726. From a historical perspective, due to the current level of

5    miniaturization and the slowing of Moore's law, Intel is a generation ahead of

6    TSMC. It will take several years for TSMC to close this gap. Intel's advance is

7    in fact moving ahead faster again (as it was before 2012) than TSMC, while Intel

8    maintains a larger manufacturing capacity, so that gap is likely to grow back to

9    the pre-2012 level.

10   727. The alleged losses that Intel's manufacturing incurred are the result of

11   manipulation that was designed to entrap Gelsinger and enable the original effort

12   that started in 2012 to break Intel and bring its parts under the Consortium's

13   control. It consisted of a plan that was announced on October 11, 2022, as IDM

14   2.0. Intel's semiconductor manufacturing would be kept as a unit of the company

15   under the Defendant's control, which would allow them to continue to impede its

16   operation and development, while at the same time, it will be treated from an

17   accounting perspective as an independent third-party entity. This strategy allowed

18   the Defendants to arbitrarily shift costs incurred by Intel's business units to its

19   foundry, thereby presenting its manufacturing operations as unprofitable.

20   Gelsinger, who correctly positioned the recovery and expansion of Intel's

21   manufacturing as Intel's first priority, was enticed with promises of financing that

22   will be available for that expansion with the supposed backing of BlackRock,

23   with BlackRock co-founder Defendant Barbara G. Novick joining Intel's board of

24   directors in December 2022, providing credibility to the entrapment plan. The

25   entrapment then was put into action at the beginning of 2024 with a shift of Intel

26   cost from its business to its manufacturing unit and culminated in August of 2024

27   after Gelsinger installed a qualified management team at the fab and limited the

28   ability of the Defendants to interfere in its operations and development efforts.

Defendant Tan, who was put in charge of the fab operation by the board and lost

its authority, left the company, and the board used the manufactured crisis

resulting from the accounting shift to force Gelsinger out of the company,

damage the company's standing and valuation, and start to dismantle the company

to achieve its original objective of bringing Intel parts under the consortium's

control by selling them.

## B. DESTRUCTION AND BLOCKING OF EFFICIENT
## TECHNOLOGIES AND ITS CONSEQUENCE

728. The Defendants took control of Intel and established a hostile work

environment that intimidates Intel employees into adhering to and carrying out

anticompetitive policies. They are compelling Intel employees to maintain and

implement predatory design and exclusionary practices, trapping competitive

technologies that could pose a threat to Consortium Participants and blocking

potential competitors from the market. They are withholding, concealing, and

misrepresenting crucial information for the design and programming of Intel's

x86-based computers and Intel semiconductor-related services to restrict the

programmability and functionality available to programmers, users, and

competitors like Plaintiff, who depend on Intel products and services and rely on

Intel's statements and mission as outlined in its 10-K filing. Their implementation

of predatory design that extends beyond the x86 architecture and the destruction

of low-power semiconductor technologies resulted in excessive power

consumption of semiconductor devices that forces consumers and businesses to

depend on the Consortium Participants' centralized computation services. the

Consortium uses that dependency to manipulate markets, prices, and publicly

traded shares. The Defendants have inflicted significant damage on Intel and the

U.S. semiconductor industry, and to continue to protect their ill-gotten gains

from their said manipulations, are currently engaged in an effort to dismantle

Intel and sell its manufacturing fab part to a foreign company they influence.

731. The Defendants illegal conduct deprived the market of low-power technologies that would have ended the Consortium's control over all aspects of computing and areas of the economy that impacted and are dependent on computing. The consequences of the blocking of low-power semiconductor technologies are dire and far-reaching, resulting in national security concerns, stunted innovation, and increased costs for consumers and businesses alike. As a result, the competitive landscape has been significantly altered, allowing monopolistic practices to flourish.

732. The effect of the Defendants conduct on incentives to innovate inside and outside Intel is hard to quantify but is well documented. Efficient technologies that may challenge the consortium's control over computing are destroyed, blocked, and removed from the market as the consortium spreads a climate of fear and helplessness throughout the industry. The Defendants have distorted the competitive process. Appropriate relief should issue, which stops the Defendants illegal acts, prevents their recurrence, and restores to the marketplace the competition they had destroyed.

## XVI.  ASSIGNMENT OF DIRECT CLAIMS TO THE PLAINTIFF

## COUNT I

### Against Individual Defendants For

### Promissory Fraud

733.  Plaintiff incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

734.  The Defendant participated in a conspiracy to build and sustain at Intel an anticompetitive network consisting of layers of Intel executives and managers that use exclusionary practices and entrapment methods that were designed to impede and entrap competitive technologies that could challenge the Consortium. That network was extended to Consortium Participants at Intel's agents and OEMs that helped to carry Intel's exclusionary practices and provided

1    information to help the Defendants operate their anticompetitive wall and carry

2    out their scheme. In 2016, Arrow Electronics, Intel's primary agent, informed

3    the Defendants about Plaintiff's technology and his plans to bring it to market.

4        735. The Defendants preyed on Plaintiff's legitimate plans and intentions

5    that were complementary and aligned with Intel's stated objective and technology

6    and activated their anticompetitive apparatus to entrap Plaintiff, misdirect his

7    resources, and spy on his technology and intention. The Defendant falsely

8    claimed they are interested in reintroducing the Intel x86 smartphones to the

9    market and are interested in collaborating with Plaintiff in the creation of an x86

10   operating system for that end. For that end, the Defendants enticed Plaintiff to

11   sign a mutual nondisclosure agreement with Intel that they had no intention to

12   fulfill. Based on the Defendants' express promises, representations, and

13   reassurances that Intel made to Plaintiff, its shareholders, and the public, Plaintiff

14   agreed to share his confidential information with Intel and dedicate his resources

15   to collaborate with Intel.

16       736. The Defendant then proceeded to mislead Plaintiff providing Plaintiff

17   with irrelevant information while hiding from Plaintiff the actual support system

18   they created for providing the essential development information to their

19   collaborators which was under restricted access. Between 2016 and 2022, the

20   Defendants reaffirmed these material promises and representations to Plaintiff on

21   numerous occasions, intentionally communicating with Plaintiff and providing

22   him with irrelevant documentation while hiding from him the actual support

23   system that Intel designed for and made available to Intel x86 developers who

24   collaborate with Intel exclusionary acts or developing technologies that do not

25   challenge the Consortium.

26       737. After Plaintiff discovered that system on his own and purchased Intel

27   x86 testing equipment that were made available to him by Intel under his mutual

28   NDA agreement with Intel, Plaintiff discovered that he could not operate those of

1    equipment without access to the development support system, which the

2    Defendant apparatus at Intel refused to allow him to access.

3        738.  The Defendants who obtained under the mutual NDA agreement

4    some of Plaintiff's confidential information about his technology have shared that

5    information with another Consortium Participant, Apple, through the sale of the

6    Intel modem department and likely shared it with others, which intensifies their

7    efforts to deceive Intel's shareholders, stakeholders, the public, and the

8    government and dismantle Intel's semiconductor manufacturing independence,

9    ignoring the dire consequences of their actions that are weakening the U.S. and

10   creating a dependency of much of the world on a vulnerable foreign company that

11   would increase global perils to the U.S. and much of the world.

12       739.  The Defendant breached their fiduciary duty to Intel and its

13   shareholders by acting to protect their ill gains from their private investments in

14   Consortium Participant companies publicly traded shares and by providing

15   protection for and maintaining favor with Consortium Participants who enrich

16   themselves at the expense of Intel and its shareholders. The Defendants carried

17   favor with those Consortium Participants in exchange for remuneration and

18   access to investment opportunities. They did it to the detriment of Intel

19   shareholders, who were left holding empty buckets while enabling Consortium

20   Participants and themselves to covertly self-deal for enormous future profits.

21       740.  The Defendants' actions destroyed Intel's most valuable assets: its

22   goodwill and reputation, its standing with its customers, developers such as

23   Plaintiff, and OEMs, who depend on Intel for their businesses and livelihood.

24   That destruction of Intel's stakeholder value injured Intel and its shareholders.

25       741.  The Defendants failed to protect the value of Intel's intellectual

26   property associated with the x86 architecture and Intel's goodwill associated with

27   the Windows trademark, further injuring Intel, its shareholders, and its

28   stakeholders.

742.  The Defendants breached security laws by misrepresenting their actions and intentions to mislead the public and Intel shareholders.

743.  In preparation for Gelsinger's return as CEO of Intel in 2021, the Defendants became even more egregious and bold in their actions and more adamant about their scheme to protect the Consortium and their private gains. They positioned Consortium Participants in key positions that would allow them to block competing technologies and impede a possible recovery. They did that knowing that their promises and representations were false when made and having no intention of carrying them out. By the time of Gelsinger's return, Consortium participants enhanced and entrenched their anticompetitive apparatus to suppress a recovery and impede competitive projects that would have allowed a possible shift that would reposition Intel and give it a competitive advantage against the Consortium Participants.

744.  After Gelsinger's return, as Intel's manufacturing began to recover from the harm caused by Defendant Bryant's installation as Intel's chairman in 2012 and the continued unhampered destruction by his team's actions until 2021, the Defendants nevertheless carried on their scheme inside Intel, hampering the recovery effort by Gelsinger. At the same time, Consortium Participants outside Intel that enjoyed the protections provided by the Defendants moved to cement their ill-gained profits and control of the market by presenting to the public and the government gigantic projects and plans that are based on false claims regarding the U.S. semiconductor industry and false information about high power consumption that high-capacity and AI computation required. The Defendants, in their actions, provided cover to those false claims to position themselves to gain enormous future profits from those gigantic projects.

745.  Despite their efforts to hamper Intel's recovery, Intel survived, and it took an orchestrated fake accounting and false information campaign to oust Gelsinger from Intel. However, the risk to the Defendants' private investment

1    and continued hold on the market that would allow them to gain enormous future

2    profits from those gigantic unnecessary projects would exist as long as Intel, with

3    its newly reinforced semiconductor manufacturing capabilities, its integrated x86

4    IP design and manufacturing, and its stated mission to support the x86

5    architectures that under the U.S. antitrust laws, would allow low-power

6    technology to reach the market, continues to operate as an independent company.

7    To prevent the risk to their scheme, Defendants intensified their effort to

8    dismantle Intel and sell its parts, bringing the U.S. semiconductor industry under

9    foreign control and Consortium influence in disregard to the law, their legal

10   duties, and the dire consequences to the U.S. and the world.

11        746.  As a direct and proximate result of the Defendant's wrongful conduct,

12   acts, and misrepresentations alleged above, Plaintiff has been damaged, and the

13   Defendants have been and will continue to be unjustly enriched, in an amount that

14   shall be assessed at trial, but which vastly exceeds $75,000. Such should include

15   the imposition of specific remedies listed below that would correct the wrong and

16   damage cause by the Defendants.

17        747.  The Defendants' wrongful conduct, acts, and misrepresentations have

18   caused and will continue to cause Plaintiff substantial injury and damage, much

19   of which cannot be reasonably or adequately measured or compensated in money

20   damages. The harm this wrongful conduct will cause to Plaintiff is both imminent

21   and irreparable, and the amount of damage sustained by Plaintiff will be difficult

22   to ascertain if such wrongful conduct is allowed to continue without restraint.

23   Plaintiff is entitled to an injunction during the pendency of this action, and

24   permanently enjoining Defendants and all persons acting in concert with them,

25   from engaging in such further tortious conduct.

26        748.  The Defendants promises to perform an action they had no intention

27   of doing intending to deceived Plaintiff in violation of 18 U.S. Code § 1341 18

28   U.S.C. § 1343.

749. Defendants wrongful conduct constitutes oppression, fraud, and/or malice under Massachusetts General Laws Chapter 190B, Section 1-106. The Defendants has been perpetrated a fraud in connection with proceeding from their private investments, remunerations and investment opportunities they obtain in return to their circumvention of the provisions of the chapter injuring Plaintiff thereby Plaintiff may obtain appropriate relief against the Defendants or restitution from any Defendant benefiting from the fraud. entitling Plaintiff to an award of punitive damages appropriate to punish or set an example of Defendants in an amount to be determined at trial.

## COUNT II

### Against Individual Defendants For

### Constructive Fraud

750. Plaintiff incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

751. The Defendants, as directors and officers of a public corporation, Intel, that erected an anticompetitive apparatus at Intel and its collaborators that was designed to collect information about and block Plaintiff's technology from accessing the market. After finding out about Plaintiff' technology and plans they approached Plaintiff and made him promises that correspond to the Intel's mission as stated in Intel's 10-K forms, while hiding from Plaintiff their true intentions.

752. The Defendants owe Plaintiff a duty to fulfill their premises and are liable for constructive fraud for any advantages they gained by misleading Plaintiff with their repeated promises, representations, and reassurances, that were designed to deceive him.

753. The Defendants solicited and obtained information and resources compelling Plaintiff to dedicate time and money including purchasing Intel's x86 testing equipment and attempting to operate them but being blocked the

apparatus the Defendants put in place. They injured Plaintiff by making repeated and material promises, representations, and reassurances to him that they would support the x86 architecture and act to bring the best technologies x86 related technologies to the market.

754. Defendants knew or could have reasonably foreseen that their promises, representations, and reassurances would be relied upon by and were material to Plaintiff.

755. Defendants deceived Plaintiff by providing him with misleading information and failing to disclose to Plaintiff their true anticompetitive objectives which were known to them.

756. The Defendants engaged in unrestricted self-dealing as they have used their positions and clout at Intel to obtain access to investment opportunities in return to the protection they provided to Consortium Participants and make private investments in Consortium Participants that rely on that protection. The Defendants did it for their own personal gain and profit. The Defendants are presently working to protect their current and future investments and investment opportunities by dismantling Intel, further defying their promises, representations, and reassurances to Plaintiff.

757. Defendants intentionally concealed their fraudulent conduct, which prevented Plaintiff from discovering their scheme earlier.

758. As a direct and proximate result of the Defendants conduct, acts, and misrepresentations alleged herein above, Plaintiff is entitled to recover the damages he sustained and will sustain.

759. As a direct and proximate result of Defendants wrongful conduct, acts, and omissions alleged herein above, Plaintiff has been damaged, and Defendants have been and will continue to be unjustly enriched, in an amount that shall be assessed at trial, but which vastly exceeds $75,000, and for which restitution and/or non-restitutionary disgorgement is appropriate. Such should

include the imposition of the remedies speechified later in this Complaint.

760. Defendants wrongful conduct, acts, and omissions have proximately caused and will continue to cause Plaintiff substantial injury and damage, much of which cannot be reasonably or adequately measured or compensated in money damages. The harm this wrongful conduct will cause to Plaintiff is both imminent and irreparable, and the amount of damage sustained by Plaintiff will be difficult to ascertain if such wrongful conduct is allowed to continue without restraint. Plaintiff is therefore entitled to an injunction during the pendency of this action, and permanently enjoining Defendants, their officers, agents, and employees, and all persons acting in concert with them, from engaging in such further tortious conduct.

761. Defendants wrongful conduct constitutes oppression, fraud, and/or malice under Massachusetts M.G.L. c. 93A, and Massachusetts General Laws Chapter 190B, Section 1-106, entitling Plaintiff to an award of punitive damages appropriate to punish or set an example of Defendants in an amount to be determined at trial.

### COUNT III

#### Against Individual Defendants For

#### Aiding And Abetting Fraud

762. Plaintiff incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

763. The Defendants participated in a scheme to defraud Plaintiff of his technology and resources and to enrich themselves, as alleged herein above.

764. Intel and other Consortium Participants had actual knowledge that the Defendants were engaging in such fraud, because the Defendants formed their anticompetitive apparatus at Intel for that very purpose, and have at all relevant times been officers, agents, employees, and/or owners whose knowledge and intent is imputed to the anticompetitive apparatus, exclusionary acts, predatory

1    practices and predatory design detailed above in this Complaint that they

2    implemented.

3        765. Intel and other Consortium Participants knowingly gave substantial

4    assistance, encouragement, and/or actively participated in the Defendants fraud

5    by willfully draining and devaluating Intel's most valuable assets, its x86

6    architecture and semiconductor manufacturing to protect their ill-gains profits.

7    766. Defendants intentionally concealed their fraudulent conduct, which

8    prevented

9    Plaintiff from discovering their scheme earlier.

10        767. As a direct and proximate result of the Defendants conduct, acts, and

11   misrepresentations alleged herein above, Plaintiff is entitled to recover the

12   damages he sustained and will sustain.

13        768. As a direct and proximate result of Defendants wrongful conduct,

14   acts, and omissions alleged herein above, Plaintiff has been damaged, and

15   Defendants have been and will continue to be unjustly enriched, in an amount that

16   shall be assessed at trial, but which vastly exceeds $75,000, and for which

17   restitution and/or non-restitutionary disgorgement is appropriate. Such should

18   include the imposition of the remedies speechified later in this Complaint.

19        769. Defendants wrongful conduct, acts, and omissions have proximately

20   caused and will continue to cause Plaintiff substantial injury and damage, much

21   of which cannot be reasonably or adequately measured or compensated in money

22   damages. The harm this wrongful conduct will cause to Plaintiff is both imminent

23   and irreparable, and the amount of damage sustained by Plaintiff will be difficult

24   to ascertain if such wrongful conduct is allowed to continue without restraint.

25   Plaintiff is therefore entitled to an injunction during the pendency of this action,

26   and permanently enjoining Defendants, their officers, agents, and employees, and

27   all persons acting in concert with them, from engaging in such further tortious

28   conduct.

770. Defendants wrongful conduct constitutes oppression, fraud, and/or malice under Massachusetts M.G.L. c. 93A, and Massachusetts General Laws Chapter 190B, Section 1-106, entitling Plaintiff to an award of punitive damages appropriate to punish or set an example of Defendants in an amount to be determined at trial.

**COUNT IV**

**Against Individual Defendants For**

**Conspiracy To Violate Federal Civil Rico, 18 U.S.C. § 1962(D)**

771. Plaintiff incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

772. The Defendants have undertaken the fraudulent acts described in Count IV above as part of a common scheme. Defendants willfully, knowingly, and unlawfully conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). Defendants intentionally concealed their fraudulent conduct, which prevented Plaintiff from discovering their scheme earlier.

773. The Defendants have were aware of the illegal activity. The Defendants have knew that they had made false and/or misleading representations to Plaintiff and others that Intel would support the development of the x86 architecture Plaintiff contributions will be used to further such purpose. The Defendants at all relevant times been officers, agents, employees, and/or owners whose knowledge and intent is imputed to the Consortium entities.

774. The Defendants directed and caused Intel to engage in the racketeering activity alleged herein above.

775. Each Defendant understood that he or it was committing numerous RICO predicate acts and participating in a racketeering scheme, evidenced among other things, by his or its overt acts and involvement in repeatedly promulgating false and/or misleading representations via wire transmissions, including email

1    correspondence, online transmittal, and social media posts, and receiving

2    financial and other contributions, including wired funds, based on those

3    fraudulent communications. In addition, The Defendants understood they were

4    facilitating and/or aiding and abetting Consortium Participants self-dealing and

5    furthering the scheme by helping to conceal Defendants fraudulent conduct.

6        776. The participation and agreement of the Defendants and other

7    Consortium Participants was listed above in this Complaint was necessary to the

8    scheme. Defendants knew their predicate acts were part of a pattern of

9    racketeering activity and agreed to the commission of those acts to further the

10   scheme, and agreed and conspired to conduct and participate in the affairs of the

11   Enterprise through a consistent and continual pattern of racketeering activity.

12   Further evidence of the agreement among the Defendants and other Consortium

13   Participants is peculiarly within the knowledge and control of Defendants.

14       777. As a direct and proximate result of the Defendants' conspiracy and

15   violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in his business and

16   property, as alleged herein, and is entitled to treble damages, attorneys fees, and

17   costs of suit.

18                              **COUNT V**

19                       **Against Individual Defendants For**

20                        **Violations Of Federal Civil Rico,**

21            **18 U.S.C. § 1962(D) U.S.C. §§ 15, 22 And 26**

22       778. Plaintiff incorporate by reference and reallege each and every

23   allegation contained above, as though fully set forth herein.

24       779. The Defendants undertaken the fraudulent acts described in Count I

25   and II above as part of a common scheme. Defendants willfully, knowingly, and

26   unlawfully conspired, confederated, and agreed together and with others to

27   violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). Defendants

28   intentionally concealed their fraudulent conduct, which prevented Plaintiff from

discovering their scheme, notwithstanding his exercise of due diligence.

780. The Defendants were aware of the illegal activity. of other Defendants and Consortium Participants and knew that they had made false and/or misleading representations to Plaintiff and others that Intel devoted to the development of fab services and the x86 architecture. The Defendants knew of and agreed to facilitate the operation of the Consortium Participants and/or Defendant's scheme.

781. The Defendants directed and caused the Intel entities to engage in the racketeering activity alleged herein above.

782. Each Defendant understood that he or it was committing numerous RICO predicate acts and participating in a racketeering scheme, evidenced among other things, by his or its overt acts and involvement in repeatedly promulgating false and/or misleading representations via wire transmissions, including email correspondence, online transmittal, and receiving financial and other remuneration, based on fraudulent communications. In addition, the Defendants understood they were facilitating and/or aiding and abetting Consortium Participants self-dealing and furthering the scheme by helping to conceal Consortium Participants fraudulent conduct.

783. The participation and agreement of each of the Defendants was necessary to the scheme. Defendants knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme, and agreed and conspired to conduct and participate in the affairs of the Enterprise through a consistent and continual pattern of racketeering activity. Further evidence of the agreement among Altman, Brockman, and the OpenAI For-Profit Entities is peculiarly within the knowledge and control of Defendants.

784. As a direct and proximate result of Defendants' conspiracy and violations of 18 U.S.C. ° 1962(d), Plaintiff has been injured in his business and

1     property, as alleged herein, and is entitled to treble damages, attorneys' fees, and costs

2     of suit.

3                  **COUNT VI**

4               **Against All Defendants For**

5             **Breach Of Express Contract**

6        785. Plaintiff incorporate by reference and reallege each and every

7     allegation contained above, as though fully set forth herein.

8        786. In a conference call that was initiated by Intel, an NDA agreement and

9     a series of express written correspondence in from 2016 to at least 2022, Intel

10     entered into a valid, enforceable, and binding agreement to collaborate with and

11     support Plaintiff in the development of an x86 smartphone operating system. Intel

12     promise to provide the necessary documentation and support and collaborate in

13     the design if the final product. 787. Plaintiff fulfilled all of his obligations and

14     has performed and/or complied with all terms and conditions of the agreement

15     that he was required to perform and/or comply with.

16        788. From the beginning of the agreement, unbeknownst to Plaintiff, the

17     Defendants breached their agreement with Plaintiff by, among other things:

18          a. Failing to disclose to Plaintiff the existence of their crucial-for-

19             development support system for developers of x86 software and

20             hardware.

21          b. Failing to disclose to Plaintiff the existence of their crucial-for-

22             development testing equipment for developers of x86 software

23             and hardware.

24          c. Provided Plaintiff with irrelevant documentation to mislead him

25             and waste his time in order to delay Defendant's discovery of

26             the Defendants true intentions, to block his low-power

27             semiconductor and software technologies, low-power

28             semiconductor technologies, and the x86 architecture from the

1    smartphone market.

2        d. Discriminated against Plaintiff by providing other developers of

3            operating systems such as Microsoft access Intel's crucial-for-

4            development support system for developers of x86 software and

5            hardware to related technology exclusively while hiding it from

6            Plaintiff.

7        e. Permitted Microsoft to attack the x86 standard, attempt to mislead

8            Plaintiff customers into purchasing computers that are presented

9            as Windows computers but cannot run Plaintiff software, as

10           detailed above in this Complaint.

11       f. Permitted Microsoft to exert undue influence and control over

12           Intel activities and maintain exclusionary practice that

13           discriminate against Plaintiff. g. Directed Intel engineers to

14           dedicate significant parts of x86 architecture to functionality that

15           accelerate Microsoft' software to compensate for degradation of

16           performance and efficiency for Plaintiff and his customers.

17       h. Walling of access to Intel essential resources for development and

18           erecting an anticompetitive wall to advance Defendants gain

19           from the protection they provide Consortium Participants.

20       i. Damaging Intel assets as detailed in above in this complaints

21           causing harm to Plaintiff and his customers who depend on the

22           x86 platform. and

23       j. Currently working to dismantle Intel and sell its part to cement the

24           anticompetitive wall that prevent Plaintiff from bringing his

25           technologies to the market.

26       789. Defendants' obligations to perform were not waived nor were their

27   breaches and/or failures to perform justified and/or excused. Defendants

28   intentionally concealed their wrongful conduct, which prevented Plaintiff from

1   discovering their scheme earlier.

2        790. As a direct and proximate result the Defendant's conduct, acts, and

3   omissions alleged herein above, Defendants have deprived Plaintiff of the benefit

4   of the parties' agreement and have caused Plaintiff to suffer damages, including

5   but not limited to the financial the loss of the time and resources he expended

6   while being prevented from reaching the market and while being blocked from

7   running his technology on x86 devices as Intel withheld the necessary information

8   while Microsoft and other Intel collaborators added to their x86 software products

9   predatory design that prevent Plaintiff and his customers to run Plaintiff

10  technology on current system, in an amount to be adjudicated and determined at

11  trial, but which vastly exceeds $75,000.

12       791. Plaintiff has no adequate remedy at law for many of the injuries he

13  suffered as a result of Defendants breaches and failures, and such injuries cannot

14  reasonably, adequately, or precisely be measured or compensated in damages.

15  Accordingly, Plaintiff also seeks and is entitled to specific performance of

16  Defendants' contractual obligations as specified later in this Complaint's Prayer

17  For Relief section.

18                          **COUNT VII**

19                  **(In The Alternative To Count Vi)**

20                      **Against All Defendants For**

21                **Breach Of Implied-in-fact Contract**

22       792. Plaintiff incorporate by reference and reallege each and every

23  allegation contained above, as though fully set forth herein.

24       793. The relationship, surrounding circumstances, and intentional course of

25  conduct between Plaintiff on the one hand, and the Defendants on the other

26  resulted in a valid, enforceable, and binding implied-in-fact contract.

27       794. The Defendants proposed that Intel and Plaintiff would collaborate in

28  the development of an x86 smartphone operating system and in the design of an

x86-based smartphone and that Intel will support Plaintiff in bringing his technology to the market.

795. From there, the Defendants proceeded and continued to reaffirm both publicly and to Plaintiff directly that Intel would continue to support the x86 architecture and . Such reaffirmations by Defendants were made, without limitation, in countless communications to the public and to Plaintiff as alleged in detail herein above.

796. The conduct of Plaintiff on the one hand, and the Defendants on the other was intentional, and each knew or had reason to know that the other party(ies) would interpret their conduct as an agreement.

797. Plaintiff fulfilled any and all obligations and has performed and/or complied with any and all terms and conditions of the agreement that he was required to perform and/or comply with.

798. From the beginning of the agreement, unbeknownst to Plaintiff, the Defendants breached their implied in-fact contract by, without limitation, failing to publicly disclose their true intentions, excluding Plaintiff from their crucial-for-development support and testing systems and by self-dealing and exploiting Intel assets and their position to enrich themselves, and as recently as June 2024, working to dismantle Intel and bring its part under the control of the Consortium to prevent Plaintiff technology including low-power semiconductor technology from reaching the market.

799. Defendant's obligations to perform were not waived nor were their breaches and/or failures to perform justified and/or excused. Defendants intentionally concealed their wrongful conduct, which prevented Plaintiff from discovering their scheme earlier.

800. As a direct and proximate result of the Defendants' conduct, acts, and omissions alleged herein above, Defendants have deprived Plaintiff of the benefit of the parties' agreement and have caused Plaintiff to suffer damages, including

1    but not limited to the loss of the time and resources he expended in an amount to

2    be adjudicated and determined at trial, but which vastly exceeds $75,000, plus

3    prejudgment interest.

4        801. Plaintiff has no adequate remedy at law for many of the injuries he

5    suffered as a result of Defendants breaches and failures, and such injuries cannot

6    reasonably, adequately, or precisely be measured or compensated in damages.

7    Accordingly, Plaintiff also seeks and is entitled to specific performance of

8    Defendants' contractual obligations as specified later in this Complaint's Prayer

9    For Relief section.

10                           **COUNT VIII**

11                       **Against All Defendants For**

12    **Breach Of Implied Covenant Of Good Faith And Fair Dealing**

13        802. Plaintiff incorporate by reference and reallege each and every

14    allegation contained above, as though fully set forth herein.

15        803. Implied in every agreement is a covenant of good faith and fair dealing

16    that each party will not do anything to unfairly interfere with the right of any

17    other party to receive the benefits of the agreement.

18        804. Plaintiff entered into a valid, binding, and enforceable agreement with

19    the Defendants with the purpose of developing his technology to be bought to the

20    market the benefit of all, and not for private profiteering by the Defendants who

21    blocked his technology for their self dealing and in exactness for favors from the

22    consortium.

23        805. Plaintiff fulfilled any and all obligations and has performed and/or

24    complied with any and all terms and conditions of the agreement that he was

25    required to perform and/or comply with.

26        806. The Defendants did not act and in good faith by fraudulently inducing

27    Plaintiff to make significant efforts, sign a non disclosure agreement and disclose

28    information about his plans and technology while the Defendants failed to

1    disclose their true intentions, closing off the x86 architecture and blocking his

2    technology from the market for personal monetary gain, and engaging in brazen

3    self-dealing and other profiteering as alleged herein above. Defendants thereby

4    breached the implied covenant of good faith and fair dealing and consciously and

5    deliberately frustrated the agreed-upon purpose and mission of the non-profit,

6    wrongfully depriving Plaintiff of the benefits of the parties agreement.

7        807. Defendants' obligations to perform were not waived nor were their

8    breaches and/or failures to perform justified and/or excused.

9        808. As a direct and proximate result the Defendant's conduct, acts, and

10   omissions alleged herein above, Defendants have deprived Plaintiff of the benefit

11   of the parties' agreement and have caused Plaintiff to suffer damages, including

12   but not limited to the financial the loss of the time and resources he expended

13   while being prevented from reaching the market and from being blocked from

14   running his technology on x86 devices as Intel withheld the necessary information

15   while Microsoft and other Intel collaborators added to their x86 software products

16   predatory design that prevent Plaintiff and his customers to run Plaintiff

17   technology on current system, in an amount to be adjudicated and determined at

18   trial, but which vastly exceeds $75,000.

19       809. Plaintiff has no adequate remedy at law for many of the injuries he

20   suffered as a result of Defendants breaches and failures, and such injuries cannot

21   reasonably, adequately, or precisely be measured or compensated in damages.

22   Accordingly, Plaintiff also seeks and is entitled to specific performance of

23   Defendants' contractual obligations as specified later in this Complaint's Prayer

24   For Relief section.

25   //

26   //

27   //

28   //

**COUNT IX**

**In the alternative to Counts VI, VII, and VIII**

**Against All Defendants For**

**Breach Of Quasi-contract/Unjust Enrichment**

810. Plaintiff incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

811. In the absence of an enforceable agreement, Defendants have still been unjustly enriched at Plaintiff expense as a result of their improper exploitation for personal profit from Consortium Participants they are protecting of Plaintiff's technology Intel, its intellectual property, good will, and assets.

812. The Defendants knowingly and repeatedly accepted remunerations from and benefited from investment in Consortium Participants they provided protection to by injuring Plaintiff. The Defendants actively work to block Plaintiff's technology including low-power semiconductor technology from the market.

813. Defendants intentionally concealed their wrongful conduct, which prevented Plaintiff from discovering their scheme earlier.

814. It would be unjust and inequitable to allow Defendants to retain the substantial benefits that were obtained as a direct and proximate result of their wrongful conduct including, without limitation, their ill-gains from investments in Consortium Participants they provided protection inn return to blocking Plaintiff technology from the market and while misrepresenting to Plaintiff and the public the Intel was developing the x86 architecture and for the public's benefit and not for private gain.

815. As a direct and proximate result the Defendant's conduct, acts, and omissions alleged herein above, Defendants have deprived Plaintiff of the benefit of the parties' agreement and have caused Plaintiff to suffer damages, including but not limited to the financial the loss of the time and resources he expended

1    while being prevented from reaching the market and from being blocked from

2    running his technology on x86 devices    as Intel withheld the necessary

3    information while Microsoft and other Intel collaborators added to their x86

4    software products predatory design that prevent Plaintiff and his customers to run

5    Plaintiff technology on current system, in an amount to be adjudicated and

6    determined at trial, but which vastly exceeds $75,000, and for which restitution

7    and/or non-restitutionary disgorgement is appropriate.

8    <u>COUNT X</u>

9    **Against All Defendants For**

10    **<u>False Advertising Under</u>**

11    **<u>The Lanham Act 15 U.S.C. § 1125(a)(1)(B)</u>**,

12    816.  Plaintiff incorporate by reference and reallege each and every

13    allegation contained above, as though fully set forth herein.

14    817.  The Defendants induced an unwitting Plaintiff to avail himself and his

15    technology for their spurious protection scheme where they exchange the

16    blocking of his technology for their gain from Consortium Participants they

17    provided protection to. They then exploited Plaintiff technology to carry favor

18    with Consortium Participants through knowingly false marketing and promotion

19    of Intel, harming Plaintiff's business interests.

20    818.  Defendants in their marketing, advertisements, and promotions made

21    knowingly false and/or misleading representations to the public that Intel' mission

22    is to develop and support a safe and efficient the relatively open x86 architecture

23    technology for the public good, not, impede the x86 architecture for their own

24    private gain.

25    819. Intel's website represent, in its current 10-K form, that:

26    - Our IDM 2.0 strategy allows us to deliver leadership products using

27    internal and external capacity while leveraging our core strengths

28    to provide foundry services to others. IDM 2.0 combines three

1    capabilities. First, we will continue to build most of our products

2    in our fabs. Second, we expect to expand our use of third-party

3    foundry capacity to manufacture a range of modular tiles on

4    advanced process technologies. Third, we are building a

5    world-class foundry business with IFS, which we expect will

6    combine leading edge packaging and process technology,

7    committed capacity in the US and Europe, and a world-class IP

8    portfolio that will include x86 cores, as well as other ecosystem

9    IP.

10   - At our core is the x86 computing ecosystem, which supports an

11   extensive and deep universe of software applications, with billions

12   of lines of code written and optimized for x86 CPUs. We continue

13   to advance this ecosystem with x86 microarchitectures focused on

14   performance, which push the limits of low latency and

15   single-threaded application performance, and microarchitectures

16   focused on efficiency, which are designed for computing

17   throughput efficiency to enable scalable multithreaded

18   performance.

19   - Open System Foundry. We are building a world-class foundry

20   business to meet the growing long-term global demand for

21   semiconductors. We plan to differentiate our foundry

22   - offerings from those of others through a combination of leading-edge

23   packaging and process technology, committed capacity in the US

24   and Europe available for customers globally, and a world-class IP

25   portfolio that will include x86 cores, as well as other ecosystem

26   IP. The current foundry model enabled explosion of ecosystem

27   innovation at the wafer level. We believe this established model

28   has historically served the industry well, but a new mindset is

1    needed in our new era of chipmaking. As innovation evolves, we

2    see the rack has collapsed into a system and the system has

3    collapsed into an advanced package. We are building out an Open

4    System Foundry that has four components: wafer fabrication,

5    packaging, chiplet standard, and software.

6    - We deploy various forms of capital to execute our strategy in a way

7    that seeks to reflect our corporate values, help our customers

8    succeed, and create value for our stakeholders.

9    - Invest significantly in R&D and IP to enable us to deliver on our

10    accelerated process technology roadmap, introduce leading x86

11    and xPU products, and develop new businesses and capabilities.

12    - We develop IP to enable next-generation products, create synergies

13    across our businesses, expand into new markets, and establish and

14    support our brands.

15    - As the guardians of Moore's Law, we continue to innovate to

16    advance the design and manufacturing of semiconductors to help

17    address our customers' greatest challenges. This makes possible

18    new leadership products with higher performance while balancing

19    power efficiency, cost, and size. Our IDM 2.0 strategy allows us

20    to deliver leadership products using internal and external capacity

21    while leveraging our core strengths to provide foundry services to

22    others. IDM 2.0 combines three capabilities. First, we will

23    continue to build most of our products in our fabs. Second, we

24    expect to expand our use of third-party foundry capacity to

25    manufacture a range of modular tiles on advanced process

26    technologies. Third, we are building a world-class foundry

27    business with IFS, which we expect will combine leading edge

28    packaging and process technology, committed capacity in the US

and Europe, and a world-class IP portfolio that will include x86 cores, as well as other ecosystem IP.

820. Intel's mission, posted on its website, in it 10-K form claims: "We deploy various forms of capital to execute our strategy in a way that seeks to reflect our corporate values, help our customers succeed, and create value for our stakeholders."

821. The Defendants made these material, false, and misleading representations of fact about the nature, characteristics, and qualities of Defendants' products and services in commercial advertising or promotion in interstate commerce, namely, Intel's website, online marketing, online blog posts, and Defendants' social media.

822. These false and misleading statements have deceived and/or are likely to deceive a substantial segment of the public.

823. Defendants' false and misleading claims are material because they are likely to induce the relevant public to invest in products and services in the belief they are getting the best technology that Intel can produce, when in fact, they are getting hampered products and technology as detailed above in this Complaint.

824. Defendants' conduct constitutes false advertising and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

825. Defendants' deceptive conduct and false and misleading claims have injured and will continue to injure Plaintiff business and his customers. Defendants intentionally concealed their wrongful conduct, which prevented Plaintiff from discovering their scheme earlier.

826. As a direct and proximate result of the Defendants' conduct, acts, and omissions alleged herein above, Plaintiff is entitled to recover the damages he sustained and will sustain, including any income, gains, compensation, profits, and advantages obtained, received, or to be received by Defendants, or any of

1    them, arising from their wrongful conduct. Plaintiff is entitled to an order

2    requiring Defendants, jointly and severally, to render an accounting to ascertain

3    the amount of such proceeds from Consortium Participants detailed above in this

4    complaint that enjoy the protection provided by the Defendants.

5        827.  As a direct and proximate result of Defendants' wrongful conduct,

6    acts, and omissions alleged herein above, Plaintiff has been damaged, and

7    Defendants have been and will continue to be unjustly enriched, in an amount that

8    shall be assessed at trial, and for which restitution and/or non-restitutionary

9    disgorgement is appropriate.

10       828.  Unless enjoined by this Court pursuant to 15 U.S.C. § 1116,

11   Defendants will continue to mislead the public and cause harm to Plaintiff.

12   Plaintiff is entitled to an injunction during the pendency of this action, and

13   permanently enjoining Defendants, their officers, agents, and employees, and all

14   persons acting in concert with them, from engaging in such further acts.

15       829.  Defendants' false and misleading claims are deliberate, willful,

16   fraudulent, and without extenuating circumstances. Defendants' conduct is thus

17   an "exceptional case" within the meaning of section 35(a) of the Lanham Act, 15

18   U.S.C. § 1117(a). Plaintiff is therefore entitled to recover three times the amount

19   of his actual damages and his attorneys' fees and costs incurred in this action.

20                              **COUNT XI**

21                      **Against All Defendants For**

22             **Unfair Competition Under Massachusetts**

23        **M.G.L. c. 93A Unfair and Deceptive Acts and Practices.**

24       830. Plaintiff incorporate by reference and reallege each and every

25   allegation contained above, as though fully set forth herein.

26       831. Defendants engaged in unfair competition and other unlawful and/or

27   fraudulent business practices by enticing Plaintiff to agree to share his

28   information, dedicate his time, resources and effort, under the false pretense that

his effort and technology will be supported by Intel for purposes articulated in Intel Certificate of Incorporation, Charter, website, online marketing, blog posts, emails, and other communications and not for the Private gain of the Defendants.

832. Defendants actively deceived Plaintiff and the public hindering valuable technology which they have hampered for their own personal gain, as described herein. Such conduct has deceived, and will likely continue to deceive, the public, and is unethical, immoral, substantially injurious to consumers, and violates public policy.

833. But for Defendants' false, misleading, and unlawful practices, Plaintiff would not have made his share his information with and dedicate his time, resources and effort to Intel. Defendants intentionally concealed their wrongful conduct, which prevented Plaintiff from discovering their scheme earlier.

834. As a direct and proximate result of Defendants' conduct, acts alleged herein above, Plaintiff is entitled to recover the damages he sustained and will sustain, including any income, gains, compensation, profits, and advantages obtained, received, or to be received by the Defendants, or any of them, from Consortium Participants arising from the wrongfully injuries to the Plaintiff, which amount vastly exceeds $75,000.

835. Defendants' wrongful conduct, acts, and omissions have proximately caused and will continue to cause Plaintiff substantial injury and damage, much of which cannot be reasonably or adequately measured or compensated in money damages. The harm this wrongful conduct will cause to Plaintiff is both imminent and irreparable, and the amount of damage sustained by Plaintiff will be difficult to ascertain if such wrongful conduct is allowed to continue without restraint. Plaintiff has no adequate remedy at law with respect to Defendants' ongoing unlawful conduct.

836. Pursuant to Massachusetts M.G.L. c. 93A, § 9, Plaintiff is entitled to an injunction during the pendency of this action, and permanently enjoining

1    Defendants, their officers, agents, and employees, and all persons acting in

2    concert with them, from engaging in such further acts of unfair competition.

3                              **COUNT XII**

4                         **Against All Defendants For**

5                **False Advertising Under M.G.L. C. 93a And**

6                      **M.G.L. C. 266, §§ 91-92.**

7                 **Massachusetts Consumer Protection Act.**

8         837. Plaintiff incorporate by reference and reallege each and every

9    allegation contained above, as though fully set forth herein.

10        838. As described above, the Defendants, in their individual capacities and

11   on behalf of Intel, have made materially false and/or misleading representations

12   of fact in commercial advertisements about the nature, characteristics, and

13   qualities of Defendants' products and services, including that Intel, will support

14   Plaintiff's more efficient x86 products and technology for the benefit of Intel

15   customers, shareholders and stakeholders, and would not use block Plaintiff's

16   technology for the private gain of the Defendants.

17        839. Defendants knew and/or should have known their communications via

18   Intel's website, online marketing, online blog posts, and social media were

19   materially false and/or misleading when they were made.

20        840. Defendants intended to use and did use the contributions from Plaintiff

21   and others to demonstrate their loyalty and adherence to the Consortium in return

22   for personal gain.

23        841. Plaintiff reasonably relied on the Defendants' statements as he

24   dedicated his efforts and shared confidential information with the Defendants,

25   believing his efforts were going toward a mutual interest in improving Intel x86

26   product and bringing to the market more efficient technologies as advertised and

27   promoted by Defendants. Defendants' conduct deceived Plaintiff and a substantial

28   segment of the public.

842. Defendants intentionally concealed their wrongful conduct, which prevented Plaintiff from discovering their scheme earlier.

843. As a direct and proximate result of Defendants' wrongful conduct, acts, and omissions alleged herein above, Plaintiff is entitled to recover the damages he sustained and will sustain, including any income, gains, compensation, profits, and advantages obtained, received, or to be received by the Defendants, or any of them, from Consortium Participants arising from the wrongfully injuries to the Plaintiff, which amount vastly exceeds $75,000.

844. Defendants' wrongful conduct, acts, and omissions have proximately caused and will continue to cause Plaintiff substantial injury and damage, much of which cannot be reasonably or adequately measured or compensated in money damages. The harm this wrongful conduct will cause to Plaintiff is both imminent and irreparable, and the amount of damage sustained by Plaintiff will be difficult to ascertain if such wrongful conduct is allowed to continue without restraint. Plaintiff has no adequate remedy at law with respect to Defendants' ongoing unlawful conduct.

845. Pursuant to Massachusetts (M.G.L. c. 93A & c. 266, §§ 91-92), Plaintiff is entitled to an injunction during the pendency of this action, and permanently enjoining Defendants, their officers, agents, and employees, and all persons acting in concert with them, from engaging in such further acts of false advertising.

## COUNT XIII

### Against Individual Defendants For

### Aiding And Abetting Breach Of Fiduciary Duty

### To Intel Stake Holders

### Under M.G.L. C. 156d, § 8.30 And M.G.L. C. 156d, § 8.30

846. Plaintiff incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

847. As a public corporation directors the Defendants owe a fiduciary duty to Plaintiff who relied on common laws and reasonable practices and expectations when assessing Intel's and the Defendants' communications.

848.  The Defendants entice Plaintiff to engaged with Intel by making repeated and material promises, representations, and reassurances to him that they would develop the x86 architecture and support bringing his efficient technology to the market for the benefits of Intel, its shareholders, customers and the public, and would not operate for the profit of any person or company, as evidenced in, without limitation, the emails, corporate filings, and online pronouncements alleged above.

849.  The Defendants breached their fiduciary duties to Plaintiff:

    a. Concealed from Plaintiff the Intel's x86 support, development and testing.

    b. Exploited Plaintiff technology to carry favor with consortium Participants by blocking it from the market.

    b. Exploited Plaintiff confidential information in relations to the sale of Intel's smartphone modem division to Apple.

    d. Permitted Microsoft to damage Plaintiff and his customers by failing to protect the x86 standard, its users and developers from Microsoft fraudulent misrepresentation that use the Windows trademark, known to be x86 compatible to entice x86-computer users to replace their computer with Microsoft computers that do not run x86 software and hence Plaintiff's software.

    e. Erecting am anticompetitive wall that kept Plaintiff efficient technologies out of the hand of x86-based computer users and compelling Intel agents, such as Arrow Electronics, and OEM who make x86 mother boards and peripherals to collaborate in

maintaining that anticompetitive wall.

    f. Self-dealing to enrich themselves by providing protection and unfair advantage to the Consortium Participants they invest in, and by directing Intel managers and engineers to implement predatory design changes to the x86 architecture that degrade operation and performance to Plaintiff but provide unfair advantage to those companies. For example, Microsoft exclusively get access to parts of the x86 architecture that manage CPU and thread allocation but that management system is preventing real parallel programming by Plaintiff by blocking access to CPU instruction that control those allocation.

850.  The Defendants had actual detailed knowledge of the fiduciary duties they owed to their shareholders and stake holders because Intel have a history of fighting lawsuit by regulators that addressed its unfair, abusive, and unequal treatment of its stakeholders. Intel signed a consent decree that addressed its mistreatment of its stakeholders, and because of ongoing litigation and scrutiny by U.S. and foreign regulators. The Defendant were all relevant times been officers, agents, employees, of Intel and Consortium Participants who benefited form the abuse Intel's stake holders suffered at the hand of the Defendants.

851.  Intel entities provided substantial assistance to the Defendants aiding and abetting their respective breaches of fiduciary duty by helping them exploit Plaintiff and his technology for Defendants' private gain, rather than advancing Intel stated mission.

852. Defendants willfully aided and abetted these breaches of fiduciary duty for Defendants' own benefit, and this was a substantial factor in causing harm to Plaintiff.

853.  Defendants have been greatly enriched by their resulting misappropriation of the Intel's assets and their self-dealing with Consortium

Participants they provided protection to in blatant derogation of the fiduciary duties Defendants owed and continue to owe Plaintiff, other stakeholders and Intel shareholders.

854. Defendants intentionally concealed their wrongful conduct, which prevented Plaintiff from discovering their scheme earlier.

855. As a direct and proximate result of the Defendants' conduct, acts, and omissions alleged hereinabove, Plaintiff is entitled to recover the damages he sustained and will sustain, including any income, gains, compensation, profits, and advantages obtained, received, or to be received by Defendants, or any of them, arising from the Defendants investments in Consortium Participants they provided protection to, by blocking Plaintiff's low-power technology from the market, including prejudgment interest. Plaintiff is entitled to an order requiring Defendants, jointly and severally, to render an accounting to ascertain the amount of such proceeds.

856. As a direct and proximate result of Defendants' wrongful conduct, acts, and omissions alleged hereinabove, Plaintiff has been damaged, and Defendants have been and will continue to be unjustly enriched, in an amount that shall be assessed at trial, but which vastly exceeds $75,000, and for which restitution and/or non-restitutionary disgorgement is appropriate.

857. Defendants' wrongful conduct, acts, and omissions have proximately caused and will continue to cause Plaintiff substantial injury and damage, much of which cannot be reasonably or adequately measured or compensated in money damages. The harm this wrongful conduct will cause to Plaintiff is both imminent and irreparable, and the damage sustained by Plaintiff will be difficult to ascertain if such wrongful conduct is allowed to continue without restraint. Plaintiff is entitled to an injunction during the pendency of this action, and permanently enjoining Defendants, their officers, agents, and employees, and all persons acting in concert with them, from engaging in such further tortious conduct.

858.  Defendants' wrongful conduct constitutes oppression, fraud, gross negligence or willful misconduct and/or malice under Massachusetts General Laws Chapter 93A, M.G.L. C. 156d, § 8.30 and M.G.L. C. 156d, § 8.30 and common law, entitling Plaintiff to an award of punitive damages appropriate to punish or set an example of Defendants in an amount to be determined at trial.

<div align="center">

**COUNT XIV**

**Against All Defendants For**

**Tortious Interference With Contract**

</div>

859.  Plaintiff incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

860.  The Defendants the Intel employees who carried on their instructions and policies knew Plaintiff had a valid contract with Intel, and that the agreement required Intel to provide Plaintiff with reasonable access to essential information, support, and resources Intel made available to developers of operating systems for its x86 architecture. Defendants all had knowledge of the significant advantages and saving Plaintiff's technology can provide consumers and the potential benefits to Intel, its shareholders customers and its stake holders. The Defendants have at all relevant times been officers, agents, or employees of Intel and consortium Participants protected by Intel whose knowledge and intent is imputed to them.

861.  The Defendants intended to disrupt Plaintiff's performance of his contract with Intel and/or knew that such disruption of their performance was certain or substantially certain to occur as a result of their conduct.

862.  The Defendants could have invested their money at Intel, but knowing that their scheme doomed Intel's profitability and prospects, they invested the majority of their money in the money-making scheme they furthered. They did it by purchasing publicly traded shares of the Consortium Participants they protected from Plaintiff's low-power technologies. When Plaintiff on one

1     occasion was told that "What you do is going to kill the goose that laid the golden

2     eggs," the "golden egg" was a reference to the windfall gains from the

3     appreciation of the shares of Consortium Participants that enjoy the Defendants'

4     protection that literally took away the potential advantages, profits, and benefits

5     to Intel, its shareholders, stakeholders, and the market and converted it to their

6     private ill-gotten gain.

7          863. Defendants intentionally concealed their wrongful conduct, which

8     prevented Plaintiff from discovering their scheme earlier.

9          864. As a direct and proximate result of the Defendants' conduct, acts, and

10    omissions alleged hereinabove, Plaintiff is entitled to recover the damages he

11    sustained and will sustain, including any income, gains, compensation, profits,

12    and advantages obtained, received, or to be received by Defendants, or any of

13    them, arising from the Defendants investments in Consortium Participants they

14    provided protection to, by blocking Plaintiff's low-power technology from the

15    market, including prejudgment interest. Plaintiff is entitled to an order requiring

16    Defendants, jointly and severally, to render an accounting to ascertain the amount

17    of such proceeds.

18         865. As a direct and proximate result of Defendants' wrongful conduct,

19    acts, and omissions alleged hereinabove, Plaintiff has been damaged, and

20    Defendants have been and will continue to be unjustly enriched, in an amount that

21    shall be assessed at trial, but which vastly exceeds $75,000, and for which

22    restitution and/or non-restitutionary disgorgement is appropriate.

23         866. Defendants' wrongful conduct constitutes oppression, fraud, gross

24    negligence or willful misconduct and/or malice under Massachusetts General

25    Laws Chapter 93A, M.G.L. C. 156d, § 8.30 and M.G.L. C. 156d, § 8.30 and

26    common law, entitling Plaintiff to an award of punitive damages appropriate to

27    punish or set an example of Defendants in an amount to be determined at trial.

28         867. Defendants' wrongful conduct constitutes oppression, fraud, and/or

malice under Massachusetts General Law M.G.L. C. 93A entitling Plaintiff to an award of damages appropriate to punish or set an example of Defendants in an amount to be determined at trial.

## COUNT XV

### Against Individual Defendants For

### Violation Of The 1950 Celear-Keyfauver Amendment to

### Section 7 of the Clayton Act 15 U.S.C. § 18 prohibiting

### Acquisition of stock that may lessen competition

### <u>Violation Of §§ 15, 22 And 26 Of The Clayton Act,</u>

### <u>15 U.S.C. §§ 15, 22 And 26</u>

868.  Plaintiff incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

869.  The Defendants' violated the 1950 Celler-Kefauver Act when they acquired shares of Intel to gain the power to lessen competition. They used that power to provide protection from competitive technologies to Consortium Participants companies purchase of the shares those Companies for their private gain.  The Defendants' purchase shares of the companies they provided protection to as apart of their scheme to gain from the lessening of competition.

870.  The Defendants' purchasing of publicly-traded shares to lessen completion for their own private gain effected every aspect of the economy over decades and brought them billions of dollars in illicit gain. The Defendants central position in this on going scheme make this case worthy of consideration of the charge, even though cases specifically addressing publicly-traded stock purchases by individuals or corporate directors outside of mergers or acquisitions are relatively rare.

871.  As a result of the Defendants unlawful acts, Plaintiff have been injured in his business and property. Plaintiff is entitled to recover direct damages, trebled as provided by law.

872. Plaintiff has no adequate remedy at law for many of the injuries he suffered as a result of Defendants breaches but desires a judicial determination that the Defendants acted to lessen competition by purchasing public shares in violation of the Clayton Antitrust Act 15 U.S.C. § 18.

<div align="center">

**COUNT XVI**

**Against All Defendants For**

**Violation Of Section 3 Of The Clayton Antitrust Act Of**

**1914, which prohibits tying arrangements that may**

**Lessen Competition Or Tend To Create A Monopoly**

**15 U.S.C. § 14**

</div>

873. Plaintiff incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

874. The Supreme Court ruled in Ethyl Gasoline Corp. v. United States (1940) that attempts to control how a product is used after sale could be considered restraint of trade. Until 1936, IBM mandated that customers leasing its tabulating machines purchase and use only IBM-produced punch cards. The Supreme Court found this practice to be in violation of Section 3 of the Clayton Antitrust Act of 1914 (15 U.S.C. §¨14), which prohibits tying arrangements that may substantially lessen competition or tend to create a monopoly. Plaintiff's conflict with the Defendants arises from the Defendants' illegal tying and restraint of trade, which they established and practiced across the computing industry and every economic sector that depends on computing¨in fact, all of them.

875. Tying arrangements that prevent Plaintiff and other developers of x86-based computer operating systems and software from using and selling their products to consumers were developed between Intel and Microsoft with the introduction of the IBM PC. They were cemented and expanded with the introduction of Microsoft Windows, with every new version introducing more

restrictions and unnecessary overhead that restrict competitors access to their and their customers products, and with Intel advancing its x86 architecture from 16-bit to 32 and then 64 bits, with every version introducing new layers of predatory design that force consumers to use Microsoft products with x86-based computers. As detailed below, every aspect of the Defendants' established policies and practices at Intel and other Consortium Participants that are designed to protect such tying arrangements and restraints of trade.

876.  Around 1999, as personal computing started to shift from desktop and laptop computers to handheld mobile devices and then smartphones, the Defendants shifted their focus from their illegal tying arrangement to an all-out effort to restrain the ability of developers and consumers to use their computers independently and create a dependency on central services that can impose tolls and mandate continued billing subscription services on common essential operations for commerce and normal activities. Such activities range from riding in a cab in public space to using a word processor in a private home. With the effort to shift the market toward dependency on central services in mind, the Defendant moved to destroy low-power semiconductors and computing technologies, with Intel at the center of the nefarious activity. At the same time, the predatory design parts that were interjected into the x86 architecture to allow the illegal tying were expanded with predatory design that occupies most of the x86 architecture, using the number of transistors as a scale, implementing design that provides Consortium Participants control over users' devices and an unfair advantage over the market, and effectively preventing independent usage of x86-based computers. The growing dependency of the market on central services provided by Consortium Participants increases the Defendants illicit gains from their scheme and makes the blocking of the Plaintiff's low-power technologies from accessing the market to protect more essential to the Defendants scheme's continuation.

877. Even more critical for the Defendant's scheme continuation is the destruction of the relatively open x86 standard that allows a certain level of local programming that is not dependent on central services. The Defendants succeeded in establishing illegal restraint on programming and usage of smartphones by forcing the use of illegal mandated application stores on smartphone users and preventing independent programming of smartphones by their owners and programmers. Both Apple and Google coordinate and enforce this practice. Re-introducing back the x86 standard to the smartphone market can upend the scheme underpinnings that were behind the destruction of Intel's x86 semiconductor technology and the attack on the x86 standard by Qualcomm and Microsoft detailed hereinabove.

878. Blocking Plaintiff from the market require blocking his access to semiconductor services and to the x86 essential-for-development information, tools and equipment.

879. AMD and Plaintiff's attempt to bring more efficient technology to the market ended with the forced sale of AMD's semiconductor manufacturing facilities to a foreign company, and coincidentally, the weakening of those facilities and the U.S. semiconductor industry as a result of the separation between AMD's profitable design powers and the manufacturing that entails higher costs, requires more investment in R&D, and can only sell commoditized semiconductor devices to OEMs at low profit margins that cannot sustain the cost and investment this industry requires to stay relevant in current technology. That in fact was the exact formula that was used by the Defendants when they set the accounting trap for Intel's fab services when they separated the accounting of the Intel fab from the rest of Intel in 2022, as detailed in this Complaint, paragraph 727 hereinabove.

880. The Defendant operated over decades in a hostile environment subject to a wide range of endeavors designed to intentionally and elaborately violate the

Clayton Antitrust Act while masking and portraying their illegal activities as normal business practices, as detailed in this Complaint paragraph 461, hereinabove..

881. As a result of the Defendants' unlawful acts, the Plaintiff has been injured in his business and property. Plaintiff is entitled to recover direct damages, trebled as provided by law.

882. Plaintiff has no adequate remedy at law for many of the injuries he suffered as a result of Defendants breaches but desires a judicial determination that the Defendants acted to lessen competition by purchasing public shares in violation of the Clayton Antitrust Act of 1914 15 U.S.C. § 14.

## COUNT XVII

### Against All Defendants For

### Declaratory Relief

883. Plaintiff incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

884. By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Plaintiff and Defendants as to whether the Defendants can perform their duties to Intel.

885. Plaintiff contends, and Defendants deny, that the forcing of Gelsinger from Intel's CEO position and the current effort to dismantle the company, sell its manufacturing to a foreign company, and the ongoing attempt by the Defendants to separate its design from its manufacturing was not justified or necessary and was done to the detriment of Intel, its shareholders, stakeholders, the market, and the U.S. semiconductor industry.

886. In a relatively short period of time, between 2021 and 2024, Gelsinger was able to repair the damage that was caused to Intel manufacturing between 2012 and 2021 under a board of directors that was controlled by the Defendants, who allowed Intel semiconductor manufacturing to fall back behind TSMC by a

few years and forced the most critical parts of the US economy to depend on a foreign, vulnerable company for their own private gain. Intel's semiconductor manufacturing current state is ahead of TSMC by more than a technological generation, with Intel's newer replacement for FinFET technology, RibbonFET, a gate-all-around (GAA) transistor architecture utilizing stacked nanosheets, which are surrounded entirely by a gate, offering improved electrostatic control and faster switching speeds. Gate-all-around transistor architecture giving Intel at least a few years head start on TSMC's older FinFET technology. To prevent further dire damage to Intel, its shareholders, stakeholders, the U.S. economy, and its global standing, request an injunctive relief.

887. In order to invalidate the recent decisions made by the Intel board, restore Gelsinger to the position of CEO, and prevent the board from making any strategic decisions regarding the company's future until a shareholders meeting is called after the shareholders have been informed of the meeting's circumstances, the court action, and this complaint, the Plaintiff seeks a judicial preliminary injunction. This injunction would require individual shareholders to vote and prohibit index-based funds and institutional investors who supported the current directors' actions from voting on behalf of their shareholders.

888. In accordance with the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., a declaration of the Court and an injunctive relief are required and appropriate based on the substantive claims described above in order to stop the Defendants, undo the harm they have already caused, and stop additional irreparable harm from happening.

## XVIII. DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury for all issues triable to a jury.

//

//

XVIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment against Defendants as follows:

A. For declaration of the Court and an injunctive relief requested at this Complaint's paragraphs 883 to 888 to stop the Defendants, undo the harm they have already caused, and stop additional irreparable harm from happening;

B. Directing Intel and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Intel, its shareholders, stakeholders and the market from repeating the damaging events described herein;

C. For compensatory, consequential, and statutory damages, restitution, and non-restitutionary disgorgement, and any other relief that may be permitted by law or equity, according to proof in an amount to be determined at trial, together with interest thereon as provided by law;

D. Determining and awarding to Plaintiff the damages sustained by him as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

E. For an accounting of all gains, profits, and advantages Defendants have derived from their illegal actions use of the same for their benefit or the benefit any third party;

F. For Intel to preserve all records, communications, and documents related to communication between Intel directors and executives and alleged Consortium Participants, including all Intel's partners, distributors, and shareholders, to allow discovery to Plaintiff as he continue his legal actions against Consortium Participants.

F. For treble damages pursuant to 18 U.S.C. § 1964(c);

G. For punitive and/or exemplary damages as provided by law;

H. For costs of suit;

I. For such other and further relief as the Court deems just and appropriate.

J. For a judicial determination that all Intel's agreements and relations with Microsoft are is null and void and must disclosed publicly, and to the extent Intel want to revive such agreements it must make same agreements available to Plaintiff.

K. For an order compelling specific performance of Defendants contractual promises to Plaintiff, as alleged herein;

    1. Intel will in good faith elaborate with Plaintiff on bringing his low-power technologies to the market with no restriction on form factors targeting low- power smartphone that will be transparently compatible and equivalent in functionality to x86-based computers, provide control to user and programmers over their communication options, provide the full x86 capabilities with no dependency on application stores and support Plaintiff technologies that provide free unrestricted communication using public free bandwidth.

    2. Intel with grant Plaintiff unlimited access to boot features of the x86 architecture including any required "blobs", security keys and requirement and including support the Intel provide to Microsoft.

    3. Intel with grant Plaintiff unlimited access to the fab manufacturing services. all design information and process PDK require to build and customs EDA tools, exiting Intel EDA tools, as well the x86 IP that should be made available Per Intel's 2024 10-K form filing in order to implement any design of his choosing.

    4. Intel will manufacture and publish specification for a PC x86 plug-in PCI modem compatible with cable ISP (Internet Service Providers)

that be controlled by the PC x86 computer CPU just like any plug-in modem with no remote back door control and will transparently replace cable box functionality and provide users with full command interface including a menu based control. Intel will provide user interface with control over x86 NAT (Network Access Table) and firewall that will facilitate transparent peer to peer communication between x86 broadband subscribers.

5. Intel will provide Plaintiff with a UEFI boot utility for every Intel x86 device on the market, which will include initialization of board management interface, I/O interface, interrupts, screen (VESA) interface, and memory management.

6. Intel will provide Thunking utility that will be maintained by Intel with compatibility to all Windows and Linux versions released for x86-based computers. It will be based on Plaintiff's Windows Thunking technology and will provide a hardware-based NTVDM-like virtual machine with full hardware interrupts and graphics access including 64 bit modes booting under real mode DOS and the ability to run on a dedicated CPU.

7. Intel will continue to support and maintain from his side the same level of transparent compatibility with AMD x86 standard to prevent fragmentation of the market and the narrowing of market of x86 developers.

8. Intel will require every x86 OEM to maintain compatibility with a version of those utilities, which will be provided to Plaintiff free of charge.

9. Intel will provide Plaintiff with unlimited access to x86 information, debugging and tracing information, debugging and tracing tools, test boards, and support. Any and all information available to Microsoft

1          or any other partner must be shared with Plaintiff.

2      10. Intel will pay for Plaintiff's unlimited usage of Asset Intertech's

3          development, debugging, support, testing and reporting and tools and

4          services to be provided to Plaintiff and his team at Intel expense.

5      11. Intel will develop an x86-based smartphone based on Plaintiff

6          specifications with an x86 processor based on Plaintiff parallel

7          channels semiconductor architecture, eliminating dark silicon based

8          on Plaintiff's parallel design. The smartphone will include built-in

9          Plaintiff's user interface, programming interfaces and applications

10         that will provide transparent compatibility with x86 computers and

11         x86 peripherals using Intel wireless technology.

12     12. Intel will introduce a wireless standard to its x86 SOC PCI as well as a

13         plug-in USB device for x86 computers and laptops that will provide

14         transparent wireless communications with said smartphone.

15     13. Intel will develop an x86-based dedicated server processor that will

16         include Plaintiff's energy saving parallel channels semiconductor

17         architecture eliminating dark silicon and providing built-in

18         hardware-based load balancing and Big-O of One database indexing

19         based on Plaintiff's technology.

20     14. Intel will make all its semiconductor fabrication services available to

21         Plaintiff for implementation of devices based on his new architecture

22         and model of computation.

23     15. Intel will finance the porting of two semiconductor intellectual property

24         cell libraries specified by Plaintiff to Intel's semiconductor processes

25         and PDK's at the cost to be negotiated with the Libraries providers of

26         up to 25 million dollars per library and make them available to

27         Plaintiff for the implementation of Plaintiff's CPU-less parallel

28         architecture.

16. Intel will not share or disclose Plaintiff's information, or any part of it, or Intel's information related to Plaintiff's agreements and projects to anyone inside or outside Intel and will provide Intel employees, managers, and executives only information that is required for manufacturing or completing essential tasks on a need-to know basis after an approval of each case by Plaintiff.

17. Intel will provide Plaintiff with unlimited access to all the technologies, tools, and design support that are available to Intel OEM, partners, and fab Services customers, as well as the ability to design devices that incorporate any and all Intel technologies available to any of Intel customers or sold by Intel and acquire them from Intel at comparable prices available to other Intel customers.

18. Intel will provide Plaintiff with access to all Altera development utilities, IP, development boards, technologies, tools, and design support at Intel's expense and make Altera's manufacturing available to Plaintiff the lowest cost commercial rate available to Intel customers.

19. Intel will consider the commercial merit in integrating Altera EDA development tools and IP with its own fab services and device manufacturing considering its own interests free of consideration of the potential impact it will have on the market and in particularly Consortium Participants.

//
//
//
//
//
//

1

2

3

4

5     DATED: March 17, 2025              Respectfully Submitted,

6                                        Moshe Frankel, Pro Se.

7                                        By: /s/ M Frankel

8                                             Moshe Frankel

9                                        Moshe Frankel

10                                       20 Harriet Street

11                                       Brighton, MA 02135

12                                       Telephone: (617)782-0782

13                                       email: m@framework.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX**

**A. INDEX (significant terms, page num)**

200LX, Palm size HP Computer, 4, 106, 107, 108, 109

    A.

Addictive, 4, 113, 114, 115, 116, 117, 118, 119, 121, 139

Agenda; Lotus' software program. 160, 196, 197, 214

Altera; FPGS Company, 4, 23, 67, 68, 100, 101, 109, 110, 196, 202, 246, 250

Android; Google's smartphone operating system, 69, 147, 191

Amazon; online services and retail company, 4, 5, 8, 47, 71, 130, 131, 132,
    151, 153, 175, 176, 177, 178, 191, 192, 194, 221, 234

AMD ; semiconductor design company, 3, 5, 9, 15, 16, 29, 30, 36, 39, 40, 45,
    49, 57, 62, 67, 68, 70, 71, 79, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98,
    99, 100, 102, 110, 112, 127, 131, 134, 135, 138, 144, 151, 154, 155, 168,
    170, 174, 175, 176, 181, 182, 185, 189, 202, 207, 209, 210, 211, 216,
    217, 218, 220, 221, 223, 224, 225, 227, 239, 240, 246, 303

Ampre; fabless semiconductor company, 251

Antiracketeering, 8

Antitrust, 2, 3, 5, 8, 11, 18, 22, 23, 37, 38, 41, 44, 49, 50, 55, 62, 67, 70, 71,
    72, 73, 81, 94, 102, 103, 114, 126, 132, 134, 140, 148, 149, 151, 156,
    157, 162, 163, 164, 166, 167, 187, 188, 189, 195, 196, 197, 201, 207,
    208, 209, 212, 213, 215, 216, 217, 221, 224, 225, 267, 299

Application store, 44, 173

Apple, Computer Company, 4, 5, 8, 15, 16, 44, 64, 69, 71, 102, 131, 132, 136,
    137, 147, 148, 151, 166, 173, 178, 179, 180, 182, 183, 191, 194, 209,
    210, 211, 217, 221, 224, 228, 231, 232, 234, 235, 241, 256, 265, 290

Ashton-Tate. software company, 3, 50, 65, 73, 74, 75, 76, 77, 78, 79, 80, 81,
    82, 83, 85, 94, 95, 96, 97, 196, 224

ASML, semiconductor EUV machine company, 136, 138, 226, 231, 240

ARM; fabless CPU architecture design company, 17, 102, 129, 130, 136, 176, 218, 240, 241, 256

Artificial intelligence, 15, 141, 152, 153

B.

BlackRock, 5, 9, 16, 24, 71, 131, 132, 152, 153, 154, 155, 170, 171, 172, 181, 183, 185, 186, 200, 233, 234, 235, 236, 237, 238, 241, 244, 257, 260

Blobs, 302

Block of shares, 170, 233, 237, 238

Block Blocked blocking, copettion, x86, low-power technology, products, access, 32, 36, 41, 46, 48, 54, 73, 100, 101, 121, 148, 163, 170, 172, 174, 198, 206, 215, 221, 230, 233, 237, 238, 246, 251, 254, 258, 266, 268, 275, 281

Borland International, software company, 3, 62, 63, 65, 75, 79, 80, 81, 82, 83, 94, 96, 106, 156, 224

Bryant, Andy, Defendant, 1, 6, 20, 21, 24, 33, 35, 39, 51, 94, 104, 115, 135, 136, 137, 138, 140, 149, 162, 190, 194, 207, 208, 210, 222, 224, 225, 226, 227, 228, 229, 230, 231, 232, 235, 238, 240, 241, 242, 243, 252, 253, 255, 266

//
//
//
//
//
//
//
//
//
//

C.

Cable companies, 14, 72, 119, 123, 124

Cable modem, 60, 72, 104, 113, 115, 116, 118, 119, 120, 121, 122, 124, 215

Cadence, EDA company, 199, 245, 247, 257

Carr, Robert, Go Corporation founder, Framework's architect, 196, 160, 196, 197

Cell Libraries, 248, 249

Celler-Kefauver Act, 22, 58, 73, 134, 178, 258

Centrally distributed services, 8, 9, 10, 11, 12, 13, 14, 15, 18, 19, 20, 21, 33, 35, 38, 39, 46, 48, 49, 59, 73, 76, 101, 103, 117, 118, 128, 129, 130, 137, 138, 140, 141, 148, 150, 153, 169, 170, 172, 177, 181, 184, 188, 190, 193, 207, 208, 209, 210, 211, 212, 217, 222, 229, 230, 236, 239, 240, 241, 242, 255

Carroll David Colston, programmer, 106

Compaq, computer company, 56, 57, 60, 61, 62, 63, 65, 77, 78, 79, 80, 83, 89, 158, 159

compilers, 29, 65, 66, 248, 249

Computational, 15, 25, 27, 29, 30, 37, 38, 41, 45, 52, 53, 70, 77, 103, 123, 125, 143, 152, 153, 155, 159, 162, 168, 170, 171, 178, 184, 200, 201, 202, 211, 212, 214, 221, 226, 236, 239, 242, 243, 247

computing power, 11, 15, 28, 36, 153, 160, 178, 206

Consent decree, 125, 143, 188, 291

Consortium, 1, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 30, 32, 33, 34, 35, 36, 37, 38, 39, 40, 43, 44, 45, 46, 47, 48, 49, 50, 51, 53, 54, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 77, 78, 79, 80, 81, 82, 84, 85, 87, 88, 89, 90, 93, 94, 95, 96, 97, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 113, 114, 115, 116, 117, 118, 120, 122, 123, 124, 125, 126, 127, 128, 129, 131, 132,

133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 147, 148, 149, 150, 151, 152, 153, 154, 155, 158, 159, 160, 161, 162, 163, 166, 167, 168, 169, 170, 171, 172, 173, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 206, 207, 208, 209, 211, 212, 214, 215, 217, 218, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 247, 249, 250, 251, 252, 253, 254, 255, 256, 257, 258, 259, 260, 261, 262, 263, 264, 265, 266, 267, 269, 270, 271, 272, 273, 274, 276, 278, 281, 282, 281, 286, 287, 288, 289, 290, 291, 292, 293, 294, 295, 297, 301, 305, 309,

Conspiracy, 6, 163, 192, 258, 263, 272, 273, 274

CPU; central processing unit, 2, 4, 11, 12, 18, 26, 27, 29, 30, 31, 32, 33, 34, 35, 36, 37, 40, 41, 43, 45, 46, 47, 48, 49, 51, 52, 53, 54, 57, 59, 60, 61, 65, 66, 67, 85, 86, 87, 88, 92, 93, 94, 99, 102, 104, 105, 106, 107, 108, 110, 112, 113, 115, 116, 118, 119, 122, 123, 124, 127, 130, 139, 142, 143, 146, 155, 172, 174, 176, 178, 185, 193, 194, 198, 205, 208, 213, 214, 215, 218, 232, 247, 248, 249, 253, 291, 303, 304

CrowdStrike; company, 4, 71, 103, 104, 125, 126, 133, 135, 152, 186, 187, 194, 234

D.

Dark Silicon, 2, 28, 29, 30, 65, 124, 141, 185, 200, 304

Database, 29, 43, 52, 64, 74, 75, 76, 77, 78, 79, 80, 81, 82, 141, 158, 304

Diller, Barry; media mogul, 113, 116

Dot-com bubble; a stock market bubble that ballooned during the late-1990s and, peaked on Friday, March 10, 2000, 15, 93, 104, 108, 114, 122, 123, 235

//

//

E.

EDA; Electronic Design Automation, 64, 168, 171, 185, 194, 196, 199, 201, 202, 203, 245, 246, 247, 248, 249, 250, 257, 262, 302, 305

EUV; machine, 98, 136, 138, 226, 227, 231, 238, 240, 253

Email; (Electronic Mail), 1, 4, 29, 42, 72, 105, 106, 107, 108, 111, 112, 114, 118, 272, 274

F.

Fabless, a business model that outsource manufacturing, 223, 251

FinFet; Fin Field-Effect Transistor, 259, 300

Foxbase, 74, 75

Framework; software suite, 1, 50, 196, 306

Frankel, Moshe; Plaintiff, 1, 19, 23, 50, 51

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

G.

gate-all-around (GAA), 259, 300

Gelsinger Patrick P., 36, 100, 101, 161, 180, 181, 190, 192, 195, 206, 207, 221, 225, 229, 232, 233, 235, 236, 237, 238, 239, 242, 243, 244, 245, 251, 253, 254, 259, 260, 261, 266, 299, 300

Go Corporation, 160, 196, 197

Goetz, James (Jim) J., Defendant, 1, 24, 252

Google, 44, 69, 102, 147, 166, 173, 179, 189, 191, 194, 217, 218, 241, 256, 298

Goldsmith, Andrea, Defendant, 1, 24, 252

Goose that laid the golden eggs, 3, 93, 294

George Tate; Ashton-Tate founder and CEO, 78

Grove, Andy; Intel CEO, 4, 55, 116, 121, 122, 160, 161, 196, 201, 203, 204, 205, 207, 225, 229

H.

Weisler, Dion, Defendant, 1, 24, 252

Henry, Alyssa, Defendant, 1, 24, 252

Hewlett-Packard, (HP), 66, 175

High density, semiconductor, 98, 200

Home Shopping Network, 104, 113, 116, 117

//

//

//

//

//

//

//

//

I.

IBM; computer company, 2, 3, 11, 12, 13, 18, 31, 32, 33, 34, 37, 40, 41, 42, 44, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 67, 74, 75, 76, 77, 78, 79, 86, 95, 121, 155, 156, 157, 158, 159, 160, 163, 168, 171, 175, 185, 193, 198, 201, 203, 215, 250, 296

Index-based funds, 3, 9, 10, 15, 38, 63, 69, 70, 71, 72, 81, 132, 133, 152, 155, 160, 170, 185, 194, 221, 225, 233, 234, 237, 238, 244, 300

Intel Capital, 197

Internet, 2, 4, 9, 10, 13, 14, 15, 17, 20, 31, 33, 39, 42, 44, 45, 46, 47, 48, 54, 56, 59, 70, 72, 73, 100, 104, 105, 106, 107, 108, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 131, 139, 148, 151, 156, 160, 164, 174, 175, 176, 193, 215, 229, 234, 302

Ishrak, Omar ; Defendant, 1, 6, 24, 232, 241, 242, 243, 244, 252, 257

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

iPhone, Apple's smartphone operating system, 69

ISP; Internet Service Providers, 302

J.

K.

Kaplan, Jerry, Go Corporation founder, Agenda's architect, 160, 196, 80

Kay, Alan, Scientist, 156

Keiretsu; Japanese market model under single ownership, 81

Kleiner Perkins; venture capital company, 63, 65, 79

Krazanich, Brian; Intel CEO, 136, 138, 190, 207, 225, 226, 227, 228, 230, 231, 238, 240, 253

L.

LANHAM ACT, 6, 282, 285, 286

Lattice, FPGA Company, 110

Lavizzo-Mourey, Risa, Defendant, 1, 24, 252

Liu, Tsu-jae, Defendant, 1, 24, 252

logic; systems operation circuits, 25, 26, 28, 52, 76

Lotus, software company, 147, 179, 160, 196, 197

low-power; semiconductor, technology, 20, 36, 37, 64, 67, 68, 88, 90, 91, 96, 103, 104, 107, 135, 136, 139, 149, 153, 155, 163, 166, 167, 170, 172, 183, 188, 190, 193, 195, 222, 233, 245, 246, 247, 254, 255, 258, 259, 261, 262, 263, 267, 275, 278, 281, 292, 293, 294, 297

//

//

//

//

//

//

//

M.

Marvel; fabless semiconductor company, 176, 186, 251

McAfee; anti-virus company, 126

Memory thunking, 85, 303

microprocessor, 27, 62, 97, 218, 219, 220

Microsoft, software company, 2, 3, 4, 5, 6, 8, 13, 15, 16, 17, 20, 32, 33, 42, 46, 50, 51, 53, 54, 55, 56, 57, 58, 60, 62, 65, 66, 67, 69, 71, 75, 77, 80, 81, 82, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 100, 102, 108, 111, 124, 127, 128, 129, 130, 131, 132, 133, 136, 143, 148, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 161, 169, 170, 171, 172, 173, 174, 175, 180, 181, 182, 183, 184, 185, 187, 188, 191, 193, 194, 196, 197, 198, 201, 202, 203, 204, 205, 206, 208, 209, 210, 211, 215, 216, 217, 218, 220, 221, 224, 225, 229, 233, 234, 240, 241, 242, 253, 256, 276, 277, 280, 282, 290, 291, 297, 298, 302, 303

Modem; (MOdulator-DEModulator), 4, 14, 60, 64, 72, 104, 105, 107, 111, 112, 113, 115, 116, 118, 119, 120, 121, 122, 123, 124, 135, 137, 145, 146, 147, 179, 180, 183, 209, 215, 228, 231, 232, 235, 241, 256, 265, 290, 302, 303, 309

Moore, Gordon

Moore's low, 2, 27, 28, 29, 30, 34, 35, 36, 38, 140, 159, 200, 205, 226, 231, 259, 260, 284

Motorola, 52, 69

//

//

//

//

//

//

N.

National Semiconductor; semiconductor company, 52, 67, 89, 109

NDA; Non Disclosure Agreement, 30, 145, 146, 264, 265, 275

Network, 72, 113, 115, 116, 117, 119, 120, 126, 132, 263, 303

Nokia, 69

Novick, Barbara G.; BlackRock founder, Defendant, 1, 6, 24, 233, 234, 235, 236, 237, 252, 257, 260

Nvidia; fabless Semiconductor device company, 4, 5, 8, 15, 16, 71, 88, 131, 132, 151, 153, 154, 155, 161, 168, 171, 180, 181, 182, 189, 190, 191, 192, 194, 204, 206, 210, 218, 221, 224, 233, 234, 238

O.

Optimality, 201, 202

Oracle; database company, 176, 185, 251

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

1      P.

2  parallel, 28, 29, 35, 65, 89, 95, 139, 140, 141, 150, 154, 172, 175, 180, 181,

3      185, 190, 238, 247, 291, 304

4  Parallelism, 35, 88, 142, 180, 205, 245

5  PCI; Peripheral Component Interconnect, 302, 304

6  PDK, Semiconductor process design kit, 98, 223, 249, 250, 302, 304

7  Peer to peer, 303

8  Perlmutter, David; Intel's head of semiconductor architecture, 224, 231

9  Pipeline, 124, 141, 200

10  Moshe Frankel; Plaintiff, 1, 19, 23, 50, 51, 306

11  Predatory; practice, design, technology code schemes effort planning changes

12      agendas, 3, 4, 5, 8, 10, 30, 34, 35, 39, 86, 87, 90, 94, 103, 115, 117,

13      119, 124, 126, 128, 134, 137, 140, 141, 142, 143, 144, 149, 153, 154,

14      157, 158, 163, 168, 169, 170, 171, 172, 174, 175, 176, 177, 178, 179,

15      184, 185, 187, 192, 193, 198, 199, 200, 202, 207, 229, 242, 255, 261,

16      270, 271, 277, 280, 282. 291, 297

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

Q.

Qualcomm; fabless semiconductor design company, 4, 5, 9, 15, 16, 17, 71, 102, 127, 128, 129, 130, 131, 132, 150, 151, 166, 173, 183, 184, 194, 209, 210, 211, 217, 221, 228, 234, 253, 256, 298

QVC; a television retail company, 113, 116

R.

Raza, Atic, 92, 93, 94, 95, 96, 97, 99

Racketeering, 5, 11, 162, 163, 201, 272, 273, 274

RICO; federal law: Racketeer Influenced and Corrupt Organizations Act, 6, 151, 272, 273, 274

Ring zero mode; compromised x86 architecture so called protection mode, 554

Rosen, Ben, 60, 62, 65, 75, 80, 81, 82, 83

RunTime, 74, 76, 79

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

1              S.

2        Sanders, Gerry, AMD Founder, 40, 89, 91, 92, 95, 96, 97, 227

3        Security company, 104, 125

4        Security defects, 137

5        Security disaster, 186

6        Security concerns, 263

7        Security failures, 135

8        Security flaws, 59, 103, 133, 135, 142, 215

9        Security keys, 302

10       Security requirements, 111

11       Security risks, 87, 104

12       Security services, 49, 104

13       Security solutions, 111

14       Security settings, 115

15       Security vulnerabilities, 2, 48, 87, 111, 124, 126, 141, 150, 193

16       Sinkclose, 135

17       Semiconductor; IP, design, companies, technology, 5, 6, 8, 10, 11, 12, 15, 16,

18            18, 19, 20, 21, 23, 25, 28, 29, 35, 36, 39, 40, 43, 45, 51, 52, 57, 58, 59,

19            60, 61, 64, 67, 68, 76, 88, 89, 90, 91, 92, 93, 95, 96, 97, 98, 101, 106,

20            109, 110, 114, 128, 131, 132, 135, 136, 137, 138, 139, 140, 142, 149,

21            150, 153, 154, 155, 156, 160, 162, 163, 165, 166, 167, 168, 171, 180,

22            185, 186, 187, 192, 193, 194, 195, 196, 198, 199, 200, 201, 202, 203,

23            205, 206, 207, 208, 209, 211, 213, 214, 221, 222, 223, 224, 225, 226,

24            227, 228, 229, 230, 231, 232, 233, 234, 236, 237, 239, 240, 242, 245,

25            246, 247, 248, 249, 250, 251, 253, 254, 257, 258, 259, 260, 261, 262,

26            263, 265, 266, 267, 271, 275, 278, 281, 298, 299 300,304

27       Smartsheet; company, 47, 48, 71, 104, 105, 152, 234

28       Smith, Gregory D., Defendant, 1, 24, 252

1      Smith, Stacy J., Defendant, 1, 24, 252

2      SOC; system on a chip, 27, 87, 220, 247, 304

3      solid-state, 25

4      Spreadsheet, 29, 63

5      State Street, index fund, 9, 16, 71, 131, 132, 155, 170, 172, 181, 186, 237, 238,

6          244

7      Subscription-based, 9, 10, 13, 14, 49, 73, 119, 127, 151, 177, 182, 241

8      Supreme Court, 2, 17, 31, 32, 34, 37, 40, 41, 43, 44, 53, 87, 102, 169, 175,

9          180, 186, 212, 213, 214, 215, 218, 296

10      //

11      //

12      //

13      //

14      //

15      //

16      //

17      //

18      //

19      //

20      //

21      //

22      //

23      //

24      //

25      //

26      //

27      //

28      //

T.

Tan, Lip-Bu, 1, 6, 24, 36, 101, 203, 245, 246, 247, 251, 252, 257, 261

Taiwan, 95, 109, 138, 195, 223, 226, 231, 237, 240, 257

Texas Instruments, (TI), 66, 68, 69, 185, 250, 250

TIGA; (Texas Instruments Graphic Adapter), 66

TSMC, Taiwan Semiconductor Manufacturing Company, 35, 98, 138, 182, 195, 196, 223, 224, 226, 227, 231, 237, 240, 243, 257, 259, 260, 300

Transistor, 25, 26, 27, 28, 29, 30, 34, 35, 91, 107, 140, 160, 198, 199, 255, 259, 260, 300, 311

Turing, Alan; scientist, Turing machine, 26, 30, 31, 41, 43, 213

Tying, 4, 12, 13, 14, 20, 22, 31, 32, 33, 34, 41, 47, 50, 53, 54, 55, 56, 60, 75, 86, 89, 104, 113, 116, 117, 118, 121, 122, 124, 149, 156, 157, 161, 163, 176, 178, 179, 185, 192, 193, 197, 198, 202, 203, 205, 211, 215, 216, 217, 218, 229, 241, 245, 246, 296, 297

Trademark, 4, 8, 50, 83, 86, 127, 128, 129, 150, 174, 197, 209, 210, 217, 240, 256, 265, 290

U.

UEFI; Unified Extensible Firmware Interface, 303

Unicorn; stock, scheme, 189, 190, 192, 199, 202, 207, 238, 189, 190, 192, 199, 202, 207, 238

U.S., 2, 6, 11, 18, 21, 23, 39, 40, 50, 67, 74, 76, 81, 89, 91, 95, 96, 97, 110, 119, 127, 131, 132, 162, 163, 164, 165, 166, 167, 168, 171, 184, 188, 192, 195, 197, 200, 203, 225, 227, 228, 230, 232, 233, 234, 237, 240, 242, 243, 244, 254, 258, 261, 262, 265, 266, 267, 272, 273, 274, 282, 291, 297, 298, 299 300 302

U.S.C.; U.S.Code, 22, 23, 203, 267, 272, 273, 274, 282, 285, 286, 295, 296, 299, 299, 300, 302

//

1         V.

2     Vadasz, Lessely; Intel founder, 197

3     Vanguard, index fund, 9, 16, 70, 131, 132, 155, 172, 181, 186, 237, 244

4     Venture capital, 63, 65, 79, 99, 197, 200

5     VLSI

6        W.

7     Wilson Sonsini Goodrich & Rosati, 19, 83, 84

8     Windows; Microsoft operating system, 17, 50, 56, 57, 65, 66, 81, 82, 84, 85,

9         86, 88, 89, 90, 91, 92, 102, 124, 127, 128, 129, 130, 133, 150, 157, 159,

10        160, 173, 174, 175, 181, 182, 183, 191, 193, 194, 197, 204, 205, 206,

11        209, 210, 211, 215, 216, 217, 240, 256, 265, 276, 290, 296, 303

12     Wintel Cartel, 3, 13, 20, 32, 33, 54, 56, 57, 58, 60, 67, 75, 77, 84, 158, 160,

13        164, 168, 171, 185, 187, 189, 202, 208, 209, 225, 229, 242, 247, 255

14     WYSIWYG, What You See Is What You Get, 29

15     //

16     //

17     //

18     //

19     //

20     //

21     //

22     //

23     //

24     //

25     //

26     //

27     //

28     //

1    X.

2   Xerox, 156, 199

3   Xilinx, FPGA company, 68, 110, 202, 246

4    Y.

5   Yeary, Frank D. Yeary, Defendant, 1, 6, 24, 232, 238, 239, 240, 241, 252

6   //

7   //

8   //

9   //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28